# 23-644

## In the
## United States Court of Appeals
### For the Second Circuit



FREE HOLDINGS, INC.,

*Plaintiff-Appellant,*

– v. –

KEVIN MCCOY and SOTHEBY'S INC.,

*Defendants-Appellees,*

– and –

NAMELESS CORPORATION and ALEX AMSEL,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume I of II (Pages JA-1 – JA-146)

PRYOR CASHMAN LLP
*Attorneys for Defendant-Appellee*
  *Kevin Mccoy*
7 Times Square, Level 40
New York, New York 10036
(212) 326-0156

FALCON RAPPAPORT & BERKMAN LLP
*Attorneys for Plaintiff-Appellant*
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(212) 203-3255

ARNOLD & PORTER KAYE
  SCHOLER LLP
*Attorneys for Defendant-Appellee*
  *Sotheby's Inc.*
250 West 55th Street
New York, New York 10019
(212) 836-8094

i

# Table of Contents

**Page**

Docket Entries ............................................................................ JA-1

Complaint, Dated February 1, 2022 .............................................JA-13

So-Ordered Stipulation of Honorable of Lorna G. Schofield,
    Dated February 16, 2022...........................................................JA-32

So-Ordered Stipulation of Honorable of Lorna G. Schofield,
    Dated February 17, 2022...........................................................JA-34

Notice of Voluntary Dismissal Pursuant to FRCP 41(a)(1)(A)(i),
    Dated March 7, 2022.................................................................JA-35

So-Ordered Notice of Voluntary Dismissal Pursuant to
    FRCP 41(a)(1)(A)(i) of Honorable of Lorna G. Schofield,
    Dated March 8, 2022.................................................................JA-36

Letter from William L. Charron to Honorable
    Lorna G. Schofield, Dated April 1, 2022 ..................................JA-37

So-Ordered Stipulation of Honorable of James L. Cott,
    Dated April 13, 2022.................................................................JA-40

Notice of Voluntary Dismissal Pursuant to F.R.C.P.
    41(a)(1)(A)(i), Dated May 9, 2022............................................JA-43

Amended Complaint, Dated May 9, 2022.....................................JA-44

So-Ordered Notice of Voluntary Dismissal Pursuant to
    F.R.C.P. 41(a)(1)(A)(i) of Honorable of James L. Cott,
    Dated May 10, 2022 .................................................................JA-69

Stipulation and Order of Honorable of
    James L. Cott, Dated May 16, 2022 ..........................................JA-70

Notice of Motion by Defendant Sotheby's Inc. to Dismiss
    Amended Complaint, Dated June 30, 2020.............................JA-72

Defendant Sotheby's Inc.'s Memorandum of Law in
    Support of Motion, Dated June 30, 2020 ..................................JA-74

Declaration of Evan M. Rothstein, for Defendant
    Sotheby's Inc., in Support of Motion, Dated June 30, 2022 .....JA-102

    Exhibit A to Rothstein Declaration -
    Amended Complaint, Dated May 9, 2022
    (Reproduced herein at pp. JA-44–JA-68) ................................JA-105

ii

**Page**

Exhibit B to Rothstein Declaration -
Auction Listing..........................................................................JA-106

Exhibit C to Rothstein Declaration -
Video of Kevin McCoy-Quantum
(Reproduced on DVD) ............................................................JA-113

Exhibit D to Rothstein Declaration -
Transcript of the Video of Kevin McCoy-Quantum,
Dated June 28, 2022................................................................JA-115

Exhibit E to Rothstein Declaration -
Video of Quantum Token-McCoy
(Reproduced on DVD) ............................................................JA-121

Exhibit F to Rothstein Declaration -
Transcript of the Video of Quantum Token-McCoy,
Dated June 28, 2022................................................................JA-123

Exhibit G to Rothstein Declaration -
Article Titled *"NFT sales hit $25 billion in 2021, but growth
shows signs of slowing"* by Elizabeth Howcreoft,
Dated January 11, 2022............................................................JA-130

Exhibit H to Rothstein Declaration -
Article Titled *"One Year After Beeple, the NFT Has
Changed Artists. Has It Changed Art?"* by Blake Gopnik,
Dated March 3, 2022................................................................JA-138

Notice of Motion by Defendant Kevin McCoy to
Dismiss Amended Complaint, Dated June 30, 2022.................JA-146

Defendant Kevin McCoy's Memorandum of Law in
Support of Motion, Dated June 30, 2022 ..................................JA-147

Declaration of William L. Charron, for Defendant
Kevin McCoy, in Support of Motion, Dated June 30, 2022 .....JA-180

Exhibit A to Charron Declaration -
"FAQ" Pages from Website "www.namecoin.org"..................JA-182

Exhibit B to Charron Declaration -
Pages from Website "www.namebrow.se" ...............................JA-218

Plaintiff's Memorandum of Law in Opposition to Sotheby's
Inc.'s Motion, Dated August 15, 2022......................................JA-221

iii

**Page**

Plaintiff's Memorandum of Law in Opposition to
    Kevin McCoy's Motion, Dated August 15, 2022 ....................JA-242

Declaration of Moish E. Peltz, for Plaintiff, in
    Opposition to Motion, Dated August 15, 2022, with
    Exhibit A to C Annexed Hereto .................................................JA-272

Letter from Moish E. Peltz to Honorable James L. Cott,
    Dated August 15, 2022............................................................JA-289

Defendant Sotheby's Inc.'s Reply Memorandum of Law in
    Further Support of Motion, Dated September 1, 2022..............JA-290

Defendant Kevin McCoy's Reply Memorandum of Law in
    Further Support of Motion, Dated September 1, 2022..............JA-305

Internet Citation Note "About Conversations on Twitter"............JA-319

Internet Citation Note "Defining "NFT" in Historical
    Context-Chainleft" ....................................................................JA-328

Internet Citation Note "Interaction Definition & Meaning -
    Merriam-Webster" ....................................................................JA-345

Internet Citation Note "Kevin McCoy on Twitter".......................JA-355

Internet Citation Note "Namebrow.se - Namecoin Block
    Explorer"...................................................................................JA-357

Internet Citation Note "Quantum: Kevin McCoy" .......................JA-359

Internet Citation Note "Quantum.Gif" ..........................................JA-368

Internet Citation Note "Quantum.Gif" ..........................................JA-369

Opinion and Order of Honorable James L. Cott,
    Dated March 17, 2023...............................................................JA-370

Judgment of The United States District Court,
    Southern District of New York, Dated March 20, 2023,
    with Attachments .....................................................................JA-413

Notice of Appeal, Dated April 17, 2023 .......................................JA-424

JA-1

**Query    Reports ⌄    Utilities ⌄    Help    Log Out**

CLOSED,APPEAL,ECF,MAGCONSENT

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00881-JLC

Free Holdings Inc. v. McCoy et al
Assigned to: Magistrate Judge James L. Cott
Cause: 28:1332 Diversity Action

Date Filed: 02/01/2022
Date Terminated: 03/20/2023
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Free Holdings Inc.**                                   represented by **Jessica Moore**
Falcon Rappaport & Berkman PLLC
265 Sunrise Highway
Suite 50
Rockville Centre, NY 11570
516-708-3546
Email: jmoore@frblaw.com
*ATTORNEY TO BE NOTICED*

**Moish Eli Peltz**
Falcon Rappaport & Berkman PLLC
1185 Avenue of the Americas
Ste Third Floor
New York, NY 10036
212-203-3255
Email: mpeltz@frblaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kevin McCoy**                                   represented by **Nicholas George Saady**
Pryor Cashman LLP
7 Times Square
New York, NY 10036
212-326-0109
Email: nsaady@pryorcashman.com
*ATTORNEY TO BE NOTICED*

**Robert J. deBrauwere**
Pryor Cashman LLP
7 Times Square
New York, NY 10036
(212) 207-8787
Fax: (212)-710-6086
Email: rdebrauwere@pryorcashman.com

JA-2

*ATTORNEY TO BE NOTICED*

**William Laurence Charron**
Pryor Cashman LLP
7 Times Square
New York, NY 10036
2124214100
Fax: 212-326-0806
Email: wcharron@pryorcashman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sotheby's Inc.**                represented by **Evan Michael Rothstein**
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street
Suite 3100
Denver, CO 80202-2569
303-863-2308
Email: Evan.Rothstein@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theresa M. House**
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-8094
Email: Theresa.House@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bridgette Gershoni**
Arnold & Porter LLP
601 Massachusetts Ave, NW
Washington d.C., DC 20001-3743
202-942-5000
Email:
bridgette.gershoni@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Marcus Aaron Asner**
Arnold & Porter Kaye Scholer LLP (NYC)
250 West 55th Street
New York, NY 10019
212-836-8000
Fax: 212-836-8689
Email: marcus.asner@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Michael Joshua Gershoni**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202-942-6767

JA-3

Email: michael.gershoni@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nameless Corporation**                represented by    **Chris Baumgartner**
*TERMINATED: 05/10/2022*                                 Agilis Legal, PC
                                                         600 17th Street
                                                         Suite 2800 South
                                                         Denver, CO 80202
                                                         303-800-2950
                                                         Email: cgb@agilis.legal
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Jeremy Seth Goldman**
                                                         Frankfurt Kurnit Klein & Selz, P.C.
                                                         2029 Century Park East
                                                         Ste 2500n
                                                         Los Angeles, CA 90067
                                                         310-579-9611
                                                         Email: jgoldman@fkks.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Khasim Kepler Lockhart**
                                                         Frankfurt Kurnit Klein & Selz, P.C.
                                                         28 Liberty Street
                                                         New York, NY 10005
                                                         646-479-4282
                                                         Email: KLockhart@fkks.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Nadav Ashner**
                                                         The Rodman Law Group, LLC
                                                         600 S. Cherry St.
                                                         Ste. 314
                                                         Denver, CO 80246
                                                         720-663-0558
                                                         Fax: 720-663-0558
                                                         Email: nadav@therodmanlawgroup.com
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Alex Amsel**
*TERMINATED: 03/08/2022*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2022 | 1 | COMPLAINT against Alex Amsel, Kevin McCoy, Nameless Corporation, Sotheby's Inc.. (Filing Fee $ 402.00, Receipt Number ANYSDC-25670490)Document filed by Free Holdings Inc...(Peltz, Moish) (Entered: 02/01/2022) |
| 02/01/2022 | 2 | CIVIL COVER SHEET filed..(Peltz, Moish) (Entered: 02/01/2022) |
| 02/01/2022 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document |

**JA-4**

| | | |
|---|---|---|
| | | filed by Free Holdings Inc...(Peltz, Moish) (Entered: 02/01/2022) |
| 02/02/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Lorna G. Schofield. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 02/02/2022) |
| 02/02/2022 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 02/02/2022) |
| 02/02/2022 | | Case Designated ECF. (pc) (Entered: 02/02/2022) |
| 02/09/2022 | 4 | NOTICE OF APPEARANCE by Jessica Moore on behalf of Free Holdings Inc...(Moore, Jessica) (Entered: 02/09/2022) |
| 02/09/2022 | 5 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR** - REQUEST FOR ISSUANCE OF SUMMONS as to Kevin McCoy, re: 1 Complaint. Document filed by Free Holdings Inc...(Moore, Jessica) Modified on 2/10/2022 (pc). (Entered: 02/09/2022) |
| 02/09/2022 | 6 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR** - REQUEST FOR ISSUANCE OF SUMMONS as to Nameless Corporation, re: 1 Complaint. Document filed by Free Holdings Inc...(Moore, Jessica) Modified on 2/10/2022 (pc). (Entered: 02/09/2022) |
| 02/09/2022 | 7 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR** - REQUEST FOR ISSUANCE OF SUMMONS as to Sotheby's Inc., re: 1 Complaint. Document filed by Free Holdings Inc...(Moore, Jessica) Modified on 2/10/2022 (pc). (Entered: 02/09/2022) |
| 02/10/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Jessica Moore to RE-FILE Document No. 6 Request for Issuance of Summons, 5 Request for Issuance of Summons, 7 Request for Issuance of Summons,. The filing is deficient for the following reason(s): Caption title must exactly match the complaint caption title;. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pc) (Entered: 02/10/2022)** |
| 02/11/2022 | 8 | REQUEST FOR ISSUANCE OF SUMMONS as to Nameless Corporation, re: 1 Complaint. Document filed by Free Holdings Inc...(Moore, Jessica) (Entered: 02/11/2022) |
| 02/11/2022 | 9 | REQUEST FOR ISSUANCE OF SUMMONS as to Sotheby's Inc., re: 1 Complaint. Document filed by Free Holdings Inc...(Moore, Jessica) (Entered: 02/11/2022) |
| 02/11/2022 | 10 | REQUEST FOR ISSUANCE OF SUMMONS as to Kevin McCoy, re: 1 Complaint. Document filed by Free Holdings Inc...(Moore, Jessica) (Entered: 02/11/2022) |
| 02/14/2022 | 11 | ELECTRONIC SUMMONS ISSUED as to Nameless Corporation. (vf) (Entered: 02/14/2022) |
| 02/14/2022 | 12 | ELECTRONIC SUMMONS ISSUED as to Sotheby's Inc.. (vf) (Entered: 02/14/2022) |

JA-5

| 02/14/2022 | 13 | ELECTRONIC SUMMONS ISSUED as to Kevin McCoy. (vf) (Entered: 02/14/2022) |
|---|---|---|
| 02/15/2022 | 14 | PROPOSED STIPULATION AND ORDER. Document filed by Sotheby's Inc...(House, Theresa) (Entered: 02/15/2022) |
| 02/16/2022 | 15 | STIPULATION: IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for plaintiff Free Holdings Inc. ("Plaintiff") and defendant Sotheby's Inc ("Sotheby's"), that: 1. Sotheby's counsel agrees to accept service of process of Plaintiff's Complaint dated February 1, 2022 (the "Complaint") on behalf of Sotheby's as of February 10, 2022; and 2. With the exception of the defense of improper service of process, all of Sotheby's defenses are expressly preserved and not waived; and 3. Sotheby's time to answer, move or otherwise respond to the Complaint is extended through and including April 11, 2022. So Ordered. Sotheby's Inc. answer due 4/11/2022. (Signed by Judge Lorna G. Schofield on 2/16/2022) (mml) (Entered: 02/16/2022) |
| 02/17/2022 | 16 | NOTICE OF APPEARANCE by William Laurence Charron on behalf of Kevin McCoy.. (Charron, William) (Entered: 02/17/2022) |
| 02/17/2022 | 17 | PROPOSED STIPULATION AND ORDER. Document filed by Kevin McCoy..(Charron, William) (Entered: 02/17/2022) |
| 02/17/2022 | 18 | STIPULATION: IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for plaintiff Free Holdings Inc. ("Plaintiff") and defendant Kevin McCoy ("McCoy"), that: 1. McCoy's counsel agrees to accept service of process of Plaintiff's Complaint dated February 1, 2022 (the "Complaint") on behalf of McCoy as of February 8, 2022; and 2. With the exception of the defense of improper service of process, all of McCoy's defenses are expressly preserved and not waived; and 3. McCoy's time to answer, move or otherwise respond to the Complaint is extended through and including April 11, 2022. SO ORDERED. Kevin McCoy answer due 4/11/2022. (Signed by Judge Lorna G. Schofield on 2/17/2022) (ate) (Entered: 02/17/2022) |
| 03/01/2022 | 19 | ORDER: This case has been assigned to me for all purposes. It is hereby ORDERED that a telephonic conference will be held on April 13, 2022 at 4:20 p.m. The parties shall call (888) 363-4749 and enter the access code 558-3333. The telephonic conference is public, and the time of the conference is approximate, but the parties shall be ready to proceed by that time. All pretrial conferences must be attended by the attorney who will serve as principal trial counsel. The parties shall ensure they are all dialed into the conference call by the appointed conference time. Initial Conference set for 4/13/2022 at 04:20 PM before Judge Lorna G. Schofield. (Signed by Judge Lorna G. Schofield on 3/1/2022) (kv) (Entered: 03/01/2022) |
| 03/02/2022 | 20 | MOTION for Bridgette C. (nee Boyd) Gershoni to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25806869. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sotheby's Inc.. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order).(Boyd, Bridgette) (Entered: 03/02/2022) |
| 03/02/2022 | 21 | MOTION for Michael J. Gershoni to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25806877. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sotheby's Inc.. (Attachments: # 1 Affidavit, # 2 Text of Proposed Order).(Gershoni, Michael) (Entered: 03/02/2022) |
| 03/03/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 20 MOTION for Bridgette C. (nee Boyd) Gershoni to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25806869. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 03/03/2022) |

JA-6

| 03/03/2022 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 21 MOTION for Michael J. Gershoni to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25806877. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies.** (bcu) (Entered: 03/03/2022) |
|---|---|---|
| 03/04/2022 | 22 | ORDER granting 20 Motion for Bridgette Boyd to Appear Pro Hac Vice and granting 21 Motion for Michael J. Gershoni to Appear Pro Hac Vice (HEREBY ORDERED by Judge Lorna G. Schofield)(Text Only Order) (jcs) (Entered: 03/04/2022) |
| 03/07/2022 | 23 | NOTICE OF VOLUNTARY DISMISSAL pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff(s) and or their counsel(s), hereby give notice that the above-captioned action is voluntarily dismissed, without prejudice against the defendant(s) Alex Amsel. Document filed by Free Holdings Inc.. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)**...(Moore, Jessica) (Entered: 03/07/2022) |
| 03/08/2022 | | ***NOTICE TO COURT REGARDING NOTICE OF VOLUNTARY DISMISSAL Document No. 23 Notice of Voluntary Dismissal, was reviewed and referred to Judge Lorna G. Schofield for approval for the following reason(s): the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety;. (nd) (Entered: 03/08/2022) |
| 03/08/2022 | 24 | NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO FRCP 41(a)(1)(A)(i): Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff and its counsel hereby give notice that the above-styled action is voluntarily dismissed, without prejudice, as to defendant Alex Amsel a/k/a Sillytuna. The Clerk of Court is respectfully directed to terminate Alex Amsel as a Defendant in this action. SO ORDERED., Alex Amsel terminated. (Signed by Judge Lorna G. Schofield on 3/08/2022) (ama) (Entered: 03/08/2022) |
| 03/10/2022 | 25 | NOTICE OF APPEARANCE by Nicholas George Saady on behalf of Kevin McCoy.. (Saady, Nicholas) (Entered: 03/10/2022) |
| 03/11/2022 | 26 | MOTION for Evan Rothstein to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25851922. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Sotheby's Inc.. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order).(Rothstein, Evan) (Entered: 03/11/2022) |
| 03/14/2022 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 26 MOTION for Evan Rothstein to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25851922. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies.** (bcu) (Entered: 03/14/2022) |
| 03/14/2022 | 27 | NOTICE OF APPEARANCE by Jeremy Seth Goldman on behalf of Nameless Corporation..(Goldman, Jeremy) (Entered: 03/14/2022) |
| 03/14/2022 | 28 | NOTICE OF APPEARANCE by Khasim Kepler Lockhart on behalf of Nameless Corporation..(Lockhart, Khasim) (Entered: 03/14/2022) |
| 03/15/2022 | 29 | ORDER granting 26 Motion for Evan Rothstein to Appear Pro Hac Vice (HEREBY ORDERED by Judge Lorna G. Schofield)(Text Only Order) (jcs) (Entered: 03/15/2022) |
| 03/24/2022 | 30 | MOTION for Nadav Aschner to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25910004. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Nameless Corporation. (Attachments: # 1 Affidavit of Nadav |

**JA-7**

| | | |
|---|---|---|
| | | Aschner in Support, # 2 Certificate of Good Standing, # 3 Text of Proposed Order). (Ashner, Nadav) (Entered: 03/24/2022) |
| 03/24/2022 | 31 | MOTION for Chris G. Baumgartner to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25910118. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Nameless Corporation. (Attachments: # 1 Affidavit of Chris G. Baumgartner in Supportrt, # 2 Certificate of Good Standing, # 3 Text of Proposed Order).(Baumgartner, Chris) (Entered: 03/24/2022) |
| 03/25/2022 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 30 MOTION for Nadav Aschner to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25910004. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 03/25/2022) |
| 03/25/2022 | | >>>**NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 31 MOTION for Chris G. Baumgartner to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-25910118. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 03/25/2022) |
| 03/28/2022 | 32 | PROPOSED STIPULATION AND ORDER. Document filed by Nameless Corporation.. (Goldman, Jeremy) (Entered: 03/28/2022) |
| 03/29/2022 | 33 | STIPULATION: IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for plaintiff Free Holdings Inc. ("Plaintiff") and defendant Nameless (misidentified as "Nameless Corporation" in the complaint) ("Nameless"), that: 1. Nameless's counsel agrees to accept service of process of Plaintiffs Complaint dated February 1, 2022 (the "Complaint") on behalf of Nameless as of February 10, 2022; and 2. With the exception of the defense of improper service of process, all of Nameless's defenses are expressly preserved and not waived; and 3. Nameless's time to answer, move or otherwise respond to the Complaint is extended through and including April 11, 2022. So Ordered. Nameless Corporation answer due 4/11/2022. (Signed by Judge Lorna G. Schofield on 3/29/2022) (vfr) (Entered: 03/29/2022) |
| 04/01/2022 | 34 | LETTER addressed to Judge Lorna G. Schofield from William L. Charron dated April 1, 2022 re: Defendants' Pre-Motion Letter regarding Motion to Dismiss. Document filed by Kevin McCoy..(Saady, Nicholas) (Entered: 04/01/2022) |
| 04/01/2022 | 35 | MEMO ENDORSEMENT on re: 34 Letter Defendants' Pre-Motion Letter regarding Motion to Dismiss filed by Kevin McCoy. ENDORSEMENT: The application to adjourn the initial pretrial conference scheduled for April 13, 2022, at 4:20 P.M., is DENIED. Defendant's proposed motion to dismiss will also be discussed at that conference. Plaintiff shall file a response to this letter by April 6, 2022. Defendants Sotheby's Inc. and Nameless Corporation shall file a letter by April 8, 2022, stating whether they would join Defendant McCoy's motion to dismiss and, if they would join, stating any additional or different basis for that motion. Defendants' deadline to answer, move or otherwise respond to the Complaint is extended to April 18, 2022. So Ordered., (Nameless Corporation answer due 4/18/2022; Sotheby's Inc. answer due 4/18/2022.)( Responses due by 4/18/2022) (Signed by Judge Lorna G. Schofield on 4/1/22) (yv) (Entered: 04/01/2022) |
| 04/06/2022 | 36 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - LETTER addressed to Judge Lorna G. Schofield from Moish E. Peltz, Esq. dated 4/6/22 re: Joint Initial Pre-Conference Letter. Document filed by Free Holdings Inc.. (Attachments: # 1 Exhibit Proposed Case Management Plan and Schedule, # 2 Exhibit Magistrate Consent Form).(Moore, Jessica) Modified on 4/6/2022 (lb). (Entered: 04/06/2022) |

| 04/06/2022 | 37 | LETTER addressed to Judge Lorna G. Schofield from Moish E. Peltz, Esq. dated 4/6/22 re: Joint Initial Pre-Conference Letter. Document filed by Free Holdings Inc.. (Attachments: # 1 Exhibit Proposed Case Management Plan and Schedule, # 2 Magistrate Consent Form).(Moore, Jessica) (Entered: 04/06/2022) |
|---|---|---|
| 04/06/2022 | 38 | CONSENT TO JURISDICTION BY A US MAGISTRATE JUDGE by Free Holdings Inc., Kevin McCoy, Nameless Corporation, Sotheby's Inc. (Case No Longer Referred to Magistrate Judge) This case is referred to Magistrate Judge James L. Cott. CASE ASSIGNED to Magistrate Judge James L. Cott. (Signed by Judge Lorna G. Schofield on 4/6/2022) (mml) (Entered: 04/06/2022) |
| 04/06/2022 | 39 | NOTICE OF APPEARANCE by Robert J. deBrauwere on behalf of Kevin McCoy.. (deBrauwere, Robert) (Entered: 04/06/2022) |
| 04/06/2022 | 40 | MEMO ENDORSEMENT on re: 37 Letter, filed by Free Holdings Inc. ENDORSEMENT: Defendants' joint pre-motion letter to dismiss at Dkt. No. 34 is DENIED without prejudice to renewal before Magistrate Judge Cott. The parties' application for an extension of time to answer, move or otherwise respond to the Complaint is DENIED without prejudice to renewalbefore Judge Cott. The initial pretrial and pre-motion conference scheduled for April 13, 2022, and all deadlines to file letters in advance of that conference, are adjourned sine die. So Ordered. (Signed by Judge Lorna G. Schofield on 4/6/2022) (tg) (Entered: 04/06/2022) |
| 04/07/2022 | 41 | ORDER granting 30 Motion for Nadav Aschner to Appear Pro Hac Vice. Application granted. (HEREBY ORDERED by Magistrate Judge James L. Cott)(Text Only Order) (Cott, James) (Entered: 04/07/2022) |
| 04/07/2022 | 42 | ORDER granting 31 Motion for Chris G. Baumgartner to Appear Pro Hac Vice. Application granted. (HEREBY ORDERED by Magistrate Judge James L. Cott)(Text Only Order) (Cott, James) (Entered: 04/07/2022) |
| 04/13/2022 | 43 | PROPOSED STIPULATION AND ORDER. Document filed by Kevin McCoy..(Saady, Nicholas) (Entered: 04/13/2022) |
| 04/13/2022 | 44 | STIPULATION: IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff and the Defendants, that: 1. The April 18, 2022 deadlines for Defendants to answer, move or otherwise respond to the Complaint are vacated; 2. Plaintiff shall file and serve an Amended Complaint by no later than May 9, 2022; 3. Defendants' deadlines to answer, move or otherwise respond to the Amended Complaint are adjourned sine die; and 4. The parties are to confer to set a schedule for the deadlines by which Defendants must answer, move or otherwise respond to the Amended Complaint. SO ORDERED. (Signed by Magistrate Judge James L. Cott on 4/13/2022) (jca) (Entered: 04/13/2022) |
| 04/13/2022 | | Set/Reset Deadlines: Amended Pleadings due by 5/9/2022. (jca) (Entered: 04/13/2022) |
| 04/15/2022 | 45 | NOTICE OF APPEARANCE by Marcus Aaron Asner on behalf of Sotheby's Inc...(Asner, Marcus) (Entered: 04/15/2022) |
| 05/09/2022 | 46 | NOTICE OF VOLUNTARY DISMISSAL pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff(s) and or their counsel(s), hereby give notice that the above-captioned action is voluntarily dismissed, with prejudice against the defendant(s) Nameless Corporation. Document filed by Free Holdings Inc.. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)...** (Peltz, Moish) (Entered: 05/09/2022) |
| 05/09/2022 | 47 | AMENDED COMPLAINT amending 1 Complaint against Kevin McCoy, Sotheby's Inc. with JURY DEMAND.Document filed by Free Holdings Inc.. Related document: 1 Complaint..(Peltz, Moish) (Entered: 05/09/2022) |

| 05/10/2022 | | ***NOTICE TO COURT REGARDING NOTICE OF VOLUNTARY DISMISSAL Document No. 46 Notice of Voluntary Dismissal, was reviewed and referred to Magistrate Judge James L. Cott for approval for the following reason(s): the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety. (tp) (Entered: 05/10/2022) |
|---|---|---|
| 05/10/2022 | 48 | NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41(a)(1)(A)(i): Pursuant to Pursuant to F.R.C.P. 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff Free Holdings, Inc., and or their counsel, hereby give notice that the above-captioned action is voluntarily dismissed, with prejudice, against the defendant nameless (misidentified as "Nameless Corporation" in the complaint). SO ORDERED. (Signed by Magistrate Judge James L. Cott on 5/10/2022) (jca) (Entered: 05/10/2022) |
| 05/16/2022 | 49 | PROPOSED STIPULATION AND ORDER. Document filed by Kevin McCoy, Sotheby's Inc...(Saady, Nicholas) (Entered: 05/16/2022) |
| 05/16/2022 | 50 | STIPULATION AND ORDER: NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff, McCoy and Sotheby's, that McCoy and Sotheby's shall each (or jointly) answer, move or otherwise respond to the Amended Complaint by June 30, 2022. SO ORDERED. (Signed by Magistrate Judge James L. Cott on 5/16/2022) (jca) (Entered: 05/16/2022) |
| 05/16/2022 | | Set/Reset Deadlines: Kevin McCoy answer due 6/30/2022; Sotheby's Inc. answer due 6/30/2022. (jca) (Entered: 05/16/2022) |
| 06/24/2022 | 51 | LETTER MOTION for Leave to File Excess Pages addressed to Magistrate Judge James L. Cott from William L. Charron (Counsel for McCoy) dated June 24, 2022. Document filed by Kevin McCoy..(Saady, Nicholas) (Entered: 06/24/2022) |
| 06/26/2022 | 52 | ORDER granting 51 Letter Motion for Leave to File Excess Pages. Application granted, on consent. (HEREBY ORDERED by Magistrate Judge James L. Cott)(Text Only Order) (Cott, James) (Entered: 06/26/2022) |
| 06/30/2022 | 53 | NOTICE OF APPEARANCE by Theresa M. House on behalf of Sotheby's Inc...(House, Theresa) (Entered: 06/30/2022) |
| 06/30/2022 | 54 | MOTION to Dismiss *THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)*. Document filed by Sotheby's Inc... (Rothstein, Evan) (Entered: 06/30/2022) |
| 06/30/2022 | 55 | MEMORANDUM OF LAW in Support re: 54 MOTION to Dismiss *THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)*. . Document filed by Sotheby's Inc...(Rothstein, Evan) (Entered: 06/30/2022) |
| 06/30/2022 | 56 | DECLARATION of EVAN M. ROTHSTEIN in Support re: 54 MOTION to Dismiss *THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)*.. Document filed by Sotheby's Inc.. (Attachments: # 1 Exhibit A - Amended Complaint, # 2 Exhibit B - Printout of Auction Listing, # 3 Exhibit C - Slip cover sheet indicating hard copy filing of DVD of the Video Kevin McCoy Quantum, # 4 Exhibit D - Transcript of the Video Kevin McCoy Quantum, # 5 Exhibit E - Slip cover sheet indicating hard copy filing of DVD of the Video QuantumToken-McCoy, # 6 Exhibit F - Transcript of the Video QuantumToken-McCoy, # 7 Exhibit G - Printout of Howcroft Article, # 8 Exhibit H - Printout of Gopnik Article).(Rothstein, Evan) (Entered: 06/30/2022) |
| 06/30/2022 | 57 | PROPOSED ORDER. Document filed by Sotheby's Inc.. Related Document Number: [ORDER DIRECTING CLERKS ACCEPTANCE OF DVD VIDEO EXHIBITS].. |

JA-10

| | | |
|---|---|---|
| | | (Rothstein, Evan) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 06/30/2022) |
| 06/30/2022 | 58 | CERTIFICATE OF SERVICE of a true and accurate copy of the DVD of video footage contained in Exhibits C and E to the Declaration of Evan R. Rothstein on 6/30/2022. Service was made by FedEx. Document filed by Sotheby's Inc...(Rothstein, Evan) (Entered: 06/30/2022) |
| 06/30/2022 | 59 | MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).* Document filed by Kevin McCoy. Responses due by 8/15/2022.(Saady, Nicholas) (Entered: 06/30/2022) |
| 06/30/2022 | 60 | MEMORANDUM OF LAW in Support re: 59 MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).* . Document filed by Kevin McCoy..(Saady, Nicholas) (Entered: 06/30/2022) |
| 06/30/2022 | 61 | DECLARATION of William L. Charron in Support re: 59 MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)..* Document filed by Kevin McCoy. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Saady, Nicholas) (Entered: 06/30/2022) |
| 07/01/2022 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 57 Proposed Order was reviewed and approved as to form. (nd)** (Entered: 07/01/2022) |
| 07/07/2022 | 62 | ORDER DIRECTING CLERK'S ACCEPTANCE OF DVD VIDEO EXHIBITS: After thorough review of the June 30, 2022 Declaration of Evan M. Rothstein and Defendant Sotheby's Inc.s Memorandum of Law in support of its Motion to Dismiss the Amended Complaint, and those papers revealing that video footage relevant to the Plaintiffs claims is material and necessary to the issues of this action; Now, upon the application of Arnold & Porter Kaye Scholer LLP, by Evan M. Rothstein, attorney for Defendant Sotheby's Inc., for an order granting leave for video footage to be filed as exhibits in this matter, it is hereby ordered as follows: The Clerk of this Court shall accept a DVD containing video footage as exhibits to motion papers in this matter, including for those exhibits annexed to the June 30, 2022 Declaration of Evan M. Rothstein, and said Clerk is directed to receive and note the DVD of the video exhibit on the above docket. SO ORDERED. (Signed by Magistrate Judge James L. Cott on 7/7/2022) (jca) (Entered: 07/07/2022) |
| 07/08/2022 | | DVD. The Clerk of the Court received a DVD containing video footage as exhibits to motion papers in this matter, including for those exhibits annexed to the June 30, 2022 Declaration of Evan M. Rothstein, as instructed in the Order Directing Clerk's Acceptance of DVD Video Exhibits (See Docket no. 62), signed by Judge James L. Cott on July 07, 2022.(jus) (Entered: 07/08/2022) |
| 08/15/2022 | 63 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -(SEE #66)** MEMORANDUM OF LAW in Opposition re: 59 MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).* . Document filed by Free Holdings Inc.. (Attachments: # 1 Exhibit Declaration of Moish Peltz).(Peltz, Moish) Modified on 8/17/2022 (kj). (Entered: 08/15/2022) |
| 08/15/2022 | 64 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -(SEE #66)** MEMORANDUM OF LAW in Opposition re: 54 MOTION to Dismiss *THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6).* . Document filed by Free Holdings Inc...(Peltz, Moish) Modified on 8/31/2022 (kj). (Entered: 08/15/2022) |
| 08/15/2022 | 65 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** MOTION for Oral Argument *in support of Opposition to Defendants' Motions to Dismiss.* Document |

| | | |
|---|---|---|
| | | filed by Free Holdings Inc...(Peltz, Moish) Modified on 8/16/2022 (kj). (Entered: 08/15/2022) |
| 08/15/2022 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Moish Peltz to RE-FILE Document 65 MOTION for Oral Argument *in support of Opposition to Defendants' Motions to Dismiss*.. ERROR(S): When asked, Is this a Letter Motion?, click the Yes radio button, then complete the Docket Entry as Instructed.. (kj) (Entered: 08/16/2022) |
| 08/16/2022 | 66 | MEMORANDUM OF LAW in Opposition re: 59 MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)*.. Document filed by Free Holdings Inc.. (Attachments: # 1 Exhibit Declaration of Moish Peltz).(Peltz, Moish) (Entered: 08/16/2022) |
| 08/16/2022 | 67 | LETTER MOTION for Oral Argument addressed to Magistrate Judge James L. Cott from Moish Peltz dated August 15, 2022. Document filed by Free Holdings Inc...(Peltz, Moish) (Entered: 08/16/2022) |
| 09/01/2022 | 68 | REPLY MEMORANDUM OF LAW in Support re: 54 MOTION to Dismiss *THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6). Defendant Sotheby's Inc.'s Reply Memorandum of Law in Further Support of Its Motion to Dismiss the Amended Complaint*. Document filed by Sotheby's Inc...(Rothstein, Evan) (Entered: 09/01/2022) |
| 09/01/2022 | 69 | REPLY MEMORANDUM OF LAW in Support re: 59 MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)*.. Document filed by Kevin McCoy..(Saady, Nicholas) (Entered: 09/01/2022) |
| 03/17/2023 | 70 | OPINION AND ORDER re: 54 MOTION to Dismiss *THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6).* filed by Sotheby's Inc., 59 MOTION to Dismiss *Plaintiff's Amended Complaint, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).* filed by Kevin McCoy. For the reasons stated herein, the Court grants the motions to dismiss the amended complaint. Accordingly, the Clerk is directed to mark the motions at docket numbers 54 and 59 as "granted" and enter judgment for defendants. SO ORDERED. (Signed by Magistrate Judge James L. Cott on 3/17/2023) (ks) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/17/2023) |
| 03/20/2023 | 71 | CLERK'S JUDGMENT re: 70 Memorandum & Opinion in favor of Sotheby's Inc., Kevin McCoy against Free Holdings Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated March 17, 2023, the Court grants the motions to dismiss the amended complaint; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/17/2023) (Attachments: # 1 Appeal Package) (tp) (Entered: 03/20/2023) |
| 04/13/2023 | 72 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion. (nb) (Entered: 04/13/2023) |
| 04/13/2023 | 73 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion. (nb) (Entered: 04/13/2023) |
| 04/13/2023 | 74 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion. (nb) (Entered: 04/13/2023) |
| 04/13/2023 | 75 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion. (nb) (Entered: 04/13/2023) |
| 04/13/2023 | 76 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 |

JA-12

| | | Memorandum & Opinion. (nb) (Entered: 04/13/2023) |
|---|---|---|
| 04/13/2023 | 77 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion.(vba) (Entered: 04/13/2023) |
| 04/13/2023 | 78 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion.(vba) (Entered: 04/13/2023) |
| 04/13/2023 | 79 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 70 Memorandum & Opinion.(vba) (Entered: 04/13/2023) |
| 04/17/2023 | 80 | NOTICE OF APPEAL from 70 Memorandum & Opinion,, 71 Clerk's Judgment,. Document filed by Free Holdings Inc.. Filing fee $ 505.00, receipt number ANYSDC-27617917. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Peltz, Moish) (Entered: 04/17/2023) |
| 04/18/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 80 Notice of Appeal. (tp) (Entered: 04/18/2023) |
| 04/18/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 80 Notice of Appeal, filed by Free Holdings Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 04/18/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/20/2023 16:11:50 | | |
| **PACER Login:** | appealteam | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00881-JLC |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

JA-13

KENNETH J. FALCON, ESQ.
MOISH E. PELTZ, ESQ.
STEVEN C. BERLOWITZ, ESQ.
FALCON RAPPAPORT & BERKMAN PLLC
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
Telephone: (516) 599-0888
Facsimile: (516) 599-0889
Counsel for Plaintiff FREE HOLDINGS INC.

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------X
FREE HOLDINGS INC.,

                Plaintiff,

  - against –

KEVIN McCOY, SOTHEBY'S INC., NAMELESS
CORPORATION, AND ALEX AMSEL
A/K/A SILLYTUNA

                Defendants.
--------------------------------------------------------X

                    **COMPLAINT**

      Plaintiff Free Holdings Inc., by its attorneys Falcon Rappaport & Berkman LLC, for its

Complaint alleges:

**NATURE OF THE CASE**

      1.      Non-fungible token ("NFT") technologies promise "indelible provenance and

ownership of digital images."[1] While the blockchain records are self-evident, such records

cannot defend themselves in the face of concerted efforts by a formative artist and auction house

to establish a false narrative concerning what is presumed to be the first NFT. This action seeks

---

[1] https://www.mccoyspace.com/project/125/

to correct that record, and in doing so establish Defendants' slander of title, deceptive and unlawful trade practices, and commercial disparagement which arises out of their false and misleading marketing, promotion, advertisement, and sale of that certain NFT titled "Quantum" which is credited as being the world's first known NFT.

2.      In 2014, artist Kevin McCoy ("McCoy") created the Quantum NFT on the Namecoin blockchain.

3.      McCoy subsequently let the record for the Namecoin blockchain containing Quantum expire. This left the Quantum Namecoin record free to claim, and a cryptocurrency wallet controlled by Free Holdings, Inc. ("Free Holdings") did so on or around April 5, 2021.

4.      In 2021, McCoy, through Sotheby's Inc. ("Sotheby's) began marketing and promoting the sale of an Ethereum-based NFT called "Quantum," which they falsely claimed was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[2]

5.      In a condition report, produced by nameless Corporation ("nameless"), Sotheby's and McCoy further stated that Quantum on the Namecoin blockchain had been "burned" or otherwise removed from the Namecoin blockchain. This is false. A Namecoin blockchain record cannot be "removed," and the blockchain record for Quantum has not been "removed" or "burned."  Rather, the Namecoin blockchain record for Quantum remains active and under the control of Free Holdings.

6.      Upon learning of the auction, Free Holdings repeatedly contacted McCoy to inform him that Free Holdings owned the Quantum Namecoin record, and that the marketing and

---

[2] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

2

JA-15

promotions were false and misleading.  Despite Free Holdings' diligent communication attempts, McCoy ignored Free Holdings. Sotheby's and McCoy continued to market and promote the auction, using Quantum to help draw bidders interested in purchasing the first NFT ever minted. Indeed, in using false and misleading marketing and promotion, McCoy, through Sotheby's, successful sold the newly re-minted Ethereum-based Quantum for a reported sum of $1,472,000.

7.     As set forth below, Sotheby's and McCoy unjustly profited from the false and misleading marketing of their Ethereum-based NFT, which they deceitfully and intentionally promoted as having previously been "burned" or "removed" from the Namecoin blockchain. Despite notice to McCoy that their representations were false, Sotheby's and McCoy improperly orchestrated the marketing, promotion, and sale of their NFT, all while causing damage to Free Holdings, the true owner of the original Quantum NFT.

**THE PARTIES**

8.     Plaintiff Free Holdings Inc. is a Canadian corporation with its principal place of business in the Province of Ontario, Canada.

9.     Upon information and belief, defendant Kevin McCoy is an individual residing in New York.

10.     Upon information and belief, Sotheby's Inc. is New York corporation with its principal place of business in New York.

11.     Upon Information and belief, nameless Corporation is a Wyoming corporation with its principal place of business in Colorado.

JA-16

12.     Upon information and belief, defendant Alex Amsel, also known as SillyTuna (for example, via Twitter at https://twitter.com/sillytuna) is an individual residing in London, England.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1132 because there is complete diversity of citizenship between Plaintiff and each Defendant and the amount in controversy exceeds $75,000, exclusive of interest and cost.

14.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 because (i) at least one of the Defendants resides in this judicial district; and (ii) a substantial part of the acts and/or omissions giving rise to these claims occurred within this judicial district.

## THE FACTS

**The Quantum NFT**

15.     A blockchain is a decentralized digital public ledger maintained on computer systems and consisting of sequential records called 'blocks.' Blockchains are known for their roles in cryptocurrency systems, and are valued for their ability to maintain secure and decentralized records of transactions. NFTs are pieces of digital content linked to the blockchain. Whereas cryptocurrencies are fungible, NFTs are non-fungible, which means that each NFT is unique. Blockchain's record keeping and authentication technology serve to provide public certificates of authenticity or proof of ownership of NFTs. NFTs can take the form of GIFS, tweets, images of physical objects, and more.

16.     The non-fungible nature of NFTs, combined with the authentication power of the blockchain, have given rise to a burgeoning NFT art and collectibles market. NFT sales reached record numbers in 2021, approaching $25 billion in sales.[3]

17.     The Namecoin blockchain was originally created in 2011 as a "fork" of the Bitcoin blockchain.  Unlike the Bitcoin blockchain, each Namecoin record can contain values in its metadata, which allows Namecoin records to be used like domain names, or to contain other values such as metadata which allows them to act as NFTs.

18.     In 2014, an NFT titled "Quantum" was originally created by the artist Kevin McCoy on the Namecoin blockchain, and is generally considered the first NFT ever created.

19.     The Quantum blockchain record contain the following entry in its on-chain metadata description:

> I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. **Title transfers to whoever controls this blockchain entry**.[4]

(emphasis added).

20.     The Quantum blockchain record was the first known blockchain record to explicitly link to an external work of art (namely the quantum.gif file hosted on mccoyspace.com), which definitionally means that the Quantum blockchain record is presumably the first known NFT.

---

[3] https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/
[4] https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a/

21.     The Namecoin blockchain requires a user who controls a Namecoin blockchain database record to periodically update their records every 35,999 blocks.  This period amounts to approximately 200-250 days.

22.     If a user fails to update their records, control of that particular block record expires and can be claimed by another user.

23.     On or around January 2015, McCoy failed to update Quantum's Namecoin blockchain record, rendering the record free to claim.

24.     On or around April 5, 2021, Free Holdings claimed the Quantum blockchain record on Namecoin.

25.     The title to the Namecoin Quantum NFT is currently held by Free Holdings.

**FREE HOLDINGS ATTEMPTS TO CONTACT McCOY**

26.     EarlyNFT is a pseudonym for Free Holding's sole member. The Twitter handle @EarlyNFT is operated by Free Holdings.

27.     Beginning around April 2021, Free Holdings began to repeatedly contact McCoy to discuss Quantum, but received no communications in response.

28.     Free Holdings first attempted to contact McCoy regarding Quantum on April 6, 2021 using the Twitter handle @EarlyNFT:



**JA-19**

29.     Free Holdings again reached out to McCoy on Twitter on April 12, 2021 in order

to discuss Quantum:



30.     Free Holdings made two further attempts to contact McCoy on April 30, 2021:



31.     Four days later, on May 3, 2021, Free Holdings again wrote to McCoy:



32.    McCoy never responded to Free Holdings' Twitter messages.

**The Sotheby's Auction**

33.    In or around May 2021, Sotheby's began marketing an art auction titled "Natively Digital: A Curated NFT Sale" scheduled for a June 2021 auction.

34.    The purpose of "Natively Digital: A Curated NFT Sale" was to market for sale "some of the earliest" NFTs.  Sotheby's included "Quantum by Kevin McCoy" as part of its auction, and positioned and marketed the work as one of the earliest NFTs ever created.

35.    On May 5, 2021, Free Holdings learned that Sotheby's was holding an auction that included Quantum.

36.    On May 6, 2021, Free Holdings made its sixth attempt to contact McCoy about Quantum:



37.    McCoy did not respond to Free Holdings' May 6, 2021 Twitter message.

38.    Leading up to and throughout the course of the auction, Sotheby's, McCoy, and nameless materially misrepresented the ownership status of the Quantum NFT, as well as other factual statements concerning its condition.

39.    The Sotheby's "condition report" on Quantum, written by nameless™, states that "this specific Namecoin entry was removed from the system after not being renewed, and was effectively burned from the chain."[5]  This statement is false.

40.    A Namecoin blockchain record cannot be "removed," and the blockchain record for Quantum has not been "removed" or "burned."

41.    The blockchain record for Quantum remains active and under the control of Free Holdings.

42.    The name record for Quantum's Namecoin blockchain record states "[t]his original NFT, entitled 'Quantum' by Kevin McCoy and minted on May 2, 2014, is currently held by the person who controls the Twitter handle @EarlyNFT."[6]

43.    As part of its auction, Sotheby's included a "new version of Quantum," minted by McCoy on the Ethereum blockchain.

---

[5] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
[6] https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a/

44.     Despite notice that Free Holdings controlled the Namecoin blockchain record containing Quantum, Sotheby's and McCoy continued to market the original Quantum NFT as having been "burned."

45.     Sotheby's and McCoy falsely represented that the NFT it was selling was the same one claimed by Free Holdings in 2014. Specifically, Sotheby's described the NFT as "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[7] This is a false and misleading statement because Quantum is still extant on the Namecoin blockchain and requires no "preservation."

46.     On June 1, 2021, Free Holdings made the first of six separate attempts to contact McCoy by email, alerting McCoy that Free Holdings owned the Namecoin Quantum record and asking to discuss the NFT.

47.     Sotheby's began its auction on June 3, 2021.

48.     On June 7, 2021, Free Holdings updated the Namecoin blockchain record for Quantum, and included the message that "[a]n authorized *print* of this original NFT, entitled 'Quantum' by Kevin McCoy, is currently being auctioned off by Sotheby's. Good luck to all the bidders." (emphasis added).

49.     Sotheby's ended its auction on June 10, 2021.

50.     On June 17, 2021, Sotheby's Senior Vice President, Caroline Moustakis ("Moustakis"), spoke with Free Holdings about Quantum on a phone call.  During that call, Free Holdings told Moustakis that the description that Sotheby's posted of its Ethereum-based Quantum NFT was inaccurate and misleading because the Namecoin record had not been

---

[7] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

10

"burned," but was still active and controlled by Free Holdings.  Free Holdings requested that Sotheby's make public statements to correct the record, including making a statement that the Quantum Namecoin record remains active and in private hands, was not listed for sale as part of Sotheby's auction, and that the item Sotheby's auctioned was in fact an authorized print of the original Quantum token.

51.    Free Holdings sent an email to Moustakis on June 18, 2021 to memorialize their phone conversation and reiterate his request that Sotheby's correct the public record concerning Free Holdings' ownership of Quantum.

52.    Neither Moustakis, nor any other Sotheby's representative, responded to Free Holdings' June 18, 2021 email.

53.    Sotheby's never complied with Free Holdings' request to issue a statement to correct the public record concerning Quantum.

54.    On August 23, 2021, McCoy, through Sotheby's, sold the newly re-minted Ethereum-based Quantum to Twitter-user @Sillytuna for a reported sum of $1,472,000.

55.    @SillyTuna is the Twitter account used and controlled by Alex Amsel.

56.    On August 23, 2021, Amsel tweeted that he had purchased Quantum, writing "First ever crypto art nft – Quantum has arrived chez Sillytuna.  Take that VISA!":



57.     The Plaintiff's Quantum NFT has significant value due to its status as the "first" NFT and such value is being significantly diminished by the false and inaccurate statements made by Defendants.

**FIRST CAUSE OF ACTION**
**Slander of Title Against Sotheby's, McCoy, nameless™, and Amsel**

58.     Free Holdings repeats and realleges Paragraphs 1 through 57 as if fully set forth herein.

59.     Nameless™ wrote a condition report on the Quantum NFT, which it provided to Sotheby's to assist with the marketing and promotion of Sotheby's auction, including the marketing and promotion of Quantum.

60.     The nameless™ condition report falsely describes Quantum as having been "removed from the [Namecoin blockchain] system after not being renewed, and was effectively burned from the chain."[8]

---

[8] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

61.     Sotheby's, McCoy, and nameless™ have falsely stated that the Namecoin Quantum NFT was destroyed or burned, or have falsely or misleadingly stated that the Ethereum-based Quantum NFT they were offering for sale was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[9]

62.     Sotheby's, McCoy, and nameless™ repeatedly and falsely marketed the original Quantum NFT on the Namecoin blockchain as having been "burned."

63.     The Quantum NFT on the Namecoin blockchain has not been "burned," and is currently controlled and owned by Free Holdings.

64.     Free Holdings notified McCoy that Free Holdings, and not McCoy, controlled the Quantum NFT on the Namecoin blockchain, and that the Quantum NFT on the Namecoin blockchain had not been "burned."

65.      McCoy ignored Free Holdings' communications, and proceeded to market the sale of the NFT as one of the first known NFTs.

66.     Amsel issued a false and misleading public statement that he purchased Quantum, the first ever NFT, tweeting: "First ever crypto art nft – Quantum has arrived chez Sillytuna. Take that VISA!"

67.     Sotheby's, McCoy, nameless™, and Amsel's statements were intended to establish the validity of the NFT they were marketing, selling, and/or purchasing as one of the first NFTs ever created, although the NFT sold at auction was not created until 2021.

---

[9] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

68.    Sotheby's, McCoy, nameless™, and Amsel's statements were intended to cast doubt on to the validity of the claim that Free Holdings controlled and had title to the original Quantum NFT on the Namecoin blockchain.

69.    Because McCoy was told by Free Holdings that Free Holdings controlled the Namecoin blockchain record containing Quantum, Sotheby's and McCoy's statements concerning the sale of their NFT was reasonably calculated to cause harm to Free Holdings.

70.    Nameless™'s statement in its condition report that the Namecoin blockchain record containing Quantum had been "burned from the chain" was also reasonably calculated to cause harm to any person or entity claiming to hold title to the Namecoin blockchain record on which Quantum resides, including Free Holdings.

71.    Amsel's statement that he purchased the "first ever crypto art nft" was reasonably calculated to cause harm to any person or entity claiming to hold title to the Namecoin blockchain record on which Quantum resides, including Free Holdings.

72.    Sotheby's and McCoy reportedly sold their NFT for $1,472,000 to Amsel.

73.    The value of the Quantum NFT owned by Free Holdings has been significantly damaged as result of all Defendants' statements and conduct.

### SECOND CAUSE OF ACTION
**Deceptive and Unlawful Trade Practices GBL § 349 Against Sotheby's, McCoy, and nameless™**

74.    Free Holdings repeats and realleges Paragraphs 1 through 57 as if fully set forth herein.

75.    Sotheby's, McCoy, and nameless™ engaged in consumer-oriented conduct by marketing for sale and selling their NFT.

14

JA-27

76.     Nameless™ wrote a condition report on the Quantum NFT, which it provided to Sotheby's to assist with the marketing and promotion of Sotheby's auction, including the marketing and promotion of Quantum.

77.     The nameless™ condition report falsely describes Quantum as having been "removed from the [Namecoin blockchain] system after not being renewed, and was effectively burned from the chain."[10]

78.     Sotheby's, McCoy, and nameless™ have falsely stated that the Namecoin Quantum NFT was destroyed or burned, or have falsely or misleadingly stated that the new Ethereum-based Quantum NFT they were offering for sale was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[11]

79.     Sotheby's, McCoy, and nameless™ repeatedly and falsely marketed the original Quantum NFT as having been "burned."

80.     Sotheby's and McCoy's statements concerning their NFT was materially misleading.  The NFT they were marketing for sale had not been "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and [then] *preserved* on a token minted on May 28, 2021 by the artist." (emphasis added).

81.     The Quantum NFT on the Namecoin blockchain has not been "burned," and is currently controlled and owned by Free Holdings.

---

[10] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
[11] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

82.     Free Holdings notified Sotheby's and McCoy that Free Holdings, and not McCoy, controlled the Quantum NFT on the Namecoin blockchain, and that the original Quantum had not been "burned."

83.      Sotheby's and McCoy ignored Free Holdings communications, and proceeded to market the sale of Quantum as one of the first known NFTs, and have otherwise not corrected their .

84.     Sotheby's, McCoy, and nameless™'s statements were intended to establish the validity of the NFT they were selling as one of the first NFTs ever created.

85.     Sotheby's and McCoy sold their NFT for $1,472,000.

86.     If the defendant acted willfully or knowingly, punitive damages may be awarded.  Treble damages are available where a defendant's actions were intentionally fraudulent.

87.     The value of the Quantum NFT owned by Free Holdings has been significantly damaged as result of all Defendants' statements and conduct.

**THIRD CAUSE OF ACTION**
**Commercial Disparagement Against Sotheby's, McCoy, nameless™, and Amsel**

88.     Free Holdings repeats and realleges Paragraphs 1 through 57 as if fully set forth herein.

89.     Sotheby's, McCoy, and nameless™ have falsely stated that the Namecoin Quantum NFT was destroyed or burned, or have falsely or misleadingly stated that the new Ethereum-based Quantum NFT they were offering for sale was "[o]riginally minted on May 3,

2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[12]

90.    Sotheby's, McCoy, and nameless™ repeatedly and falsely marketed the original Quantum NFT as having been "burned."

91.    Sotheby's, McCoy, and nameless™'s statements concerning the Ethereum-based NFT was materially misleading.  The NFT they were marketing for sale had not been "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and [then] preserved on a token minted on May 28, 2021 by the artist" and had not been "burned."

92.    Free Holdings notified McCoy that Free Holdings, and not McCoy, controlled the Quantum NFT on the Namecoin blockchain, and that the original Quantum had not been "burned."

93.     McCoy ignored Free Holdings communications, and proceeded to market the sale of Quantum as one of the first known NFTs.

94.    Because Free Holdings notified McCoy that Free Holdings was the true owner of Quantum on the Namecoin blockchain, Sotheby's and McCoy made their statements concerning their NFT knowing that they were untrue.

95.    Amsel issued a public statement that he purchased Quantum, the first ever NFT, tweeting: "First ever crypto art nft – Quantum has arrived chez Sillytuna.  Take that VISA!"

96.    Sotheby's, McCoy, nameless™, and Amsel's statements were intended to establish the validity of the NFT they were selling and/or purchasing as one of the first NFTs ever created.

---

[12] https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

97.     Sotheby's, McCoy, nameless™, and Amsel's statements were also intended to delegitimize other persons or entities claiming to control or own the Quantum NFT on the Namecoin blockchain, including Free Holdings.

98.     Sotheby's, McCoy, nameless™, and Amsel's statements were made with the intent, or reasonable belief, that they would cause financial loss to other persons or entities claiming to control or own the Quantum NFT on the Namecoin blockchain, including Free Holdings.

99.     Sotheby's and McCoy sold their NFT to Amsel for $1,472,000.

100.    The value of the Quantum NFT owned by Free Holdings has been significantly damaged as result of all Defendants' statements and conduct.

101.    Sotheby's, McCoy, nameless, and Amsel's statements deprived Free Holdings of the legitimacy of owning one of the first NFTs, thereby precluding any future sale of the same for its true market price and causing Free Holdings to suffer financial loss and damages.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

(a)     on the Count I, damages against Defendants in an amount to be determined at trial;

(b)     on the Count II, damages against Defendants in an amount to be determined at trial; including damages provided under GBL § 349, including treble and or punitive damages, and for plaintiff's reasonable attorney's fees;

(c)     on the Count III, damages against Defendants in an amount to be determined at trial;

(d)     On Counts I, II, and III, a preliminary and permanent injunction enjoining and restraining Defendants and their respective officers, directors, agents, servants, employees, and attorneys, as well as those in active concert and participation with them from advertising, marketing, or otherwise promoting the sale of the New Quantum NFT as the Original Quantum NFT;

18

(e)      On Counts I, II and III, injunctive relief requiring Defendants to engage in corrective advertising, including but not limited to making public statements and creating corrective advertising in major industry publications, and direct communication with any persons who are known to have purchased the Quantum NFT, or sold or bid on its sale;

(f)      all costs, disbursements and attorney's fees incurred in connection with this action; and

(g)      such other and further relief under law or equity as the Court may deem just and proper.

### PLAINTIFF  DEMANDS A TRIAL BY JURY ON ALL COUNTS.

Dated:  February 1, 2022

Respectfully submitted,

**FALCON RAPPAPORT & BERKMAN PLLC**
*Attorneys for Plaintiff*

By:  _/s/Moish Peltz_____
Moish E. Peltz, Esq. (S.D.N.Y. # MP3333)
Kenneth J. Falcon, Esq. (S.D.N.Y. # KF1204)
Steven C. Berlowitz, Esq.
265 Sunrise Highway, Suite 50
Rockville Centre, NY 11570
Telephone: (516) 599-0888
mpeltz@frblaw.com
kfalcon@frblaw.com
sberlowitz@frblaw.com

JA-32

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
FREE HOLDINGS INC.,

                 Plaintiff,

                                     Index No. 1:22-cv-00881 (LGS)

    -against-

KEVIN McCOY, SOTHEBY'S INC., NAMELESS      **STIPULATION**
CORPORATION, AND ALEX AMSEL
A/K/A SILLYTUNA,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

       IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel

for plaintiff Free Holdings Inc. ("Plaintiff") and defendant Sotheby's Inc ("Sotheby's"), that:

      1.     Sotheby's counsel agrees to accept service of process of Plaintiff's Complaint

dated February 1, 2022 (the "Complaint") on behalf of Sotheby's as of February 10, 2022; and

      2.     With the exception of the defense of improper service of process, all of Sotheby's

defenses are expressly preserved and not waived; and

      3.     Sotheby's time to answer, move or otherwise respond to the Complaint is extended

through and including April 11, 2022.

So Ordered.

Dated: February 16, 2022
New York, New York

                                  LORNA G. SCHOFIELD
                           UNITED STATES DISTRICT JUDGE

JA-33

Dated:  February 15, 2022

FALCON RAPPAPORT &
BERKMAN PLLC

By: */s/ Moish E. Peltz*
        Moish E. Peltz
265 Sunrise Highway, Suite 50
Rockville Centre, New York  11570
Tel. (516) 599-0888
mpletz@frblaw.com

*Attorneys for Plaintiff*

ARNOLD & PORTER
KAYE SCHOLER LLP

By: /s/ Theresa M. House
        Theresa M. House
250 West 55th Street
New York, New York 10019
Tel. (212) 836-8094
Fax (212) 836-8689
Theresa.House@arnoldporter.com

Evan M. Rothstein
1144 Fifteenth Street
Suite 3100
Denver, CO 80202
Tel. (303) 863-1000
Fax (303) 863-2301
Evan.Rothstein@arnoldporter.com
*(Pro hac vice application pending)*

Michael J. Gershoni
Bridgette C. Gershoni
601 Massachusetts Ave, NW
Washington, DC 20001
Tel. (202) 942-5000
Fax (202) 942-5999
Michael.Gershoni@arnoldporter.com
Bridgette.Gershoni@arnoldporter.com
*(Pro hac vice application pending)*

*Attorneys for Defendant Sotheby's*


SO ORDERED

_____

JA-34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FREE HOLDINGS INC.,

                Plaintiff,

                                        Index No. 1:22-cv-00881 (LGS)

    -against-

KEVIN McCOY, SOTHEBY'S INC., NAMELESS      **STIPULATION**
CORPORATION, AND ALEX AMSEL
A/K/A SILLYTUNA


                Defendants.
------------------------------------------------------------X

      IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned

counsel for plaintiff Free Holdings Inc. ("Plaintiff") and defendant Kevin McCoy ("McCoy"),

that:

      1.    McCoy's counsel agrees to accept service of process of Plaintiff's Complaint

dated February 1, 2022 (the "Complaint") on behalf of McCoy as of February 8, 2022; and

      2.    With the exception of the defense of improper service of process, all of McCoy's

defenses are expressly preserved and not waived; and

      3.    McCoy's time to answer, move or otherwise respond to the Complaint is extended

through and including April 11, 2022.

Dated:  February 8, 2022

FALCON RAPPAPORT &
BERKMAN PLLC

By: _*Moish Peltz*_____
     Moish E. Peltz
265 Sunrise Highway, Suite 50
Rockville Centre, New York  11570
(516) 599-0888
*Attorneys for Plaintiff*

PRYOR CASHMAN LLP

By: _____
     William L. Charron
7 Times Square
New York, New York  10036
(212) 421-4100
*Attorneys for Defendant Kevin McCoy*

So Ordered.

Dated: February 17, 2022
New York, New York

_____
LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

JA-35

Case 1:22-cv-00881-JLC   Document 23   Filed 03/07/22   Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FREE HOLDINGS INC.,

               Plaintiff,

v.

KEVIN McCOY, SOTHEBY'S INC.,
NAMELESS CORPORATION, AND ALEX
AMSEL A/K/A SILLYTUNA

               Defendants.

Civil Action No.: 1:22-cv-00881 (LGS)

---

## NOTICE OF VOLUNTARY DISMISSAL PRUSUANT TO FRCP 41(a)(1)(A)(i)

     Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff and its counsel

hereby give notice that the above-styled action is voluntarily dismissed, without prejudice, as to

defendant Alex Amsel a/k/a Sillytuna.


**Dated**:  Rockville Centre, New York
        March 7, 2022

                    **FALCON RAPPAPORT & BERKMAN PLLC**


             By:    /s/ Jessica M. Moore
                    Kenneth J. Falcon, Esq.
                    Moish E. Peltz, Esq.
                    Steven C. Berlowitz, Esq.
                    Jessica M. Moore, Esq.
                    265 Sunrise Highway, Suite 50
                    Rockville Centre, New York 11570
                    T: (516) 599-0888
                    kfalcon@frblaw.com
                    mpeltz@frblaw.com
                    sberlowitz@frblaw.com
                    jmoore@frblaw.com
                    *Attorneys for Plaintiff*

JA-36

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FREE HOLDINGS INC., | |
| Plaintiff, | |
| v. | Civil Action No.: 1:22-cv-00881 (LGS) |
| KEVIN McCOY, SOTHEBY'S INC., NAMELESS CORPORATION, AND ALEX AMSEL A/K/A SILLYTUNA | |
| Defendants. | |

## NOTICE OF VOLUNTARY DISMISSAL PRUSUANT TO FRCP 41(a)(1)(A)(i)

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff and its counsel hereby give notice that the above-styled action is voluntarily dismissed, without prejudice, as to defendant Alex Amsel a/k/a Sillytuna.

**Dated**:  Rockville Centre, New York
        March 7, 2022

So Ordered.

The Clerk of Court is respectfully directed to terminate Alex Amsel as a Defendant in this action.

Dated: March 8, 2022
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

**FALCON RAPPAPORT & BERKMAN PLLC**

By:    /s/ Jessica M. Moore
       Kenneth J. Falcon, Esq.
       Moish E. Peltz, Esq.
       Steven C. Berlowitz, Esq.
       Jessica M. Moore, Esq.
       265 Sunrise Highway, Suite 50
       Rockville Centre, New York 11570
       T: (516) 599-0888
       kfalcon@frblaw.com
       mpeltz@frblaw.com
       sberlowitz@frblaw.com
       jmoore@frblaw.com
       *Attorneys for Plaintiff*

# PRYOR CASHMAN LLP

New York | Los Angeles | Miami

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806              www.pryorcashman.com

**William L. Charron**
Partner

Direct Tel: 212-326-0156
Direct Fax:  212-798-6927
wcharron@pryorcashman.com

April 1, 2022

**VIA ECF**

Hon. Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, New York  10007

> **Re:**    *Free Holdings Inc. v. Kevin McCoy*, Case No. 1:22-cv-00881 (LGS);
>              **Defendants' Pre-Motion Letter regarding Motion to Dismiss Complaint**

Dear Judge Schofield:

We represent defendant Kevin McCoy ("McCoy") in the above-referenced action.  We respectfully write pursuant to Your Honor's Individual Rule III.C.2 to advise of McCoy's intention to move to dismiss the Complaint of plaintiff Free Holdings Inc. ("Plaintiff") in its entirety, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  We understand that co-defendants Sotheby's Inc. and Nameless Corporation intend to join McCoy's motion.

We have conferred with Plaintiff's counsel and respectfully propose the following briefing schedule:  McCoy's motion to be filed by April 11, 2022; Plaintiff's opposition to be filed by May 23, 2022; McCoy's reply to be filed by June 6, 2022.  We also respectfully request (with Plaintiff's consent) that the Rule 16 conference scheduled for April 13, 2022, and Rule 26(f) requirements, be adjourned pending decision on McCoy's motion.

**Summary Of Complaint**

Plaintiff alleges that it holds title to a non-fungible token ("NFT"), which it describes as the "First Known NFT."  (ECF No. 1 at ¶¶ 1–7.)  Plaintiff alleges that McCoy, who is a well-known digital artist, created the First Known NFT in 2014 in association with his creation of a digital work of art known as *Quantum*.  (*Id.* at ¶ 18.)  Plaintiff alleges that McCoy created the First Known NFT using a blockchain platform known as Namecoin.  (*Id.*)  Plaintiff alleges that McCoy subsequently abandoned the First Known NFT and allowed it to be claimed by Plaintiff in 2021.  (*Id.* at ¶¶ 21–25.)  Plaintiff alleges that McCoy's sale of a NFT in the fall of 2021 through a Sotheby's auction, which marketed McCoy's NFT as the first NFT, has slandered the title and damaged the value of the NFT that Plaintiff now claims to own.  (*Id.* at ¶¶ 58–101.)  None of Plaintiff's claims is viable.

# ⠿■ PRYOR CASHMAN LLP

Hon. Lorna G. Schofield
April 1, 2022
Page 2

**Plaintiff Fails To Allege Special Damages To Support Its First Claim**

Plaintiff's First Claim is for slander of title under New York law. (*Id.* at ¶¶ 58–73.) Slander of title requires Plaintiff to plead special damages. *E.g.*, *Kriger v. Indus. Rehab. Corp.*, 185 N.Y.S.2d 658, 662 (1959), *aff'd*, 166 N.E.2d 189 (1960); *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *11 (S.D.N.Y. Sept. 24, 2007). Courts "routinely grant motions to dismiss for failure to allege special damages with requisite specificity." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 278 (S.D.N.Y. 2003) (finding it insufficient to "state a general, cumulative figure" without itemizing "actual losses" sustained or naming specific lost customers); *see also* Fed. R. Civ. P. 9(g). A plaintiff "will be denied even nominal or punitive damages if he cannot show special damage, since in such a case no cause of action at all is established." *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992).

Plaintiff's pleading falls far short of this standard. Plaintiff alleges only that "the value of the [] NFT owned by [Plaintiff] has been significantly damaged" by McCoy's sale of his NFT. (*Id.* at ¶ 73.) Plaintiff has not alleged any amount of actual damage. Nor has Plaintiff alleged any specific lost sale opportunities. To the extent that Plaintiff is alleging that is ability to sell its NFT in the future may somehow be hampered, such an allegation is insufficient as a matter of law. *See Rosenbaum v. City of N.Y.*, 8 N.Y.3d 1, 12 (2006) (explaining that claim for slander of title "does not arise until special damages actually result").

Accordingly, Plaintiff's First Claim should be dismissed.

**Plaintiff Fails To Allege Consumer-Oriented Conduct To Support Its Second Claim**

Plaintiff's Second Claim is for violation of New York General Business Law ("GBL") § 349. Such a claim requires Plaintiff to allege that McCoy engaged in deceptive conduct that was "consumer-oriented." *E.g.*, *Genesco Entm't v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) (explaining that "the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type ... that confront the average consumer who requires the protection of a statute against fraudulent practices," not a "'single shot transaction' involving complex arrangements, knowledgeable and experienced parties and large sums of money"); *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 294 (1999).

Plaintiff conclusorily alleges that McCoy "engaged in consumer-oriented conduct by marketing for sale and selling their [sic.] NFT." (ECF No. 1 at ¶ 75.) Nevertheless, Plaintiff does not allege that McCoy engaged in conduct that threatens to defraud consumers generally through recurring transactions. Plaintiff alleges a "single shot transaction" involving McCoy, Sotheby's, Nameless and Sotheby's buyer (who was initially named by Plaintiff as a co-defendant in this case as well, but whom Plaintiff voluntarily dismissed from the case to preserve diversity jurisdiction).

Accordingly, Plaintiff's Second Claim should be dismissed.

PRYOR CASHMAN LLP

Hon. Lorna G. Schofield
April 1, 2022
Page 3

**Plaintiff Fails To Allege Special Damages Or An Actionable
Statement Directed At Plaintiff To Support Its Third Claim**

Plaintiff's Third Claim is for commercial disparagement under New York law. (ECF No. 1 at ¶¶ 88–101.) This claim should be dismissed for at least two reasons. *First*, like a claim for slander of title, a claim for commercial disparagement requires Plaintiff to allege special damages with particularity. *E.g.*, *Eminah Properties LLC v. Energizer Holdings, Inc.*, 531 F. Supp. 3d 593, 608 (E.D.N.Y. 2021); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15 CIV. 8775 (LGS), 2016 WL 6310777, at *6 (S.D.N.Y. Oct. 27, 2016). Again, Plaintiff has failed to do so. (ECF No. 1 at ¶¶ 100-101.)

*Second*, Plaintiff is required to allege that McCoy made a disparaging statement directed "at" Plaintiff or "at" Plaintiff's NFT. *E.g.*, *North Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 231 (E.D.N.Y. 2020). Plaintiff alleges that McCoy marketed and sold his NFT as the first NFT, but Plaintiff does not allege that McCoy made any statements that were directed at Plaintiff or Plaintiff's NFT specifically.

**All Of Plaintiff's Claims Fail For Lack Of Standing**

In addition to the grounds stated above, all three of Plaintiff's claims should be dismissed for want of subject matter jurisdiction and Article III justiciability because Plaintiff has not alleged any injury-in-fact, which is necessary for it to establish its standing to sue. *Spokeo Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). This matter will be fully explained in McCoy's motion, but in sum Plaintiff has not actually or plausibly alleged that it holds title to the First Known NFT. Plaintiff alleges that it controls a "unique" and "sequential[ly]" distinct NFT that merely copies certain metadata from the First Known NFT. (*See* ECF No. 1 at ¶ 15.)

Because all of Plaintiff's claims proceed from the faulty premise that Plaintiff owns the First Known NFT, which is the alleged source of vague, future damages to Plaintiff (as discussed above), all of Plaintiff's claims should be dismissed for lack of standing. *E.g.*, *Doe v. Quest Diagnositcs, Inc.*, No. 15 CIV. 8992 (LGS), 2017 WL 1102663, at *2 (S.D.N.Y. Mar. 23, 2017) (granting Rule 12(b)(1) motion to dismiss and explaining that "'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'") (quotation and citation omitted).

Furthermore, because the issue of subject matter jurisdiction and justiciability is fundamental, McCoy is permitted to introduce facts concerning Plaintiff's standing that are extrinsic to Plaintiff's Complaint. *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

Respectfully submitted,

William L. Charron

cc:     All counsel (via ECF)

JA-40

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _4/13/2022_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FREE HOLDINGS INC.,

*Plaintiff,*

-against-

KEVIN McCOY, SOTHEBY'S INC. and
NAMELESS CORPORATION,

*Defendants.*

ECF CASE

Case No.: 1:22-cv-00881 (JLC)

**STIPULATION**

---

**WHEREAS,** on February 1, 2022, Plaintiff filed the Complaint against Defendants;

**WHEREAS,** on February 16, 2022, the Court ordered that Defendant Sotheby's Inc.'s time to answer, move or otherwise respond to the Complaint was extended through and including April 11, 2022;

**WHEREAS,** on February 17, 2022, the Court ordered that Defendant Kevin McCoy's time to answer, move or otherwise respond to the Complaint was extended through and including April 11, 2022;

**WHEREAS,** on March 29, 2022, the Court ordered that Defendant Nameless Corporation's time to answer, move or otherwise respond to the Complaint was extended through and including April 11, 2022;

**WHEREAS,** on April 1, 2022, Defendants filed a pre-motion letter regarding a motion to dismiss the Complaint;

**WHEREAS,** on April 1, 2022, the Court ordered that Defendants' deadlines to answer, move or otherwise respond to the Complaint were extended to April 18, 2022;

1

JA-41

**WHEREAS,** on April 6, 2022, the parties consented to transfer the case to Magistrate Judge James L. Cott;

**WHEREAS**, Plaintiff has indicated to Defendants that it will be amending the Complaint, as of right;

**WHEREAS**, the April 18, 2022 deadlines for Defendants to answer, move or otherwise respond to the Complaint remain in place;

**IT IS HEREBY STIPULATED AND AGREED**, by and between Plaintiff and the Defendants, that:

1.  The April 18, 2022 deadlines for Defendants to answer, move or otherwise respond to the Complaint are vacated;

2.  Plaintiff shall file and serve an Amended Complaint by no later than May 9, 2022;

3.  Defendants' deadlines to answer, move or otherwise respond to the Amended Complaint are adjourned *sine die*; and

4.  The parties are to confer to set a schedule for the deadlines by which Defendants must answer, move or otherwise respond to the Amended Complaint.

Dated: New York, New York
       April 13, 2022

FALCON RAPPAPORT & BERKMAN PLLC

By: /s/Moish E. Peltz/ _____
    Moish E. Peltz
    (mpeltz@frblaw.com)
    1185 Avenue of Americas
    New York, New York 10036
    Tel: (212) 203-3255

*Attorneys for Plaintiff*

PRYOR CASHMAN LLP

By: /s/William L. Charron/ _____
    William L. Charron
    (wcharron@pryorcashman.com)
    7 Times Square
    New York, New York 10036
    Tel: (212) 421-4100

*Attorneys for Defendant Kevin McCoy*

2

JA-42

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/Evan Rothstein/
    Evan Rothstein (*pro hac vice*)
    (evan.rothstein@arnoldporter.com)
    1144 Fifteenth Street, Suite 3100
    Denver, CO 80202
    Tel: (303) 863-2308

*Attorneys for Defendant Sotheby's Inc.*

THE RODMAN LAW GROUP, LLC

By: /s/Nadav Aschner/
    Nadav Aschner (*pro hac vice*)
    (nadav@therodmanlawgroup.com)
    600 S. Cherry St, Suite 835
    Denver, CO 80246
    Tel: (720) 663-0558

*Attorneys for Defendant Nameless Corporation*

**SO ORDERED.**

Dated: April 13, 2022
    New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

3

JA-43

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

FREE HOLDINGS INC.,                                    Index No. 1:22-cv-00881 (LGS)

        Plaintiff,

           v.                                           **NOTICE OF VOLUNTARY
                                                       DISMISSAL PURSUANT TO F.R.C.P.
                                                       41(a)(1)(A)(i)**

KEVIN McCOY, SOTHEBY'S INC., and
NAMELESS CORPORATION,

        Defendants.

-----------------------------------------------------X

**NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41(a)(1)(A)(i)**

     Pursuant to Pursuant to F.R.C.P. 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure,
the plaintiff Free Holdings, Inc., and or their counsel, hereby give notice that the above-
captioned action is voluntarily dismissed, with prejudice, against the defendant nameless
(misidentified as "Nameless Corporation" in the complaint).

Date:  May 9, 2022

                         FALCON RAPPAPORT & BERKMAN PLLC

                         By: /s/ Moish E. Peltz
                         Moish E. Peltz
                         265 Sunrise Highway, Suite 50
                         Rockville Centre, New York  11570
                         Tel. (516) 599-0888

                         *Attorneys for Plaintiff*

JA-44

KENNETH J. FALCON, ESQ.
MOISH E. PELTZ, ESQ.
STEVEN C. BERLOWITZ, ESQ.
FALCON RAPPAPORT & BERKMAN PLLC
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
Telephone: (516) 599-0888
Facsimile: (516) 599-0889
Attorney for FREE HOLDINGS INC.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

FREE HOLDINGS INC.,                    Case No.: 1:22-cv-00881 (LGS) (JLC)

                     Plaintiff,          **<u>AMENDED COMPLAINT</u>**

   - against –

KEVIN McCOY AND SOTHEBY'S INC.,

                     Defendants.

--------------------------------------------------------X

Plaintiff Free Holdings Inc., by its attorneys Falcon Rappaport & Berkman PLLC, for its

Amended Complaint alleges:

### NATURE OF THE CASE

1.     This action for declaratory judgment, unjust enrichment, slander of title, deceptive

and unlawful trade practices, commercial disparagement, and false advertising concerns two

non-fungible tokens ("NFTs"), both called *Quantum*, and arises out of Defendants' false and

misleading marketing, promotion, advertisement, and sale of their Ethereum-based NFT called

*Quantum*.

2.     In 2014, artist, Kevin McCoy ("McCoy"), created an NFT called *Quantum* on the

Namecoin blockchain (the "Namecoin-*Quantum*").

JA-45

3.      McCoy subsequently let the record for the Namecoin-*Quantum* expire on or around January 2015.  This left the Namecoin-*Quantum* free to claim.

4.      Any user of the Namecoin network may freely claim an expired record on the Namecoin blockchain.

5.       On or around April 5, 2021, Free Holdings, Inc. ("Free Holdings") claimed the Namecoin-*Quantum*.

6.      On May 28, 2021, McCoy minted another NFT, also called *Quantum*, this time on the Ethereum blockchain (the "Ethereum-*Quantum*").

7.      Although both NFTs refer to the same visual image, the Ethereum-*Quantum* and the Namecoin-*Quantum* are different NFTs.

8.      Shortly after McCoy minted the Ethereum-*Quantum*, McCoy and Sotheby's Inc. ("Sotheby's) began marketing and promoting the sale of the Ethereum-*Quantum* as the crown jewel of Sotheby's auction entitled *Natively Digital: A Curated NFT Sale* ("*Natively Digital*").

9.      McCoy and Sotheby's falsely claimed the Ethereum-*Quantum* was the first NFT "[o]riginally minted on May 3, 2014 on [the] Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[1]

10.     McCoy and Sotheby's further falsely stated that the Namecoin-*Quantum* had been "burned" or otherwise "removed" from the Namecoin blockchain.

11.     A Namecoin blockchain record cannot be "removed."

---

[1] *Natively Digital: A Curated NFT Sale/ Lot 2*, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
[https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022).

12.     The blockchain record for the Namecoin-*Quantum* has not been "removed" or "burned."

13.     The statements by McCoy and Sotheby's were therefore false when made.

14.     Rather, the Namecoin-*Quantum* remains active and under the control of Free Holdings.

15.     Upon learning of the auction, Free Holdings repeatedly contacted McCoy to inform him that Free Holdings owned the Namecoin-*Quantum* and that the marketing and promotional materials concerning McCoy and Sotheby's Ethereum-*Quantum* were false and misleading.  Despite Free Holdings' diligent communication attempts, McCoy ignored Free Holdings.  McCoy and Sotheby's continued to market and promote the *Natively Digital* auction, relying on the mischaracterization of the Ethereum-*Quantum* as the first NFT to help draw bidders interested in purchasing the first NFT ever minted.  Indeed, in using false and misleading marketing and promotion, McCoy and Sotheby's successfully sold the newly re-minted Ethereum-*Quantum* for a reported sum of $1,472,000.

16.     McCoy and Sotheby's continue to unjustly profit from their false and misleading statements.

17.     McCoy trumpets his sale of the Ethereum-*Quantum* as the first NFT in news publications, magazine articles, and television interviews to help build his brand and generate sales for his future projects.

18.     Sotheby's similarly uses its sale of the Ethereum-*Quantum* to establish its credentials in a rising and profitable NFT art and collectibles market.  Sotheby's held a second *Natively Digital* auction entitled *Natively Digital 1.2: The Collectors*, and recently closed

3

JA-47

bidding on the third iteration of its *Natively Digital* auction series, titled *Natively Digital 1.3: Generative Art*.

19.     As set forth below, McCoy and Sotheby's unjustly profited, and continue to unjustly profit, from the false and misleading marketing and sale of the Ethereum-based *Quantum* NFT, which they deceitfully and intentionally promoted as having previously been "burned" or "removed" from the Namecoin blockchain.  Despite notice that their representations were false, McCoy and Sotheby's improperly orchestrated the marketing, promotion, advertisement, and sale of the Ethereum-*Quantum*, while causing damage to Free Holdings, the owner of the Namecoin-*Quantum*.

## THE PARTIES

20.     Plaintiff Free Holdings Inc. is a Canadian corporation with its principal place of business in the Province of Ontario, Canada.

21.     Upon information and belief, defendant Kevin McCoy is an individual residing in New York.

22.     Upon information and belief, Sotheby's Inc. is a New York corporation with its principal place of business in New York.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and each Defendant and the amount in controversy exceeds $75,000, exclusive of interest and cost.

24.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's Lanham Act claim arises under 15 U.S.C. § 1125(a).

4

25.     This Court has jurisdiction over Plaintiff's common law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

26.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and/or omissions giving rise to these claims occurred within the district.

## THE FACTS

### The Namecoin Blockchain

27.     A blockchain is a digital public ledger maintained on a decentralized computer system and consisting of records called blocks.

28.     Blockchains are known for their roles in cryptocurrency systems, and are valued for their ability to maintain secure and decentralized records of transactions.

29.     NFTs are tokens that authenticate digital content via blockchain technology.

30.     Whereas cryptocurrencies are fungible, NFTs are non-fungible, which means that no two NFTs are the same.

31.     The blockchain's record-keeping and authentication technology serves to provide public certificates of authenticity or proof of ownership of NFTs.

32.     The content linked to NFTs can take the form of digital images of physical objects, music, text, and more.

33.     The non-fungible nature of NFTs, combined with the authentication power of the blockchain, has given rise to a burgeoning NFT art and collectibles market.

5

34.     NFT sales reached record numbers in 2021, approaching $25 billion in sales.[2]

35.     The Namecoin blockchain was originally created in 2011 as a "fork" of the Bitcoin blockchain.  A "fork" refers to a change in the blockchain protocol that results in new branches, one that follows the previous protocol, and one that follows the new version.  In the case of Namecoin, unlike the Bitcoin blockchain, the added functionality included the ability of each Namecoin record to store data within its blockchain records.  This allows Namecoin records to be used like domain names, or to contain other values, such as references to external images that allow them to act as NFTs.

**The Quantum NFT**

36.     In 2014, Kevin McCoy minted an NFT titled, *Quantum,* on the Namecoin blockchain.

37.     The Namecoin-*Quantum* is considered the first NFT ever created.

38.     The Namecoin-*Quantum* contains the following in its metadata description:

I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry.[3]

---

[2] Elizabeth Howcroft, *NFT Sales Hit $25 Billion in 2021, But Growth Shows Signs of Slowing*, Reuters (January 11, 2022 10:50 AM EST) https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/ [https://web.archive.org/web/20220422015222/https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/].
[3] Name d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a/ [https://web.archive.org/web/20211117005510/https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a/] (last visited April 27, 2022).

6

**JA-50**

39.     The Namecoin blockchain requires a user who controls a Namecoin record to periodically update the record every 35,999 blocks.  This period amounts to approximately 200-250 days.

40.     If a user fails to update their record, control of that particular block record expires and can be claimed by another user.

41.     On or around January 2015, McCoy failed to update the Namecoin-*Quantum* blockchain record, rendering the record free to claim.

42.     On or around April 5, 2021, Free Holdings claimed the Namecoin-*Quantum* record on the Namecoin blockchain.

43.     The title to the Namecoin-*Quantum* NFT is currently held by Free Holdings.[4]

**FREE HOLDINGS ATTEMPTS TO CONTACT McCOY**

44.     Beginning around April 2021, Free Holdings began to repeatedly contact McCoy to discuss McCoy's sale of the Ethereum-*Quantum*, but received no communications in response.

45.     Free Holdings first attempted to contact McCoy on April 6, 2021, using the Twitter handle @EarlyNFT:



---

[4] *See id.*

7

46.    Free Holdings again reached out to McCoy on Twitter on April 12, 2021, in order

to discuss *Quantum*:



47.    Free Holdings made two further attempts to contact McCoy on April 30, 2021:



48.    Four days later, on May 3, 2021, Free Holdings again wrote to McCoy:

8



49.     On May 5, 2021, Free Holdings learned that Sotheby's was holding an auction that included McCoy's Ethereum-*Quantum*.

50.     On May 6, 2021, Free Holdings made its sixth attempt to contact McCoy about *Quantum*:



51.     McCoy never responded to any of Free Holdings' Twitter messages.

## THE *NATIVELY DIGITAL* AUCTION

52.     In or around May 2021, Sotheby's began marketing an art auction titled *Natively Digital: A Curated NFT Sale*, scheduled for June 2021.

9

53.     The purpose of *Natively Digital* was to market for auction "some of the earliest" NFTs.[5]

54.     Sotheby's included "Quantum by Kevin McCoy" as part of *Natively Digital*, and positioned and marketed the work as the first NFT ever created.

55.     Specifically, McCoy and Sotheby's promoted the Ethereum-*Quantum* as a seminal, first-of-its-kind, artistic work to help raise excitement and draw bidders for the sale of the Ethereum-*Quantum* in particular and the *Natively Digital* auction in general.

56.     McCoy stated that his idea for the Namecoin-*Quantum* was to create a work of art that represents "birth" and "provenance."[6]  The artwork is more than just pulsing images of color. Rather, according to McCoy, the nature of the work lies in the immutable engraving of information to the Namecoin blockchain.

57.     Indeed, McCoy described the Namecoin-*Quantum* as "an idea to use blockchain technology to create ***indelible*** provenance and ownership of digital images of this kind. *Quantum* was the first ever to be recorded in this way."[7]

58.     Sotheby's describes the Ethereum-*Quantum* as "seismic," and its creation as the dawn of a new artistic era:

> In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history.  They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories.  These works close chapters on the art histories that came before, while anchoring a new

---

[5] *See Natively Digital: A Curated NFT Sale* https://www.sothebys.com/en/digital-catalogues/natively-digital-a-curated-nft-sale [https://web.archive.org/web/20220420040406/https://www.sothebys.com/en/digital-catalogues/natively-digital-a-curated-nft-sale] (last visited May 5, 2022).

[6] *See Quantum,* https://www.mccoyspace.com/project/125/
[https://web.archive.org/web/20220226234629/https://www.mccoyspace.com/project/125/] (last visited April 27, 2022).

[7] *Natively Digital: A Curated NFT Sale,* https://www.mccoyspace.com/exhibition/180/
[https://web.archive.org/web/20220125000732/https://www.mccoyspace.com/exhibition/180/] (last visited April 27, 2022) (emphasis added).

flowering of human creativity. These prime movers occupy a singular position in art history. They came first. Kevin McCoy's *Quantum* is such a work. **Minted on 2nd May 2014 21:27:35**, or more precisely Namecoin block 174923, the NFT era quietly dawned. What a noise it makes today.[8]

59.    Sotheby's further describes *Quantum* as "the most art historically important work in the history of NFTs."[9]

60.    Leading up to and throughout the course of the auction, McCoy and Sotheby's materially misrepresented the status of the Ethereum-*Quantum* and the Namecoin-*Quantum*.

61.    Sotheby's stated that the Ethereum-*Quantum* was minted on May 2, 2014, when the Ethereum-*Quantum* was actually minted on May 28, 2021.[10]

62.    Sotheby's further falsely stated that the Namecoin-*Quantum* had been "burned" or otherwise "removed" from the Namecoin blockchain.

63.    Sotheby's retained nameless, a company that specializes in NFTs and provides consulting services to help launch and manage NFT projects, to assist Sotheby's with its *Natively Digital* auction.

64.    nameless wrote condition reports for the works in the *Natively Digital* auction, including the condition report for the Ethereum-*Quantum*.

65.    The Ethereum-*Quantum* condition report that Sotheby's published in connection with the *Natively Digital* auction falsely states that the Namecoin-*Quantum* "was removed from the system after not being renewed, and was effectively burned from the chain."[11]

---

[8] *Natively Digital: A Curated NFT Sale/ Lot 2*, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
[https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022) (emphasis in original).
[9] *Id.*
[10] *Id.*
[11] *Id.*

66.     In a video posted on the Sotheby's website promoting and marketing the Ethereum-*Quantum* and the *Natively Digital* auction, McCoy states that he originally minted *Quantum* on the Namecoin blockchain and that he "moved the original on chain data from a burned Namecoin token into a modern industry standard ERC-721 token, while preserving all of the original on chain information."[12]

67.     McCoy's statement is also false.

68.     A Namecoin blockchain record cannot be "removed," and the blockchain record for the Namecoin-*Quantum* has not been "removed" or "burned."

69.     The blockchain record for the Namecoin-*Quantum* remains active and under the control of Free Holdings.

70.     McCoy and Sotheby's promoted, marketed, and advertised their false and misleading claims concerning the Namecoin-*Quantum*, the Ethereum-*Quantum* and the *Natively Digital* auction throughout the United States using the Sotheby's website and other marketing materials.

71.     Free Holdings made repeated attempts to alert McCoy that Free Holdings owned title to the Namecoin-*Quantum*, and that the work had not been "burned" or "removed" from the Namecoin blockchain.

72.     Despite notice that Free Holdings controlled the Namecoin-*Quantum*, McCoy and Sotheby's continued to market the Namecoin-*Quantum* as having been "burned" or "removed" from the Namecoin blockchain.

---

[12] *Id.*

73.     McCoy and Sotheby's falsely and misleadingly represented that the

Ethereum-*Quantum* they were selling was the same one claimed by Free Holdings in 2021.

Specifically, Sotheby's described the Ethereum-*Quantum* as "[o]riginally minted on May 3, 2014

on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."[13]

This is a false and misleading statement because the Namecoin-*Quantum* is still extant on the

Namecoin blockchain and requires no preservation.

74.     McCoy similarly stated that the Namecoin-*Quantum* had been "burned," but was

now preserved on the Ethereum blockchain.[14]  This is also false and misleading because the

Namecoin-*Quantum* has not been "burned" or "removed" from the Namecoin blockchain, and

need not be preserved.

75.     McCoy and Sotheby's knew, or recklessly disregarded the fact, that the

Namecoin-*Quantum* was extant, had not been "burned" or "removed" from the Namecoin

blockchain, and was privately owned by Free Holdings.

76.     On June 1, 2021, Free Holdings made the first of six separate attempts to contact

McCoy by email, alerting McCoy that Free Holdings owned the Namecoin-*Quantum* and asking

to discuss the NFT.

77.     Sotheby's began its auction on June 3, 2021.

78.     Sotheby's ended its auction on June 10, 2021.

---

[13] *Natively Digital: A Curated NFT Sale/ Lot 2*, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
[https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022).
[14] *Id.*

79.     On June 17, 2021, Sotheby's Senior Vice President, Caroline Moustakis ("Moustakis"), spoke with Free Holdings about *Quantum* on a phone call.  During that call, Free Holdings told Moustakis that the description that Sotheby's posted of its Ethereum-*Quantum* NFT was inaccurate and misleading because the Namecoin-*Quantum* had not been "burned" or "removed" from the Namecoin blockchain, but rather was still active and controlled by Free Holdings.  Free Holdings requested that Sotheby's make public statements to correct the record, including making a statement that the Namecoin-*Quantum* remains active and in private hands, was not listed for sale as part of Sotheby's auction, and that the item Sotheby's auctioned was in fact an authorized print of the Namecoin-*Quantum* token.

80.     Free Holdings sent an email to Moustakis on June 18, 2021, to memorialize their phone conversation and reiterate its request that Sotheby's correct the public record concerning Free Holdings' ownership of the Namecoin-*Quantum*.

81.     Neither Moustakis, nor any other Sotheby's representative, responded to Free Holdings' June 18, 2021 email.

82.     Sotheby's refused and/or failed to comply with Free Holdings' request to issue a statement to correct the public record concerning the status and existence of the Namecoin-*Quantum*.

**McCOY AND SOTHEBY'S UNJUSTLY PROFIT FROM THEIR FALSE STATEMENTS**

83.     McCoy and Sotheby's statements are materially false and misleading, and are likely to influence, and have influenced, the purchasing decision of the relevant consumer.

84.     On August 23, 2021, McCoy and Sotheby's sold the newly re-minted Ethereum-*Quantum* to Twitter user @Sillytuna for a reported sum of $1,472,000.

14

85.    @SillyTuna is the Twitter account used and controlled by Alex Amsel ("Amsel").

86.    On August 23, 2021, Amsel tweeted about his purchase of the

Ethereum-*Quantum*: "First ever crypto art nft – Quantum has arrived chez Sillytuna.  Take that

VISA!":



87.    Despite repeated requests, and opportunities to do so, McCoy and Sotheby's have

failed or refused to retract their false statements or issue public corrective statements.

88.    On May 6, 2022, nameless retracted its condition report for the

Ethereum-*Quantum* in the following statement issued on its Twitter account:



89.     Rather than retract or issue corrective public statements, McCoy and Sotheby's continue to unjustly profit and trade on the false and misleading statements concerning the Namecoin-*Quantum* and the Ethereum-*Quantum*.

90.     The false and misleading statements issued by Sotheby's about both the Namecoin-*Quantum* and the Ethereum-*Quantum*, as well as the false video statements by McCoy concerning the same, remain on the Sotheby's website to this day.

91.     Sotheby's has used and continues to use its sale of the Ethereum-*Quantum* to establish itself as a legitimate vendor within the lucrative and growing NFT art and collectibles market.

92.     Sotheby's used the *Natively Digital* auction to jump-start its digital art metaverse offerings.  This includes the 2021 *Natively Digital* auction and its progeny, *Natively Digital 1.2: The Collectors*, and *Natively Digital 1.3: Generative Art*.  Indeed, Sotheby's spawned an entire Metaverse brand, in part, based on the successful sale of the Ethereum-*Quantum*, which Sotheby's marketed, promoted, and advertised using false and misleading statements concerning the Namecoin-*Quantum* and the Ethereum-*Quantum*.

93.     McCoy likewise touts his sale of the Ethereum-*Quantum* as the first NFT to establish himself within the NFT community and promote future projects.

94.     McCoy's sale of the Ethereum-*Quantum* lead to national media exposure.

16

95.     On March 3, 2022, the New York Times published an article entitled *One Year After Beeple, the NFT Has Changed Artists.  Has It Changed Art?*  The article states: "That first NFT that Kevin [McCoy] created . . . sold last June at Sotheby's for $1.4 million."[15]

96.     On June 14, 2021, McCoy told a Fox Business television audience that the Ethereum-*Quantum* he sold was the world's first NFT, announced a new NFT project, and declared his intent to continue creating NFT artwork as part of his art practice.

97.     The chyron featured below Fox Business host Stuart Varney and McCoy, read "FIRST-EVER NFT 'QUANTUM' SOLD FOR $1.47 MILLION," and remained visible for the entirety of the interview.



98.     Free Holdings' Namecoin-*Quantum* NFT has significant value due to its status as the first NFT and such value is being significantly diminished by the false and misleading statements made by McCoy and Sotheby's.

99.     Free Holdings has incurred damages to repair the reputation to the Namecoin-*Quantum* as a result of McCoy and Sotheby's false and misleading statements, including formal requests that McCoy and Sotheby's issue corrective public statements.

---

[15] Blake Gopnik, *One Year After Beeple, the NFT Has Changed Artists.  Has It Changed Art?* (March 3, 2022) https://www.nytimes.com/2022/03/03/arts/design/nft-art-beeple.html?msclkid=eacb622dcf0a11ec93b64ee394548d56 (last accessed May 8, 2022).

100.    Free Holdings expended $5,311.49 seeking to have McCoy and Sotheby's issue public statements correcting their false and misleading claims.

**FIRST CAUSE OF ACTION**
**Declaratory Judgment**

101.    Free Holdings repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

102.    Free Holdings is the rightful owner of the still-extant Namecoin-*Quantum* NFT.

103.    McCoy and Sotheby's falsely promoted, marketed, and advertised the Ethereum-*Quantum* as the first NFT.

104.    McCoy and Sotheby's promoted, marketed, and advertised the Ethereum-*Quantum* by falsely claiming that the Namecoin-*Quantum* had been "burned" or otherwise "removed" from the Namecoin blockchain.

105.    McCoy and Sotheby's statements concerning their Ethereum-*Quantum* and Free Holdings' Namecoin-*Quantum* are materially false and misleading.

106.    The Namecoin-*Quantum* pre-dates the Ethereum-*Quantum*, has not been "burned" or otherwise removed from the Namecoin blockchain, and is currently controlled and owned by Free Holdings.

107.    A justiciable controversy exists between Plaintiff Free Holdings and Defendants Sotheby's and McCoy concerning the existence or "burning" of the Namecoin-*Quantum* NFT.

108.    Free Holdings has no adequate remedy at law.

109.    As a result of the foregoing, Free Holdings seeks a judgment declaring that:
(a) Free Holdings is the rightful owner of the Namecoin-*Quantum*; (b) the Namecoin-*Quantum* has not been "burned" or otherwise "removed" from the Namecoin blockchain; and (c) the

18

statements issued by McCoy and Sotheby's in connection with their sale of the Ethereum-*Quantum* were false and misleading.

## SECOND CAUSE OF ACTION
### Unjust Enrichment Against McCoy and Sotheby's

110.    Free Holdings repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

111.    McCoy and Sotheby's have derived profits from the false and misleading statements concerning the promotion, marketing, advertisement, and sale of the Ethereum-*Quantum*.

112.    McCoy and Sotheby's continue to enrich themselves through future projects by falsely promoting and marketing their successful sale of the Ethereum-*Quantum*.

113.    McCoy and Sotheby's profits are obtained at Free Holdings' expense.

114.    It is against equity and good conscience to permit McCoy and Sotheby's to retain the profits they obtained through the sale of the Ethereum-*Quantum*, as well as the profits they derive from projects marketed and promoted on the basis of the sale of the Ethereum-*Quantum*.

115.    As a result of the foregoing, Free Holdings has suffered and will continue to suffer damages.

116.    The amount by which McCoy and Sotheby's have been unjustly enriched will be proven at trial but is not less than $1,472,000, together with interest thereon.

## THIRD CAUSE OF ACTION
### Slander of Title Against McCoy and Sotheby's

117.    Free Holdings repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

118.    McCoy and Sotheby's made false and misleading statements about the status of both the Namecoin-*Quantum* NFT and the Ethereum-*Quantum* NFT.

119.    McCoy and Sotheby's falsely stated that the Namecoin-*Quantum* was "burned" or otherwise "removed" from the Namecoin blockchain.

120.    McCoy and Sotheby's further falsely stated that the Ethereum-*Quantum* NFT they sold at auction was the first NFT ever created.

121.    McCoy and Sotheby's refused and/or failed to issue corrective public statements, and continue to describe the Ethereum-*Quantum* they sold as the world's first NFT, and also maintain that the Namecoin-*Quantum* has been "burned," in order to promote future projects and establish their brands within the NFT art and collectibles market.

122.    McCoy and Sotheby's statements are materially false and misleading.

123.    The Namecoin-*Quantum* pre-dates the Ethereum-*Quantum*, has not been "burned," and is currently controlled and owned by Free Holdings.

124.    McCoy and Sotheby's statements were reasonably calculated to cause harm to Free Holdings and/or were made with reckless disregard for the truth.

125.    As a direct and proximate cause, Free Holdings has incurred special damages.

126.    As a result of the foregoing, Free Holdings seeks judgment against McCoy and Sotheby's in an amount to be determined at trial and estimated to exceed $5,311.49, plus interest and attorney's fees as allowed by law.

## FOURTH CAUSE OF ACTION
### Deceptive and Unlawful Trade Practices GBL § 349 Against McCoy and Sotheby's

127.    Free Holdings repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

20

128.    McCoy and Sotheby's engaged in consumer-oriented conduct by marketing and promoting the Ethereum-*Quantum* as the first NFT ever created in order to draw more and higher bids for the Ethereum-*Quantum*, the *Natively Digital* auction, additional and/or future *Natively Digital* auction series', and the Sotheby's Metaverse brand.

129.    McCoy and Sotheby's continue to engage in consumer-oriented conduct by marketing and promoting themselves and their auctions and projects on the basis of the false statements they issued about the Namecoin-*Quantum* and Ethereum-*Quantum*.

130.    McCoy and Sotheby's falsely stated that the Namecoin-*Quantum* was "burned" or otherwise "removed" from the Namecoin blockchain.

131.    McCoy and Sotheby's further falsely stated that the Ethereum-*Quantum* NFT they sold at auction was the first NFT ever created.

132.    McCoy and Sotheby's statements are materially false and misleading.

133.    The Namecoin-*Quantum* pre-dates the Ethereum-*Quantum*, has not been "burned," and is currently controlled and owned by Free Holdings.

134.    McCoy and Sotheby's refused and/or failed to issue corrective public statements.

135.    Free Holdings notified McCoy and Sotheby's that Free Holdings controlled the *Quantum* NFT on the Namecoin blockchain, and that the Namecoin-*Quantum* had not been "burned" or "removed" from the Namecoin blockchain.

136.    McCoy and Sotheby's sold the Ethereum-*Quantum* NFT for $1,472,000.

137.    McCoy and Sotheby's false statements have caused Free Holdings damages.

138.    If the defendant acted willfully or knowingly, punitive damages may be awarded.  Treble damages are available where a defendant's actions were intentionally fraudulent.

139.    The value of the Namecoin-*Quantum* NFT owned by Free Holdings has been significantly damaged as a result of all Defendants' statements and conduct.

**FIFTH CAUSE OF ACTION**
**Commercial Disparagement Against McCoy and Sotheby's**

140.    Free Holdings repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

141.    McCoy and Sotheby's made false and misleading statements about the status of both the Namecoin-*Quantum* NFT and the Ethereum-*Quantum* NFT.

142.    McCoy and Sotheby's falsely stated that the Namecoin-*Quantum* was "burned" or otherwise "removed" from the Namecoin blockchain.

143.    McCoy and Sotheby's further falsely stated that the Ethereum-*Quantum* NFT they sold at auction was the first NFT ever created.

144.    McCoy and Sotheby's refused and/or failed to issue corrective public statements, and continue to describe the Namecoin-*Quantum* as having been "burned," and the Ethereum-*Quantum* that they sold as the world's first NFT, in order to promote future projects and establish their brands within the NFT art and collectibles market.

145.    McCoy and Sotheby's statements are materially false and misleading.

146.    The Namecoin-*Quantum* pre-dates the Ethereum-*Quantum*, has not been "burned," and is currently controlled and owned by Free Holdings.

22

147. McCoy and Sotheby's statements were reasonably calculated to cause harm to Free Holdings and/or were made knowingly or with reckless disregard for the truth.

148. As a direct and proximate cause, Free Holdings has incurred special damages. As a result of the foregoing, Free Holdings seeks judgment against McCoy and Sotheby's in an amount to be determined at trial and estimated to exceed $5,311.49, plus interest and attorney's fees as allowed by law.

## SIXTH CAUSE OF ACTION
### 15 U.S.C. § 1125(a) Lanham Act Claim Against McCoy and Sotheby's

149. Free Holdings repeats and realleges Paragraphs 1 through 100 as if fully set forth herein.

150. McCoy and Sotheby's issued statements about the status of both the Namecoin-*Quantum* NFT and the Ethereum-*Quantum* NFT that were false or misleading representations, descriptions, or designations of origin.

151. McCoy and Sotheby's falsely stated that the Namecoin-*Quantum* was "burned" or otherwise "removed" from the Namecoin blockchain.

152. McCoy and Sotheby's further falsely stated that the Ethereum-*Quantum* NFT they sold at auction was the first NFT ever created.

153. The Namecoin-*Quantum* pre-dates the Ethereum-*Quantum*, has not been "burned," and is currently controlled and owned by Free Holdings.

154. McCoy and Sotheby's false or misleading representations, descriptions, or designations of origin were used in commercial advertisements or promotions in order to market, promote, and advertise the sale of the Ethereum-*Quantum* and the *Natively Digital* auction.

23

155.    McCoy and Sotheby's false or misleading representations, descriptions, or designations of origin deceived or was likely to mislead or confuse consumers.

156.    McCoy and Sotheby's false or misleading representations, descriptions, or designations of origin were used to promote, market, and advertise the sale of the Ethereum-*Quantum* and the *Natively Digital* auction in interstate commerce.

157.    McCoy and Sotheby's advertisement and sale of the Ethereum-*Quantum* in the *Natively Digital* auction left a false impression on consumers, namely that the NFT sold in the *Natively Digital* Auction was the "first-ever" NFT.

158.    McCoy and Sotheby's false or misleading representations, descriptions, or designations of origin caused damage to Free Holdings in an amount to be determined at trial, but not less than $1,472,000.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

(a)    on Count I, declaring and adjudicating that (i) Free Holdings is the rightful owner of the Namecoin-based *Quantum*; (ii) the Namecoin-*Quantum* has not been burned or otherwise removed from the Namecoin blockchain; and (iii) the statements issued by McCoy and Sotheby's in connection with their sale of the Ethereum-*Quantum* were false and misleading.

(b)    on Count II, damages against Defendants in an amount to be determined at trial;

(c)    on Count III, damages against Defendants in an amount to be determined at trial; including damages provided under GBL § 349, including treble and or punitive damages;

(d)    on Count IV, damages against Defendants in an amount to be determined at trial;

(e)    on Count V, damages against Defendants in an amount to be determined at trial;

(f)    on Count VI, damages against Defendants in an amount to be determined at trial; including damages under 15 U.S.C. § 1117 for profits, damages and costs, and attorneys' fees;

(g)     On Counts I, II, III, IV, V, and VI a preliminary and permanent injunction enjoining and restraining Defendants and their respective officers, directors, agents, servants, employees, and attorneys, as well as those in active concert and participation with them from advertising, marketing, or otherwise promoting the Namecoin-*Quantum* as having been "burned" or otherwise removed from the Namecoin blockchain, as well enjoining Defendants from advertising, marketing, otherwise promoting the sale of the Ethereum-*Quantum* NFT as the world's first NFT;

(h)     On Counts I, II, III, IV, V, and VI injunctive relief requiring Defendants to engage in corrective advertising, including but not limited to making public statements and creating corrective advertising in major industry publications, and direct communication with any persons who are known to have purchased the Ethereum-*Quantum* NFT, or sold or bid on its sale;

(i)     all costs, disbursements, and attorney's fees incurred in connection with this action; and

(j)     such other and further relief under law or equity as the Court may deem just and proper.

<strong>PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.</strong>

Dated:  May 9, 2022

Respectfully submitted,

**FALCON RAPPAPORT & BERKMAN PLLC**

*Attorneys for Plaintiff*

By: /s/Moish Peltz
Moish E. Peltz, Esq.
Kenneth J. Falcon, Esq.
Steven C. Berlowitz, Esq.
265 Sunrise Highway, Suite 50
Rockville Centre, NY 11570
Telephone: (516) 599-0888
mpeltz@frblaw.com
kfalcon@frblaw.com
sberlowitz@frblaw.com

**JA-69**

Case 1:22-cv-00881-JLC   Document 48   Filed 05/10/22   Page 1 of 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/10/2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

FREE HOLDINGS INC.,                          Index No. 1:22-cv-00881 (LGS)

        Plaintiff,

        v.                                              **NOTICE OF VOLUNTARY
                                                        DISMISSAL PURSUANT TO F.R.C.P.
                                                        41(a)(1)(A)(i)**

KEVIN McCOY, SOTHEBY'S INC., and
NAMELESS CORPORATION,

        Defendants.

-----------------------------------------------------X

**NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41(a)(1)(A)(i)**

      Pursuant to Pursuant to F.R.C.P. 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure,
the plaintiff Free Holdings, Inc., and or their counsel, hereby give notice that the above-
captioned action is voluntarily dismissed, with prejudice, against the defendant nameless
(misidentified as "Nameless Corporation" in the complaint).

Date:  May 9, 2022

                    FALCON RAPPAPORT & BERKMAN PLLC

                    By: /s/ Moish E. Peltz
                    Moish E. Peltz
                    265 Sunrise Highway, Suite 50
                    Rockville Centre, New York  11570
                    Tel. (516) 599-0888

                    *Attorneys for Plaintiff*

        **SO ORDERED.**

        Dated: May 10, 2022
               New York, New York

                          JAMES L. COTT
                          United States Magistrate Judge

JA-70

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   5/16/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FREE HOLDINGS INC.,

　　　　　　　*Plaintiff,*

-against-

KEVIN McCOY and SOTHEBY'S INC.,

　　　　　　　*Defendants.*

---

Case No.: 1:22-cv-00881

**STIPULATION AND**
**ORDER**

---

**WHEREAS,** on or about February 1, 2022, plaintiff Free Holdings Inc. ("Plaintiff") filed its Complaint against defendants Kevin McCoy ("McCoy"), Sotheby's Inc. ("Sotheby's"), Nameless Corporation ("Nameless") and Alex Amsel ("Amsel"); and

**WHEREAS,** on or about March 7, 2022, Plaintiff voluntarily dismissed the action, without prejudice, against Amsel; and

**WHEREAS,** on or about April 1, 2022, McCoy, Sotheby's and Nameless jointly filed a pre-motion to dismiss letter with the Court seeking to dismiss all claims in the Complaint; and

**WHEREAS,** on or about April 13, 2022, the Court so ordered a Stipulation between the parties providing that: (i) Plaintiff could file an Amended Complaint by May 9, 2022; (ii) McCoy's, Sotheby's and Nameless's deadline to answer, move or otherwise respond to the initial Complaint was adjourned *sine die*; and (iii) the parties were to confer to set a new deadline for McCoy, Sotheby's and Nameless to answer, move or otherwise respond to the anticipated Amended Complaint; and

**WHEREAS,** on or about May 9, 2022, Plaintiff voluntarily dismissed the action, with prejudice, against Nameless; and

**WHEREAS,** on May 9, 2022, Plaintiff filed its Amended Complaint against McCoy and Sotheby's; and

1

JA-71

**WHEREAS**, Plaintiff, McCoy and Sotheby's have conferred to set a deadline for McCoy and Sotheby's to answer, move or otherwise respond to the Amended Complaint.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED**, by and between Plaintiff, McCoy and Sotheby's, that McCoy and Sotheby's shall each (or jointly) answer, move or otherwise respond to the Amended Complaint by **June 30, 2022**.

Dated: New York, New York
        May 16, 2022


FALCON RAPPAPORT & BERKMAN PLLC

By: /s/Moish E. Peltz/
    Moish E. Peltz
    (mpeltz@frblaw.com)
    1185 Avenue of Americas
    New York, New York 10036
    Tel: (212) 203-3255

*Attorneys for Plaintiff*


PRYOR CASHMAN LLP

By: /s/William L. Charron/
    William L. Charron
    (wcharron@pryorcashman.com)
    7 Times Square
    New York, New York 10036
    Tel: (212) 421-4100

*Attorneys for Defendant McCoy*


ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/Evan Rothstein/
    Evan Rothstein (*pro hac vice*)
    (evan.rothstein@arnoldporter.com)
    1144 Fifteenth Street, Suite 3100
    Denver, CO 80202
    Tel: (303) 863-2308

*Attorneys for Defendant Sotheby's Inc.*


**SO ORDERED.**

Dated: May 16, 2022
       New York, New York

JAMES L. COTT
United States Magistrate Judge

2

JA-72

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREE HOLDINGS INC.,

*Plaintiff*,

-against-

KEVIN McCOY and SOTHEBY'S INC.,

*Defendants*.

ECF CASE

Case No.: 1:22-cv-00881-JLC

**NOTICE OF DEFENDANT SOTHEBY'S INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

PLEASE TAKE NOTICE that upon, (i) Defendant Sotheby's Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint, joining the motion filed by Defendant Kevin McCoy and all supporting papers therein, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6); and (ii) the Declaration of Evan M. Rothstein in Support of Defendant Sotheby's Inc.'s Motion to Dismiss the Amended Complaint and the exhibits attached thereto, Defendant Sotheby's Inc. moves this Court, before the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, on a date and time to be determined by the Court, for an Order dismissing with prejudice all claims asserted by Plaintiff Free Holdings Inc. against it in the Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and for such other relief as the Court may deem just and proper.  Plaintiff's opposition to this motion shall be filed on or before August 15, 2022, and Defendants' replies in further support of their motions shall be due on or before September 2, 2022. PLEASE TAKE FURTHER NOTICE that, in connection with the above, Sotheby's also seeks an order granting leave for video footage to be filed as exhibits in this matter, a proposed order for which is filed concurrently herewith.

Dated:     New York, New York
           June 30, 2020

                                   ARNOLD & PORTER KAYE SCHOLER LLP

                              By    /s/ Evan M. Rothstein
                                   Evan M. Rothstein

                                   Evan M. Rothstein (admitted *pro hac vice*)
                                   1144 Fifteenth Street | Suite 3100
                                   Denver, CO 80202-2569
                                   T: +1 303.863.2308
                                   F: +1 303.863.1000
                                   Evan.Rothstein@arnoldporter.com

                                   Theresa M. House
                                   250 West 55th Street
                                   New York, NY 10019-9710
                                   Telephone: +1 212.836.8000
                                   Fax: +1 212.836.8689
                                   Theresa.House@arnoldporter.com

                                   *Attorneys for Defendant Sotheby's Inc.*

TO:

Moish E. Peltz                          William L. Charron
Falcon Rappaport & Berkman PLLC         Nicolas G. Saady
1185 Avenue of the Americas             Robert J. deBrauwere
Ste Third Floor                         Pryor Cashman LLP
New York, NY 10036                      7 Times Square
212-203-3255                            New York, NY 10036
Email: mpeltz@frblaw.com                212-421-4100
                                        Email: wcharron@pryorcashman.com
Jessica Moore                           Email: nsaady@pryorcashman.com
Falcon Rappaport & Berkman PLLC         Email: rdebrauwere@pryorcashman.com
265 Sunrise Highway
Suite 50
Rockville Centre, NY 11570
516-708-3546
Email: jmoore@frblaw.com

*Attorneys for Plaintiff*                *Attorneys for Defendant Kevin McCoy*

US 172137898v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| FREE HOLDINGS INC., | ECF CASE |
| *Plaintiff,* | Case No.: 1:22-cv-00881-JLC |
| -against- | |
| KEVIN McCOY and SOTHEBY'S INC., | |
| *Defendants.* | |

## DEFENDANT SOTHEBY'S INC.'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

Evan M. Rothstein (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2569
T: +1 303.863.2308
F: +1 303.863.1000
Evan.Rothstein@arnoldporter.com

Theresa M. House
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
T: +1 212.836.8000
F: +1 212.836.8689
Theresa.House@arnoldporter.com

*Attorneys for Defendant Sotheby's Inc.*

JA-75

**TABLE OF CONTENTS**

Preliminary Statement.................................................................................................... 1

Factual Background........................................................................................................ 3

   The Parties ................................................................................................................... 3

   The Content of the Challenged Statements.................................................................. 3

   The Immediate Context of the Challenged Statements ................................................ 5

   The Broader Context of the Challenged Statements..................................................... 8

Procedural History.......................................................................................................... 9

Argument...................................................................................................................... 10

I.    PLAINTIFF'S CLAIMS FOR SLANDER OF TITLE AND PRODUCT
      DISPARAGEMENT FAIL BECAUSE THE CHALLENGED STATEMENTS ARE
      PROTECTED OPINION; ALTERNATIVELY, SUBSTANTIALLY TRUE; AND
      PUBLISHED WITHOUT MALICE. .............................................................. 10

      A.     Both Claims Fail Because the Challenged Statements
            Are Protected Opinion ...................................................................... 11

      B.     The Challenged Statements Are Substantially True .............................. 17

      C.     The FAC Fails to Allege That Sotheby's Acted With Actual Malice.... 18

II.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM ALSO FAILS AGAINST
      SOTHEBY'S BECAUSE NO BENEFIT FLOWED DIRECTLY FROM PLAINTIFF
      AND IT IS DUPLICATIVE OF THE INJURIOUS FALSEHOOD CLAIMS ......... 20

III.  PLAINTIFF'S DECLARATORY JUDGMENT CLAIM SEEKS AN ANSWER TO
      A HYPOTHETICAL QUESTION ON WHICH THERE IS NO ADVERSITY TO
      SOTHEBY'S ....................................................................................... 21

      CONCLUSION ........................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*600 W. 115th St. Corp. v. Von Gutfeld,*
    80 N.Y.2d 130, 589 N.Y.S.2d 825 (1992) ........................................................... 12

*Bilinski v. Keith Haring Found., Inc.,*
    96 F.Supp.3d 35 (S.D.N.Y. 2015) ............................................................... 20, 21

*Biro v. Condé Nast,*
    807 F.3d 541 (2d Cir. 2015) .......................................................................... 19

*Biro v. Condé Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013),
    *aff'd,* 807 F.3d 541 (2d Cir. 2015), *aff'd,* 622 F. App'x 67 (2d Cir. 2015) ............ 14

*Biro v. Condé Nast,*
    No. 11-CV-4442 (JPO), 2014 WL 4851901 (S.D.N.Y. Sept. 30, 2014),
    *aff'd in part,* 807 F.3d 541 (2d Cir. 2015),
    *aff'd,* 622 F. App'x 67 (2d Cir. 2015) ................................................................ 5

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984) .................................................................................... 11

*Brian v. Richardson,*
    87 N.Y.2d 46, 637 N.Y.S.2d 347 (1995) ..................................................... *passim*

*Chamilia, LLC v. Pandora Jewelry, LLC,*
    No. 04-CV-6017 (KMK), 2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007) ......... 10, 19

*Condit v. Dunne,*
    317 F. Supp. 2d 344 (S.D.N.Y. 2004) .............................................................. 14

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.,*
    551 F. Supp. 3d 320 (S.D.N.Y. 2021),
    *aff'd sub. nom. Daleiden v. Planned Parenthood Fed'n of Am.,* No. 21-2068-
    cv, 2022 WL 1013982 (2d Cir. April 5, 2022) .................................................... 17

*Dillon v. City of New York,*
    261 A.D.2d 34, 704 N.Y.S.2d 1 (1st Dep't 1999) ............................................... 13

*Dow Jones & Co. v. Harrods, Ltd.,*
    237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd,* 346 F.3d 357 (2d Cir. 2003) ............ 22

*Drug Research Corp. v. Curtis Publ'g Co.*,
  7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960) ................................................................17

*Edwards v. Nat'l Audubon Soc'y*,
  Inc., 556 F.2d 113, 121 (2d Cir. 1977). ...........................................................19

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48 (2d Cir. 2002) ...............................................................................10

*Ganske v. Mensch*,
  480 F. Supp. 3d 542 (S.D.N.Y. 2020) ..............................................................14

*Gross v. New York Times Co.*,
  82 N.Y.2d 146, 603 N.Y.S.2d 813 (1993) .......................................................13

*Hengjun Chao v. Mount Sinai Hosp.*,
  476 F. App'x 892 (2d Cir. 2012) ......................................................................21

*Immuno AG. v. Moor–Jankowski*,
  77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991) ................................................ *passim*

*John Grace & Co. v. Todd Assocs., Inc.*,
  188 A.D.2d 585, 591 N.Y.S.2d 477 (2d Dep't 1992) .......................................11

*Kitchen v. Sothebys*,
  18 Misc.3d 1132(A), 859 N.Y.S. 2d 895 (N.Y. Civ. Ct. 2008) ..................18, 19

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997) .............................................................................12

*Mann v. Abel*,
  10 N.Y.3d 271, 856 N.Y.S.2d 31 (2008) .........................................................16

*Markowitz v. Republic Nat'l Bank of N.Y.*,
  651 F.2d 825 (2d Cir. 1981) .............................................................................19

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) .............................................................................................12

*MMS Trading Co. Pty Ltd. v. Hutton Toys, LLC*,
  No. 20-CV-1360 (MKB), 2021 WL 1193947 (E.D.N.Y. Mar. 29, 2021) ..........11

*Mr. Chow of New York v. Ste. Jour Azur S.A.*,
  759 F.2d 219 (2d Cir. 1985) .............................................................................13

*Newport Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*,
  18 A.D.3d 454, 794 N.Y.S.2d 426 (2nd Dep't 2005) .......................................11

*Penn Warranty Corp. v. DiGiovanni,*
    10 Misc. 3d 998, 810 N.Y.S.2d 807 (Sup. Ct., N.Y. Cnty. 2005) ................................4, 11, 13

*Rutty v. Krimko,*
    No. 17-cv-6090 (BMC), 2018 WL 1582290 (E.D.N.Y. Mar. 30, 2018) ...............................19

*Sandals Resorts Int'l Ltd. v. Google, Inc.,*
    86 A.D.3d 32, 925 N.Y.S.2d 407 (1st Dep't 2011) ................................................13

*Sandler v. Simoes,*
    609 F. Supp. 2d 293 (S.D.N.Y. 2009)..............................................................4, 12

*Silverman v. Daily News, L.P.,*
    129 A.D.3d 1054, 11 N.Y.S.3d 674 (2d Dep't 2015).........................................16, 17

*Steinhilber v. Alphonse*
    68 N.Y.2d 283, 508 N.Y.S.2d 901 (1986) ..............................................................13

*Tannerite Sports, LLC v. NBCUniversal News Grp.,*
    864 F.3d 236 (2d Cir. 2017)...........................................................................17

**Statutes**

Lanham Act.......................................................................................................1, 3

N.Y. Gen. Bus. L. § 349 ...................................................................................1, 3

C.P.L.R. § 3016(a) ..................................................................................................4

**Other Authorities**

New York State Constitution Article I, Section 8.................................................2, 12

U.S. Constitution First Amendment.....................................................................2, 12

2 Robert D. Sack, Sack on Defamation § 13 (5th ed. 2017)...................................10, 11

Defendant Sotheby's Inc. ("Sotheby's") respectfully moves and joins in the motion filed by Defendant Kevin McCoy ("McCoy") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss Plaintiff Free Holdings Inc.'s ("Plaintiff") Amended Complaint dated May 9, 2022 (ECF # _) (the "McCoy Motion"), and adopts and incorporates herein the arguments raised there. Additionally, Sotheby's respectfully submits this memorandum of law in support of its motion to emphasize additional grounds for dismissing all claims against it.

## PRELIMINARY STATEMENT

Despite over a year's time, two complaints, and the benefit of Defendants' pre-conference motion letter detailing the deficiencies of Plaintiff's original pleading, Plaintiff still fails to allege any viable claim. Defendant McCoy filed the McCoy Motion seeking dismissal of the Amended Complaint in full because: (1) none of Plaintiff's claims are justiciable because Plaintiff lacks standing insofar as it cannot establish injury-in-fact and its claims are not ripe; (2) Plaintiff's cause of action for unjust enrichment fails because it cannot allege Defendants were enriched "at Plaintiff's expense" and there is no "connection" between Plaintiff and Defendants as required to state that claim; (3) Plaintiff's cause of action for slander of title fails to adequately allege both malice and special damages, each an independently fatal defect to that claim; (4) Plaintiff fails to allege that Defendants' conduct caused public harm, as required to state a claim under N.Y. Gen. Bus. L. § 349; (5) Plaintiff's commercial disparagement claim fails for the same reason as its claim for slander of title; (6) Plaintiff has not alleged literally or impliedly false statements sufficient to support its Lanham Act claim and also has not viably pleaded causation of harm; and finally (7) Plaintiff's declaratory judgment claim should be dismissed as duplicative. Each of these reasons (to which Sotheby's joins) justify dismissing Plaintiffs' Amended Complaint with prejudice. But there's more.

1

Plaintiff's claims as to Sotheby's fail for additional reasons. The gravamen of each claim is that it was false for Defendants (Sotheby's included) to assert that the admittedly expired Namecoin Quantum NFT was "burned" or "removed" from the blockchain, and that the Ethereum Quantum "preserved" the data associated with the original Namecoin Quantum NFT. Plaintiff's arguments attacking these statements, however, are barred by bedrock principles of freedom of speech.

First, Plaintiff's twin claims for slander of title and commercial disparagement (often referred to as two branches of the tort of "injurious falsehood") fail because the statements underlying those claims (the "Challenged Statements") are protected opinion. Considered in their context (as they must be), the Challenged Statements are, on the one hand, too vague and imprecise to constitute a statement of fact, and, on the other, are accompanied by a thorough recitation of the facts upon which they are based, rendering them "pure opinion" that is fully protected by the First Amendment to the Constitution and Article I, Section 8 of the New York State Constitution, which provides even broader protection to statements of opinion than the Federal Constitution.

Second, Plaintiff's injurious falsehood claims also fail because, even if they could be construed as statements of fact, they are substantially true. Read in their entirety, as they must be, the publications containing the Challenged Statements fully acknowledge that the Quantum artwork was originally minted as an NFT on the Namecoin blockchain, and after that Namecoin entry expired (as Plaintiff admits that it did), the data from the original entry was preserved by screenshot and other methods and published in the new Ethereum entry. Accordingly, the version of the truth as alleged by Plaintiff would have no different effect on the mind of a reasonable reader than what is conveyed by the Challenged Statements, rendering them substantially true as a matter of law and thus not actionable, including at the pleading stage.

2

Third, both claims fail for the additional and independent reason that Plaintiff cannot allege that Sotheby's acted with malice—it was merely publishing statements regarding its own interests, and in doing so, relied upon the bona fides of a condition report.  These facts are admitted by Plaintiff and are dispositive of the issue of malice.

Finally, Plaintiff's additional claims—for unjust enrichment, N.Y. Gen. Bus. L. § 349, the Lanham Act, and declaratory judgment—fail (in addition to those reasons addressed in the McCoy Motion) because Plaintiff cannot escape the Constitutional protections that bar its injurious falsehood claims simply by denominating its claims under a different heading.  Further, Sotheby's obtained no benefit from Plaintiff, further barring its unjust enrichment claim, and has no legal ability to remedy Plaintiff's claim of ownership, which is fatal to the declaratory judgment claim.

Accordingly, for the foregoing, as well as the reasons set forth in the McCoy Motion, the Amended Complaint (the "FAC")[1] should be dismissed in full and with prejudice.

## FACTUAL BACKGROUND[2]

### The Parties

Plaintiff is a Canadian corporation that claims ownership of the Namecoin-Quantum NFT. (FAC ¶¶ 5, 20.)  McCoy is the artist who authored the Quantum artwork that was originally minted with the Namecoin-Quantum NFT and is associated with the Ethereum-Quantum NFT.  (FAC ¶¶ 2, 6, 7, 21.)  Sotheby's is a New York-based auction house that ran an auction for sale of the Ethereum-Quantum NFT in 2021.  (FAC ¶¶ 8, 22.)

### The Content of the Challenged Statements

Plaintiff's claims are based on three statements it attributes to Sotheby's, each taken from the auction listing for the Quantum artwork, which is cited and quoted throughout the FAC (the

---

[1] A true and correct copy of the FAC is annexed as Exhibit A to the Declaration of Evan M. Rothstein, dated June 30, 2022 (the "Rothstein Decl.") and filed concurrently herewith.
[2] Sotheby's assumes familiarity with the factual background set forth in the McCoy Motion.  (ECF # _.)

"Auction Listing")[3]:  (1) a statement in the "Condition Report" section of the Auction Listing prepared by "nameless Corporation" (the "Condition Report"), that the Namecoin listing for Quantum had been "burned" or otherwise "removed" from the Namecoin blockchain (the "First Challenged Statement"); (2) a statement in a video posted within the Auction Listing in which McCoy states that he "moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information" (the "Second Challenged Statement"); and (3) a statement in the "Description" section of the Auction listing that Quantum was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist" (the "Third Challenged Statement").[4]  (FAC ¶¶ 9-10, 62, 65-68, 73.)

Plaintiff alleges that the First and Second Challenged Statements are false because in its view "[a] Namecoin blockchain record cannot be 'removed,'" and "[t]he blockchain record for the Namecoin-Quantum has not been 'removed' or 'burned.'"  (FAC ¶¶ 11-13, 67-69.)  The key words underlying Plaintiff's claims within those statements are "removed" and "burned."  But the actual wording of the Auction Listing does not only say "burned"—the full text of the Second Challenged Statement states:  "[The Namecoin-Quantum entry] was removed from the system after not being renewed, and was _effectively burned_ from the chain."  (_Compare_ FAC ¶¶ 10-12 _with id._ ¶ 65 (emphasis added).)  Plaintiff alleges that the Third Challenged Statement is "false and misleading … because the Namecoin-Quantum is still extant on the Namecoin blockchain and requires no preservation."  (FAC ¶¶ 73-74.)  Thus, the key word supporting that component of Plaintiff's claim

---

[3] (_See, e.g._, FAC  ¶¶ 9 n.1, 58 n.8, 59 n.9, 61 n.10, 65 n.11, 66 n.12, 73 n.13, 74 n.14.)

[4] "CPLR § 3016(a) requires that the particular words complained of be set forth in a complaint alleging defamation. Thus, in evaluating plaintiff's claim, only the words alleged in the complaint as constituting the libel may be considered by the Court as the actionable language.  [For this reason,] claims of other unidentified defamations … may not be relied upon . . . ."  _Penn Warranty Corp. v. DiGiovanni_, 10 Misc. 3d 998, 1002, 810 N.Y.S.2d 807, 812 (Sup. Ct., N.Y. Cnty. 2005) (applying C.P.L.R. § 3016(a) to trade libel claim); _see Sandler v. Simoes_, 609 F. Supp. 2d 293, 301, 303 (S.D.N.Y. 2009) (applying C.P.L.R. § 3016(a) in a federal action).

is "preservation" i.e., "preserved."

**The Immediate Context of the Challenged Statements**

  The Court may properly consider the entirety of the content of the Auction Listing, which is attached as Exhibit B to the Rothstein Decl., because it is cited in and relied upon by Plaintiff in the Complaint.[5]

  The Auction Listing begins with an image of McCoy's Quantum artwork, followed by a "Description" section that lists McCoy as the author of the artwork, his biographical details, the dates over which the Quantum artwork was created (2014-2021), and information about the associated "Non-fungible token ERC-721."  (Rothstein Decl., Ex. B.)  In that same section, the Auction Listing discloses that the Quantum artwork was  "[o]riginally minted on May 3, 2014 on the Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."  (*Id.*)

  Immediately below this "Description" of the Quantum artwork, the Auction Listing displays the Condition Report on the same page.  The Condition Report describes the Quantum artwork as follows:

> The hash and all the information <u>about the artwork</u> are stored on the Ethereum blockchain, and therefore cannot be modified. <u>This token was minted May 2021, but the referenced pieces were originally made public in 2014, with a link to the image hosted on the Namecoin network.</u> The token is a very early example of utilizing a blockchain token to identify the provenance of a piece of art. <u>Documents contained within the media bundle hosted on IPFS indicate the date and block location that the Namecoin DNS pointer was set to point to mccoyspace.com, and shows the transactions used at the time to create this trail.</u> To avoid domain squatting, Namecoin was designed to include removal of pointers after 36,000 blocks. <u>Accordingly, this specific Namecoin entry was removed from the system after not being renewed, and was effectively burned from the chain.</u>

---

[5] On a Rule 12(b)(6) motion, the Court may consider the allegations in the Complaint, as well as documents that are incorporated by reference, documents that are "integral" even if not incorporated, and judicially noticeable facts. *See* McCoy Motion; *see also Biro v. Condé Nast*, No. 11-CV-4442 (JPO), 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014), ("On a Rule 12(b)(6) or Rule 12(c) motion, the court may consider documents that are incorporated by reference in or are integral to the complaint. In a defamation case, this may include the entirety of a challenged publication that is excerpted in the complaint."; allowing consideration of both the entire publication and articles that were hyperlinked within it), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F. App'x 67 (2d Cir. 2015).

(*Id.* (emphasis added).)   The Condition Report continues:

> "nameless™ Condition Reports <u>are statements of opinion only and not representation of fact</u>. The reports are non-exhaustive and based solely on information provided to nameless and/or obtained by nameless prior to sale, unless otherwise specified. The reports may make reference to a lot's smart contract details and history, metadata and/or media file specifics, storage, and/or origin, and other token features, however such reports may not refer to or identify all faults and potential vulnerabilities that may exist.  …Condition reports are not an alternative to carrying out your own inspection and investigation of a lot and/or seeking your own independent professional advice. <u>All auction participants should inspect a lot and satisfy oneself as to its condition prior to bidding</u>. The responsibility for ascertaining the condition of a lot remains with the purchaser, and nameless cannot be held responsible for the content of condition reports, which are provided for guidance only in assessing the condition of a lot."

(*Id.* (emphasis added).)

The Auction Listing then displays a lengthy "Catalogue Note," which analyzes the Quantum artwork and its artistic significance.   The Catalogue Note begins with two videos of McCoy, recorded transcripts of which are annexed as Exhibits D ("Kevin McCoy-Quantum") and F ("QuantumToken-McCoy") to the Rothstein Decl., which also attaches DVDs and contains links to the videos available online, respectively.   In the first video, McCoy explains his background and intention in creating the Quantum artwork.   (*Id.*, Exs. C, D.)   In the second video, McCoy explains "the preservation process he made to Quantum, originally minted in 2014 on the Namecoin blockchain."   (*Id.*, Exs. E, F.)  He states:

> Hi, I'm Kevin McCoy.  I'm the artist that created Quantum and minted it in 2014. I want to tell you about the restoration and preservation efforts that I made to bring this early work back into the present day.  Throughout, I was guided by ideas of provenance, of data integrity, and data conservation.  I've moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information.

(*Id.*, Exs. E, F (quoted in FAC ¶ 66).) He then walks the viewer through the documentation available on "the newly-issued token," showing screen views of, e.g., the associated Rights Agreement:

6



Kevin McCoy explaining the preservation process he made to *Quantum*, originally minted in 2014 on the Namecoin blockchain.

(*Id.*, Exs. E, F.)  McCoy then explains that the new Ethereum NFT also contains "screenshots taken the original Namecoin wallet" for the same Quantum artwork, which show the original transaction set and data, along with a signed message "proving that I have continued possession of the private key for the address which originally sent Quantum's minting transaction."  (*Id.*, Exs. E, F.)  McCoy then offers his view that "As we enter into this new era of tokenization, I think we will increasingly be faced with issues of <u>cross-chain translation</u>, <u>preservation</u>, and <u>archiving and conservation</u>.  **In fact, we're already there with Quantum**.  And hopefully the efforts that I made here, in collaboration with lawyers, with digital conservators, and with developers, will be a useful example for others in this community facing similar challenges."  (*Id.*, Exs. E, F (emphasis added).)

The Catalogue Note follows these videos with lengthy text that examines the context surrounding the Quantum artwork and its historical significance:

> In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history. They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers occupy a singular position in

art history. They came first. Kevin McCoy's Quantum is such a work. **Minted on
2nd May 2014 21:27:34**, or more precisely Namecoin Block 174923, the NFT era
quietly dawned. What a noise it makes today.  Pulsing with colour, a riotously raw
beacon to a new era, McCoy minted Quantum - unwittingly placing it within this
vaulted pantheon of firsts. …  In my view, Quantum will always be the most art
historically important work in the history of NFTs.

(*Id.*, Ex. B (emphasis in original) (quoted in FAC ¶¶ 58-59).)  The Catalogue Note also expresses

its interpretation of the meaning conveyed by the Quantum artwork, stating, for example:

Creation, time, art history and the very idea of blockchains themselves intersect in
the ripples of Quantum. It is a work to meditate not just on the genesis of art
history's newest chain but on the founding principles that underpin the entirety of
this new decentralised system. Rippling out and in, it is a work about creation, a
work that captures the spirit of the blockchain network itself expanding and
contracting as the world processes the place they want to give this radical new
technology.  …  One's eye meditates on this unapologetic celebration of digital
colour, a hexadecimal testimony that encodes the full spectrum of colours endless
possibilities - remixed and reassembled by every digital creative that follows
McCoy's first steps into the world of blockchain based art.

(*Id.*) The Catalogue Note further analyzes such artistic elements as the "musicality" of the

Quantum artwork, its visual language of "pixels iteratively jostl[ing] for position and color as they

execute their algorithmic form," and connecting the themes of the visual piece to other artists—

among them LaMonte Young, Sol LeWitt, John Whitney—and other "important aesthetic

touchstones for McCoy."  (*Id.*)

**The Broader Context of the Challenged Statements**

NFTs, considered a "speculative crypto asset," "exploded in popularity" in 2021.

(Rothstein Decl., Ex. G—Howcraft Article cited in FAC ¶ 34 n.2.)  "Around 28.6 million wallets

traded NFTs in 2021, up from some 545,000 in 2020."  (*Id.*)  The marketplaces for NFTs are

numerous, fragmented, and decentralized.  NFTs are created and sold across at least "ten different

blockchains, which are used to record who owns the NFT."  (*Id.*)  There are additionally sales of

NFTs that are considered "off-chain," such as "major NFT art sales at auction houses."  (*Id.*)

Despite their popularity, NFTs are the subject of considerable debate, with many people

8

reportedly still "baffled as to why so much money is being spent on items which do not physically exist." (*Id.*)  More specifically within the art community, there persist questions such as whether NFTs can be regarded as art, whether NFTS are "trigger[ing] any kind of sea change in what art looks like, what it means or what, in some profound sense, it is?"; whether "NFT art" exists at all; whether works associated with NFTs "would be just as good or bad, depending on your tastes, if they had never been 'certified' with the NFT"; and whether, "as the novelty of NFTs wears off, people will just talk about 'digital art' and leave the NFT off to one side, as a detail in the transfer of ownership." (Rothstein Decl., Ex. H—Gopnik Article cited in FAC ¶ 95 n.15.)

As reported by the Gopnik Article cited and quoted in the FAC, McCoy took part in this debate—in coining the use of NFTs for digital art,  he "was looking for a way to assert authorship, and to transfer ownership, of the digital creations that he and his friends made and mostly failed to sell" and to answer the question of whether there was "a way to make a few of those copies 'authentic,' different enough from all other copies." (*Id.*)

## Procedural History

Plaintiff filed its initial complaint on February 1, 2022.  (ECF #1.)  Sotheby's accepted service of the complaint by stipulation dated February 16, 2022, which was so-ordered to extend Sotheby's time to answer, move, or otherwise respond to the Complaint through April 11, 2022. (ECF # 15.)  McCoy received the same extension.  (ECF # 18.)  Plaintiff thereafter voluntarily dismissed claims against two original defendants—the purchaser of the Ethereum-Quantum (ECF # 23-24) and, later, the author of the Condition Report (ECF # 46, 48.)

On April 1, 2022, McCoy filed a pre-motion conference letter seeking to file a motion to dismiss the initial complaint, on grounds that Plaintiff failed to allege special damages to support its first claim, that it failed to allege consumer-oriented conduct to support its second claim, and

that all of Plaintiff's claims failed for lack of standing.  (ECF # 34.)  In response, Plaintiff elected

to file an amended complaint (ECF # 44, 47), and the deadline for the remaining Defendants

McCoy and Sotheby's to respond to the FAC was extended to June 30 (ECF # 50).

## ARGUMENT

I. **PLAINTIFF'S CLAIMS FOR SLANDER OF TITLE AND PRODUCT DISPARAGEMENT FAIL BECAUSE THE CHALLENGED STATEMENTS ARE PROTECTED OPINION; ALTERNATIVELY, SUBSTANTIALLY TRUE; AND PUBLISHED WITHOUT MALICE.**

Slander of title and commercial disparagement (also known as "product disparagement,"

which is the term we will use here to more clearly distinguish the two torts) are two common-law

torts with significant overlap.  Indeed, the tort of slander of title is essentially identical to the tort

of product disparagement, and the two torts are sometimes referred to together as "injurious

falsehood."  *See* 2 Robert D. Sack, Sack on Defamation §§ 13:1.1, at 13-2-13-3, 13:1.4[A], at 13-

9 (5th ed. 2017).  The principal difference is that statements impugning *title or ownership* of

products are actionable as slander of title, while statements about the *quality* of those same

products are actionable as product disparagement.  *See Chamilia, LLC v. Pandora Jewelry, LLC*,

No. 04-CV-6017 (KMK), 2007 WL 2781246, at *11 n.6 (S.D.N.Y. Sept. 24, 2007).

To state a claim for slander of title under New York law, a plaintiff must allege publication

of "(1) a communication falsely casting doubt on the validity of [the] complainant's title, (2)

reasonably calculated to cause harm, and (3) resulting in special damages," with the second

element interpreted to require allegations that the defendant acted with malice.  *Id.* at *11 (citation

and internal quotation marks omitted).  The elements of product disparagement are nearly

identical, requiring a showing that the "defendant published an oral, defamatory statement directed

at the quality of a business's goods and ... that the statements caused special damages."  *Fashion

Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002).  To state a claim

10

for product disparagement, a plaintiff must adequately plead (1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) special damages. *MMS Trading Co. Pty Ltd. v. Hutton Toys, LLC*, No. 20-CV-1360 (MKB), 2021 WL 1193947, at *11 (E.D.N.Y. Mar. 29, 2021) (citation omitted).

Injurious falsehood torts are related to defamation, but they are "far more difficult" to sustain. 2 Robert D. Sack, Sack on Defamation § 13:1.4[A], at 13-10 (5th ed. 2017). This is because they are actions "only for special damages caused by the false statement, and the burden of proving falsity, damages, and 'malice' in many forms is generally higher than in defamation." *Id.* Moreover, the same constitutional protections to speech that are available in defamation actions also apply to injurious falsehood claims. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) (product disparagement). "As with any claim for defamation, both libel per se and trade libel are defeated by a showing that the published statements are substantially true. …[and] [t]hey are also subject to a defense that the material, when read in context, would be perceived by a reasonable person to be nothing more than a matter of personal opinion." *Penn Warranty Corp.*, 810 N.Y.S.2d at 813-14 (*citing Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 566 N.Y.S.2d 906 (1991); *Newport Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*, 18 A.D.3d 454, 794 N.Y.S.2d 426 (2nd Dep't 2005)); *John Grace & Co. v. Todd Assocs., Inc.*, 188 A.D.2d 585, 586, 591 N.Y.S.2d 477 (2d Dep't 1992) (applying opinion defense to commercial disparagement claim).

### A.    Both Claims Fail Because the Challenged Statements Are Protected Opinion

Like a defamation case, claims for injurious falsehood "cannot be maintained unless it is premised on published assertions of fact." *See Brian v. Richardson*, 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 350 (1995) (describing opinion defense for defamation); *Penn Warranty Corp.*, 810

11

N.Y.S.2d at 813-14 (opinion defense applies to injurious falsehood claims); *Sandler*, 609 F. Supp. 2d at 303 (same). Courts have long interpreted both the First Amendment of the U.S. Constitution and Article I, Section 8 of the New York Constitution to forbid speech claims that target statements of opinion or rhetorical hyperbole. *See 600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 136, 589 N.Y.S.2d 825, 827 (1992).

The standards under the New York Constitution for determining whether a statement is actionable are more protective of speech than federal standards. *See Immuno AG*, 77 N.Y.2d at 249; *see also Levin v. McPhee*, 119 F.3d 189, 196 (2d Cir. 1997) ("New York's … inquiry … does and is intended to differ from the inquiry required under the First Amendment"). Relying on these broader protections, the New York Court of Appeals in *Immuno* held that in determining whether a statement is actionable, courts must "begin[] by looking at the content of the whole communication, its tone and apparent purpose." 77 N.Y.2d at 254. "[R]ather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were conveying facts . . . .'" *Brian*, 87 N.Y.2d at 51 (quoting *Immuno*, 77 N.Y.2d at 254). This approach "avoid[s] 'the fine parsing ... that might now be required under Federal law'" following the U.S. Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). *Von Gutfeld*, 80 N.Y.2d at 145.

*Immuno* applied these principles to reject a libel case brought by a pharmaceutical company against a scientific researcher. The researcher wrote a letter published in an academic journal that raised serious concerns about the company's proposal to conduct research on primates. *Immuno*, 77 N.Y.2d at 240. The court held that the researcher's statements were not actionable. It focused on the "social setting" and "immediate" context of the letter, including that it was denominated as

opinion by virtue of it being a letter to the editor. *Id.* at 254. The court also found significant that the letter was "related to a public controversy." *Id.*

Following *Immuno*, New York courts generally consider three factors in determining whether a statement is actionable: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Brian*, 87 N.Y.2d at 51 (internal quotation marks omitted). Courts apply the same analysis to evaluate whether statements, even if factual in tenor, are nonactionable "rhetoric or hyperbole." *E.g. Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 42, 925 N.Y.S.2d 407, 414 (1st Dep't 2011). Loose, figurative or hyperbolic statements that are susceptible to ambiguous meanings, even if deprecating to the plaintiff, are not actionable. *Dillon v. City of New York,* 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1st Dep't 1999); *Penn Warranty Corp.*, 810 N.Y.S.2d at 815 (finding words too ambiguous to qualify as a statement of fact where "in the complaint the plaintiff had to frame or augment the allegedly defamatory words with its own words in order to even allege that the language was defamatory"). Moreover, the Court of Appeals makes a distinction between a statement of opinion that implies a factual basis that is not disclosed to the reader and an opinion that is accompanied by a recitation of facts on which it is based. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 818 (1993). The former is actionable, the latter is not. "[T]he determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court." *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985); *accord Steinhilber v. Alphonse* 68 N.Y.2d 283, 290, 508

13

N.Y.S.2d 901, 904 (1986).

Applying these standards, the Challenged Statements are protected as opinion.  To begin, the imprecise, vague nature of the language used supports that Challenged Statements are protected opinion. The notion that an NFT has been "preserved," "burned," "effectively burned" or otherwise "removed" is loose, imprecise language that lacks a defined meaning that is readily understood.  As discussed in the McCoy Motion, the definition of "burned" or otherwise removed in the NFT context is ambiguous and encompasses a "range of scenarios"—including but not limited to transferring ownership to a null address, having the owner revoke rights, and status changes recorded on the blockchain. (McCoy Motion ("'[Because there is no established, formal definition of a 'burn' [in the context of NFTs] … 'people may refer to a range of scenarios as a burn.'") (citing and quoting Maghan McDowell, "Why brands are burning NFTs," Vogue Business, Feb. 8, 2022 (https://www.voguebusiness.com/technology/why-brands-are-burning-nfts)).)[6] But even without this larger context, Plaintiff's own allegations[7] show that the definitions of these terms within an emerging, decentralized, and quickly changing marketplace and community are subject to debate, refinement, new uses, and change—and thus, are unverifiable and incapable of being proved false.  They cannot be the basis of a speech-based claim.

But even if the wording had an accepted, verifiable meaning, the "larger context" of all of the statements overwhelmingly supports that they are opinions, not facts. *Brian*, 87 N.Y.2d at 51. Each of the Challenged Statements, just like in *Immuno*, "related to a public controversy." 77

---

[6] The Court may take judicial notice of news articles showing there is an existing debate about the range of potential definitions of these terms. *See Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (in granting a motion to dismiss, taking judicial notice of newspaper articles showing public controversy in order "to place [defendants'] comments in the broader social context."); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 271 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F. App'x 67 (2d Cir. 2015); *Ganske v. Mensch*, 480 F. Supp. 3d 542, 555 (S.D.N.Y. 2020) (granting a Rule 12(b)(6) motion, observing practices on social media to find that "[i]t is difficult to conjure a 'precise meaning' for the statement that Plaintiff [engaged in behavior specific to a social media platform]").
[7] (Rothstein Decl., Exs. G, H.)

N.Y.2d at 254.  In the video included in the Auction Statement, McCoy specifically explains this controversy:  "As we enter into this new era of tokenization, I think we will increasingly be faced with issues of <u>cross-chain translation</u>, <u>preservation</u>, and <u>archiving and conservation</u>.  **<u>In fact, we're already there with Quantum</u>**."  (Rothstein Decl., Ex. D (emphasis added).)  The specific issues of what it means to "preserve" an NFT as new industry-standard protocols like Ethereum emerge, how to "translate" NFTs across chains, and how to archive and conserve NFTs in these processes, were at the heart of the opinions that Sotheby's and McCoy were expressing in the Challenged Statements.  Plaintiff's claims essentially as the Court to take a side in this dispute.  Under the opinion doctrine, it should decline the invitation.

Further, the Auction Listing made clear that Sotheby's and McCoy were "not a disinterested observer," further confirming that readers would understand the Challenged Statements to be opinions. *Brian*, 87 N.Y.2d at 53.  In *Brian*, which involved a claim against then-Attorney General Elliot Richardson, the court found significant that Richardson, as the author of the challenged opinion piece, "disclosed that he had been" directly involved in the controversy on which he wrote.  *Id.*  The same was true in *Immuno*, where the defendant was "a known animal rights activist" and the letter "made clear that its purpose was to voice the conservationist concerns of [a] partisan group in order 'to draw this situation to the attention of interested parties.'"  77 N.Y.2d at 254.  Here, McCoy expressly identified himself as a participant in this debate, stating "And hopefully the efforts that I made here, in collaboration with lawyers, with digital conservators, and with developers, will be a useful example for others in this community facing similar challenges."  (Rothstein Decl., Ex. D (emphasis added).)

Additionally, the nature and tone of the forum—an Auction Listing—strongly signals to readers that the statements are opinions, not facts.  New York courts treat the "nature of the

15

particular forum" as highly significant in deciding whether statements in that forum are actionable. *Brian*, 87 N.Y.2d at 51.  *Immuno*, for example, found important that the statements were made in a letter to the editor of a journal—"a medium that is typically regarded by the public as a vehicle for the expression of individual opinion rather than 'the rigorous and comprehensive presentation of factual matter.'" *Id.* at 52 (*quoting Immuno*, 77 N.Y.2d at 253); *see Mann v. Abel*, 10 N.Y.3d 271, 276-77, 856 N.Y.S.2d 31, 33 (2008) (column "on the 'opinion' page of the newspaper"). Here, the Condition Report within the Auction Listing specifically stated that "nameless™ Condition Reports <u>are statements of opinion only and not representation of fact</u>" and that "All auction participants should inspect a lot and satisfy oneself as to its condition prior to bidding." (Rothstein Decl., Ex. B (emphasis added).)

The "predominant tone" of Auction Listing confirms that the post was not merely "objective reportage." *Brian*, 87 N.Y.2d at 53; *see Mann*, 10 N.Y.3d at 277 (relying on "the tenor of the column").  The Auction Listing contains pages of highly expressive commentary regarding the visual expression of the Quantum artwork and its historical significance.  Using phrases like "I think" and "In my view," it takes a stand in the evolving conversation about preservation and provenance and links the artwork to some of the most significant moments in art history, and in doing so "called particular attention to the circumstances surrounding" the communication and "point[ed] up that this was [the author's] view." *Immuno*, 77 N.Y.2d at 253.

Finally, even when the bare language of a statement might appear factual, courts hold the statement nonactionable so long as there is "full disclosure of the facts supporting [it]." *Silverman v. Daily News, L.P.*, 129 A.D.3d 1054, 1055, 11 N.Y.S.3d 674, 676 (2d Dep't 2015).  In *Silverman*, the court held nonactionable statements in the Daily News calling the plaintiff's written materials "racist writings," and stating that he had "ties to a 'white supremacist group.'" *Id.*  Because the

16

defendant "made the statements with express reference to the written materials authored by the plaintiff," the "statements of opinion [were] nonactionable"; "there was full disclosure of the facts supporting the opinions." *Id.*  Here, too, Sotheby's fully disclosed all of the "facts" that Plaintiff claims show that the Challenged Statements were purportedly false.  In multiple locations, it disclosed that the Quantum artwork originally had been minted on Namecoin, and it explained in great detail that *the data associated with* that Namecoin entry had been "preserved" and included in the Ethereum entry.  Indeed, on the Auction Listing's caption for McCoy's video, it states expressly that the video depicts "Kevin McCoy explaining the preservation process he made to Quantum, originally minted in 2014 on the Namecoin blockchain."  (Rothstein Decl., Exs. B, D.) These disclosures render the Challenged Statements protected opinion.

> **B.**     **The Challenged Statements Are Substantially True**

Plaintiff's claims also fail for the independent reason that it has not "plead[ed] facts that, if proven, would allow a reasonable person to consider the statement[s] false." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017).  Truth is a complete defense to an injurious falsehood claim, although strictly speaking it is not a defense as falsity is an element of the claim and the burden of pleading and proving falsity is on the plaintiff.  *See id.* at 246-47*; see also Drug Research Corp. v. Curtis Publ'g Co.*,  7 N.Y.2d 435, 440, 199 N.Y.S.2d 33 (1960).  "[A] statement need not be completely true, but can be substantially true because fact and fiction may not be crisply delineated categories in [speech] cases." *Tannerite Sports, LLC*, 864 F.3d at 242 (emphasis and internal quotation marks omitted).  Under New York law, "[a] statement is substantially true, if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 326 (S.D.N.Y. 2021) (internal quotation marks omitted), *aff'd*

JA-96

*sub. nom. Daleiden v. Planned Parenthood Fed'n of Am.*, No. 21-2068-cv, 2022 WL 1013982 (2d Cir. April 5, 2022). Indeed, in the context of the art world, falsity is particularly difficult to prove—the plaintiff's "burden in proving the falsity of a statement concerning a work of art" has been described as "very heavy" and "nearly impossible." *Kitchen v. Sothebys*, 18 Misc.3d 1132(A), at *7, 859 N.Y.S. 2d 895 (N.Y. Civ. Ct. 2008) (finding plaintiff failed to demonstrate falsity).

Here, Plaintiff admits that the Namecoin-Quantum "expire[d]." (FAC ¶¶ 3, 40.) While Plaintiff disputes the consequences of that expiration—whether it made it possible or advisable for McCoy to take steps to "preserve" the data associated with the token, or whether the change in the status of the token caused by the expiration qualified "*effectively*" as a "burn"—the pleaded truth would have no different effect on the mind of the reader than what was stated in the publications at issue. McCoy and Sothebys accurately reported that Quantum was originally minted in 2014 on the Namecoin blockchain, and that McCoy "moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information."[8] (Rothstein Decl., Ex. F.)

**C.     The FAC Fails to Allege That Sotheby's Acted With Actual Malice**

The tort of injurious falsehood requires sufficient allegations that Defendants acted with malice. "In New York, courts have applied the 'actual malice' standard, and have regularly dismissed claims where the plaintiff has failed to show that the defendant acted with knowledge that the statements were false or with a 'reckless disregard' for the truth or falsity of the

---

[8] Plaintiff's allegation that former Defendant nameless "retracted" its condition report has no effect on the substantial truth of the Challenged Statements. (FAC ¶ 88.) On its own terms, the statement provides that "nameless expresses no opinion about the merits of the allegations" and has reviewed its statement not because it has determined that it was false, but rather "[i]n light of subsequent allegations challenging this statement." (*Id.*) This is to say nothing of the fact that this "evidence" or retraction occurred under specious circumstances to begin with. *See* McCoy Motion.

statements." *Chamilia, LLC*, 2007 WL 2781246, at *11. "Malice under this standard is not a measure of whether the speaker harbored ill will or spite; rather, actual malice exists when a speaker makes a statement knowing it is false or while personally harboring serious doubts about its veracity." *Id.* (citation omitted). Complaints that fail to adequately allege malice are "facially defective" and must be dismissed. *Id.* (citation omitted). Allegations of malice must be supported by probative facts. *See id.* "[C]onclusory statements" regarding actual malice cannot survive dismissal. *See Biro v. Condé Nast*, 807 F.3d 541, 544, 546-47 (2d Cir. 2015).

Under this rubric, "[m]ere falsity, prior disputes between the parties, and '[s]uspicion, surmise and accusation' are insufficient to raise an inference of malice." *Chamilia, LLC*, 2007 WL 2781246, at *12 (citation omitted). Furthermore, this requirement of malice or reckless disregard on defendant's part means that "[a] defendant who asserts a claim against property in good faith under an honest impression of its truth will not be penalized." *Markowitz v. Republic Nat'l Bank of N.Y.*, 651 F.2d 825, 828 (2d Cir. 1981) (citation and internal quotation marks omitted); *Rutty v. Krimko*, No. 17-cv-6090 (BMC), 2018 WL 1582290, at *3 (E.D.N.Y. Mar. 30, 2018) (same). *See Kitchen*, 18 Misc.3d 1132(A), at *10 (acting based on "perceived economic interests" incompatible with finding of malice). Likewise, "liability … cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. Nat'l Audubon Soc'y*, Inc., 556 F.2d 113, 121 (2d Cir. 1977). *See Kitchen*, 18 Misc.3d 1132(A), at *10 (allegations that defendant art dealer failed to "explain its opinion to him, retract it, or alter it" regarding a piece of artwork, was insufficient to prove malice because defendant had no duty to do any of those things).

Here, Plaintiff's only allegations of malice are conclusory (FAC ¶¶ 75, 124, 147) or based

JA-98

on a refusal to credit Plaintiff's denial (FAC ¶¶ 121, 144)[9]; all are insufficient as a matter of law to survive a motion to dismiss. Further, Plaintiff's allegations affirmatively demonstrate Sotheby's good faith. The full and repeated disclosures of the Namecoin-Quantum and detailed discussion of the "preservation" efforts show a good-faith claim to the Quantum-Ethereum that bars any inference of malice. So, too, does Sotheby's admitted reliance on a Condition Report which Plaintiff alleges was prepared by a third party, and which Plaintiff has not (and cannot) alleged that Sotheby's had any reason to doubt. In short, Plaintiff does not come close to alleging malice, and this dooms its claims.

## II.   PLAINTIFF'S UNJUST ENRICHMENT CLAIM ALSO FAILS AGAINST SOTHEBY'S BECAUSE NO BENEFIT FLOWED DIRECTLY FROM PLAINTIFF AND IT IS DUPLICATIVE OF THE INJURIOUS FALSEHOOD CLAIMS

To state a claim for unjust enrichment, Plaintiff must allege that the Defendant was enriched at the Plaintiff's expense. *Bilinski v. Keith Haring Found., Inc.*, 96 F.Supp.3d 35, 52 (S.D.N.Y. 2015). Further, "[t]he benefit acquired by the defendant must be 'specific' and directly related to the loss suffered by the plaintiff." *Id.*

In *Blinksi*, the alleged owners of artwork by Keith Haring brought an unjust enrichment claim against the foundation that owned the majority of the artist's work. The plaintiff owned a collection of artwork that the foundation refused to authenticate as Haring pieces. The foundation ultimately issued a press release that described plaintiff's collection of artwork as "fake Haring works," which led to a loss of a sale of some of the artwork. *Id.* at 42. The plaintiff sued the foundation for, among other things, unjust enrichment, based on a theory that the defendants were enriched because the value of their own works "was increased by preventing others from selling

---

[9] Indeed, Plaintiff only alleges that it contacted McCoy prior to the auction. It does not even allege (because Plaintiff cannot) to have spoken to anyone at Sotheby's until *after* the auction was completed. (FAC ¶¶ 76-82.)

works." *Id.* at 52.

The Court, however, rejected this theory completely and dismissed the claim in full.  It held that "The benefit acquired by the Foundation—the alleged increase in value of Haring works owned by the Foundation—is not a benefit flowing directly to the defendants at plaintiffs' expense. Rather, it is an indirect and hypothetical benefit." *Id.*

Here, as in *Bilinski*, Plaintiff attempts to allege a claim for unjust enrichment based on the notion that "Free Holdings' Namecoin-Quantum NFT has significant value due to its status as the first NFT and such value is being significantly diminished by the false and misleading statements made by McCoy and Sotheby's." (FAC ¶ 98.)  This allegation is indistinguishable from the claim in *Bilinski* found to be fatally defective.  It is not a benefit flowing at all directly to Defendants at Plaintiff's expense, and it is indirect and entirely hypothetical.  The claim fails on this basis alone.

Plaintiff's new allegations in the FAC regarding overall brand enhancement and value to "future projects" fare even worse.  (*E.g.,* FAC ¶ 112.)  They are speculative (at best) and lack any cognizable (or pled) connection to Plaintiff.

The claim is also duplicative of Plaintiff's injurious falsehood claims.  Where tort claims essentially restate a defamation claim that has been dismissed on a motion to dismiss, the tort claims must also be dismissed as duplicative.  *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012).  Here, Plaintiff's claim for unjust enrichment also fails because it is expressly based on the same conduct underlying its injurious falsehood claims, namely: "McCoy and Sotheby's have derived profits from the false and misleading statements concerning the promotion, marketing, advertisement, and sale of the Ethereum-Quantum." (FAC ¶ 111.)

III. **PLAINTIFF'S DECLARATORY JUDGMENT CLAIM SEEKS AN ANSWER TO A HYPOTHETICAL QUESTION ON WHICH THERE IS NO ADVERSITY TO SOTHEBY'S**

"Declaratory judgment actions are justiciable only in cases in which an 'actual

21

JA-100

controversy' exists." *See, e.g., Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003). A "substantial controversy, between the parties having adverse legal interests," with "immediacy and reality" that allows "specific and conclusive relief" may be the subject of a DJA, but "an abstract, hypothetical or academic question" may not. *Id.*

Plaintiff seeks a judgment declaring: (1) Free Holdings is the rightful owner of the Namecoin-Quantum; (2) the Namecoin-Quantum has not been "burned" or otherwise "removed" from the Namecoin blockchain; and (3) the statements issued by McCoy and Sotheby's in connection with their sale of the Ethereum-Quantum were false and misleading." Several of these limitations on DJAs prohibit Plaintiff's claim here.

For requested declaration (1), Sotheby's has no legal position or legal adversity to Free Holding's claim of ownership of the Namecoin-Quantum. For requested declarations (2) and (3), Plaintiff merely seeks a determination of alleged "falsity." But that is not a legal determination that, on its own, could possibly result in any relief for Plaintiff, especially as against Sotheby's. Indeed, Plaintiff points to no such relief—merely stating that it "has no adequate remedy at law." (FAC ¶ 108.) It is entirely an abstract question, seeking a legal determination about hypothetical facts. For these reasons, Plaintiff's DJA claim also should be dismissed in full.

## CONCLUSION

For the foregoing reasons, Sotheby's respectfully requests that the Court dismiss Plaintiff's Amended Complaint with prejudice, and that the Court award Sotheby's such other and further relief as deemed just and proper.

Dated:   New York, New York            ARNOLD & PORTER KAYE SCHOLER LLP
         June 30, 2022

                                       By: /s/ Evan M. Rothstein
                                           Evan M. Rothstein (admitted *pro hac vice*)
                                           1144 Fifteenth Street | Suite 3100

22

JA-101

Denver, CO 80202-2569
T: +1 303.863.2308
F: +1 303.863.1000
Evan.Rothstein@arnoldporter.com

Theresa M. House
Marcus Asner
250 West 55th Street
New York, NY 10019-9710
T: +1 212.836.8000
F: +1 212.836.8689
Theresa.House@arnoldporter.com

*Attorneys for Defendant Sotheby's Inc.*

JA-102

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FREE HOLDINGS INC., <br><br> *Plaintiff*, <br><br> -against- <br><br> KEVIN McCOY and SOTHEBY'S INC., <br><br> *Defendants*. | ECF CASE <br><br> Case No.: 1:22-cv-00881-JLC |

### DECLARATION OF EVAN M. ROTHSTEIN IN SUPPORT OF DEFENDANT SOTHEBY'S INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT

I, Evan M. Rothstein, declare as follows:

1.      I am an attorney at law duly licensed in the State of Colorado, admitted *pro hac vice* in the above-captioned matter, and work for the law firm of Arnold & Porter Kaye Scholer LLP, attorneys of record for the Defendant Sotheby's Inc.  I submit this declaration in support of Defendant Sotheby's Motion to Dismiss the Amended Complaint in this action.  I am aware of the facts stated herein of my own knowledge and if called to testify, I could and would competently so testify.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Amended Complaint in this Action ("FAC") (ECF # 47).

3.      Attached hereto as **Exhibit B** is a true and correct copy of the website available at Natively     Digital:     A     Curated     NFT     Sale/     Lot     2, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum (the "Auction Listing"), referenced in ¶¶ 9 n.1, 58 n.8, 59 n.9, 61 n.10, 65 n.11, 66 n.12, 73 n.13, 74 n.14 of the FAC.

**JA-103**

4.      Attached hereto as **Exhibit C** is a true and correct copy of the Video "Kevin McCoy – Quantum" available at Natively Digital: A Curated NFT Sale/ Lot 2, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum [https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022), referenced in ¶¶ 9 n.1, 58 n.8, 59 n.9, 61 n.10, 65 n.11, 66 n.12, 73 n.13, 74 n.14 of the FAC.  Exhibit C is contained on a DVD filed in hard copy, which also contains the video associated with Exhibit E, described below.

5.      Attached hereto as **Exhibit D** is a true and correct copy of the transcript of the Video "Kevin McCoy – Quantum" available at Natively Digital: A Curated NFT Sale/ Lot 2 (attached hereto as Exhibit C), https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum [https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022), referenced in ¶¶ 9 n.1, 58 n.8, 59 n.9, 61 n.10, 65 n.11, 66 n.12, 73 n.13, 74 n.14 of the FAC, prepared by a court reporter.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the Video "QuantumToken-McCoy" available at Natively Digital: A Curated NFT Sale/ Lot 2, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum [https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022), referenced in ¶ ¶¶ 9 n.1, 58 n.8, 59 n.9, 61 n.10, 65 n.11, 66 n.12, 73 n.13, 74 n.14 of the FAC.  Exhibit E is contained on a DVD filed in hard copy, which also contains the video associated with Exhibit C, described above.

JA-104

7.      Attached hereto as **Exhibit F** is a true and correct copy of the transcript of the Video "QuantumToken-McCoy" available at Natively Digital: A Curated NFT Sale/ Lot 2 (attached hereto as Exhibit E), https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum [https://web.archive.org/web/20220208083953/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum] (last visited April 27, 2022), referenced in ¶¶ 9 n.1, 58 n.8, 59 n.9, 61 n.10, 65 n.11, 66 n.12, 73 n.13, 74 n.14 of the FAC, prepared by a court reporter.

8.      Attached hereto as **Exhibit G** is a true and correct copy of the article Elizabeth Howcroft, "NFT Sales Hit $25 Billion in 2021, But Growth Shows Signs of Slowing," *Reuters* (January 11, 2022 10:50 AM EST), *available at* https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/, cited in FAC ¶ 34 n.2.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the article Blake Gopnik, "One Year After Beeple, the NFT Has Changed Artists. Has It Changed Art?," *N.Y. Times* (March 3, 2022), *available at* https://www.nytimes.com/2022/03/03/arts/design/nft-art-beeple.html?msclkid=eacb622dcf0a11ec93b64ee394548d56, cited in FAC ¶ 95 n.15.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  June 30, 2022                                      Respectfully submitted,
            Denver, Colorado

                                                                    By    _/s/ Evan M. Rothstein_____
                                                                            Evan M. Rothstein

JA-105

**EXHIBIT A TO ROTHSTEIN DECLARATION -
AMENDED COMPLAINT, DATED MAY 9, 2022
(REPRODUCED HEREIN AT PP. JA-44-JA-68)**

# Exhibit B

JA-107

**🔒 Page Vault**

| | |
|---|---|
| Document title: | Quantum \| Natively Digital: A Curated NFT Sale \| 2021 \| Sotheby's |
| Capture URL: | https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum |
| Page loaded at (UTC): | Wed, 29 Jun 2022 23:47:01 GMT |
| Capture timestamp (UTC): | Wed, 29 Jun 2022 23:50:14 GMT |
| Capture tool: | v7.14.1 |
| Collection server IP: | 34.230.137.168 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 6 |
| Capture ID: | ab96196c-cbe5-4dc1-9ca5-9196fe0ae18d |
| User: | ap-jchang |

PDF REFERENCE #:      55one9uHudjPaG7voJHYcb

Sotheby's

LOG IN   PREFERRED ACCESS   ABOUT   DISCOVER   SERVICES   LANGUAGE

AUCTIONS   BUY NOW   PRIVATE SALES   SELL

Search Sotheby's

Natively Digital: A Curated NFT Sale / Lot 2





**2**

**Kevin McCoy**

Quantum

Cryptocurrency Payments

Estimate Upon Request

Lot sold:                    1,472,000 USD

SAVE                    PLACE BID

Print

Authenticity Guarantee
What is guaranteed?

**Description**                                      —

Owner: Kevin McCoy

Kevin McCoy
b. 1967
*Quantum*
2014-21

Non-fungible token ERC-721
Token ID: 0
9 mb Tif + file archive with documentation
Originally minted on May 3, 2014 on Namecoin blockchain, and preserved on a
token minted on May 28, 2021 by the artist
Calls to
https://ipfs.io/ipfs/QmRWhsnDKBwWDuzDgDp8Te25KDViDcfz83rDs7ykR1x995
for supporting documentation
Smart Contract Address: 0xe81a45439ff9bc5841202ce4b2049e579f8771d9

**Condition Report**                                —

The following condition report is provided by **nameless™**.

The hash and all the information about the artwork are stored on the Ethereum
blockchain, and therefore cannot be modified. This token was minted May 2021, but
the referenced pieces were originally made public in 2014, with a link to the image
hosted on the Namecoin network. The token is a very early example of utilizing a
blockchain token to identify the provenance of a piece of art. Documents contained
within the media bundle hosted on IPFS indicate the date and block location that
the Namecoin DNS pointer was set to point to mccoyspace.com, and shows the
transactions used at the time to create this trail. To avoid domain squatting,
Namecoin was designed to include removal of pointers after 36,000 blocks.
Accordingly, this specific Namecoin entry was removed from the system after not
being renewed, and was effectively burned from the chain.

This NFT's data storage security is high. This NFT's associated media and
additional legal and archival JSON encoded data are stored on IPFS.

The NFT's security follows standard ERC-721 practices. The function, use, and
standards compliance are on par with current industry standards.

There are 10% future royalties referenced in the legal disclaimer noted on the linked
IPFS archival files, along with an Ethereum address to send the royalties to, however
this is not directly enforced at the contract level.



Kevin McCoy - Quantum

LOT 3 →

There are 10% future royalties referenced in the legal disclaimer noted on the linked IPFS archival files, along with an Ethereum address to send the royalties to, however this is not directly enforced at the contract level.

**nameless™** Condition Reports are statements of opinion only and not representation of fact. The reports are non-exhaustive and based solely on information provided to nameless and/or obtained by nameless prior to sale, unless otherwise specified. The reports may make reference to a lot's smart contract details and history, metadata and/or media file specifics, storage, and/or origin, and other token features, however such reports may not refer to or identify all faults and potential vulnerabilities that may exist. The images of a lot form part of the condition report for the lot, however certain images of a lot provided online may not accurately reflect the actual condition of the lot. Condition reports may make reference to particular imperfections of a lot, although the lot may have other faults or issues not expressly referred to in the condition report for the lot or shown in the online images of the lot.

Condition reports are not an alternative to carrying out your own inspection and investigation of a lot and/or seeking your own independent professional advice. All auction participants should inspect a lot and satisfy oneself as to its condition prior to bidding. The responsibility for ascertaining the condition of a lot remains with the purchaser, and nameless cannot be held responsible for the content of condition reports, which are provided for guidance only in assessing the condition of a lot. *NOTWITHSTANDING THIS ONLINE CONDITION REPORT OR ANY DISCUSSIONS CONCERNING A LOT, ALL LOTS ARE OFFERED AND SOLD "AS IS" IN ACCORDANCE WITH THE CONDITIONS APPLICABLE TO THE RESPECTIVE SALE(S).*

**Catalogue Note**





Kevin McCoy explaining the preservation process he made to Quantum, originally minted in 2014 on the Namecoin blockchain.

In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history. They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers

Document title: Quantum | Natively Digital: A Curated NFT Sale | 2021 | Sotheby&#39;s
Capture URL: https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
Capture timestamp (UTC): Wed, 29 Jun 2022 23:50:14 GMT

Page 2 of 5

 Kevin McCoy · Quantum

usher in new movements that block by block, by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers occupy a singular position in art history. They came first. Kevin McCoy's Quantum is such a work. **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block 174923, the NFT era quietly dawned. What a noise it makes today.

Pulsing with colour, a riotously raw beacon to a new era, McCoy minted Quantum - unwittingly placing it within this vaulted pantheon of firsts. Timestamped July 1907, Picasso's Les Demoiselles ushered in the chain of Cubism. December 1917, Malevich's Black Square stands as the genesis block of Abstraction. April 1917, Duchamp timestamps the era of the idea. 2nd May 2014 21:27.34, Quantum stands alone in the precision of its timestamp - immutably, verifiably, trustlessly pure. If blockchain's themselves are a radical recalibration of the concept of time, then the timing of Quantum takes on a pantheonic position within this new art history. For what it is a blockchain, when stripped to its bones, but humanity's latest innovation in the humble art of record keeping. And if blockchains stand as the Gutenberg Bible of the 21st century, then how do we prize the first of these records? In my view, Quantum will always be the most art historically important work in the history of NFTs.

Creation, time, art history and the very idea of blockchains themselves intersect in the ripples of Quantum. It is a work to meditate not just on the genesis of art history's newest chain but on the founding principles that underpin the entirety of this new decentralised system. Rippling out and in, it is a work about creation, a work that captures the spirit of the blockchain network itself expanding and contracting as the world processes the place they want to give this radical new technology.

*"How to picture the moment of creation. A spark, a seed, a particle. We have narratives that describe it as an interval of days or as a cryptic alphabet that divides the earth from the firmament. [Kevin McCoy's] Quantum takes its place alongside other original icons replacing their aura and gilding with a pulsating luminous heartbeat. To call this a mandala would be an understatement, since what is a mandala if not a allegory for a universe, its revolutions, breath and winking into being out of nothingness?"*

DAVID GREER, 2021

If Quantum stands tall as a mandala for a new age, what so of its aesthetics? Its pulsating riot of raw colour forebears not just the generative, code-based works that now sit at the cutting edge of the NFT space, but encapsulate in no small part the palette of this new era. Bold, brash, unfiltered, acid green vibrates into cool blue. Flat aggressive reds bleed into fluorescent pinks. One's eye meditates on this unapologetic celebration of digital colour, a hexadecimal testimony that encodes the full spectrum of colours endless possibilities - remixed and reassembled by every digital creative that follows McCoy's first steps into the world of blockchain based art.

Beyond their formal concerns, there is a musicality to Quantum. As pixels iteratively jostle for position and color as they execute their algorithmic form, extends through to ideas expressed by John Cage around the nature of rehearsal, execution and repetition. To Cage, 4' 33" was a different score every time, reflecting the environment and subtleties of the audience's noise. The musical background to Quantum was important to McCoy, who himself trained at Rensselaer Polytechnic Institute under the musician Pauline Oliveros. It was here that McCoy! learnt to develop his creative coding as a form of musical play, using real time live systems to test, or tune, as he has discussed. This sense of tuning a visual artwork through code finds commonality with the conceptual musical experiments of LaMonte Young's Composition #7, held in the MOMA's collection.



Document title: Quantum | Natively Digital: A Curated NFT Sale | 2021 | Sotheby&#39;s
Capture URL: https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
Capture timestamp (UTC): Wed, 29 Jun 2022 23:50:14 GMT

Page 3 of 5

Kevin McCoy - Quantum    LOT 3 →



La Monte Young, *Composition 1960 No. 7* (excerpt 1961)

In the work, Young finds a note and then once played its reverberates out as a single entity. Young's thoughts of the conflict of flux versus stasis, act as a manifesto for the formal visual tropes expressed in Quantum. "Change or flux is inevitable" Young wrote, "Stasis, or remaining the same, is impossible. Therefore, to achieve the static state is the goal, while the state of flux, variation, or contrast, is unavoidable and thus unnecessary as a goal." Quantum, formatted in endless looping repetition is work both in the stasis of its originality but the flux of its repetition. The GIF file format stands as the ultimate standard bearer for the ideas so elegantly expressed by Young in 1960.

Indeed, these formal concerns and art historical references find themselves in direct conversation with the idea of the NFT themselves. In thinking of Quantum as a type of tuning, its final form minted on Namecoin stands not as the experience proper, but the record of that experience, further drawing parallels between the work itself and the core principles of the blockchain. While code equals flux, records equal stasis. There is a comi-tragic nature to this idea of freezing flux, an idea expressed elegantly in both the writings of Cage and that other conceptual touchstone that NFTs are starting to reexamine, Walter Benjamin. The blockchain as a decentralised clock is limited to seeing time in the rear view mirror, it is not a clock of the future but an archive of the past. In his 1940 essay, "Theses on the Philosophy of History", Benjamin discusses the idea of a Paul Klee painting named *Angelus Novus*.

*"looking as though he is about to move away from something he is fixedly contemplating. His eyes are staring, his mouth is open, his wings are spread. This is how one pictures the angel of history. His face is turned toward the past. Where we perceive a chain of events, he sees one single catastrophe which keeps piling wreckage upon wreckage and hurls it in front of his feet. The angel would like to stay, awaken the dead, and make whole what has been smashed. But a storm is blowing from Paradise...The storm irresistibly propels him into the future to which his back is turned, while the pile of debris before him grows skyward. This storm is what we call progress"*

In surveying the past as a sum of actions seen from the last link in the chain, what other of art history's chains does Quantum fork out from? Any discussion around the generative ideas inherent to Quantum, as in most code based art, must link back to Sol LeWitt's instruction-based art. The minimal simplicity of Quantum's formal aesthetic borrows as much from America's history of minimalist music as it does to the ideas of LeWitt in whose work one can easily see how the permutations of instructions create new formal compositions. LeWitt's instructional drawings



SOL LEWITT, *WALL DRAWING #1111 CIRCLE WITH BROKEN BANDS OF COLOR*, 2003. PRIVATE COLLECTION © THE LEWITT ESTATE / ARTISTS RIGHTS SOCIETY (ARS), NEW YORK.

Document title: Quantum | Natively Digital: A Curated NFT Sale | 2021 | Sotheby&#39;s
Capture URL: https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum
Capture timestamp (UTC): Wed, 29 Jun 2022 23:50:14 GMT                    Page 4 of 5

 Kevin McCoy · Quantum



actions seen from the last link in the chain, what other of art history's chains does Quantum fork out from? Any discussion around the generative ideas inherent to Quantum, as in most code based art, must link back to Sol LeWitt's instruction-based art. The minimal simplicity of Quantum's formal aesthetic borrows as much from America's history of minimalist music as it does to the ideas of LeWitt in whose work one can easily see how the permutations of instructions create new formal compositions. LeWitt's instructional drawings, John's Target Paintings, and the computer art pioneer John Whitney all stand out as important aesthetic touchstones for McCoy. Yet we have discussed art and music - what of literature? In discussions with McCoy it is revealing to note that the emanating, mesmerizing, light source was to him inspired by the work of science fiction writers like Philip K. Dick and Stanislaw Lem.

SOL LEWITT, *WALL DRAWING #1111 CIRCLE WITH BROKEN BANDS OF COLOR*, 2003, PRIVATE COLLECTION © THE LEWITT ESTATE / ARTISTS RIGHTS SOCIETY (ARS), NEW YORK.



John Whitney · *Permutations*, 1968

In Philip K. Dick's novel, *VALIS* (or Vast Active Living Intelligence System), the main character sees history as a simultaneous event as communicated through a mysterious pink light. Earlier works by Jennifer and Kevin McCoy that engage with this idea include *Pink Light* from 2001 and both *Priests of the Temple* and *Chysalis* from 2012. In *Pink Light*, the McCoys quote passages from the novel as a pink light blinks through the doors of a miniature elevator. In *Priests of the Temple* a yellow pulsating sun is overlayed onto projected images of sculptures depicting Gordon Moore as an early Silicon Valley holy man. *Chysalis* employs the same pulsing star projected over a sculpture of a building that is hatching from an amorphous rubbery skin. This is a trope that the McCoys have turned to time and time again, it is deeply embedded in their artistic lexicon and now into the history of NFTs. I will leave the last words to McCoy himself: "The idea that information is communicated through light, of course, extends through enlightenment philosophers back to the star of Bethlehem. The beams of Quantum, and the conceptual maneuver to fix its own "coming into being" into the record of the blockchain, represents the chronicling of the birth of ideas themselves into the record of human activity.



Follow Us

SUPPORT
Contact Us
Locations
Download the App
FAQ

CORPORATE
Press
Privacy Policy
Corporate Governance
Careers

MORE...
Security
Terms & Conditions
Modern Slavery Statement
Do Not Sell My Personal Information

(C) 2021 Sotheby's

JA-113

# Exhibit C

JA-114

Video Exhibit C

Video titled "Kevin McCoy - Quantum"

https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

Distributed in mp4 format on a DVD

JA-115

# Exhibit D

Case 23-644, Document 39, 07/25/2023, 3546478, Page120 of 150

```
 1

 2

 3

 4

 5

 6

 7

 8    Transcript of Video:  Video 1 - Kevin McCoy - Quantum

 9

10                        Video Link:

11    https://www.sothebys.com/en/buy/auction/2021/natively-

12            digital-a-curated-nft-sale-2/quantum

13                   Runtime:  2:32

14

15

16

17

18

19

20

21

22

23

24

25
```

JA-117

Page 2

```
 1          MR. MCCOY:  I'm Kevin McCoy, and
 2    I'm an artist here in New York City.  I've
 3    been doing this kind of work -- digital
 4    work, media work -- for a long time,
 5    probably 25 years.  My work's been in the
 6    collections of museums like then MoMA, the
 7    Whitney Museum, the Metropolitan Museum, as
 8    well as other institutions around the U.S.
 9    and Europe.  I've always worked with media
10    in one form or another.  Sometimes that work
11    takes the form of video installations,
12    sometimes it looks like kinetic sculpture,
13    and sometimes it's code driven works.  But
14    throughout all of those different forms,
15    it's always been a question of looking at
16    how meaning is put together.  How things
17    come to mean what they do mean, and the role
18    that technology and code driven systems
19    plays in that process, in terms of creating
20    the meaning of words, the meaning of
21    memories, the meaning of experiences that
22    we're all living with right now.
23          The work in the show is called Quantum
24    and it's from 2014.  It's an animation
25    that's made entirely out of code, so in that
```

Page 3

1    sense, I would call it generative work,

2    generative artwork.  But it's also an

3    optical work and a process-oriented work.

4    And so, in that sense, it draws from earlier

5    efforts from artists like Sol LeWitt, like

6    Victor Vasarely, like Bridget Riley.  But

7    the effect of it from a, kind of, experience

8    level is more mysterious than that.  And so,

9    that pulsing light, that kind of hidden

10   world that seems to be being born endlessly

11   with that piece, really, is inspired by the

12   work of science fiction writer Philip K.

13   Dick, and how in the -- his book, Valis, the

14   role of the pink light to create this

15   experience of memory and this experience of

16   information.  That's something that I was

17   thinking a lot about in the creation of

18   Quantum.

19        Quantum is the first autonomous work,

20   the first artwork that was inscribed into a

21   blockchain, and that happened in May of

22   2014.  And that traces back the previous

23   year in to 2013, when I discovered Bitcoin

24   and blockchain technology.  And I thought

25   about how the scarcity mechanism that

Case 23-644, Document 39, 07/25/2023, 3546478, Page123 of 150

Page 4

 1   Bitcoin presented could be a way for digital

 2   artists to create provenance and ownership

 3   systems around digital works.  It was a

 4   pretty abstract idea at the time, and no one

 5   really understood what I was talking about,

 6   but when I finally put the pieces together

 7   to do an initial effort with that, Quantum

 8   seemed like the perfect piece to do that

 9   with.

10              (End of recording.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                      CERTIFICATE

 2

 3                        - - -

 4

 5        I, Alexandria Brobst, Transcriptionist,

 6   do hereby certify that I was authorized to

 7   and did listen to and transcribe the

 8   foregoing recorded proceedings and that the

 9   transcript is a true record to the best of

10   my professional ability.

11

12        Dated this 28th day of June, 2022.

13

14

15

16   _____

17   Alexandria Brobst

18

19

20

21

22

23

24

25
```

# Exhibit E

Case 23-644, Document 39, 07/25/2023, 3546478, Page126 of 150

Video Exhibit E

Video titled "QuantumToken-McCoy"

https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum

Distributed in mp4 format on a DVD

JA-123

# Exhibit F

Case 23-644, Document 39, 07/25/2023, 3546478, Page128 of 150

Page 1

```
 1

 2

 3

 4

 5

 6

 7      Transcript of Video:  Video 2 - QuantumToken - McCoy

 8

 9                        Video Link:

10      https://www.sothebys.com/en/buy/auction/2021/natively-

11           digital-a-curated-nft-sale-2/quantum

12                      Runtime:  3:54

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

1          MR. MCCOY:  Hi, I'm Kevin McCoy.  I'm

2     the artist that created Quantum and minted

3     it in 2014.  I want to tell you about the

4     restoration and preservation efforts that I

5     made to bring this early work back into the

6     present day.  Throughout, I was guided by

7     ideas of provenance, of data integrity, and

8     data conservation.  I've moved the original

9     on-chain data from a burned NameCoin token

10    into a modern, industry-standard, ERC-721

11    token, while preserving all of the original

12    on-chain information.

13         Let's start by looking at the newly

14    issued token.  It appears on an address that

15    I've previously announced on Twitter as the

16    McCoy Space Studio contract address.  I've

17    created a studio-named ERC-721 compatible

18    contract entitled, "McCoy Space," with a

19    token short name of, "McCoy."  Yes, it's a

20    real McCoy.  The Quantum token is the first

21    mint from that contract, Token ID: zero.

22    The token URI points to a JSON encoded

23    documents stored on IPFS, that defines the

24    full scope of the artwork and the token.

25    Here, I've pasted it into a JSON decoder to

Case 23-644, Document 39, 07/25/2023, 3546478, Page130 of 150

Page 3

1   make it easier to read.  There are three

2   other additional documents on IPFS that

3   pertain to the artwork, it's associated

4   rights and provenance, and additional data

5   for long term archiving.  All of these IPFS

6   files are currently penned by me, but the

7   collector will need to take on that penning

8   responsibility, in order to protect the

9   long-term integrity of the token.

10        As part of a data redundancy strategy,

11   information appears multiple times in

12   different places.  So, while we have an IPFS

13   link for the artwork itself and another one

14   for the rights document, both of these files

15   also appear in the archive bundle.  And for

16   that reason, I'll look mostly at that link.

17   All of the files in the archive bundle have

18   a SHA256 hash to verify file integrity.  The

19   rights agreement appears here as an easy-to-

20   read PDF.  Sections two and three of the

21   agreement deal with the specific definition

22   of the artwork, as the data that reproduces

23   a known SHA256 hash, and with the provenance

24   chain, which begins on NameCoin, but now is

25   irrevocably transferred to this more modern

Page 4

1  and stable specification on the Ethereum

2  blockchain.  Other provenance information

3  can be found in the archive called, "wallet

4  documentation."  That contains a set of

5  screenshots taken from the original NameCoin

6  wallet showing the original transaction set,

7  the original on-chain data, and a signed

8  message proving that I have continued

9  possession of the private key for the

10  address that originally sent Quantum's

11  minting transaction.  That signed message

12  appears separately in the archive as a text

13  file, and the data of which can be used in a

14  contemporary NameCoin wallet to

15  independently verify the message's validity.

16      Finally, in order to facilitate the

17  long-term preservation of the artwork

18  itself, including its eventual translation

19  into future archival data formats, I've

20  included an archive containing every frame

21  from Quantum as uncompressed and

22  sequentially numbered TIFF files.  Returning

23  to the token JSON file, much of the same

24  information -- both historical and

25  contractual -- is included here for both

Case 23-644, Document 39, 07/25/2023, 3546478, Page132 of 150

JA-128

Page 5

1    redundancy and for ease of inspection as

2    plain text.

3       As we enter into this new era of

4    tokenization, I think we will increasingly

5    be faced with issues of cross-chain

6    translation, preservation, archiving, and

7    conservation.  In fact, we're already there

8    with Quantum.  And hopefully the efforts

9    that I made here in collaboration with

10   lawyers, with digital conservators, and with

11   developers, will be a useful example for

12   other people in this community facing

13   similar challenges.  Thanks for watching.

14              (End of recording.)

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1                   CERTIFICATE

 2

 3                    - - -

 4

 5       I, Alexandria Brobst, Transcriptionist,

 6   do hereby certify that I was authorized to

 7   and did listen to and transcribe the

 8   foregoing recorded proceedings and that the

 9   transcript is a true record to the best of

10   my professional ability.

11

12       Dated this 28th day of June, 2022.

13

14

15

16   _____

17   Alexandria Brobst

18

19

20

21

22

23

24

25
```

# Exhibit G

🔒 **Page Vault**

| | |
|---|---|
| Document title: | NFT sales hit $25 billion in 2021, but growth shows signs of slowing \| Reuters |
| Capture URL: | https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/ |
| Page loaded at (UTC): | Wed, 29 Jun 2022 19:24:56 GMT |
| Capture timestamp (UTC): | Wed, 29 Jun 2022 19:26:28 GMT |
| Capture tool: | v7.14.1 |
| Collection server IP: | 3.90.170.83 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 7 |
| Capture ID: | 510ec2dc-316a-44c7-a738-4aea7b1907b1 |
| User: | ap-jchang |



Document title: NFT sales hit $25 billion in 2021, but growth shows signs of slowing | Reuters
Capture URL: https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/
Capture timestamp (UTC): Wed, 29 Jun 2022 19:26:28 GMT

REUTERS    World    Business    Legal    Markets    Breakingviews    Technology    Investigations    More    My View    Sign In    Register

changing hands. One NFT artwork fetched a record $69.3 million at a Christie's sale in March. read more

Meanwhile, some of the world's top brands, including Coca-Cola and Gucci, have also sold NFTs. read more

NFT sales volume totalled $24.9 billion in 2021, compared to just $94.9 million the year before, DappRadar said on Monday. DappRadar collects data across ten different blockchains, which are used to record who owns the NFT.

### NFT sales climb to $11.6 billion in Q4 - DappRadar

Quarterly non-fungible token sales volumes across multiple blockchains, in U.S. dollars



Note: Data excludes "off-chain" sales.
Source: DappRadar

NFT sales climb to $11.6 billion in Q4 - DappRadar

Estimates of volumes vary by different data provider, depending on what is included. Transactions which take place 'off-chain', such as major NFT art sales at auction houses, are often not captured by the data.

Advertisement · Scroll to continue



ORACLE NETSUITE

Smart CFOs use data to support their position

Download the Business Guide
Download the Business Guide to Learn More About Habits That Successful CFOs Use.

ad   Oracle NetSuite                                    Open

CryptoSlam, which also tracks multiple blockchains, said the 2021 total was $18.3 billion. NonFungible.com, which tracks the ethereum blockchain only, put 2021 sales at $15.7 billion.

This means the money spent on NFTs in 2021 is roughly equivalent to the amount pledged at COP26 to help countries phase out coal, or the funding made available by the World Bank to buy and deploy COVID-19 vaccines. read more

Advertisement · Scroll to continue



Download the Business Guide
Download this Business Guide to Learn More About Habits That Successful CFO's Use.

Oracle NetSuite                    Open

Sales peaked in August, then declined in September, October and November



Replay
Learn More

Sponsored by IHG Hotels & Resorts

Get back to business with IHG® Hotels & Resorts

With our award-winning loyalty program, IHG One Rewards, you can make the most of your time on the road at over 6,000 hotels and resorts worldwide.

Learn more

Read Next

Business
Analysis: Argentina's economic crisis whack-a-mole goes into overdrive

U.S. Markets
Analysis: Latest U.S. stocks bounce tests skepticism that rally can last

EXPLAINER
Explainer: Why the survival of Scandinavian airline SAS hinges on Denmark

European Markets
Rouble heads away from 50 vs dollar as authorities flag interventions





Download the Business Guide

NFT sales hit $25 billion in 2021

REUTERS    World ⌄   Business ⌄   Legal ⌄   Markets ⌄   Breakingviews   Technology ⌄   Investigations ⌄   More ⌄        My View ⌄    Sign In ⌄    Register

Sales peaked in August, then declined in September, October and November before picking up again in December, data from the biggest NFT marketplace, OpenSea, showed.

This does not appear to be correlated with fluctuations in the price of cryptocurrencies, which are often used to buy NFTs, as bitcoin and ether rose in the September to November period.



1/2    Visitors walk in front of "HOLD ONTO YOUR BITCOIN" by Gustav Szabo, known as Szabotage, which will be converted into NFT and auctioned online at Sotheby's, at the Digital Ar...

Read More

### NFT sales on OpenSea peak in August

Monthly non-fungible token sales volume on OpenSea marketplace, in U.S. dollars.

Note: Data only shows transactions on the ethereum blockchain
Source: opensea.io, cryptoart.io, Dune Analytics

NFT sales on OpenSea

Around 28.6 million wallets traded NFTs in 2021, up from some 545,000 in 2020, DappRadar said.

While some see NFTs as the future of ownership in the online world, buying NFTs as a vote of confidence in the development of "Web3" or the metaverse, others are baffled as to why so much money is being spent on items which do not physically exist. read more

Just 10% of traders accounted for 85% of all NFT transactions, research published in the journal Nature said.

### Weekly NFT buyers - NonFungible.com

Number of wallets buying non-fungible tokens on the ethereum blockchain per week

● primary market ● secondary market



Download the Business Guide

Oracle NetSuite

Open ›

Read Next

Business
Bed Bath & Beyond replaces CEO Tritton as sales sink



Macro Matters
Russia's jobless rate falls to record low but economic hurdles mount

European Markets
Critfos' shares fall 6% on media report of possible capital increase

European Markets
Analysis: Private equity's swoop on listed European firms runs into rising execution risks

Feedback

Download the Business Guide

Oracle NetSuite



Kevin McCoy's 'Quantum'

NFT sales hit $25 billion in 2021

Case 1:22-cv-00881-JLC   Document 56-7   Filed 06/30/22   Page 6 of 8



Note: Data only shows transactions on the ethereum blockchain and excludes "off chain" sales. Figures for January to September have been revised higher than earlier estimates as NonFungible.com said it added more data sources.
Source: NonFungible.com

Weekly NFT buyers · NonFungible.com

While the most expensive known NFT sale was $69.3 million, a common price range was $100 to $1,000, NonFungible.com said. **read more**

Prices of the most sought-after NFTs were highly volatile. The average sale price of a CryptoPunk image rose from around $100,000 in July to nearly $500,000 in November. By December it had fallen to around $350,000, CryptoSlam data shows. **read more**

### Most NFTs are under $1,000

Number of non-fungible token sales in each price bracket in 2021

Note: Data only shows transactions on the ethereum blockchain and excludes "off-chain" sales
Source: NonFungible.com

NFT price ranges

Collectible NFTs were the most popular category, followed by art, NonFungible.com said. Some of the most eye-watering NFT sales have been for land in online metaverse environments.

Virtual real estate investor Republic Realm bought land in the virtual world The Sandbox for $4.3 million in November.

### Collectible NFTs are most popular

Number of non-fungible token sales in popular categories in past month

| | |
|---|---|
| Game | 8,352 |
| Metaverse | 11,459 |
| Art | 29,215 |
| Utility | 101,909 |
| Collectible | 116,567 |

Note: Data for the month up to January 10, 2022. Data only shows transactions on the ethereum blockchain and excludes "off-chain" sales.
Source: NonFungible.com

Collectible NFTs are most popular

Register now for FREE unlimited access to Reuters.com        Register

Reporting by Elizabeth Howcroft; Editing by Alexander Smith

Our Standards: The Thomson Reuters Trust Principles.

**More from Reuters**



January 6th Committee Interview

Trump didn't care Jan. 6 rioters were armed – witness

Two charged in Texas migrants tragedy

Turkey lifts veto on Finland, Sweden joining NATO

Five rulings will disproportionately hurt Black women



**Read Next**

European Markets
Wall Street seesaws, trading choppy near end of quarter

Currencies
Russia may buy 'friendly' countries' currencies to weaken rouble -Siluanov

Business
Just Eat Takeaway shares fall 19% to all-time low on doubts over Grubhub

U.S. Markets
Euro turns negative after Lagarde warns low inflation unlikely to return

Global Investor
Subscribe to our investor newsletter to get the latest news and trends in global financial markets



Kevin McCoy's 'Quantum'

NFT sales hit $25 billion in 2021



REUTERS

World ∨  Business ∨  Legal ∨  Markets ∨  Breakingviews  Technology ∨  Investigations  More ∨    My View    Sign In ∨    **Register**



### Global Investor

Subscribe to our investor newsletter to get the latest news and trends in global financial markets.

**Sign up**

---

Sponsored Content                                                                   Dianomi



First stop on your road trip? Getting one of these travel cards.

Sponsored by NerdWallet



3 Order Types: Market, Limit and Stop Orders

Sponsored by Charles Schwab



Wall St Legend Has Urgent Message for Baby Boomers

Sponsored by Empire Financial Research



Get the card that automatically adapts to you.

Sponsored by Citi Custom Cash℠ Card

### European Markets



## Credit Suisse scraps negative rates for Swiss private clients

Business · June 29, 2022 · 4:17 PM UTC

Credit Suisse is scrapping the negative interest rates it has charged wealthy Swiss clients since 2020, the lender said on Wednesday, as its economists anticipate a further rate hike in Switzerland this year.



Business
Uniper withdraws 2022 outlook on Gazprom supply restrictions
6:57 PM UTC · Updated 27 min ago



Business
Strike underway at Exxon refinery in France
5:15 PM UTC



MacroMatters
Bank of England may not need to act forcefully, Bailey says
3:07 PM UTC



European Markets
EU race to fill gas storage draws record supplies from Britain
12:50 PM UTC

---

Sponsored Content                                                                   Dianomi



Save More With Up to 11X the Average APY. Compare Accounts.

Sponsored by NerdWallet



Reach goals faster with 1.01% APY. Select Markets Only. Member FDIC.

Sponsored by Citi® High-Yield Savings



7 Investing Secrets Once Your Portfolio Reaches $500k+

Sponsored by Fisher Investments



If You Have More Than $1,000 in Your Bank Account, Make These 5 Moves

Sponsored by The Penny Hoarder

Sponsored Content


NFT sales hit $25 billion in 2021

---

Document title: NFT sales hit $25 billion in 2021, but growth shows signs of slowing | Reuters
Capture URL: https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/
Capture timestamp (UTC): Wed, 29 Jun 2022 19:26:28 GMT                                          Page 5 of 6



Document title: NFT sales hit $25 billion in 2021, but growth shows signs of slowing | Reuters
Capture URL: https://www.reuters.com/markets/europe/nft-sales-hit-25-billion-2021-growth-shows-signs-slowing-2022-01-10/
Capture timestamp (UTC): Wed, 29 Jun 2022 19:26:28 GMT

JA-138

# Exhibit H

**The New York Times** | https://www.nytimes.com/2022/03/03/arts/design/nft-art-beeple.html

CRITIC'S NOTEBOOK

## One Year After Beeple, the NFT Has Changed Artists. Has It Changed Art?

Hardly at all.

 **By Blake Gopnik**

March 3, 2022

Around 1425, the Florentine artist Masaccio painted the first major works in one-point perspective. That revolutionized what artists could do ever after.

In Paris in 1839, Louis-Jacques-Mandé Daguerre demonstrated his new photographic invention. It changed the nature of visual representation and museum walls haven't been the same since.

On March 11, 2021, all of one year ago, Mike Winkelmann, whose *nom d'artiste* is Beeple, sold a collage of computer illustrations for $69 million simply because that collage came attached to a digital certificate called an NFT. That colossal price launched a mad scramble among creators of all kinds — illustrators, musicians, photographers, even a few veteran avant-gardists — to join the NFT gold rush.

In the 12 months since, something like $44 billion has been spent on about six million NFTs, usually issued to certify digital creations but sometimes for physical objects like paintings and sculptures.

But did this vast tsunami of "NFT art" actually trigger any kind of sea change in what art looks like, what it means or what, in some profound sense, it is? Hardly at all, and there's a chance such a change might barely be possible: That's because "NFT art" simply does not exist.



"Everydays — The First 5000 Days," a work of digital art by Mike Winkelmann, known as Beeple, sold at Christie's for $69 million. The work is a collage of 5,000 digital images.  Christie's Images Ltd.

An NFT — a nonfungible token — is nothing more than a certificate of ownership and authenticity that can be attached to any kind of object, even a sneaker or newspaper article, and that can't be changed or lost because it lives on a blockchain.

Imagine an NFT as being the deed to a house: It tells you who owns it and maybe a few things about it, but you would never talk about a "deeded house" as though that were somehow different from a plain-old-fashioned house. Ditto for "NFT art" vs. plain-old-fashioned "art."

Typically, the art object that gets NFT'd is a digital file — maybe a JPEG image or an MP4 video — that lives on some hard drive, and that looks or sounds precisely the way it would have in the decades before NFTs came along. Even the least traditional works that come with an NFT "certificate," like the autobiographical animations of the transgender teenager known as Fewocious, would be just as good or bad, depending on your tastes, if they had never been "certified" with the NFT.

Beeple himself is trading the digital for the physical in his first gallery show at Jack Hanley in New York: He's showing prints, drawings and paintings — as though there had never been anything inherently NFT-ish in his work from the start. (The objects at Hanley will also be NFT'd, for sale, on the blockchain.)

If a hacker managed to destroy every NFT, 99.9 percent of the creations those NFTs "certified" would remain unchanged. (We'll get to the remaining .1 percent in a bit, because that's the fun and vital part of this story: the very few NFTs that may lead to new art.)

"I would wholeheartedly underwrite the statement that there is no NFT art — that there is art, or there is digital art," said Rudolf Frieling, media-arts curator at the San Francisco Museum of Modern Art, which has been a pioneer in collecting digital art of all kinds, from websites to 3-D-printed sculptures. "The idea that you could have an 'NFT art show' is, to my mind, frankly, ridiculous," Frieling said.

Michael Bouhanna, a specialist at Sotheby's auction house in London, has been selling digital art works with NFT "deeds" for longer than almost anyone. He thinks that before too long, as the novelty of NFTs wears off, people will just talk about "digital art" and leave the NFT off to one side, as a detail in the transfer of ownership.

Sales, rather than aesthetics, were the reason NFTs were created. In 2014, the veteran digital artist Kevin McCoy was working into the wee hours at a tech-friendly art-a-thon at the New Museum in New York, when he and a technologist named Anil Dash created what is widely seen as the first NFT. (Though it didn't have that name yet.)

The other week, I went to a nicely renovated house in Greenpoint, Brooklyn, to meet with McCoy, 55, and his wife, Jennifer, 53, who have been partners in life and art since 1990. McCoy explained that, back in 2014, he was looking for a way to assert authorship, and to transfer ownership, of the digital creations that he and his friends made and mostly failed to sell. After all, a digital file, whether a video or a JPEG like the ones made by Beeple, can be endlessly and perfectly copied — and maybe should be, if artists want their ideas to have the widest impact.

What was needed was a way to make a few of those copies "authentic," different enough from all other copies. McCoy realized that blockchains could function as a kind of virtual vault. Put the deed to a digital artwork in that vault, as an NFT, and a collector suddenly has something fixed that can be owned and traded.

The McCoys said that by giving digital artists a way to sell art objects with some of the ease that painters and sculptors have always had, the new token Kevin designed would help them, and their art, survive and thrive. "You could actually feel like you had free space to think," Jennifer said.

Eight years later, the idea has finally paid off for the McCoys. That first NFT that Kevin created, which he'd attached to a modest digital abstraction titled "Quantum," sold last June at Sotheby's for $1.4 million.

## Amid the Hype, No One's Making Money

But NFTs aren't doing as much for most artists. I asked the economist Ethan McMahon of the analytics firm Chainalysis to crunch some numbers, and they showed that about half of all NFTs that sell go for less that $400 — hardly enough to cover the blockchain costs when a creator "mints" an NFT, let alone the costs of maintaining a digital studio. (And that's not counting the untold number of NFTs that don't sell at all.)

McMahon also said that almost all the resale action for NFTs, where the real money gets made, happens at the top end of the market; the vast majority of NFTs barely get resold. "People who are trying to profiteer off whatever crazed hype there is around this NFT space really need to be careful," McMahon said. "Because a lot of times it ends up being to your disadvantage."

## NFTs and the Crowds They Bring

Rather than looking to NFTs for a bigger payday, some technophilic artists might be satisfied if those tokens brought a bigger and more attentive audience. The NFT craze has attracted a community of digital natives with even closer ties than the ones that bind collectors in the art market. These eager NFT newbies might just have the potential to create "a revolution of support for digital creatives," said John Gerrard, a 48-year-old Irishman whose digital art won him wide recognition before NFTs existed. In 2014, on the plaza of Lincoln Center in New York, a giant LED screen displayed a dazzlingly realistic "live" image of a solar-power plant in Nevada, entirely constructed from the zeros and ones of Gerrard's computer.

And yet for all his success Gerrard feels that the art world has mostly turned its back on digital work like his, in favor of the paintings that dominate an ever more conservative and analog scene. The popularity of NFTs might lead to something like a new gallery neighborhood, the equivalent of Chelsea or TriBeCa in New York — except that it would be virtual, a marketplace for the most fascinating digital files instead of brilliant objects.

But Gerrard may be misunderstanding what the world of NFTs is really about. Just as no one collects a 1916 Babe Ruth card to contemplate the portrait on it, or the "Inverted Jenny" stamp to enjoy the biplane it bears, so the vast majority of the NFT'd files that get bid into the stratosphere are collected for their collectability alone. The artistic brilliance is pretty much beside the point.

John Gerrard's "Solar Reserve (Tonopah, Nevada)," 2014, a simulation installation at Lincoln Center, was made using gaming software.  John Gerrard, PACE Gallery

It's not hard to imagine an eBay community all about buying old deeds to homes: "Look, I've got a Frank Lloyd Wright!"; "Hey, my mint Eames is way rarer." To an amazing degree, collecting NFTs is pretty much the same. It fulfills quite different human needs and drives than those of fine art.

Yet those needs — for community, for ownership and its power, for social validation — reveal the truly artistic potential of NFTs.

## NFTs as Artistic Inspiration

"Art exists in a world where one is always making political choices about one's relationship to economics," said Amy Whitaker, who teaches art-world economics at New York University. The way NFTs have been bought, sold and admired automatically raises issues of ownership and its meaning. Issues of generosity (in that NFT'd images are supposed to circulate freely) and greed (in that they are mostly bought to make the cryptorich richer). And issues of community in the making of NFTs, which can be a group act, and of individualism, often, in who gets the money for any one creation. With NFTs, Whitaker said, such social "incidentals" take center stage, whereas it's just about possible to see a work of conventional fine art in glorious aesthetic isolation.

But those links to social and economic factors have in fact been central to the fine art of the last few decades at its most novel and challenging. Take the genre known as "Business Art," where the act of buying and selling, in all its cultural complexity, has been turned into the work itself. The genre was pioneered some 60 years ago in projects by Yves Klein, Andy Warhol and various 1960s conceptualists, and then took off in the 1990s in work by Damien Hirst.

Last summer, when Hirst moved into NFTs — one of the first art stars to do so — he called his project "The Currency": He offered NFTs that corresponded to 10,000 of his Spot paintings; one year after a purchase, a collector would be given the choice between keeping the blockchain token and watching the corresponding canvas burn, or keeping the canvas and giving up the NFT. Hirst, the Business Artist, was staging a fight between market forces and aesthetic delight. Produced with HENI, an art services business, the project grossed about $18 million from the initial sale.

NFTs by the digital native known as Pak can also be placed in the Business Art tradition: He has offered digital images with the barest visual interest — riffs on a minimal cube such as any designer could make — but which get lots of impact from the bizarre way in which they are sold as NFTs. They are offered to the public for just minutes at a time, and the total number you buy affects the kind of NFT'd image you get. If we're looking for true "NFT art," where the NFT-ness itself is at issue, then Pak's digital Business Art qualifies.

CryptoPunk by Larva Labs. The consignor of a recent lot of CryptoPunk NFTs pulled the lot at Sotheby's before a recent sale.  Larva Labs

Cryptopunk #2710  Larva Labs

And then there's the even more slippery genre known as "relational art," whose goal is to cast light on human interactions by triggering new ones. Back in 1992, the Thai artist Rirkrit Tiravanija crafted the classic example: He began to cook and serve curry to museumgoers, not for the sake of gastronomy — he started out as a pretty weak chef — but to put a spotlight on what it means to make such an offer.

Where Tiravanija experimented with food and generosity, CryptoPunks, some of the earliest of all art NFTs, can be thought of as an experiment that puts a spotlight on the act of collecting, and what it means.

CryptoPunks were born in June 2017, when the programmers Matt Hall and John Watkinson used some basic code to generate 10,000 cartoonish pictures of different human heads, so pixelated that you can only just make out a few identifying features — a purple hat on one, red hair on another. They were free for the asking when first NFT'd, but because of their variety, and their limited supply, they became some of the most collectible of collectibles, and can now trade for millions of dollars each.

In late February, Sotheby's was about to sell a single lot of 104 CryptoPunk NFTs for as much as $30 million, when the collector who consigned them pulled out at the last minute. "People were extremely upset," said Kent Charugundla, an NFT collector who was at the canceled auction. The problem, he explained, was that the surging market for the collectibles might begin to sputter.

That explanation shows how even when the new art puts NFT-ness on the table, in all its social and economic complexity, it can't escape the rapacious capitalism that has come to be at its heart. Speaking over Zoom from Buffalo, Tina Rivers Ryan, a curator at the Albright-Knox museum who showed early interest in NFTs, said that if digital artists see NFTs as promising a rich future for their neglected medium, the new world of tokens may instead bring about "an impoverishment — and not just of digital art, but of art full stop, because it reduces art to being a frictionless commodity."

But Ryan pointed me to one remote corner of the NFT universe where work is going on that pushes back against business as usual. A year ago, just as NFTs were exploding into view, Kelani Nichole, the founder of Transfer, the bricks-and-mortar gallery in Brooklyn devoted to all kinds of computer art, helped organize an online NFT exhibition called "Pieces of Me." A mission statement declared that the show was meant to "reflect on NFTs through a curatorial and technological framework that emphasizes the ethics of care, redistribution of wealth, and artist's agency and rights."

Some artists offer their works free ("an explicit rejection of the capitalist urge to consume"), while others offer works that come with conditions not exactly standard in the NFT world. A piece by the Londoner Danielle Brathwaite-Shirley, for instance, consists of a low-fi GIF that presents a series of written out "Terms and Conditions," committing the buyer to "showcase and invest in the works of Black trans artists" — and then in the NFT's binding contract the collector agrees to abide by those commitments, printing them out and pasting them up for two years.

The buyer of the NFT for Kim Laughton's "Ascetic" acquires a work that is anything but: They get ownership of an actual chain, golden and bejeweled, with the title word spelled out, as well as a digital image of the piece meant for sharing. The project captures contradictions in the NFT world between its claims for a transcendent new immateriality and the very earthbound bling involved in almost all its transactions.

JA-145

Kim Laughton's "Ascetic" (2021), digital image and chain edition, from the online exhibition "Pieces of Me."   Kim Laughton

As art objects, not all the pieces in "Pieces" have much new to say to a critic, and they certainly didn't need NFTs to not say it. Taken together, however, they turn the show into a work of "meta-art" — of meta-*relational*-art — that reflects on what it means to be an artist, a curator, or a collector in our post-Beeple world.

**JA-146**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FREE HOLDINGS INC., <br><br> Plaintiff, <br><br> -against- <br><br> KEVIN McCOY and SOTHEBY'S INC., <br><br> Defendants. | ECF CASE <br><br> Case No.: 1:22-cv-00881 (LGS) (JLC) <br><br> **NOTICE OF MOTION TO** <br> **DISMISS AMENDED COMPLAINT** |

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, the accompanying Declaration of William L. Charron dated June 30, 2022 and the exhibits annexed thereto, and all prior proceedings heretofore had and all papers filed herein, defendant Kevin McCoy ("McCoy") will move this Court, at a date and time to be determined by the Court, for an Order dismissing with prejudice all claims against him in plaintiff Free Holdings Inc.'s ("Plaintiff") Amended Complaint dated May 9, 2022, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

PLEASE TAKE FURTHER NOTICE that, pursuant to agreement of the parties, Plaintiff shall electronically file any opposition by August 15, 2022; and McCoy shall file any reply by September 2, 2022.

Dated:  New York, New York
        June 30, 2022

PRYOR CASHMAN LLP

By: _____
    William L. Charron
    Robert J. deBrauwere
    Nicholas Saady
7 Times Square
New York, NY 10036
(212) 421 4100

*Attorneys for Defendant Kevin McCoy*