# 23-644

## In the
## United States Court of Appeals
### For the Second Circuit



FREE HOLDINGS, INC.,

*Plaintiff-Appellant,*

– v. –

KEVIN MCCOY and SOTHEBY'S INC.,

*Defendants-Appellees,*

– and –

NAMELESS CORPORATION and ALEX AMSEL,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume II of II (Pages JA-147 – JA-424)

PRYOR CASHMAN LLP
*Attorneys for Defendant-Appellee*
  *Kevin Mccoy*
7 Times Square, Level 40
New York, New York 10036
(212) 326-0156

FALCON RAPPAPORT & BERKMAN LLP
*Attorneys for Plaintiff-Appellant*
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(212) 203-3255

ARNOLD & PORTER KAYE
  SCHOLER LLP
*Attorneys for Defendant-Appellee*
  *Sotheby's Inc.*
250 West 55th Street
New York, New York 10019
(212) 836-8094

i

# Table of Contents

**Page**

Docket Entries ............................................................................. JA-1

Complaint, Dated February 1, 2022 .............................................JA-13

So-Ordered Stipulation of Honorable of Lorna G. Schofield,
    Dated February 16, 2022...........................................................JA-32

So-Ordered Stipulation of Honorable of Lorna G. Schofield,
    Dated February 17, 2022...........................................................JA-34

Notice of Voluntary Dismissal Pursuant to FRCP 41(a)(1)(A)(i),
    Dated March 7, 2022 .................................................................JA-35

So-Ordered Notice of Voluntary Dismissal Pursuant to
    FRCP 41(a)(1)(A)(i) of Honorable of Lorna G. Schofield,
    Dated March 8, 2022 .................................................................JA-36

Letter from William L. Charron to Honorable
    Lorna G. Schofield, Dated April 1, 2022 ..................................JA-37

So-Ordered Stipulation of Honorable of James L. Cott,
    Dated April 13, 2022 .................................................................JA-40

Notice of Voluntary Dismissal Pursuant to F.R.C.P.
    41(a)(1)(A)(i), Dated May 9, 2022...........................................JA-43

Amended Complaint, Dated May 9, 2022.....................................JA-44

So-Ordered Notice of Voluntary Dismissal Pursuant to
    F.R.C.P. 41(a)(1)(A)(i) of Honorable of James L. Cott,
    Dated May 10, 2022 ..................................................................JA-69

Stipulation and Order of Honorable of
    James L. Cott, Dated May 16, 2022 ..........................................JA-70

Notice of Motion by Defendant Sotheby's Inc. to Dismiss
    Amended Complaint, Dated June 30, 2020.................................JA-72

Defendant Sotheby's Inc.'s Memorandum of Law in
    Support of Motion, Dated June 30, 2020 ...................................JA-74

Declaration of Evan M. Rothstein, for Defendant
    Sotheby's Inc., in Support of Motion, Dated June 30, 2022 .....JA-102

    Exhibit A to Rothstein Declaration -
    Amended Complaint, Dated May 9, 2022
    (Reproduced herein at pp. JA-44–JA-68) .................................JA-105

ii

**Page**

Exhibit B to Rothstein Declaration -
Auction Listing.............................................................JA-106

Exhibit C to Rothstein Declaration -
Video of Kevin McCoy-Quantum
(Reproduced on DVD) ................................................JA-113

Exhibit D to Rothstein Declaration -
Transcript of the Video of Kevin McCoy-Quantum,
Dated June 28, 2022....................................................JA-115

Exhibit E to Rothstein Declaration -
Video of Quantum Token-McCoy
(Reproduced on DVD) ................................................JA-121

Exhibit F to Rothstein Declaration -
Transcript of the Video of Quantum Token-McCoy,
Dated June 28, 2022....................................................JA-123

Exhibit G to Rothstein Declaration -
Article Titled *"NFT sales hit $25 billion in 2021, but growth
shows signs of slowing"* by Elizabeth Howcreoft,
Dated January 11, 2022...............................................JA-130

Exhibit H to Rothstein Declaration -
Article Titled *"One Year After Beeple, the NFT Has
Changed Artists. Has It Changed Art?"* by Blake Gopnik,
Dated March 3, 2022....................................................JA-138

Notice of Motion by Defendant Kevin McCoy to
    Dismiss Amended Complaint, Dated June 30, 2022.................JA-146

Defendant Kevin McCoy's Memorandum of Law in
    Support of Motion, Dated June 30, 2022 ...................................JA-147

Declaration of William L. Charron, for Defendant
    Kevin McCoy, in Support of Motion, Dated June 30, 2022 .....JA-180

Exhibit A to Charron Declaration -
"FAQ" Pages from Website "www.namecoin.org"..................JA-182

Exhibit B to Charron Declaration -
Pages from Website "www.namebrow.se" ...............................JA-218

Plaintiff's Memorandum of Law in Opposition to Sotheby's
    Inc.'s Motion, Dated August 15, 2022 ......................................JA-221

iii

**Page**

Plaintiff's Memorandum of Law in Opposition to
 Kevin McCoy's Motion, Dated August 15, 2022 ....................JA-242

Declaration of Moish E. Peltz, for Plaintiff, in
 Opposition to Motion, Dated August 15, 2022, with
 Exhibit A to C Annexed Hereto ................................................JA-272

Letter from Moish E. Peltz to Honorable James L. Cott,
 Dated August 15, 2022............................................................JA-289

Defendant Sotheby's Inc.'s Reply Memorandum of Law in
 Further Support of Motion, Dated September 1, 2022..............JA-290

Defendant Kevin McCoy's Reply Memorandum of Law in
 Further Support of Motion, Dated September 1, 2022..............JA-305

Internet Citation Note "About Conversations on Twitter"............JA-319

Internet Citation Note "Defining "NFT" in Historical
 Context-Chainleft" ...................................................................JA-328

Internet Citation Note "Interaction Definition & Meaning -
 Merriam-Webster" ....................................................................JA-345

Internet Citation Note "Kevin McCoy on Twitter".......................JA-355

Internet Citation Note "Namebrow.se - Namecoin Block
 Explorer"...................................................................................JA-357

Internet Citation Note "Quantum: Kevin McCoy" .......................JA-359

Internet Citation Note "Quantum.Gif" .........................................JA-368

Internet Citation Note "Quantum.Gif" .........................................JA-369

Opinion and Order of Honorable James L. Cott,
 Dated March 17, 2023...............................................................JA-370

Judgment of The United States District Court,
 Southern District of New York, Dated March 20, 2023,
 with Attachments ......................................................................JA-413

Notice of Appeal, Dated April 17, 2023 ......................................JA-424

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FREE HOLDINGS INC.,

                Plaintiff,

-against-

KEVIN McCOY and SOTHEBY'S INC.,

                Defendants.

---

ECF CASE

Case No.: 1:22-cv-00881 (LGS) (JLC)

 

 

**DEFENDANT KEVIN McCOY'S MEMORANDUM**
**OF LAW IN SUPPORT OF HIS MOTION TO DISMISS**

 

William L. Charron
Robert J. deBrauwere
Nicholas Saady
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 798-6307

*Attorneys for Defendant Kevin McCoy*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

RELEVANT ALLEGATIONS AND FACTS.......................................................... 2

    McCoy's Creation Of The 2014 NFT ............................................................ 2

    Plaintiff Admits That Every NFT Is Unique................................................. 3

    Plaintiff's Misdescription Of The Namecoin Protocol ................................. 4

    Plaintiff's Title Claim Is Illusory ................................................................. 5

    The Namecoin Namespace Report................................................................ 6

    The Allegedly "False And Misleading" Auction Marketing Statements....... 7

    Plaintiff Pleads No Special Damages ........................................................... 8

    Procedural History ........................................................................................ 9

SUMMARY OF PLAINTIFF'S CLAIMS TO BE DISMISSED ........................... 9

STANDARDS OF REVIEW ................................................................................. 10

    The Standard Under Fed. R. Civ. P. 12(b)(1) ............................................. 10

    The Standard Under Fed. R. Civ. P. 12(b)(6) ............................................. 10

ARGUMENT ........................................................................................................ 11

    I.      PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE..................... 11

          A.    Plaintiff Lacks Standing................................................... 11

          B.    Plaintiff's Claims Are Not Ripe....................................... 13

    II.    PLAINTIFF'S SECOND CAUSE OF ACTION FOR
          UNJUST ENRICHMENT SHOULD BE DISMISSED ................. 14

          A.    Plaintiff Does Not Plausibly Allege Enrichment At
               Plaintiff's Expense ........................................................... 14

          B.    Plaintiff Does Not Allege A Close Connection
               Between Itself And McCoy ............................................... 15

    III.   PLAINTIFF'S THIRD CAUSE OF ACTION FOR SLANDER OF
          TITLE SHOULD BE DISMISSED ................................................ 16

          A.    Plaintiff Does Not Allege Malice By McCoy.................... 16

i

|     | B.   | Plaintiff Does Not Allege Special Damages | 17 |

IV.   PLAINTIFF'S FOURTH CAUSE OF ACTION FOR VIOLATION OF N.Y. G.B.L. § 349 SHOULD BE DISMISSED ......... 20

V.    PLAINTIFF'S FIFTH CAUSE OF ACTION FOR COMMERCIAL DISPARAGEMENT SHOULD BE DISMISSED ......... 22

VI.   PLAINTIFF'S SIXTH CAUSE OF ACTION FOR VIOLATION OF SECTION 43(a) OF THE LANHAM ACT SHOULD BE DISMISSED ......... 22

      A.   Plaintiff Fails To Allege That McCoy Made Any Literally Or Impliedly False Statements ......... 23

      B.   Plaintiff Has Not Viably Pleaded Causation Of Harm ......... 25

VII.  PLAINTIFF'S FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT SHOULD BE DISMISSED ......... 25

CONCLUSION ......... 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Clapper*,
   785 F.3d 787 (2d Cir. 2015)..................................................................11

*Aleem v. Experience Hendrix, L.L.C.*,
   No. 16 CIV. 9206 (ER), 2017 WL 3105870 (S.D.N.Y. July 20, 2017)....................19

*Angio-Med. Corp. v. Eli Lilly & Co.*,
   720 F. Supp. 269 (S.D.N.Y. 1989) ..........................................................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................................10

*Bilinksi v. Keith Haring Found., Inc.*,
   632 F. App'x 637 (2d Cir. 2015) .......................................................18, 19

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)..................................................................10

*Chamila, LLC v. Pandora Jewelry, LLC*,
   No. 04-CV-6017 (KMK), 2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007) ...............17

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*,
   790 F.3d 411 (2d Cir. 2015)..................................................................12

*Davis v. Avvo, Inc.*,
   345 F. Supp. 3d 534 (S.D.N.Y. 2018).......................................................23

*Dentsply Int'l Inc. v. Dental Brands for Less LLC*,
   No. 15 Civ. 8775 (LGS), 2016 WL 6310777 (S.D.N.Y. Oct. 27, 2016) ................19

*Doe v. Quest Diagnostics, Inc.*,
   No. 15 CIV. 8992 (LGS), 2017 WL 1102663 (S.D.N.Y. Mar. 23, 2017) ...........10, 11

*Doyle v. Allstate Ins. Co.*,
   1 N.Y.2d 439 (1956) .........................................................................18

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016)........................................................18

*Ferraro v. Seamen's Church Inst. of N.Y. and N.J.*,
  2007 NY Slip Op 52470(U), 18 Misc. 3d 1108(A) (Sup. Ct., N.Y. Cty.,
  Dec. 3, 2007)........................................................................................................18

*Fink v. Shawangunk Conservancy, Inc.*,
  15 A.D.3d 754 (3d Dep't 2005) .............................................................................17

*Fitzgerald v. Thompson*,
  353 F. App'x 532 (2d Cir. 2009) ...........................................................................12

*Gambles v. Sterling Infosystems, Inc.*,
  234 F. Supp. 3d 510 (S.D.N.Y. 2017)..............................................................11, 12

*Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*,
  593 F. Supp. 743 (S.D.N.Y. 1984) ........................................................................20

*Georgia Malone & Co., Inc. v. Rieder*,
  19 N.Y.3d 511 (2012) ......................................................................................14, 15

*Groden v. Random House, Inc.*,
  61 F.3d 1045, 1051 (2d Cir. 1995) ........................................................................25

*Grosz v. Museum of Modern Art*,
  772 F. Supp. 2d 473 (S.D.N.Y. 2010)....................................................................11

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
  277 F. Supp. 2d 269 (S.D.N.Y. 2003)....................................................................18

*Karlin v. IVF Am., Inc.*,
  93 N.Y.2d 282 (1999) ............................................................................................20

*Kirby v. Wildenstein*,
  784 F. Supp. 1112 (S.D.N.Y. 1992)..................................................................17, 18

*Lokai Holdings, LLC v. Twin Tiger USA, LLC*,
  306 F. Supp. 3d 629 (S.D.N.Y. 2018)....................................................................24

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................................11

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247, 255 (2d Cir. 2014) ..........................................................................23

*Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
  960 F.2d 294 (2d Cir. 1992)..............................................................................23, 24

*Miller v. Walters*,
  997 N.Y.S.2d 237 (Sup. Ct. N.Y. Cnty. 2014) ...............................................15, 21

*Mini Theatres v. New Line Distrib.*,
　　No. 98 CIV. 2997(SHS), 1998 WL 637465 (S.D.N.Y. Sept. 16, 1998) .............................6, 13

*National Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
　　198 F. Supp. 2d 474 (S.D.N.Y. 2002) ....................................................................................21

*North Am. Olive Oil Ass'n v. D'Avolio Inc.*,
　　457 F. Supp. 3d 207 (E.D.N.Y. 2020) ...............................................................20, 21, 22, 25

*Peck v. Aponte*,
　　880 F. Supp. 184 (S.D.N.Y. 1995) .......................................................................................13

*Raines v. Byrd*,
　　521 U.S. 811, 818, (1997) ....................................................................................................11

*RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*,
　　No. 14CV6294-LTS-HBP, 2015 WL 5008762 (S.D.N.Y. Aug. 24, 2015) ...........................20

*Rosenbaum v. City of N.Y.*,
　　8 N.Y.3d 1 (2006) ...........................................................................................................16, 17

*SM Kids, LLC v. Google LLC*,
　　963 F.3d 206 (2d Cir. 2020) ..............................................................................................4, 11

*Spokeo, Inc. v. Robins*,
　　578 U.S. 330, 340 (2016) .....................................................................................................12

*Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*,
　　No. 96 Civ. 5150 (JFK), 1997 WL 137443 (S.D.N.Y. Mar. 24, 1997) .................................21

*Technomarine SA v. Jacob Time, Inc.*,
　　905 F. Supp. 2d 482 (S.D.N.Y. 2012) ..................................................................................10

*Teller v. Bill Hayes, Ltd.*,
　　213 A.D.2d 141 (2d Dep't 1995) ..........................................................................................20

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
　　497 F.3d 144 (2d Cir. 2007) .................................................................................................24

*United States v. Broadcast Music, Inc.*,
　　275 F.3d 168 (2d Cir. 2001) .................................................................................................13

*W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
　　549 F.3d 100 (2d Cir. 2008) .................................................................................................13

*Wei Su & Hai Wang v. Sotheby's, Inc.*,
　　No. 17-CV-4577 (VEC), 2019 WL 4917609 (S.D.N.Y. Oct. 4, 2019) ............................16, 17

*Williams v. GMAC Mortg., Inc.*,
   No. 13 Civ. 4315 (JPO), 2014 WL 2560605 (S.D.N.Y. June 6, 2014) ................................11

*Worley v. Giuliani*,
   8 F. App'x 131 (2d Cir. 2001) ...................................................................................12

**Statutes**

Lanham Act Section 43(a), 15 U.S.C. § 1125(a) ....................................................................9, 22

New York General Business Law § 349 ..................................................................9, 20, 21, 22

**Other Authorities**

Fed. R. Civ. P. 9(g) ....................................................................................................................18

Fed. R. Civ. P. 12 .........................................................................................................................1

Maghan McDowell, "Why brands are burning NFTs," *Vogue Business*, Feb. 8, 2022
   (https://www.voguebusiness.com/technology/why-brands-are-burning-nfts) .......................24

Defendant Kevin McCoy ("McCoy") respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), to dismiss plaintiff Free Holdings Inc.'s ("Plaintiff") Amended Complaint dated May 9, 2022 (ECF No. 47).  McCoy also respectfully joins and incorporates fully by reference the accompanying Fed. R. Civ. P. 12 motion to dismiss filed by co-defendant Sotheby's Inc. ("Sotheby's").

## PRELIMINARY STATEMENT

This case concerns property ownership of non-fungible tokens ("NFTs").  Plaintiff claims to own a NFT created by McCoy in 2014, which is "the first NFT ever created" (the "2014 NFT"). (ECF No. 47 at ¶ 37.)  Plaintiff's pleading, however, is sleight-of-hand and based upon implausible conclusions.  What Plaintiff actually alleges itself to own is a distinct NFT that it created *seven years later*, in 2021 (the "2021 NFT").  Plaintiff asks this Court to declare that its 2021 NFT is effectively the same as McCoy's 2014 NFT.  Such pleading is implausible; indeed, Plaintiff admits in its pleading that "no two NFTs are the same."  (*Id.* at ¶ 30.)  Plaintiff is, in truth, asking the Court to endorse an attempted forgery or piracy of the 2014 NFT.  As explained below, Plaintiff's case should be dismissed because Plaintiff has not viably or plausibly alleged its ownership of the 2014 NFT, and therefore has not alleged standing.

Plaintiff's claims also suffer a ripeness problem.  Plaintiff complains that the promotion and sale of another NFT that McCoy created and sold through co-defendant Sotheby's in 2021 (the "*Quantum* NFT") may confuse potential future buyers into thinking that the 2014 NFT no longer exists, which may one day harm Plaintiff's efforts to sell its 2021 NFT.  Because each of these NFTs is different, Plaintiff's theory is a *non sequitur.*

But even putting that fact aside, Plaintiff alleges no immediacy or concreteness to this supposed problem.  In particular, Plaintiff does not allege that it has lost any sales opportunities of the 2021 NFT due to the possible confusion it has alleged – Plaintiff does not allege that it has

1

even *tried* to sell the 2021 NFT.   Nor does Plaintiff allege any evidence of consumer confusion. Plaintiff's claims are entirely speculative, hypothetical and unripe.

Moreover, Plaintiff's case should be dismissed with prejudice.   This is Plaintiff's second attempt to artfully plead a case against McCoy and Sotheby's.   Plaintiff was given an abundance of time to try.   Plaintiff has now shown that it cannot allege anything that could transform its 2021 NFT into McCoy's 2014 NFT.   Which makes perfect sense because every NFT is a *non-fungible* token.   No two NFTs are the same, exactly as Plaintiff alleges.

Plaintiff also used its time between its pleadings to try to manufacture new facts for its Amended Complaint.   Specifically, Plaintiff leveraged its agreement to voluntarily dismiss its initial complaint against another former co-defendant, nameless Corporation ("Nameless"), as a *quid pro quo* for Nameless retracting an independent consulting and condition report concerning the 2014 NFT, which Plaintiff alleges includes false or misleading statements.   Plaintiff's attempted contrivance of new facts does not create any actionable claims.   As explained below, and as further discussed in Sotheby's accompanying motion to dismiss (which McCoy incorporates by reference), all of Plaintiff's claims fail to state, and cannot state, necessary elements.   For these independent reasons as well, this case should be dismissed.

## RELEVANT ALLEGATIONS AND FACTS

### McCoy's Creation Of The 2014 NFT

McCoy created the 2014 NFT.   (ECF No. 47 at ¶¶ 2, 37.)[1]

---

[1] McCoy is an acclaimed digital artist, and his creation of the 2014 NFT in association with his *Quantum* digital artwork has received widespread attention in the art and collectibles world, including recently earning McCoy the honor of a 2022 Webby Lifetime Achievement Award "for developing a block-chain powered way for artists to own and monetize digital work, which laid the groundwork for what would be known as [n]on-fungible tokens (NFTs)." (https://winners.webbyawards.com/2022/specialachievement/301/anil-dash--kevin-mccoy.)

McCoy created the 2014 NFT using a blockchain known as Namecoin.  (*Id.* at ¶ 36.) Plaintiff alleges that a "blockchain is a digital public ledger maintained on a decentralized computer system and consisting of records called blocks."  (*Id.* at ¶ 27.)  In its initial Complaint, Plaintiff made the same allegation but included the statement that the blocks are "sequential records."  (ECF No. 1 at ¶ 15.)  In its Amended Complaint, Plaintiff deleted the term "sequential" from this allegation, but the fact nonetheless remains.

Plaintiff alleges that "NFTs are tokens that authenticate digital content via blockchain technology."  (ECF No. 47 at ¶ 29.)  "The content linked to NFTs can take the form of digital images of physical objects, music, text, and more."  (*Id.* at ¶ 32.)  Namecoin, therefore, is a digital public ledger that can be used to record NFTs, which themselves evidence the authenticity of other assets, such as digital art.  (*See id.*)  Plaintiff alleges that McCoy created, or "minted," the 2014 NFT to evidence the authenticity of his digital art known as *Quantum*.  (*See id.* at ¶¶ 2, 36.)[2]

**<u>Plaintiff Admits That Every NFT Is Unique</u>**

Plaintiff alleges that NFTs "are valued for their ability to maintain secure and decentralized records of transactions."  (*Id.* at ¶ 28.)  That is because, according to Plaintiff, "no two NFTs are the same."  (*Id.* at ¶ 30.)  "Whereas cryptocurrencies are fungible," the uniqueness and "non-fungible nature of NFTs," combined with the "blockchain's record-keeping and authentication technology," make NFTs valuable as tools of authentication.  (*Id.* at ¶¶ 30, 31, 33.)[3]

---

[2] Plaintiff mistakenly refers to the 2014 NFT as itself being "titled 'Quantum'".  (*Id.* at ¶ 36.)  *Quantum* is the digital artwork; the 2014 NFT is the blockchain record that McCoy created in association with that artwork.  In its initial Complaint, Plaintiff correctly distinguished between *Quantum* and "the Quantum blockchain record," which blockchain record Plaintiff alleged "is presumably the first known NFT."  (ECF No. 1 at ¶ 20.)  In its Amended Complaint, Plaintiff conflates *Quantum* with the 2014 NFT.

[3] In its initial Complaint, Plaintiff more concisely alleged that "each NFT is unique" and is "sequential[ly]" distinct from every other NFT within a blockchain.  (ECF No. 1 at ¶¶ 1, 15.)  Plaintiff's amendment does not save its pleading; its allegation that "no two NFTs are the same" constitutes the same admission that the 2021 NFT created by Plaintiff is different from the 2014 NFT that McCoy created.

3

The 2014 NFT, therefore, is a unique record that exists in the Namecoin blockchain.  The 2014 NFT includes, *inter alia*, a unique transaction identification number, and a unique date and time stamp.  (Declaration of William L. Charron dated June 30, 2022 ("Charron Decl.") at Ex. B.)[4]

**Plaintiff's Misdescription Of The Namecoin Protocol**

Plaintiff relies upon it characterization of Namecoin's protocol as the integral basis for its theory that it owns and controls the 2014 NFT.  (*Id.* at ¶¶ 39-42.)  The Court may consider Namecoin's actual protocol (referred to as its "FAQ") on this motion.  *E.g.*, *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 214 (2d Cir. 2020).  As the Court can see, Plaintiff seriously misdescribes that protocol.

Plaintiff alleges that Namecoin "requires a user who controls a Namecoin record to periodically update the record every 35,999 blocks" or "approximately 200-250 days." (*Id.* at ¶ 39.)  Plaintiff then alleges that, "[i]f a user fails to update their record," then "control of that particular block record [sic] expires and can be claimed by another user." (*Id.* at ¶ 40.)

That is *not* what Namecoin actually says.  Namecoin does not state that so-called "block records" (which is a term invented by Plaintiff) can expire and be claimed by others.  Namecoin states that "*registered names*" and "*namespaces*" chosen by users can expire and be claimed by others if those *names* are not periodically renewed or updated.  Namecoin states:

> *Registered names* semi-expire if they are not renewed or updated for 31,968 blocks (approximately 222 days).  If your *name* is semi-expired, it will stop resolving for your users until you renew or update it, but you are still the sole owner of *the name*.  Semi-expired *names that are not renewed or updated* for an additional 4,032 blocks (approximately 28 days) will expire.  *Expired names* can be re-registered by anyone.  There are no registration fees for renewals or updates, but a transaction fee does apply.  [Emphases supplied.]

(Charron Decl. Ex. A (https://www.namecoin.org/docs/faq/) (last accessed on June 28, 2022) at p.3/35.)

---

[4] In its initial Complaint, Plaintiff acknowledged that such unique metadata is "self-evident" from a public search of the 2014 NFT record in the Namecoin ledger.  (ECF No. 1 at ¶ 1.)

A name is associated with a record, but it is not the record itself.  Namecoin describes "namespaces" as "arbitrary binary blobs" that are created by users.  (*Id.* at p.6/35.)  Because of that fact, Namecoin also states that it "itself isn't aware of namespaces."  (*Id.*)  Namecoin further expressly states that namespaces "*don't have any effect* on validation rules" which govern the ownership and control of records themselves.  (*Id.* (emphasis supplied).)  Critically, Plaintiff never alleges that it can or could control the 2014 NFT.

Thus, Plaintiff's allegation that control of a Namecoin namespace gives control and ownership of all records (including NFTs) that were once associated with that namespace is not only implausible, it is demonstrably false.

**Plaintiff's Title Claim Is Illusory**

Plaintiff alleges that "McCoy failed to update the Namecoin-*Quantum* record on the Namecoin blockchain" in January 2015, "rendering the *record* free to claim."  (ECF No. 47 at ¶ 41 (emphasis supplied).)  Plaintiff alleges that it "claimed the Namecoin-*Quantum* record on the Namecoin blockchain" on or around April 5, 2021.  (*Id.* at ¶ 42.)  Plaintiff alleges that "title to the Namecoin-*Quantum* NFT [the 2014 NFT] is currently held by Free Holdings."  (*Id.* at ¶ 43.)

Plaintiff would thus have the Court accept that the 2014 NFT "blockchain record" expired and was free to claim after January 2015 – as if McCoy abandoned the 2014 NFT like used furniture on the side of the road with a sign saying 'Free To Take.'  But, as Namecoin's actual protocol provides, McCoy only allowed the Namecoin *namespace* associated with the 2014 NFT to be registered by someone else.  Plaintiff's alleged new registration in 2021 of the namespace that McCoy had used in connection with the 2014 NFT "d[id]n't have any effect" on the validation rules which govern the ownership and control of the 2014 NFT.  (*See* Charron Decl. Ex. __.)[5]

---

[5] Plaintiff alleges that "Namecoin records [can] be used like domain names, or ... act as NFTs."  (*Id.* at ¶ 35.) Regardless of whether that is a fair and accurate characterization or not, only "expired names" or "namespaces" can be re-registered by different users according to Namecoin's protocol.

**The Namecoin Namespace Report**

Plaintiff cites certain metadata that McCoy included in the 2014 NFT (in the "Value" field), which states, in relevant part:

> I [McCoy] assert title to the file at the URL http://staticmccoyspace.com/gifs/ quantum.gif [*i.e.*, the *Quantum* artwork] .... Title transfers to whoever controls this blockchain entry [*i.e.*, the 2014 NFT].

(ECF No. 47 at ¶ 38.) Plaintiff includes a footnoted citation to this paragraph of its pleading, which links to a historical report of the Namecoin namespace associated with the 2014 NFT (the "Namespace Report"). (*Id.* at ¶ 38 n.3; Charron Decl. Ex. B.) The Namespace Report is illuminating – indeed, it is dispositive.

The Namespace Report recites all "Name operations" associated with this namespace that have occurred over time. (Charron Decl. Ex. B.) The name operations began on May 2, 2014, at 11:33 p.m. (*Id.*) That is when McCoy registered the namespace that he would use in association with the 2014 NFT, indicated by the "Operation" description: "NAME_NEW" with a unique "Value" description. (*Id.*; *accord* ECF No. 47 at ¶ 36.) The next day, May 3, 2014, at 1:27 a.m., McCoy performed his "NAME_ FIRSTUPDATE" operation, which was the first update to that namespace and which added McCoy's unique metadata that created the 2014 NFT. (Charron Decl. Ex. B.)

The next namespace transaction occurred *seven years later*, on April 5, 2021, at 7 a.m. (*Id.*) That is when Plaintiff allegedly claimed the namespace and created a *new* NFT (the 2021 NFT), indicated by the operation description: "NAME_NEW," with a *different* "Value" description. (*Id.*; *accord* ECF No. 47 at ¶ 42.) Later that same day, at 12:14 p.m., Plaintiff performed its own "NAME_ FIRSTUPDATE" operation to its "NEW" NFT, in which Plaintiff performed its own *first* update to *that* NFT. (Charron Decl. Ex. B.) Plaintiff then proceeded to perform multiple, further "NAME_UPDATE" operations – no longer the "FIRSTUPDATE"

6

operation – to its "NEW" NFT on April 30, 2021, June 7, 2021, June 14, 2021, and February 10, 2022. (*Id.*)  In particular, on April 30, 2022, Plaintiff copied the "Value" field metadata from the 2014 NFT into the 2021 NFT. (*Id.*)

The Namespace Report is conclusive that the 2021 NFT copies, but is nonetheless distinct from, the 2014 NFT – which accords with Plaintiff's admission that "no two NFTs are the same." (ECF No. 47 at ¶ 30.)  That is why Plaintiff's effort to have this Court equate the 2021 NFT with the 2014 NFT is best described as attempted forgery or piracy.

**The Allegedly "False And Misleading" Auction Marketing Statements**

Plaintiff alleges that, "[l]eading up to and throughout the course of the auction" of the *Quantum* NFT by Sotheby's in the fall of 2021, "McCoy and Sotheby's materially misrepresented the status of [the *Quantum* NFT] and [the 2014 NFT]." (ECF No. 47 at ¶ 60.)  Specifically, Plaintiff alleges that "Sotheby's retained [former co-defendant Nameless] … to assist Sotheby's with its [] auction," and that Nameless "wrote condition reports for the works in the [] auction, including the condition report for [the *Quantum* NFT]." (*Id.* at ¶¶ 63-64.)  That condition report, *written by Nameless*, allegedly "falsely state[d] that the [2014 NFT] 'was removed from the system after not being renewed, and was effectively burned from the chain.'" (*Id.* at ¶ 65.)  Plaintiff alleges that "[a] Namecoin blockchain record cannot be 'removed,' and the blockchain record for the [2014 NFT] has not been 'removed' or 'burned.'" (*Id.* at ¶ 68.)

Plaintiff further alleges that, following Nameless's issuance of its independent consulting and condition report, Sotheby's later posted a video on its website "promoting and marketing the … auction," in which "McCoy states that he originally minted [the 2014 NFT] on the Namecoin blockchain and that he 'moved the original on chain data from a burned Namecoin token into a modern industry standard ERC-721 token [*i.e.*, the *Quantum* NFT], while preserving all of the original on chain information.'" (*Id.* at ¶ 66.)  Because McCoy used one of the same terms as

7

Nameless had used in its consulting and condition report (*i.e.*, "burned"), Plaintiff alleges that "McCoy's statement is also false." (*Id.* at ¶ 67.)

Plaintiff alleges that it "made repeated attempts to alert McCoy … that the [2014 NFT] had not been 'burned' or 'removed' from the Namecoin blockchain," and to request that those allegedly false statements be "retract[ed]" or that "public corrective statements" be issued. (*Id.* at ¶¶ 71-87.) Plaintiff then alleges, however, that on May 6, 2022, "nameless retracted its condition report" that had referred to the 2014 NFT as having been "removed" and "burned." (*Id.* at ¶ 88.) Plaintiff also alleges that Nameless publicized its retraction of those statements. (*Id.*) Coincident thereto, Plaintiff dismissed its claims against Nameless (as an obvious *quid pro quo*). (ECF Nos. 46, 48.)[6]

**Plaintiff Pleads No Special Damages**

Plaintiff vaguely alleges that "the value [of the 2021 NFT] is being significantly diminished by the false and misleading statements made by McCoy and Sotheby's" that were made in promoting Sotheby's auction of the *Quantum* NFT. (ECF No. 47 at ¶ 98.) Plaintiff alleges that it "has incurred damages to repair the reputation to [the 2021 NFT] as a result of McCoy and Sotheby's false and misleading statements." (*Id.* at ¶ 99.) Plaintiff further alleges that it "expended $5,311.49 seeking to have McCoy and Sotheby's issue public statements correcting their false and misleading claims." (*Id.* at ¶ 100.) Nevertheless, Plaintiff does not allege that it lost any specific sales opportunities, or that it has ever tried to sell the 2021 NFT, or that the 2021 NFT has ever held any specific value.

---

[6] While Nameless retracted its condition report, Nameless also expressly stated "'no opinion about the merits of [Plaintiff's] allegations'" in this case. (ECF No. 47 at ¶ 88.) That statement of non-opinion by Nameless makes clear that its condition report retraction was not merits-based, but was simply a bargain struck by Nameless to quickly and easily get out of this case. Thus, Plaintiff did nothing more than improperly leverage the mere existence of this spurious lawsuit to pressure Nameless to retract its condition report.

**Procedural History**

Plaintiff filed its initial Complaint on February 1, 2022.  (ECF No. 1.)  McCoy filed a pre-motion to dismiss letter with the Court on April 1, 2022, identifying many of the same points discussed in detail below as bases for dismissal.  (ECF No. 34.)  In response, Plaintiff elected to file its Amended Complaint, which dismisses two of the initially named defendants.  (ECF Nos. 24, 24, 44, 46-48.)

## SUMMARY OF PLAINTIFF'S CLAIMS TO BE DISMISSED

As explained below, each of Plaintiff's claims should be dismissed for lack of subject matter jurisdiction (justiciability).  Each claim should be dismissed for the following independent reasons as well:

- Plaintiff's First Cause of Action for declaratory judgment should be dismissed because there is no "actual controversy."

- Plaintiff's Second Cause of Action for unjust enrichment should be dismissed because Plaintiff fails to allege any enrichment of McCoy at Plaintiff's expense.  Nor does Plaintiff allege a sufficiently close relationship (or any relationship at all) between itself and McCoy.

- Plaintiff's Third Cause of Action for slander of title should be dismissed because, in addition to failing to viably state that Plaintiff holds title to the 2014 NFT, and in addition to complaining about protected speech (as discussed in Sotheby's accompanying and incorporated motion to dismiss), Plaintiff fails to allege special damages.

- Plaintiff's Fourth Cause of Action for violation of New York General Business Law ("GBL") § 349 should be dismissed because Plaintiff fails to allege any generalized, consumer-oriented misconduct by McCoy.

- Plaintiff's Fifth Cause of Action for commercial disparagement should be dismissed because, again, Plaintiff complains about protected speech and because Plaintiff fails to particularize special damages.  Plaintiff also fails to allege that McCoy made any disparaging statements directed at Plaintiff or its 2021 NFT.

- Plaintiff's Sixth Cause of Action for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), should be dismissed because Plaintiff does not allege any literally or impliedly false statements of fact by McCoy.  Plaintiff also fails to allege any causation of harm.

9

**JA-163**

## STANDARDS OF REVIEW

### The Standard Under Fed. R. Civ. P. 12(b)(1)

On a motion to dismiss for lack of subject matter jurisdiction, the Court "must accept as true all material factual allegations in the complaint," but it cannot "draw inferences from the complaint favorable to plaintiffs." *Doe v. Quest Diagnostics, Inc.*, No. 15 CIV. 8992 (LGS), 2017 WL 1102663, at *2 (S.D.N.Y. Mar. 23, 2017) (citations omitted). In particular, a plaintiff "cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Id.* (citations omitted). The court may consider evidence extrinsic to the pleading to determine whether subject matter jurisdiction actually exists. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).

### The Standard Under Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

"'[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.'" *Technomarine SA v. Jacob Time, Inc.*, 905 F. Supp. 2d 482, 491-93 (S.D.N.Y. 2012) (citation omitted) (finding "no plausible claim for trademark infringement or false

10

designation of origin" where complaint did not address "why differences in packaging are material" and did not plausibly allege "interference with warranty coverage").

On a Rule 12(b)(6) motion, the Court's review is limited to the Complaint, documents incorporated by reference, documents that are "integral" even if not incorporated, and judicially noticeable facts. *Williams v. GMAC Mortg., Inc.*, No. 13 Civ. 4315 (JPO), 2014 WL 2560605, at *1 (S.D.N.Y. June 6, 2014) (internal quotations omitted). A document is "integral" where the pleading relies heavily upon its terms and effect. *Id.*; *accord SM Kids*, 963 F.3d at 214; *Grosz v. Museum of Modern Art*, 772 F. Supp. 2d 473, 497 (S.D.N.Y. 2010) (plaintiffs could not avoid dismissal by failing to include integral document).

## ARGUMENT

## I.   PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE

All of Plaintiff's claims should be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because Plaintiff lacks standing and because its alleged claims are not ripe.

### A.   Plaintiff Lacks Standing

Every plaintiff "must, among other things, establish that they have standing to sue." *ACLU v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) (citing *Raines v. Byrd*, 521 U.S. 811, 818, (1997)); *accord Doe*, 2017 WL 1102663, at *2.

To establish standing, a plaintiff must viably allege that it has suffered an actual or imminent injury-in-fact to a "legally protected interest" that is concrete and particularized. *E.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The alleged injury "must be 'de facto'; that is, it must actually exist." *Gambles v. Sterling Infosystems, Inc.*, 234 F. Supp. 3d 510,

11

517-18 (S.D.N.Y. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)).  It must also be likely that a favorable decision for the plaintiff in the case will redress the injury alleged.  *Id.*

Plaintiff has not viably or plausibly alleged any injury-in-fact and standing to sue.  As explained above, Plaintiff alleges itself to own a *different* and "NEW" NFT rather than the 2014 NFT.  The 2021 NFT that Plaintiff owns includes certain metadata that Plaintiff copied from the 2014 NFT, but it is distinct from the 2014 NFT; as Plaintiff admits, "no two NFTs are the same." (ECF No. 47 at ¶ 30.)

Plaintiff's reliance on its alleged new registration of the same Namecoin namespace that McCoy used in connection with the 2014 NFT is misplaced.  That new registration does nothing more than make Plaintiff the current user of that *namespace*.  Plaintiff has not plausibly alleged that its right to use a Namecoin namespace granted Plaintiff title to and control over the 2014 NFT itself (indeed, such a theory is nonsensical and contrary to Namecoin's protocol).  *See, e.g.*, *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 420 (2d Cir. 2015) (holding that "the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim.") (citation and internal quotations omitted).

Therefore, Plaintiff has not plausibly alleged that it controls and holds title to the 2014 NFT. As such, Plaintiff's allegations that McCoy's sale of the *Quantum* NFT somehow harms the value of the 2014 NFT does not establish any injury-in-fact suffered by Plaintiff, or any standing to sue. This Court could not provide any redress that would transform the 2021 NFT that Plaintiff owns into the 2014 NFT.  *See, e.g.*, *Fitzgerald v. Thompson*, 353 F. App'x 532, 534 (2d Cir. 2009) (affirming dismissal for lack of standing because appellants failed to plead injury-in-fact where their "complaint failed to allege a property interest" in subject matter); *Worley v. Giuliani*, 8 F. App'x 131, 133 (2d Cir. 2001) (finding that plaintiffs failed to establish standing because they had no legal right or interest in property at issue (a garden) and their claims were insufficiently "based

12

on the effect the absence of the garden will have on the area community"); *W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008) (finding that plaintiff lacked standing because plaintiff's client, who suffered the relevant injuries giving rise to the relevant claims, did "not transfer[] ownership of, or title to, their claims to" the plaintiff).

Accordingly, all of Plaintiff's claims should be dismissed for lack of standing.

**B.     Plaintiff's Claims Are Not Ripe**

"An issue is ripe for judicial resolution only if it presents a real, substantial controversy, not a mere hypothetical question." *United States v. Broadcast Music, Inc.*, 275 F.3d 168, 178 (2d Cir. 2001) (citation and internal quotations omitted); *accord Peck v. Aponte*, 880 F. Supp. 184, 185 (S.D.N.Y. 1995) (explaining that ripeness requires "definite and concrete issues involved which cannot be based on a hypothetical dispute," and "[i]n the end, the question becomes whether there is a substantial controversy of sufficient immediacy and reality to warrant judicial intervention" so that the "case can be decided on the merits given the current situation.") (citations omitted); *Mini Theatres v. New Line Distrib.*, No. 98 CIV. 2997(SHS), 1998 WL 637465, at *2 (S.D.N.Y. Sept. 16, 1998) (finding that declaratory judgment claim concerning meaning of contract provision was not ripe and sought improper advisory opinion where plaintiff had not yet signed the contract and there was thus no "substantial controversy" between the parties "of sufficient immediacy and reality" to warrant adjudication because "[a]ny harm that may arise … [is] necessarily speculative.") (citations omitted).

Here, Plaintiff's claims fail because they are hypothetical.  Plaintiff speculates that the promotion of McCoy's sale of the *Quantum* NFT may cause confusion and somehow dilute the value of the 2021 NFT that Plaintiff owns.  But this alleged concern is not of any "immediacy and reality" because Plaintiff does not allege any actual, imminent or attempted sale of the 2021 NFT. Plaintiff also does not allege that Nameless's public retraction failed to help Plaintiff market its

**JA-167**

2021 NFT as Plaintiff would like.  Nor does Plaintiff allege it has even *tried* to market its own NFT.  Nor does Plaintiff allege any facts demonstrating actual or likely consumer confusion arising out of any statements made by McCoy – Plaintiff's allegations about confusion are conclusory and speculative.  (ECF No. 47 at ¶¶ 83, 155.)  Plaintiff makes no allegations about actual harm it suffered (or will suffer) by the actions of which it complains, and thus Plaintiff's claims are unripe.

## II.  PLAINTIFF'S SECOND CAUSE OF ACTION FOR UNJUST ENRICHMENT SHOULD BE DISMISSED

Plaintiff's newly added unjust enrichment claim is unduly attenuated and not viable. Plaintiff alleges that McCoy and Sotheby's "derived profits from the false and misleading statements concerning the promotion, marketing, advertisement, and sale of [the *Quantum* NFT]," and that Defendants "continue to enrich themselves through future projects by falsely promoting and marketing their successful sale of [the *Quantum* NFT]."  (ECF No. 47 at ¶¶ 111-112.)  Plaintiff alleges that such enrichment is at Plaintiff's "expense," for which Plaintiff seeks disgorgement of the auction sale proceeds for the *Quantum* NFT:  $1.472 million.  (*Id.* at ¶¶ 113, 116.)  In addition to the justiciability problems discussed above, this claim should be dismissed for two reasons.

### A.  Plaintiff Does Not Plausibly Allege Enrichment At Plaintiff's Expense

"[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties."  *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (citation and internal quotations omitted).  "Thus, in order to adequately plead such a claim, the plaintiff must allege 'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against

14

equity and good conscience to permit the other party to retain what is sought to be recovered.'" *Id.* (citation omitted).

Plaintiff does not allege facts to support a plausible inference that McCoy was enriched in the amount of at least $1.472 million at Plaintiff's "expense." For one thing, Plaintiff makes no allegation of having any stake in the *Quantum* NFT, which is what McCoy sold.

Plaintiff also makes no allegations about the value of the 2021 NFT, or why the 2021 NFT – which copies metadata from the 2014 NFT, akin to a forgery – should be deemed of equal value to the *Quantum* NFT (which, like the 2014 NFT, is authentically by McCoy). Critically, Plaintiff does not allege that it had any role in the creation of the 2014 NFT and its metadata. Plaintiff has accordingly not pleaded facts to show that the sale value of the *Quantum* NFT was attained at Plaintiff's "expense."

**B.       Plaintiff Does Not Allege A Close Connection Between Itself And McCoy**

"In addition, while Plaintiffs need not allege privity or a business relationship with the Defendants, the pleadings must assert a connection between the parties that [is] not too attenuated." *Miller v. Walters*, 997 N.Y.S.2d 237, 244 (Sup. Ct. N.Y. Cnty. 2014) (citations and internal quotations omitted). "The connection between the parties must be such that it 'could have caused reliance or inducement.'" *Id.* (citations omitted). Mere "awareness" of a plaintiff by a defendant, "without more, does not establish the relationship necessary to state an unjust enrichment claim." *Id.* (citation omitted); *Georgia Malone*, 19 N.Y.3d at 517-18 ("[T]he relationship between [the parties] is too attenuated because they simply had no dealings with each other.").

Plaintiff alleges no relationship between itself and McCoy, let alone a sufficiently close relationship. Nor does Plaintiff allege any dealings that caused some sort of inducement or reliance by Plaintiff. Plaintiff alleges that McCoy should have been aware of Plaintiff's existence through an e-mail and social media outreach by Plaintiff's anonymous principal, "EarlyNFT." (ECF No.

15

47 at ¶¶ 15, 45.)  But such alleged awareness does not create privity or a relationship required to state a viable unjust enrichment claim.  Indeed, Plaintiff alleges that McCoy never responded to Plaintiff's (actually "EarlyNFT's") communications.  (*Id.* at ¶ 15.)  Plaintiff also does not allege any facts to support an inference that McCoy knows who "EarlyNFT" is (he does not), or that "EarlyNFT" is somehow affiliated with "Free Holdings."

## III.   PLAINTIFF'S THIRD CAUSE OF ACTION FOR
## SLANDER OF TITLE SHOULD BE DISMISSED

"To state a claim for slander of title, the claimant must plausibly allege that the offending party 'maliciously' used false statements to cast doubt upon another's property interest, causing 'special damages,' typically in the form of a lost sale resulting from the cloud on the claimant's title." *Wei Su & Hai Wang v. Sotheby's, Inc.*, No. 17-CV-4577 (VEC), 2019 WL 4917609, at *3 (S.D.N.Y. Oct. 4, 2019) (citing *Rosenbaum v. City of N.Y.*, 8 N.Y.3d 1, 12 (2006)).  In addition to not plausibly stating that it holds title to the 2014 NFT (as explained above), and in addition to the fact that McCoy's statements are protected speech (as explained in Sotheby's accompanying and incorporated motion to dismiss), Plaintiff's slander of title claim should be dismissed for the following reasons.

### A.   Plaintiff Does Not Allege Malice By McCoy

Plaintiff alleges that, following Nameless's issuance of its condition report that referred to the 2014 NFT as having been "removed" and "burned," McCoy gave statements that also referred to the 2014 NFT as having been "burned." (ECF No. 47 at ¶¶ 64-82.)  Plaintiff alleges that McCoy acted wrongfully because he did not agree with Plaintiff's entreaties asking that McCoy state (falsely) that Plaintiff owns the 2014 NFT.  (*Id.* at ¶¶ 76-82.)

Nowhere, however, does Plaintiff allege that McCoy acted "maliciously."  (*See id.* at ¶¶ 117-126.)  Plaintiff's slander of title claim should be dismissed for this reason alone.

16

Nor has Plaintiff pleaded facts to support a plausible inference of malice by McCoy. Plaintiff alleges a disagreement it had with McCoy as to the ultimate merits of Plaintiff's specious claim that it somehow owns the 2014 NFT.  A dispute about the meaning of the law and the merits of a legal claim is not "malice" or "reckless disregard" for the truth.  *See Chamila, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *11-12 (S.D.N.Y. Sept. 24, 2007); *Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 756 (3d Dep't 2005) ("We find no evidence of the malicious intent necessary to support a cause of action for slander of title and, given our conclusion that defendant had probable cause to claim title to the disputed property, these public assertions cannot be said to have been made 'with a reckless disregard for their truth or falsity.'") (citations omitted).

Nor is there any plausible basis to infer malice by McCoy because he used the same word "burned" that Nameless used in its *independent* NFT consulting and condition report.  *See Fink*, 15 A.D.3d at 756 (rejecting allegation of malice where defendant had relied in part on independent report of "[a] firm experienced in land surveying and research").

### B.   Plaintiff Does Not Allege Special Damages

"Special damages are an element of a cause of action for slander of title …."  *Rosenbaum*, 8 N.Y.3d at 12.  "Because the existence of special damages is an element of the cause of action, the claim begins to accrue … 'from the time a prospective sale is lost because of the cloud on plaintiff's title.'"  *Wei Su*, 2019 WL 4917609, at *3 (citation and internal quotations omitted); *accord Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992) ("As a result, a 'plaintiff will be denied even nominal or punitive damages if he cannot show special damage, since in such a case no cause of action at all is established.'") (citation omitted).

"The rules surrounding the pleading and proof of special damages are stringent and well-articulated.  Special damages are limited to losses having pecuniary or economic value, and must

17

be 'fully and accurately stated,' … 'with sufficient particularity to identify actual losses.'" *Kirby*, 784 F. Supp. at 1116 (citations omitted); *accord Bilinksi v. Keith Haring Found., Inc.*, 632 F. App'x 637, 642-43 (2d Cir. 2015); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 292 (S.D.N.Y. 2016); *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 278 (S.D.N.Y. 2003); *see also* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

Furthermore, "special damages must be the 'natural and immediate consequence of the disparaging statements' to be recoverable." *Kirby*, 784 F. Supp. at 1116 (citations omitted); *accord Bilinski*, 632 F. App'x at 642. "Special damages must flow directly from the injury to reputation caused by the defamation, not from the effects of defamation." *Ferraro v. Seamen's Church Inst. of N.Y. and N.J.*, 2007 NY Slip Op 52470(U), 18 Misc. 3d 1108(A) (Sup. Ct., N.Y. Cty., Dec. 3, 2007) (citations and internal quotations omitted).

Costs incurred to *redress* the alleged wrong are *not* special damages. *See, e.g., Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 444 (1956) ("'The legal expenses necessarily incurred by the plaintiff beyond the taxable costs in seeking legal redress for the wrong, while a loss in a sense resulting from the wrongful act of the defendant, are not recoverable as general or special damages.'") (citation omitted); *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989) ("[L]egal fees and executive time, standing alone do not comprise special damages, and, therefore, [] the trade libel claim is insufficiently pleaded ….").

After having a second opportunity to plead special damages, Plaintiff still fails to do so, let alone with requisite specificity.  Plaintiff alleges that it "expended $5,311.49 seeking to have McCoy and Sotheby's issue public statements correcting their false and misleading claims." (ECF No. 47 at ¶¶ 100, 125-126.)  Plaintiff does not allege that it suffered $5,311.49 in direct, reputational harm, such as through a specific diminution in value of the 2021 NFT or through

18

specific lost sales opportunities.  Plaintiff alleges that it spent $5,311.49 to try to redress the alleged

defamation:  *i.e.*, to try to get the defendants to "correct" allegedly false marketing statements "to

*repair* the reputation of the [2021 NFT] …."  (*Id.* at ¶ 99.)  Such pleading is insufficient.

Plaintiff otherwise alleges that the "value" of the 2021 NFT "is being significantly

diminished by the false and misleading statements made by McCoy and Sotheby's."  (*Id.* at ¶ 98.)

Once again, however, Plaintiff ascribes no actual damages value and identifies no specific lost

sales opportunities for the 2021 NFT.  Plaintiff simply asks the Court to speculate that Plaintiff

might be unable to sell the 2021 NFT (if it ever chooses to try) because of McCoy's sale of the

*Quantum* NFT.  Such pleading is insufficient as a matter of law.  *See Dentsply Int'l Inc. v. Dental

Brands for Less LLC*, No. 15 Civ. 8775 (LGS), 2016 WL 6310777, at *6-7 (S.D.N.Y. Oct. 27,

2016) (dismissing counterclaims that failed to sufficiently allege special damages, and explaining

that counterclaims did "not state any dollar amount and instead aver[red] that [the

counterclaimant's] damages are 'lost sales, profits and business opportunities, and harm to [the

counterclaimant's] business goodwill and reputation'"); *Aleem v. Experience Hendrix, L.L.C.*, No.

16 CIV. 9206 (ER), 2017 WL 3105870, at *7 (S.D.N.Y. July 20, 2017) (dismissing slander of title

claim because "Plaintiffs do not provide sufficient factual support to establish that they are entitled

to special damages") (citation omitted).[7]

---

[7] Plaintiff likewise fails to allege causation with sufficient specificity.  *See Bilinski*, 632 F. App'x at 642 ("Moreover, plaintiffs fail plausibly to plead the causation requirements [of special damages].") (citation omitted).  Plaintiff's theory appears to be that McCoy's marketing of the *Quantum* NFT, and in particular his statement that the 2014 NFT was "burned," renders the 2021 NFT incapable of being sold.  But nowhere does Plaintiff allege, with specificity, why it is supposedly incapable of "correct[ing] the public record" on its own, according to its world view that its 2021 NFT has value because the 2014 NFT is still on the Namecoin blockchain.  The market is free to treat that view as it would like.  Nor does Plaintiff allege why Nameless's public retraction of its condition report constitutes an insufficient "correction" of the "public record."  (ECF No. 47 at ¶ 88.)

19

IV.   **PLAINTIFF'S FOURTH CAUSE OF ACTION FOR**
      **VIOLATION OF N.Y. G.B.L. § 349 SHOULD BE DISMISSED**

New York General Business Law § 349 is a consumer-protection statute.  "[T]he deceptive practices this statute seeks to combat involve recurring transactions of a consumer type … that confront the average consumer who requires the protection of a statute against fraudulent practices." *Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) (citations omitted).

Allegations concerning a "'single shot transaction' involving complex arrangements, knowledgeable and experienced parties and large sums of money" that "truly affected" only the parties directly involved do not state a viable claim under GBL § 349 as a matter of law.  *Id.*; *accord Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 294 (1999); *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 148-49 (2d Dep't 1995) ("That General Business Law § 349 was primarily intended to apply to more modest transactions 'is evidenced by the remedies it provides.  Section 349(h) provides parties with the opportunity to receive the greater of actual damages or $50' ….  Even treble damages available under the statute for willful violations are capped at one thousand dollars ….  At the other end of the spectrum, and clearly not cognizable under the statute, are large, private, single-shot contractual transactions.") (citations omitted); *see also RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294-LTS-HBP, 2015 WL 5008762, at *4 (S.D.N.Y. Aug. 24, 2015) (explaining that non-consumer plaintiff "must allege conduct that has 'significant ramifications for the public at large'") (citation omitted).

In particular, a dispute by one competitor against another, alleging a particular lost market opportunity – as Plaintiff alleges in this case – does not state a viable or plausible § 349 claim. *See, e.g.*, *North Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 229 (E.D.N.Y. 2020) ("'Where a plaintiff makes only conclusory allegations of impact on consumers at large, a GBL §

20

349 claim must be dismissed.'") (citing *Miller v. HSBC Bank U.S.A., N.A.*, No. 13 CIV. 7500, 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015)); *Sports Traveler, Inc. v. Advance Mag. Publishers, Inc.*, No. 96 Civ. 5150 (JFK), 1997 WL 137443, at *3 (S.D.N.Y. Mar. 24, 1997) ("The courts of this Circuit have held that trademark infringement actions alleging only general consumer confusion do not threaten the direct harm to consumers that is required to state a claim under Section 349.") (citations omitted); *National Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 486–87 (S.D.N.Y. 2002) (same).

Plaintiff alleges that McCoy "engaged in consumer-oriented conduct by marketing and promoting the [*Quantum* NFT] as the first NFT ever created in order to draw more and higher bids for the [*Quantum* NFT], …." (ECF No. 47 at ¶ 128.)  Plaintiff further alleges that "McCoy and Sotheby's continue to engage in consumer-oriented conduct by marketing and promoting themselves and their auctions and projects on the basis of the false statements they issued about the [2014 NFT] and [the *Quantum* NFT]." (*Id.* at ¶ 129.)

While Plaintiff alleges that McCoy "announced a new NFT project" and "declared his intent to continue creating NFT artwork as part of his art practice," (*id.* at ¶ 96), however, Plaintiff fails to allege how McCoy's statements about the 2014 NFT, in connection with a single auctioned item (*i.e.*, the *Quantum* NFT), would have any impact on McCoy's new "project" or future "artwork," or how those statements would specifically harm consumers at large.  Indeed, Plaintiff does not allege that McCoy has engaged in any recurring conduct that threatens to defraud consumers generally.  Nor does Plaintiff allege that the average consumer was aware of McCoy's *Quantum* sale, or that the average consumer even knows what a NFT is.  *Cf. North Am. Olive Oil*, 457 F. Supp. 3d at 231.

Plaintiff alleges a single-shot transaction (one auctioned item), involving a complex arrangement (the sale of a NFT), for a large sum of money (nearly $1.5 million), involving

21

knowledgeable and experienced parties, which allegedly harmed Plaintiff's hypothetical competitive opportunity to sell its own NFT at some undescribed future point.  For this reason, as well as the justiciability problems discussed above, Plaintiff's GBL § 349 claim should be dismissed.

## V.    PLAINTIFF'S FIFTH CAUSE OF ACTION FOR COMMERCIAL DISPARAGEMENT SHOULD BE DISMISSED

"Trade libel, also known as product disparagement, is the 'disparagement of a business's goods or services' …." *North Am. Olive Oil*, 457 F. Supp. 3d at 231 (citation omitted).  Required elements of the claim include malice and special damages. *Id.* (citations omitted).

As discussed above, Plaintiff fails to plead – let alone particularize – any special damages.  Plaintiff's commercial disparagement claim should be dismissed on this basis alone.  Plaintiff's commercial disparagement claim should also be dismissed because, as addressed in Sotheby's incorporated motion to dismiss, this claim invalidly complains about protected speech.

Furthermore, to be actionable, a statement must be "directed at" the plaintiff or the plaintiff's product or service. *E.g., id.*  Plaintiff does not allege that McCoy made any statements directed at Plaintiff or at the 2021 NFT.  Plaintiff alleges that McCoy marketed the *Quantum* NFT by making allegedly false statements about the 2014 NFT being "burned."  Such statements are not alleged to mention or have anything to do with Plaintiff or with Plaintiff's 2021 NFT.  For this reason as well (along with the justiciability problems discussed above), Plaintiff's commercial disparagement claim should be dismissed.

## VI.   PLAINTIFF'S SIXTH CAUSE OF ACTION FOR VIOLATION OF SECTION 43(a) OF THE LANHAM ACT SHOULD BE DISMISSED

Plaintiff's newly added claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), alleges that McCoy "issued statements about the status of both the [2014 NFT] and the [*Quantum* NFT] that were false or misleading representations, descriptions, or

22

designations of origin" because they "falsely stated that the [2014 NFT] was 'burned' or otherwise 'removed' from the Namecoin blockchain."   (ECF No. 47 at ¶¶ 150-151.)   Because, Plaintiff alleges, the 2014 NFT was not "burned" or "removed," Plaintiff additionally alleges that McCoy "further falsely stated that the [*Quantum* NFT] … sold at auction was the first NFT ever created." (*Id.* at ¶ 152.)   Plaintiff alleges that McCoy's allegedly false statements "were used in commercial advertisements or promotions in order to market, promote, and advertise the sale of the [*Quantum* NFT] and the [] auction," and that such statements "deceived or was [sic] likely to mislead or confuse consumers."   (*Id.* at ¶¶ 154-155.)   Plaintiff alleges that such statements "caused damage" to Plaintiff in the amount of the sale value of the *Quantum* NFT.   (*Id.* at ¶ 158.)   In addition to the justiciability problems discussed above, this claim should be dismissed for two reasons.

### A.   Plaintiff Fails To Allege That McCoy Made Any Literally Or Impliedly False Statements

A claim for false advertising requires a plaintiff to allege that a challenged message is:  (1) literally or impliedly false; (2) material; (3) placed in interstate commerce; and (4) the cause of actual or likely injury to the plaintiff.  *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 539-40 (S.D.N.Y. 2018) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)).

Plaintiff fails to viably plead the first element.  Plaintiff does not make clear whether it is alleging that McCoy's challenged statements were literally or impliedly false, but Plaintiff's failure to allege any facts supporting that consumers were actually or likely to be misled by such statements (such as through a survey) means that Plaintiff has not alleged implied falsity as a matter of law.  *Davis*, 345 F. Supp. 3d at 543 (citation omitted); *accord Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) (affirming dismissal of implied false advertising claim because plaintiff failed to make "threshold showing" that "a not insubstantial number of consumers [] hold the false belief allegedly

23

communicated in the ad") (citation and internal quotations omitted).   Plaintiff's conclusory pleading and "'mere subjective belief'" about the impact on consumers is insufficient.  *Id.*

Nor has Plaintiff plausibly alleged that McCoy's challenged statements about the 2014 NFT being "burned" were literally false.  (Plaintiff does not allege that *McCoy* ever stated that the 2014 NFT was "removed" from the Namecoin blockchain, which is the other challenged statement.  Plaintiff alleges that former defendant Nameless made that statement in its now-withdrawn condition report.  (ECF No. 47 at ¶¶ 65-66.))

A statement is "literally false" only if its message is "unambiguous" and not "susceptible to more than one reasonable interpretation".  *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (citations omitted).  A literally false message "must conflict with reality." *Lokai Holdings, LLC v. Twin Tiger USA, LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018) (citation omitted).

Plaintiff does not allege a singular definition for the term, "burned," in the context of NFTs, which would necessarily be at odds with statements made by McCoy.  Indeed, "there is no established, formal definition of a 'burn'" for NFTs, and  "people may refer to a range of scenarios as a burn."  Maghan McDowell, "Why brands are burning NFTs," *Vogue Business*, Feb. 8, 2022 (https://www.voguebusiness.com/technology/why-brands-are-burning-nfts)   (last   accessed   on June 30, 2022).

One "method for burning is by transferring ownership of an item from the blockchain to a general, null address that one owns or has access to."  *Id.*  "Another scenario is if the original creator of the item revokes the rights – but this can only be done if the creator still owns the rights.… Although the NFT owner might still own a token, it does not represent any usable rights, .…" *Id.* And "some might refer to a 'burn' event when the ownership record is not changed, but there is a status change recorded on the blockchain."  *Id.*

24

Plaintiff offers no basis for the Court to credit as true, or plausible, that McCoy's statements about the 2014 NFT being "burned" necessarily meant something that was literally false. McCoy's decision to let his Namecoin namespace expire according to Namecoin's protocol ensured that the record he had created, *i.e.*, the 2014 NFT, could no longer be modified or transferred. That is a "burn" event (among a number of other kinds of burn events). Plaintiff offers *no* allegations to support a plausible inference that it can, or could at any time, itself modify or transfer the 2014 NFT. And Plaintiff offers no allegations that a "burn" event *cannot* comprehend precisely what McCoy did. *See also North Am. Olive Oil Ass'n*, 457 F. Supp. 3d at 221-22 (dismissing literal falsity claim where complaint included "no allegation to support its contention that the statement is [literally] false") (citing *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995)).

### B.   Plaintiff Has Not Viably Pleaded Causation Of Harm

As explained above, Plaintiff has not viably pleaded that it owns, or has any proprietary interest in, the 2014 NFT. Therefore, any allegedly false statements about the 2014 NFT could not possibly cause any injury to Plaintiff.

## VII.   PLAINTIFF'S FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT SHOULD BE DISMISSED

For all the reasons discussed above, Plaintiff's claim for declarations that it "is the rightful owner of the [2014 NFT]," that "the [2014 NFT] has not been 'burned'", and that "statements issued by McCoy and Sotheby's in connection with their sale of the [*Quantum* NFT] were false and misleading," should be dismissed. (ECF No. 47 at ¶ 109.) Plaintiff has not alleged an "actual controversy" sufficient to sustain its declaratory judgment claim (which is also discussed by Sotheby's in its incorporated motion to dismiss).

**JA-179**

## <u>CONCLUSION</u>

For the foregoing reasons, and the reasons stated in Sotheby's accompanying and incorporated motion to dismiss, McCoy respectfully requests that the Court dismiss Plaintiff's Amended Complaint with prejudice, and that the Court award McCoy such other and further relief as deemed just and proper.

Dated:   New York, New York
        June 30, 2022

**PRYOR CASHMAN LLP**

By: _____
       William L. Charron
       Robert J. deBrauwere
       Nicholas Saady
7 Times Square
New York, New York  10036
Tel. (212) 421-4100

*Attorneys for Defendant Kevin McCoy*

JA-180

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FREE HOLDINGS INC., | Case No. 1:22-cv-00881 (LGS) (JLC) |
| Plaintiff, | **DECLARATION OF WILLIAM L. CHARRON IN SUPPORT OF DEFENDANT KEVIN McCOY'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** |
| v. | |
| KEVIN McCOY and SOTHEBY'S INC., | |
| Defendants. | |

WILLIAM L. CHARRON, declares under penalty of perjury as follows:

1.      I am a member of Pryor Cashman LLP, attorneys for defendant Kevin McCoy ("McCoy") in the above-captioned action.  I respectfully submit this Declaration in support of McCoy's motion to dismiss the Amended Complaint filed by plaintiff Free Holdings Inc. ("Plaintiff"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

2.      Annexed hereto as **Exhibit A** is a true and correct copy of a printout of the Namecoin "FAQ" page from Namecoin's website, https://www.namecoin.org/docs/faq/ (last accessed on June 28, 2022), which is referenced at paragraphs 35, 39 and 40 of Plaintiff's Amended Complaint (ECF No. 47).

3.      Annexed hereto as **Exhibit B** is a true and correct copy of the printout of the website, https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b 68709a/ (last accessed on June 28, 2022), which is referenced at footnote 3 to paragraph 38 of Plaintiff's Amended Complaint (ECF No. 47).

JA-181

I declare under penalty of perjury that the foregoing is true and correct.

Executed: New York, New York
         June 30, 2022

By: _____
        William L. Charron

PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 798-6307

*Attorneys for Defendant Kevin McCoy*

2

JA-182

# EXHIBIT A

Case 23-644, Document 40, 07/25/2023, 3546479, Page41 of 282

**JA-183**

# FAQ

- General
  - How does Namecoin work?
  - Do I need to back up my wallet?
  - How much does it cost to register a domain (a.k.a. a name)?
  - How do I obtain namecoins? Can I mine them?
  - Who gets the registration fee?
  - Who gets the transaction fee?
  - How long are names good for?
  - How do I browse a .bit domain?
  - How do I register and host a .bit domain?
  - Do I have to pay renewal fees?
  - What applications is Namecoin well-suited to?
  - Do I need to download the entire Namecoin blockchain to use Namecoin?
  - What is the smallest currency unit of Namecoin called?
  - What do Namecoin addresses look like?
- Design
  - What is a namespace?
  - Why is there a separate pre-registration step?
  - How are names represented?
  - What if I spend that special coin by mistake?
  - Why does registering a name incur a fee?
  - Why don't name registration fees go to miners?
  - Why do names have to be renewed regularly?
  - Does Namecoin support "layer 2" technologies?
  - Why focus on getting browsers and OS's to support Namecoin instead of getting ISP's or public DNS resolvers (e.g. Google DNS) to do so?
  - Why focus on browser add-ons and OS packages instead of native browser and OS support?
  - Why focus on getting existing browsers and OS's to support Namecoin instead of forking those browsers and OS's?
  - Is Namecoin's support of atomic name trades a feature primarily aimed at squatters?
  - Does Namecoin have any browser add-ons?

Case 23-644, Document 40, 07/25/2023, 3546479, Page42 of 282

- ○ Why doesn't Namecoin use a WebExtension to resolve `.bit` domains to IP addresses?
- ○ Why doesn't Namecoin use "proof of stake"?
- Comparison of Namecoin to other projects
  - ○ What is the relationship of Namecoin to Bitcoin?
  - ○ What is the difference between Namecoin and Bitcoin?
  - ○ What are the similarities between Namecoin and Bitcoin?
  - ○ Does Namecoin mandate usage of Bitcoin as a parent chain?
  - ○ Does Namecoin influence Bitcoin's hashrate?
  - ○ How does Namecoin compare to Tor Onion Services?
  - ○ How does Namecoin compare to Let's Encrypt?
  - ○ How does Namecoin compare to Blockstack?
  - ○ How does Namecoin compare to Monero?
  - ○ What is Namecoin's relationship to OpenNIC?
- Weaknesses
  - ○ How easy is it for names to be stolen? What can be done if it happens?
  - ○ What is the threat posed by 51% attacks?
  - ○ Is squatting a problem? What can be done about it?
  - ○ Is Namecoin anonymous?
  - ○ I heard that an academic study found that Namecoin is only used by 28 websites; is that really true?
  - ○ How does Namecoin affect global heating?

## General

## How does Namecoin work?

The Namecoin software is used to register names and store associated values in the blockchain, a shared database distributed by a P2P network in a secure way. The software can then be used to query the database and retrieve data.

## Do I need to back up my wallet?

If you're using Namecoin to register or otherwise own names, or to transfer namecoins, then you do need to periodically back up your wallet. Like Bitcoin, your wallet's keys are located in your `wallet.dat` file. You should encrypt this file by going to `Settings > Encrypt Wallet` and making a backup thereafter. Close the

JA-185

Namecoin client and make a backup of your `wallet.dat` file in your Namecoin profile folder. (On GNU/Linux, this is usually `~/.namecoin/`; on Windows, it is usually `C:\Users\<Your Username>\AppData\Roaming\Namecoin\`). It is currently recommended to back up more often than every 100 transactions (including both currency and name transactions).

If you are only using Namecoin to look up names (e.g. browsing `.bit` domains), then you do not need to encrypt or back up your wallet.

## How much does it cost to register a domain (a.k.a. a name)?

The cost includes a registration fee and a transaction fee. The registration fee is 0.01 NMC, and the transaction fee is determined dynamically by miners (just like in Bitcoin). The registration fee might be made dynamic in the future, to improve economic incentives.

## How do I obtain namecoins? Can I mine them?

You can mine them alongside bitcoins or trade them, see How to get Namecoins.

## Who gets the registration fee?

The registration fees are destroyed by the transaction. Nobody gets them.

## Who gets the transaction fee?

The miners do, just like in Bitcoin. Paying higher fees improves the chance that the transaction will be processed quickly. Like Bitcoin, the client will suggest a fee that is likely to be processed quickly.

## How long are names good for?

Registered names semi-expire if they are not renewed or updated for 31,968 blocks (approximately 222 days). If your name is semi-expired, it will stop resolving for your users until you renew or update it, but you are still the sole owner of the name. Semi-expired names that are not renewed or updated for an additional 4,032 blocks (approximately 28 days) will expire. Expired names can be re-registered by anyone. There are no registration fees for renewals or updates, but a transaction fee does apply.

## How do I browse a .bit domain?

See Browsing .bit Websites.

You can also use ncdns (experimental). If you have the ZeroNet software installed, you can visit ZeroNet-enabled .bit domains.

## How do I register and host a .bit domain?

See Documentation for Name Owners.

## Do I have to pay renewal fees?

Other than the standard transaction fee, not at the moment. This might change in the future, to improve economic incentives.

## What applications is Namecoin well-suited to?

Consider that Namecoin values are limited to 520 bytes, and that the block size limit is somewhere between 500 kB and 1 MB. (It's lower than Bitcoin's.) Given that blocks occur every 10 minutes on average (usually fluctuating between 1 and 60 minutes), and that names have to be updated or renewed at least every 35,999 blocks, try to figure out whether your application would comfortably fit into blocks if your application became widespread. Domain names and identities are applications that are near the upper limit of the scale that Namecoin can handle. For example, misusing the Namecoin blockchain as a decentralized file storage is not feasible. There are several other decentralized systems that serve this purpose way more efficiently. In many cases, if you want to store data that is larger than 520 bytes, or that is updated very often, you may prefer to only store a content hash or a public key in the blockchain, along with information on where to get the full data. The full data can then be authenticated using Namecoin as a trust anchor without storing the entire data in Namecoin. See our Layer 2 documentation for examples of such usage.

If you're developing an application, consider doing your development on the Namecoin Testnet. This prevents your testing from bloating the production blockchain, and also allows you to test without spending real money on names. If more than one implementation might have the same use case, consider writing a spec so that incompatible implementations of similar ideas don't become a problem.

Case 23-644, Document 40, 07/25/2023, 3546479, Page45 of 282

# Do I need to download the entire Namecoin blockchain to use Namecoin?

No, but you will get better security if you choose to do so. A *full node* such as Namecoin Core gives you maximum security by downloading the entire blockchain and validating that all transactions comply with the Namecoin consensus rules. However, if you don't wish to download the entire blockchain, you can instead use a *lightweight SPV node* such as Electrum-NMC, which only downloads block headers (along with transactions that are relevant to you), which are much smaller than the entire blockchain. Namecoin also makes possible some security models that don't directly correspond to Bitcoin. For example, the ConsensusJ-Namecoin node downloads block headers like Electrum-NMC, but also downloads the entire blocks from the past year only (i.e. all blocks that contain unexpired name transactions), which provides a security level somewhere between Electrum-NMC and Namecoin Core.

## What is the smallest currency unit of Namecoin called?

The smallest currency unit of Namecoin is called the *swartz* (similar to the *satoshi* in Bitcoin). It is named after Aaron Swartz, the activist who was murdered by the U.S. government, and who proposed Nakanames (which, along with BitDNS, described the concept that was later implemented as Namecoin).

## What do Namecoin addresses look like?

Namecoin addresses follow the same format as Bitcoin addreses, but with different prefixes (to avoid ambiguity about whether an address is for Bitcoin or Namecoin):

- New-style Bech32 addresses begin with `nc1`.
- Old-style P2SH addresses begin with `6`.
- Even-older-style P2PKH addresses begin with `N` or `M`.

## Design

## What is a namespace?

Namespaces are name prefixes used by applications to distinguish between different type of names in Namecoin. For example, `d/example` is the domain name `example.bit`, and `id/example` is an identity. Namespaces help prevent

JA-188

multiple applications from accidentally conflicting. Namecoin itself isn't aware of namespaces, and namespaces don't have any effect on validation rules; they are only used by higher-level applications that use Namecoin.

## Why is there a separate pre-registration step?

This is to prevent others from stealing your new name by registering it quickly themselves when they see your transaction. The name is not broadcasted during the pre-registration step, only a salted hash of it. There is a mandatory minimum delay of 12 blocks before you can broadcast your name with the registration step; this means that by the time other people know what name you're registering, they would have to reverse at least 12 blocks in order to steal the name.

## How are names represented?

Names and values are attached to special coins with a value of 0.01 NMC. Updates are performed by creating a transaction with the name's previous coin as input. Think of it like a colored coin. As far as Namecoin's consensus layer is concerned, names and their values are arbitrary binary blobs; any semantics assigned to those binary blobs (e.g. names being ASCII and values being JSON) are solely conventions used by higher-layer applications (e.g. ncdns).

## What if I spend that special coin by mistake?

The code prevents those coins from being used for normal payments.

## Why does registering a name incur a fee?

Fees on name operations are a rate-limiting mechanism to disincentivize squatting.

## Why don't name registration fees go to miners?

If name registration fees went to miners, it would enable an attack in which miners could register names at a discount compared to typical users. This would incentivize miners to sell discounted name registration services, which would enable miners to frontrun registrations that passed through such services, bypassing the frontrunning protections enabled by the separate pre-registration step.

## Why do names have to be renewed regularly?

Case 23-644, Document 40, 07/25/2023, 3546479, Page47 of 282

Two reasons:

1. It incentivizes owners of names who no longer intend to use them to either let them expire or sell them, thereby decreasing squatting.
2. It ensures that if a name owner loses their private keys, the name will eventually be returned to the pool of available names instead of permanently being stuck in limbo. Names being stuck in limbo would both pollute the namespace and be a security risk (since it would not be possible to revoke TLS keys for such names).

## Does Namecoin support "layer 2" technologies?

Yes. See our Layer 2 documentation.

## Why focus on getting browsers and OS's to support Namecoin instead of getting ISP's or public DNS resolvers (e.g. Google DNS) to do so?

The reasons mostly fall under three categories: security concerns, usability concerns, and political concerns.

Security concerns:

- ISP's would be in a position to censor names without easy detection.
- ISP's would be in a position to serve fraudulent PKI data (e.g. TLSA records), which would enable ISP's to easily wiretap users and infect users with malware.
- Either of the above security concerns would even endanger users who are running Namecoin locally, because it would make it much more difficult to detect misconfigured systems that are accidentally leaking Namecoin queries to the ISP. See this case study for a practical example of how this can happen.

Usability concerns:

- Namecoin-to-DNS bridges rely on DNS security protocols such as DNSSEC, DNS over TLS, or DNSCrypt to prevent tampering.
- Many local network firewalls break DNSSEC.
- Many ISP's don't support DNS over TLS or DNSCrypt.
- Many OS's don't support DNSSEC, DNS over TLS, or DNSCrypt.
- These compatibility issues are straightforward to solve by adding locally installed software (e.g. Dnssec-Trigger), but are not otherwise easily solvable

Case 23-644, Document 40, 07/25/2023, 3546479, Page48 of 282

by non-technical users.

- If a non-technical user is installing DNS security software anyway, installing Namecoin as well doesn't add any particular extra difficulty.
- In the case of non-ISP public DNS resolvers, changing DNS settings manually in mainstream OS's is not something that non-technical users are usually comfortable doing, and is significantly more difficult to walk a user through than simply running a `.exe` file or installing a package via `apt-get`.

Political concerns:

- Namecoin's `.bit` TLD isn't part of the DNS; asking public DNS infrastructure to mirror Namecoin would probably be seen as hostile by IETF and ICANN.
- Namecoin is seeking to be added to IETF's special-use names registry; the precedent set by `.onion`'s inclusion is that public DNS infrastructure should always return `NXDOMAIN` for special-use names.
- While getting Namecoin bundled with a major browser or OS certainly is a major undertaking, it's not at all clear that getting Namecoin resolution included by a major ISP or public DNS resolver would be easier. Statistically (though exceptions certainly exist), software vendors tend to be more interested in innovating via software, security, and cryptography, whereas ISP's tend to be more interested in "innovating" via antitrust violations and net neutrality violations. We believe that software vendors are therefore more likely to be interested in Namecoin (though we don't claim that no ISP's exist who might be persuadable).

In addition, it's not clear that there would even be any significant benefit to counterbalance these concerns. Namecoin intentionally makes different tradeoffs from the DNS. For example, the DNS is much more scalable than Namecoin, can protect name owners from trivial deanonymization much better than Namecoin can, and doesn't rely on comparatively weak game-theoretic security properties as Namecoin does. Namecoin has some benefits that counterbalance these weaknesses (e.g. the non-reliance on trusted third parties), but serving Namecoin data from public DNS infrastructure would provide the **union** of Namecoin's and the DNS's weaknesses, while providing the **intersection** of Namecoin's and the DNS's strengths. Users who require a DNS-like naming system that works without any software installation are likely to be better off simply using the DNS.

Case 23-644, Document 40, 07/25/2023, 3546479, Page49 of 282

## Why focus on browser add-ons and OS packages instead of native browser and OS support?

Because browser add-ons and OS packages are the standard method by which browser and OS vendors evaluate features for future inclusion. In our discussions with browser vendors and OS vendors (even the ones who are enthusiastic about bundling Namecoin by default), one of the first things they ask for as a prerequisite to inclusion by default is a browser add-on or an OS package.

## Why focus on getting existing browsers and OS's to support Namecoin instead of forking those browsers and OS's?

Maintaining a fork of a web browser or OS is a substantial time investment, and attempting it without the necessary resources would inevitably result in delayed security updates, which would be unethical to our users. Examples of browser and OS forks that have suffered from delayed security updates include IceCat and Trisquel. One of the very few cases where a web browser fork has not resulted in a security disaster is Tor Browser, which has the following advantages:

1. The Tor Project employs a dedicated team of full-time browser engineers who merge security fixes from Firefox.
2. Tor Browser is based on the ESR variant of Firefox, which results in significantly less code churn from upstream.
3. The Tor Browser developers are actively getting their patches against Firefox merged upstream by Mozilla.

These advantages do not obviously apply to us, so Tor Browser's relative success would not obviously apply to us either.

## Is Namecoin's support of atomic name trades a feature primarily aimed at squatters?

Short answer: No. The Namecoin developers are strongly against trademark infringement, and we do not endorse the behavior of users who squat on domains, either in Namecoin or the DNS.

Longer answer from a high-level point of view:

In a naming system, the ability to transfer ownership of a name to a new keypair has significant security benefits. For example, it allows a corporation to replace the employee(s) who control a name, and it also allows secure recovery of a name whose keys are believed to have been compromised but which has not yet been stolen. As a result, Namecoin supports the ability to transfer names to a new keypair. In a naming system that doesn't enforce legal identity verification, it is not possible to automatically disambiguate a transfer between two keypairs that belong to the same corporation or person from a transfer between two different people. As a result, Namecoin supports the ability to transfer names to a different corporation or person. Since it is always possible for two parties to coordinate a payment out-of-band, it is not possible for a cryptographic naming system to prevent name sales without preventing name donations. As a result, Namecoin supports the ability to sell a name. Given that Namecoin supports the ability to sell a name, there isn't really much benefit to not supporting atomic name sales: the only people who would benefit from not supporting atomic name sales are scammers. There are plenty of legitimate reasons why someone might want to sell a name (which we assume is the main reason why selling DNS names isn't banned, even though in the DNS it's usually quite easy on a technical level to seize domain names that are listed for sale). And we don't think that the legitimate users of that functionality deserve to be unnecessarily exposed to counterparty risk.

Longer answer from a low-level point of view:

Namecoin is a fork of Bitcoin, and therefore Namecoin (like Bitcoin) supports a wide variety of smart contract schemes, including the ability for a transaction to have an arbitrary number of outputs (thereby making multiple payments atomically). Because Namecoin represents names as transaction outputs, it is naturally possible to atomically transfer a name in combination with a currency payment. This isn't a feature that Namecoin was specifically designed to support, it's simply a feature that naturally exists, which would have required extra effort to not support. Technically, it would be possible to softfork Namecoin to ban name outputs from coexisting in a transaction with currency outputs, but in practice this would have detrimental effects unrelated to atomic name trades, because it would also ban change outputs from single-party name transactions. There *is* a restriction in Namecoin's consensus rules that prevents two name outputs from being created atomically. As far as we're aware, there is no documented reason for this rule (none

of us were around to ask when the rule was first created, and Vince isn't around for us to ask anymore), and this rule also has harmful side effects that are unrelated to atomic name trades, e.g. it prevents CoinJoin-style constructions for name transactions. Because CoinJoin is useful for both scalability and privacy, we would prefer that this rule be removed, and it is possible that a future consensus fork will do so.

## Does Namecoin have any browser add-ons?

Yes; we have a PKCS#11 module (ncp11) for TLS certificate validation, and we have a WebExtension (DNSSEC-HSTS) for protecting against SSLStrip attacks. However, there is no browser add-on for resolving `.bit` domains to IP addresses.

## Why doesn't Namecoin use a WebExtension to resolve `.bit` domains to IP addresses?

There is no WebExtensions API for intercepting DNS lookups; thus such a WebExtension is not possible. It *is* possible to abuse the HTTP proxy API to simulate DNS interception (and there are various 3rd-party WebExtensions that purport to do this for Namecoin). Unfortunately, this form of API abuse is fundamentally incompatible with HTTPS. Since such WebExtensions cannot work with HTTPS and are therefore inherently insecure, we recommend avoiding such WebExtensions. It also is possible to use the WebRequest API to redirect `.bit` URL's to the associated IP address. Unfortunately, this will not work with properly configured servers, because both the HTTP `Host` header and the TLS SNI header won't match; thus we recommend against this as well.

## Why doesn't Namecoin use "proof of stake"?

We defer to the analysis of Bitcoin developer Andrew Poelstra about the security problems with PoS. For a more accessible summary, Namecoin developer Yanmaani's article on PoS may be of interest.

## Comparison of Namecoin to other projects

## What is the relationship of Namecoin to Bitcoin?

Case 23-644, Document 40, 07/25/2023, 3546479, Page52 of 282

The Namecoin codebase consists of the Bitcoin codebase with relatively minor changes (~400 lines) and additional functionality built on top on it. The mining procedure is identical but the block chain is separate, thus creating Namecoin. This approach was taken because Bitcoin developers wanted to focus almost exclusively on making Bitcoin a viable *currency* while the Namecoin developers were interested in building a *naming system*. Because of the different intended use cases between the two projects, consensus and protocol rules might make sense in one but not the other. Examples of places where it could make sense to have different protocol or consensus rules:

- Namecoin's consensus rules need to enforce uniqueness of names. While it is possible to store data in Bitcoin (e.g. key/value pairs in `OP_RETURN` outputs), uniqueness is not enforced by Bitcoin. It would be theoretically possible to build a layer on top of Bitcoin that discards `OP_RETURN` outputs that don't respect uniqueness (e.g. a name operation that steals someone else's name), but any such layer would not be enforced by miners. If transaction validity rules are not enforced by miners, then they are not backed by PoW, which means that SPV–based lightweight clients will fail to enforce those validity rules.
- Since consumers expect different fees for financial transactions versus name registrations, and since the volume of financial transactions worldwide versus name registrations worldwide are different, Namecoin and Bitcoin might have different optimal block sizes.
- In a currency, inflation attacks are fatal, while in a naming system, they simply amount to a spamming or squatting attack: bad, but not anywhere near fatal. Therefore, decisions about features such as zk–SNARK–based anonymity (which introduce a risk of inflation attacks) might come to different conclusions between Namecoin and Bitcoin.
- Some script features that make sense for Namecoin might not make sense for Bitcoin, e.g. allowing a scriptPubKey to restrict the scriptPubKeys of any spending transaction. In a naming system, features like this could make renewing and updating names more convenient and secure, but in a currency, they could be harmful to fungibility.
- Coinbase commitments to the name database could be enforced by Namecoin consensus rules, allowing SPV proofs of a name's nonexistence to be created.

Case 23-644, Document 40, 07/25/2023, 3546479, Page53 of 282

In general, the Namecoin developers attempt to minimize our patchset against Bitcoin. If a feature makes sense to have in Bitcoin, we try to get it into Bitcoin and then merge it to Namecoin; Namecoin usually only introduces differences from Bitcoin in cases where the proposed change wouldn't make sense for Bitcoin due to the differing use cases. Although it is theoretically possible to use Namecoin as a general-purpose currency, the Namecoin developers do not encourage this use case. There are lots of cryptocurrency projects out there that are specifically designed for such usage (e.g. Bitcoin); if you're looking for a currency, you should use one of those projects.

## What is the difference between Namecoin and Bitcoin?

- There are additional commands for special transactions containing *names* and *data* (key/value pairs).
- The most important commands are: `name_new`, `name_firstupdate`, and `name_update`.
- The coins used to pay for a `name_firstupdate` operation are destroyed, i.e. every new name reduces the finally usable maximum of 21 million NMC by 0.01 NMC.
- `name_new`, `name_firstupdate` and `name_update` contain a pair of name/value which expires after 36,000 blocks (between 200 and 250 days).
- The `d/` prefix is used to register a domain name, without the .bit TLD: { "name" : "d/opennic", "value" : "what you want", "expires_in" : 10227 }
- The `id/` prefix is used to register an identity, see NameID.
- Energy-efficient: if you are already mining bitcoins you can merge-mine namecoins at no extra cost for hardware and electricity. For a list of current Namecoin mining pools, see our Metrics data.

## What are the similarities between Namecoin and Bitcoin?

- 21 million coins total, minus the lost coins.
- 50 coins are generated each block at the beginning; the reward halves each 210000 blocks (around 4 years).
- Security: a large fraction of Bitcoin miners also mine Namecoin, giving it a staggering difficulty.
- Pseudonymous founder: Vince, like Satoshi, never revealed his real-world identity and disappeared around the same time, leaving Namecoin project wild

in the open, to flourish only thanks to the help of enthusiasts in the FLOSS
community.

- Free / libre / open-source platform: Anyone can improve the code and report
  issues on GitHub and even use it on other projects.

## Does Namecoin mandate usage of Bitcoin as a parent chain?

No. Namecoin's merged mining can use *any* Hashcash-SHA-256d blockchain as a
parent chain. Bitcoin is the most commonly used such parent chain, but others
(such as BCH) are sometimes used as parent chains as well. Note that this implies
that Namecoin's hashrate and difficulty can theoretically be higher than those of
Bitcoin. (In fact, Namecoin's 24-hour hashrate occasionally does exceed that of
Bitcoin.)

## Does Namecoin influence Bitcoin's hashrate?

The existence of Namecoin as a merge-mined sidechain acts as a de facto increase
of the Bitcoin block reward. This incentivizes mining Bitcoin at a higher difficulty
than would otherwise be profitable. As a result, Namecoin indirectly increases
Bitcoin's hashrate. Namecoin and Bitcoin hashrate are thus in
a mutualist relationship. That said, since the real-world value of Namecoin's block
reward is much less than that of Bitcoin's, the extent to which Namecoin increases
Bitcoin's hashrate is relatively small. Specifically, as of 2022, Bitcoin's block reward
was $47,299,467.42 USD/day, while Namecoin's block reward was $1,429.55
USD/day. Thus, Namecoin is responsible for a ~0.003% increase in Bitcoin hashrate.
Namecoin's contribution might increase in the future as a result of increased
adoption causing the exchange rate or transaction fees to increase. For example, in
a hypothetical distant future in which all 368 million DNS second-level
domains moved to Namecoin and paid $10 USD/year in renewal fees, Namecoin's
block reward would be $10,075,291 USD/day, which would result in Namecoin
contributing a 21.3% boost to Bitcoin hashrate.

## How does Namecoin compare to Tor Onion Services?

The Tor Project's Onion Services (which have a `.onion` top-level domain) use
domains which are a public key hash. This means that their domain names are not
human-meaningful, whereas Namecoin domain names are human-meaningful.
Namecoin's `.bit` domains can point to `.onion` domains, providing a human-

JA-197

meaningful naming layer on top of Tor Onion Services. Blockchain-based systems like Namecoin are, at this time, unable to match the cryptographic security guarantees (against impersonation or deanonymization attacks) that systems like Onion Service names provide when used directly, but Namecoin's human-meaningful names do make Namecoin more resistant than Onion Service names to some classes of attacks that exploit human psychology rather than breaking cryptography. For example, humans have trouble remembering a public key hash or recognizing a public key hash as the correct one; this is much better with meaningful names such as Namecoin names (or DNS names). Attackers can exploit this property of Onion Service names in order to trick users into visiting the incorrect website. We believe that both systems serve a useful purpose, and determining whether direct usage of Onion Service names or Namecoin naming for Onion Services is more secure for a given user requires consideration of that user's threat model.

## How does Namecoin compare to Let's Encrypt?

Let's Encrypt constitutes a trusted 3rd party, i.e. the Let's Encrypt certificate authority can issue fraudulent certificates to 3rd parties for your domain without your consent. In contrast, using TLS with Namecoin (assuming that negative certificate overrides are supported by your TLS client) does not involve a trusted 3rd party; only certificates that chain to a TLSA record in your name's value will be accepted.

Let's Encrypt also has the ability to censor your ability to receive TLS certificates. Let's Encrypt routinely uses this capacity to engage in geopolitical censorship. For example, in response to a support request pertaining to an error "Policy forbids issuing for name", Josh Aas (Executive Director of ISRG, the corporation that operates Let's Encrypt) stated on February 6, 2018:

> The People's Republic of Donetsk is on the U.S. Treasury Department Specially Designated Nationals list. The website you are inquiring about appears to be a part of, or a state enterprise of, the People's Republic of Donetsk, thus we cannot provide service according to U.S. law.

Let's Encrypt also routinely censors journalism websites for political purposes. For example, on January 2, 2019, Let's Encrypt revoked the TLS certificate for an allegedly-Russian-funded journalism website aimed at American audiences, on the grounds that the website allegedly "engaged in efforts to post content focused on divisive political issues" and "attempted to hold a political rally in the United States".

ISRG executive director Josh Aas stated on January 4, 2019, that "This happens to maybe one domain per month".

In contrast, Namecoin does not have any 3rd party who can censor your ability to receive TLS certificates.

Let's Encrypt's services are entirely gratis. For Namecoin, the pricing is more complicated. In Namecoin, you create a private CA and place its public key into the blockchain; you can use that CA to issue as many certificates for your domain as you like without requiring additional blockchain transactions. Issuing certificates from your private CA (e.g. to rotate your TLS server's keys) is gratis. However, changing the set of private CA's (e.g. to immediately revoke old certificates before they expire) does require a blockchain transaction, which means you'll have to pay a transaction fee. The extra storage used by your private CA's public key also implies that renewing your domain name will incur a higher transaction fee than if you weren't using TLS.

TLS certificates issued by Let's Encrypt will work in most TLS clients (without security warnings) without any changes from defaults. In contrast, Namecoin TLS certificates will only work (without security warnings) if Namecoin is installed.

## How does Namecoin compare to Blockstack?

Below is a comparison table of Namecoin and Blockstack (with Bitcoin added for reference).

|  | Namecoin | Blockstack | Bitcoin |
| --- | --- | --- | --- |

Case 23-644, Document 40, 07/25/2023, 3546479, Page57 of 282

|  | Namecoin | Blockstack | Bitcoin |
|---|---|---|---|
| **Lightweight validation mode** | SPV backed by PoW (e.g. BitcoinJ+libdohj or Electrum–NMC). | Checkpoints provided by a trusted 3rd party. Blockstack refers to this as "Consensus Hashes", "SNV" ("Simplified Name Verification"), or (confusingly) "SPV". Is not backed by PoW and has no relation to Bitcoin's SPV threat model. | SPV backed by PoW (e.g. BitcoinJ or Electrum). |
| **Hashrate attesting to transaction ordering** | ~95% of Bitcoin as of 2020 Jan 12. | 100% of Bitcoin. | 100% of Bitcoin. |
| **Hashrate attesting to transaction validity** | ~95% of Bitcoin as of 2020 Jan 12. | 0% of Bitcoin (miners do not attest to transaction validity). | 100% of Bitcoin. |
| **Miners possessing a majority of hashrate** | None. | None. | None. |
| **Mining pools influencing a majority of hashrate** | None. | None. | None. |
| **Legal jurisdictions influencing pools with a majority of hashrate** | China. | China. | China. |

JA-200

|  | Namecoin | Blockstack | Bitcoin |
|---|---|---|---|
| **Infrastructure capable of censoring all new blocks (non-selectively)** | Bitcoin Relay Network, by censoring all Bitcoin blocks that commit to Namecoin blocks. | Bitcoin Relay Network. | Bitcoin Relay Network. |
| **Infrastructure capable of censoring new blocks based on content (e.g. targeting a name)** | None. | Bitcoin Relay Network. | Bitcoin Relay Network. |
| **Scalability (blockchain download size, fully validating node)** | 6.06 GB as of 2020 Jan 12 (source) (includes name values). | 300.79 GB as of 2020 Jan 12 (source), plus name values. | 300.79 GB as of 2020 Jan 12 (source). |
| **Scalability (maximum name updates per hour)** | ~5494 to ~10989 (~546 on-chain bytes per update, block size limit 500 kB to 1 MB per ~10 minutes) | ~4363 to ~6545 (~275 on-chain bytes per update, block size limit 200 kB to 300 kB per ~10 minutes) | N/A |
| **Scalability (required incoming bandwidth for read operations, full block node)** | 500 kB to 1 MB per ~10 minutes (if blocks are full) | 1 MB per ~10 minutes for Bitcoin parent chain (blocks usually full), plus all name operation data | 1 MB per ~10 minutes (blocks usually full) |

Case 23-644, Document 40, 07/25/2023, 3546479, Page59 of 282

JA-201

|  | Namecoin | Blockstack | Bitcoin |
|---|---|---|---|
| **Scalability (required incoming bandwidth for read operations, headers–only node)** | ~1 kB to ~10 kB per ~10 minutes, plus a Merkle branch per read operation | Headers–only nodes not possible | 80 B per ~10 minutes |
| **Consensus codebase** | Fork of Bitcoin Core with minimal changes (primarily merged mining and 3 new opcodes for altering a name database). | Codebase built by Blockstack developers. | Bitcoin Core. |
| **Blockchain type** | Is a sidechain (merge–mined with Bitcoin). | Developers have stated that "the community needs to look into side chains" because Blockstack's design won't scale well. | Bitcoin. |
| **Parent blockchain agility** | Bitcoin is the de facto parent chain. If Bitcoin is attacked, dies out, or has other issues, miners can use a different Hashcash–SHA–256d parent chain without requiring any changes in Namecoin's consensus rules (this worked in practice when BCH forked from Bitcoin). Non–Hashcash–SHA–256d parent chains could be adopted via a hardfork. | Bitcoin is the enforced parent chain. Using any non–Bitcoin parent chain requires a hardfork. | No parent chain. |

|  | Namecoin | Blockstack | Bitcoin |
|---|---|---|---|
| **Data storage** | Choice between blockchain (similar threat model to Bitcoin; resistance to censorship is enforced as a consensus rule) and external storage (lower transaction fees, higher scalability). External DNS storage currently supports nameservers (threat model is DNSSEC with user−supplied keys; the DNSSEC keys have similar threat model to Bitcoin). External identity storage currently supports OpenPGP keyservers. | Required external storage; consensus rules do not enforce resistance to censorship. | Blockchain; resistance to censorship is enforced as a consensus rule. |
| **Namespace creation pricing** | Creating namespaces is open to all users, free of charge. | Creating a desirable namespace costs a large amount of money (0.4 BTC minimum; 40 BTC for a 2−character namespace). | N/A. |
| **Name pricing and name length** | All names have equal registration price. | Name registration price deterministically depends on length, character usage, and namespace. | N/A. |
| **Name pricing and exchange rates** | Price optimality is dependent on NMC/fiat exchange rates. | Price optimality is dependent on BTC/fiat exchange rates. | N/A. |
| **Names premined?** | Not premined. | Premined. | N/A. |
| **Coins premined?** | Not premined. | Premined via ICO (source). Falsely claimed that there would not be an ICO. | Not premined. |

JA-203

|  | Namecoin | Blockstack | Bitcoin |
|---|---|---|---|
| **Funding sources and ethics** | Crowdfunding, donations, consulting/contracting (e.g. for F2Pool and an employee of Kraken). Has refused funding opportunities that were perceived to create conflicts of interest regarding user freedom, privacy, and security. Frequently references WikiLeaks and Ed Snowden in specification examples and other development discussion. | Business model is not publicly disclosed. Seed round led by an investor who has endorsed cryptographic backdoors and who considers ROT13 to be a "serious" and "intriguing" security mechanism, and another investor who has also endorsed cryptographic backdoors. | (N/A) |
| **Do the developers run services that hold users' private keys?** | No. Many years ago, a former Namecoin developer did run such a service. It has been discontinued, as the current Namecoin developer team considers such services to be harmful and a liability. | Yes, Onename holds users' private keys. | Not as far as we know. |
| **Patented by developers?** | Not patented by developers. | Patented by developers.. Developers did not disclose the patent to their users. As of 2017 Nov 20, Startpage for "patent", "patented", or Blockstack's patent number shows zero hits on blockstack.org, nor does searching the Blockstack forum for those terms yield any hits. | Not patented by developers. |

The Blockstack developers have demonstrated a repeated, consistent history of obfuscating their security model. Three examples:

Example 1: At launch, Blockstack used a DHT for data storage. See the opinions of Bitcoin developers Peter Todd and Greg Maxwell about DHT's. Namecoin developers publicly warned when Blockstack launched that DHT's were likely to be unsafe in Blockstack. Quoting the Namecoin blogpost from 2015 Sept. 29:

> Additionally, DHT-based discovery of storage nodes is one of the classic suggestions of new users as an alternative to DNS seeds, and, originally, IRC-based discovery: it has never been committed because it is trivial to attack DHT-based networks, and partly because once a node is connected, Bitcoin (and thus Namecoin) peer nodes are solicitous with peer-sharing.

> As an actual data store, DHT as it is classically described runs into issues with non-global or non-contiguous storage, with little to no way to verify the completeness of the data stored therein. With the decoupled headers in OP_RETURN-using transactions in Bitcoin and the data storage in a DHT (or DHT-like) separate network, there is the likelihood of some little-used data simply disappearing entirely from the network. There is no indication of how Blockstore intends to handle this highly-likely failure condition.

In response to this criticism, Ryan Shea (Blockstack CEO) stated on 2015 Sept. 30:

> Using a DHT could mean that data could become inaccessible

> The information one gets from the DHT is hash-validated by the record in the blockchain which means you can get it from anywhere without trusting the source. The DHT is just one possible source of information and we have set up mirrors to ensure data redundancy and allow anyone to run a mirror in addition to a DHT node. Further, the data in the DHT gets periodically data mined and re-populated as needed by mirrors, to ensure there is no data loss whatsoever. This has been extensively tested.

Muneeb Ali (Blockstack CTO) also stated on 2015 Sept. 30 (emphasis in original):

> Their DHT arguments show a lack of understanding of how Blockstore's storage works. They **incorrectly assume that the DHT doesn't have global state. It does.**

Case 23-644, Document 40, 07/25/2023, 3546479, Page63 of 282

However, on 2017 Jan. 23, Muneeb Ali (Blockstack CTO) posted the following (link uses archive.is, which is not Tor–friendly, due to Blockstack apparently blocking the Tor–friendly archive.org Wayback Machine from archiving their forum):

---

Over this weekend (Jan 22), some community members (thanks, Albin!) reported "Data not saved in DHT" error for their profiles. I debugged this issue and turned out that some nodes of our DHT deployment were on a partition. This is very common in DHTs. We've been lucky in our deployment (which started in summer 2015 and has been running continuously since) and haven't experienced partition issues that frequently. This is because of:

1. Active monitoring of default discovery nodes and throwing more RAM/CPU at the discovery nodes, so it's hard to overwhelm them with requests.
2. Use of a caching layer where even if the underlying DHT network is experiencing, and recovering from, a partition read queries going to nodes that use a caching layer will still work for (heavily) cached data.
3. We can proactively check the blockchain for new data and check if data has propagated on the DHT network (traditional DHTs don't have any such channel where new data writes get broadcasted).

Even with these additional monitoring and caching services, and extra information about new writes, we still experience issues. And the Atlas network described above helps a lot because it's a fundamentally new design which, in my view, is much better than using a traditional DHT for our use case. Anyway, just restored the DHT partition and things are back to normal.

---

Blockstack subsequently stopped using a DHT; Muneeb Ali (Blockstack CTO) stated on 2017 Jan. 13 about why their proposed replacement (a custom P2P network called Atlas) is better than their DHT (emphasis in original; link uses archive.is, which is not Tor–friendly, due to Blockstack apparently blocking the Tor–friendly archive.org Wayback Machine from archiving their forum):

Case 23-644, Document 40, 07/25/2023, 3546479, Page64 of 282

JA-206

> Atlas nodes have a **global view** of the state meaning that they know if they're missing any data items. This is because we use the blockchain to propagate information about new puts (new data items written to the network). This increases reliability a lot because traditional DHT nodes don't even know if they're missing data (there is no global view in traditional DHTs and there are theoretical proofs for that).

In other words, the exact issue whose existence we pointed out, and he denied, in 2015.

Example 2: Namecoin developers pointed out when Blockstack launched that Blockstack was incompatible with SPV. Ryan Shea (Blockstack CEO) replied on Reddit on 2015 Sept. 30:

> Implementing SPV wouldn't be secure as it depends on having all block information

> The short version is that blockstore definitely supports lightweight nodes. We'll be publishing a blog post on exactly how this works very soon.

Muneeb Ali (Blockstack CTO) also claimed on 2015 Sept. 30 (emphasis in original):

> it is **possible to have SPV–like functionality** in Blockstore. We will publish details about it.

However, the Blockstack developers **already knew** that this was impossible; on 2014 Dec. 12 (before Namecoin developers pointed out the issue), Chris Pacia (an OpenBazaar developer collaborating with Blockstack) stated on the Blockstack issue tracker:

> OK. I don't think a blockchain–only lightweight proof is possible without an additional consensus mechanism (blockchain). In fact, I think this is why counterparty and mastercoin don't have SPV implementations — because you can't do it.

JA-207

The system that Blockstack ended up releasing was… trusted 3rd-party checkpoint hashes. Not remotely similar to SPV, and not something that most blockchain developers would refer to as a "lightweight node".

Example 3: Namecoin developers have pointed out in this FAQ that Onename (Blockstack's centralized web application for registering names) holds users' private keys. On 2017 Apr. 07, Muneeb Ali (Blockstack CTO) complained about this, stating:

> Private keys on Onename are encrypted with a password only the user has. So Onename doesn't technically hold private keys, just encrypted blobs that are useless without the users' passwords. In comparison, Coinbase actually holds private keys. Exchanges can send bitcoin without the user's permission. This is not the case for Onename.

Namecoin developers initially pointed out that the web server could easily serve malicious JavaScript to steal private keys, and therefore Blockstack developers still had access to keys. However, it turned out to be even worse than that. Blockstack's own documentation states:

> For new registration, the Onename webapp registers your username on Blockstack on your behalf and then transfers the ownership to you.

This implies that the Onename server controls the keys during the registration process, and could easily steal names while they're being registered without serving malicious JavaScript. A quite different picture than what one might imagine from what Muneeb said to us.

Blockstack's security model obfuscation raises serious questions about whether any future security claims by the Blockstack developers can be taken at face value.

## How does Namecoin compare to Monero?

Monero's MoneroDNS project is similar in concept to Namecoin. MoneroDNS's technical differences to Namecoin are similar to Monero's technical differences to Bitcoin. Monero has had much less technical review than Bitcoin, and merge-mined chains based on Monero have significantly less hashrate security available to them than merge-mined chains based on Bitcoin. On the other hand, Monero's small size

enables them to liberally experiment with more advanced features and cryptography, whereas Bitcoin-based systems like Namecoin are more conservative. The Namecoin and Monero development teams are cooperating on areas of common interest, as both projects agree that Namecoin and Monero both have a future.

## What is Namecoin's relationship to OpenNIC?

On May 27, 2014, OpenNIC voted to add a centralized Namecoin inproxy to their DNS infrastructure. No Namecoin developers participated in the discussion surrounding that vote.

On December 4, 2018, a brief discussion occurred within OpenNIC about whether Namecoin should be removed. The cited reason for considering removing Namecoin was that some OpenNIC server operators had been harassed by blacklist providers and hosting providers due to some botnet activity that was accessing OpenNIC for C&C infrastructure. The alleged botnet C&C domains included some Namecoin domains, but also included some centralized OpenNIC domains, such as domains on `.fur`. OpenNIC criticized those blacklist providers for the harassment, saying "none of them have the courtesy to so much as send an email to abuse@domain to let you know that a problem was detected… they claim to be trying to protect the internet but don't give victims a chance to fix the problems". The discussion "[produced] little in the way of support or dissent" for whether to continue resolving Namecoin domains, and OpenNIC decided to continue resolving Namecoin.

On December 19, 2018, PRISM Break lead maintainer Yana Timoshenko floated the idea to Namecoin developer Jeremy Rand of de-listing OpenNIC due to security concerns about centralized Namecoin resolution. Jeremy concurred that centralized Namecoin resolution was a security risk, pointed to a case study he had previously written on the subject, and recommended that PRISM Break not list centralized Namecoin resolvers; Yana removed OpenNIC from PRISM Break.

On June 9, 2019, Katie Holly from OpenNIC contacted Yana and Jeremy on the PRISM Break issue tracker, stated that she had recently discovered Yana's and Jeremy's concerns, and asked what OpenNIC would need to do to be re-listed on PRISM Break. Katie also said that OpenNIC would shortly hold an election on whether to remove Namecoin support as Yana and Jeremy had recommended.

On June 10, 2019, Yana replied, stating that removing centralized Namecoin resolution was of "critical" priority if OpenNIC was to be re-listed. Jeremy subsequently recommended the same.

On June 11, 2019, OpenNIC announced that they were beginning their election on whether to follow Yana's and Jeremy's recommendation to remove Namecoin support.

On June 25, 2019, Jeff Taylor from OpenNIC announced that the election had concluded in favor of following Yana's and Jeremy's recommendation, by a final margin of 13 to 2.

On July 30, 2019, Jeremy published a blogpost publicly thanking OpenNIC for doing the right thing. Yana signed off on the blogpost before publication. (The blogpost was written on June 30, but publication was delayed by the Tor Developer Meeting.)

There is currently no active relationship between Namecoin and OpenNIC, but some Namecoin developers (including Jeremy) continue to recommend OpenNIC to users who want a centralized naming system that isn't run by ICANN.

## Weaknesses

## How easy is it for names to be stolen? What can be done if it happens?

For an attacker who does not have a majority of hashrate, stealing a Namecoin name is, roughly speaking, equivalent to the task of stealing bitcoins. This usually requires stealing the private key which owns the name. Assuming that proper security measures are in place by the owner, this is very difficult. However, if a user fails to keep their private keys safe, all bets are off. The standard method for attempting to steal bitcoins is to use malware; this is likely to be equally effective for stealing Namecoin names. Users can protect themselves using all the standard methods of avoiding malware, which are out of scope of this FAQ.

The good news is that the script system inherent in Bitcoin and Namecoin is designed to enable features that make theft more difficult. Many features are under development that would allow users considerable flexibility in constructing anti-theft policies that meet their needs. For example:

JA-210

- **Multisig** (similar to Bitcoin) would allow names to be controlled by M–of–N keys. Some of these keys could belong to the various directors of a company, be stored in a secure location, or be stored by semi–trusted service providers. This is currently supported by the Namecoin protocol and consensus rules, but not well–exposed to end users.

- **Offline signing** (similar to Bitcoin) would allow names to be controlled by keys that are located on an air–gapped computer, an isolated offline Qubes virtual machine, or a hardware wallet. This is currently supported by the Namecoin protocol and consensus rules, but not well–exposed to end users.

- **Delegated renewal** (Namecoin–specific) would allow a key to be authorized to renew a name, but not change its value or its owner. Efforts are underway to add this to the Namecoin protocol and consensus rules.

- **Delegated alteration** (Namecoin–specific) would allow a key to be authorized to alter the value of a name, but not change its owner. This is supported, but not well exposed to end users. Further improvements are underway. See the docs on delegated alteration.

- **Delegated partial alteration** (Namecoin–specific) would allow a key to be authorized to alter a specific subset of the value of a name (for example, be allowed to change a domain name's IP address but not its TLS certificate), but not change other parts of the value or its owner. This is supported, but not well–exposed to end users. Further improvements are underway. See the docs on delegated alteration.

The above features can, of course, be combined arbitrarily for additional layered security.

Unfortunately, if all of the above security measures fail (or are not in use for a given name), and a name does get stolen, it is very difficult to recover it. Legal action might be able to fine or imprison the thief if they refuse to return the name, but this is not reliable, given that there is no guarantee that the thief will be identifiable, or that the thief will be in a legal jurisdiction who cares. Furthermore, since names do get sold or transferred on a regular basis, it would be difficult to prove that the name was not voluntarily transferred. (False claims of theft are problematic in Bitcoin too.) In cases where it is obvious that a theft has occurred (e.g. a previously reputable website starts serving malware), voluntary and user–

bypassable third-party blacklists (e.g. PhishTank) could be reasonably effective at protecting users in some circumstances. While this doesn't recover the name, it does reduce the incentive to attempt to steal names.

We are unaware of convincing empirical evidence of how Namecoin's theft risk compares to that of the DNS when the recommended security procedures of both are in use; this is difficult to measure because it is likely that a significant number of Namecoin users and DNS users are not using the recommended security procedures.

## What is the threat posed by 51% attacks?

Information about what a 51% attacker can do in Bitcoin is described on the Bitcoin StackExchange. Namecoin is quite similar. The primary things that adversely affect Namecoin are reversing transactions sent by the attacker and preventing transactions from gaining confirmations.

Reversing transactions sent by the attacker would allow name registrations to be stolen if the reversed transaction is a `name_firstupdate`. This is because prior to being registered, names are considered to be "anyone can spend", meaning that prior to the registration, any arbitrary attacker is equally in ownership of a name as the user who actually registers it. Preventing transactions from gaining any confirmations would allow names to be stolen if all transactions for a name are prevented from confirming until the name expires after 36000 blocks, at which point the attacker can register it (but it should be noted that this would require a prolonged 51% attack lasting until the 36000-block expiry period elapses, which would be highly expensive).

Both of these attacks are detectable. In the case of reversing transactions, the evidence would be an extremely long fork in the blockchain, possibly thousands of blocks long or longer. In the case of preventing transactions from confirming, the evidence would be that the blockchain indicates that a name expired and was re-registered. In both cases, it is detectable which names were attacked. In the case of preventing transactions from confirming, it is also possible for the legitimate owner of the stolen name to register a new name after the attack is over, and sign it with the owner key of the original name, thus proving common ownership and allowing secure resurrection of the name. The only way to prevent this resurrection is for the attacker to continue to expend mining resources on the attack for as long as they

with to prevent the name from being resurrected. In the case of reversing transactions, it is not possible to prove ownership of the original name and resurrect it. Luckily, reversing old transactions is considerably more expensive than preventing new transactions from confirming.

It is noteworthy that a 51% attacker cannot sell a name to a user and then steal back the name. Nor can a 51% attacker buy a name from a seller and then steal back the money. This is because Namecoin supports *atomic* name trades: reversing the purchase payment also reverses the name transfer, and vice versa. Double-spending of `name_update` transactions also isn't beneficial to an attacker, because `name_update` transactions typically are sent by a user to themself, meaning that the attacker could only scam themself.

In both Bitcoin and Namecoin, the Chinese government has jurisdiction over a majority of hashpower. This is problematic for both Bitcoin and Namecoin, and should be fixed in both. Because not all Bitcoin miners also mine Namecoin, F2Pool previously had a majority of Namecoin hashpower (they no longer do). This was also problematic when it was the case. However, in practice, the Chinese government has considerably more motivation to perform a 51% attack than F2Pool does. (The Chinese government has a history of messing with Internet traffic. F2Pool has supported Namecoin development both financially and logistically, which makes it unlikely that they would want to attack it.)

A majority of Bitcoin's hashpower is routed via the Bitcoin Relay Network, which has the ability to censor Bitcoin blocks that pass through it. This produces incentives for Bitcoin miners to self-censor any blocks that might violate any policy introduced in the future by Bitcoin Relay Network, because routing blocks through Bitcoin Relay Network reduces orphan rates for miners. Namecoin's blocks are much smaller than Bitcoin's, and therefore Namecoin does not have similar incentives for centralized block relay infrastructure. While it is possible for Bitcoin Relay Network to attack Namecoin by censoring Bitcoin blocks that commit to merge-mined Namecoin blocks, it is not feasible for Bitcoin Relay Network to look inside the Namecoin blocks that are committed to, which means that Bitcoin Relay Network cannot censor Namecoin blocks by content as they can with Bitcoin blocks. Bitcoin Relay Network is operated by Bitcoin Core developer Matt Corallo, who is unlikely to want to attack Bitcoin (just as F2Pool is unlikely to want to attack Namecoin).

The takeaway here is that while F2Pool theoretically used to be capable of attacking Namecoin (but not Bitcoin), and Bitcoin Relay Network is theoretically capable of attacking Bitcoin (but not Namecoin), *in practice* the party with the most motivation to attack either chain (the Chinese government) has jurisdiction over a hashrate majority of both Bitcoin and Namecoin. Mining decentralization is an active research area, and we hope that significant improvements in this area are made, as they would improve the security of both Bitcoin and Namecoin.

## Is squatting a problem? What can be done about it?

There are several types of squatting concerns sometimes raised in relation to Namecoin.

The first concern is that too many potentially high-value domains, e.g. `d/google`, have been squatted for the purpose of resale. This is not a problem that can be solved in a decentralized system, because "squatting on `d/google`" is defined as "owning `d/google` while not being the real-world company named Google", and determining that a given name is or is not owned by a given real-world entity requires some trusted party. Raising the price of names wouldn't have any effect on this, because no matter what the cost of registering a name is, the resale value of `d/google` is likely to be higher.

The second concern is that too many potentially high-value domains have been squatted for the purpose of impersonation. This is not a problem specific to Namecoin; phishing sites exist in the DNS world too, and are frequently countered by using systems such as web-of-trust and voluntary user-bypassable third-party blacklists (e.g PhishTank). There is no reason to think that similar counters would not work in Namecoin.

The third concern is that single entities can squat on a large number of names, which introduces centralization into the space of squatted names. For comparison, DNS domain names are squatted a lot, but the space of squatted names is very decentralized, which reduces abusive behavior such as would happen if most squatted names belonged to one of a few people. This concern could be resolved by raising the price of name registrations, so that a squatter with a given investment budget cannot register as many names without selling or otherwise using them to recoup costs. While raising prices sounds like a great plan, the devil is in the details: increasing prices constitutes a softfork, and decreasing prices

constitutes a hardfork. Since cryptocurrencies like Namecoin have an exchange rate that varies over time, the optimal name price might need regular adjustment. There is ongoing research into how regular name price adjustment could be done safely and non-disruptively, and research in the wider cryptocurrency world on block size adjustment (which is a similar problem in many ways) may be applicable.

At the moment, the current developers consider other issues to be somewhat higher priority. For example, getting a domain name without dealing with squatters doesn't mean much if it's difficult for people to view your website. Once development of other areas has progressed further, we do intend to spend a larger fraction of our time on improving name pricing. However, if new developers want to get involved with proposing, prototyping, or analyzing name price systems, we would be delighted to have the assistance.

In the meantime, practical advice is that if you want a name but it's squatted, try to contact the owner (many squatters leave contact information in the value of their names) and see if they'll let you have it. We have heard of many cases where squatters either gave away names or sold them for very little money if the recipient actually planned to use the name rather than resell it. If they demand money that you're unwilling to pay, consider registering a different name. It's unlikely that the website or service you want to set up can only work with that one specific name. Strategies for finding an unused DNS domain name or an untrademarked business name are likely to be applicable for Namecoin too.

## Is Namecoin anonymous?

Like Bitcoin, Namecoin is not anonymous. A thorough description of Bitcoin's poor anonymity properties is outside the scope of this FAQ.

When used properly in conjunction with Tor, Namecoin *may* offer sufficient pseudonymity or location-anonymity for many use cases. Users who need these properties are advised to carefully evaluate their specific situation. Using Namecoin over Tor does *not* by itself magically make you anonymous.

We recognize that better anonymity is an important use case. We occasionally receive questions from users about whether Namecoin can be used anonymously. While we don't know much about these users (for obvious reasons), some of them

appear to be in circumstances where failure of anonymity could lead to significant negative consequences. We aim to support these use cases in the future, but right now it would be irresponsible and reckless to do so.

We are currently engaging with projects that provide blockchain anonymity (e.g. Monero and Zcash), with the goal of achieving similar anonymity for Namecoin. Both Monero and Zcash have mathematical security proofs of their anonymity, subject to given assumptions and a given anonymity set. Blockchain anonymity is also an active research area, so further innovations may very well occur in the future.

## I heard that an academic study found that Namecoin is only used by 28 websites; is that really true?

This claim is derived from a study out of Princeton University, and is a result of faulty study design. The study's design considers all `.bit` websites that contain identical content to a DNS website to be "trivial" and discounts such websites, leaving only 28 `.bit` websites that contain content that cannot be found on a DNS website. This number seems plausible to us, though we haven't tried to reproduce the result independently. However, the Namecoin developers have never recommended that typical `.bit` domain owners restrict their website to only `.bit`; we usually recommend that `.bit` be used **in addition to** DNS. Reading Sec. 4.3 of the study reveals that the study authors found an additional 111 `.bit` domains that pointed to a website that was also available via DNS. This results in a total count of 139 `.bit` domains with non-trivial content, if the definition of "trivial" doesn't include websites that are available on both Namecoin and DNS. This count of 139 also seems plausible to us, though (again) we haven't tried to reproduce the result independently.

It is unfortunate that the Princeton study authors primarily marketed the count of 28 despite the count of 139 being a far more relevant measure. It is also unfortunate that the study authors did not contact us to ask for peer review, as we would have easily caught that issue had we been consulted. (Interestingly, the study authors *did* contact the CTO of a Namecoin competitor to ask for feedback on their paper prior to publishing.)

## How does Namecoin affect global heating?

JA-216

Namecoin does mildly increase Bitcoin's hashrate, which incentivizes greater electricity consumption by Bitcoin mining. However, this increase in electricity consumption is quite small compared to what Bitcoin would consume without Namecoin, because Namecoin's block reward is of much lower real-world value than Bitcoin's. Thus, Namecoin is not a major contributor to Bitcoin's electricity usage. Specifically, of the 39 Mt $CO_2e$ net emissions produced by Bitcoin+Namecoin mining in 2021, Namecoin was responsible for ~1.2 kt (0.003%). Of the S&P 500 companies, only 4 have a lower greenhouse footprint (each) than Namecoin mining. In addition, most Bitcoin mining is powered by renewable electricity sources, so Namecoin and Bitcoin are not a major cause of global heating. For information about Bitcoin mining's electricity usage, these articles may be informative:

- The reports of bitcoin environmental damage are garbage (Robert Sharratt, Jan. 2019)
- RE: Cost of Bitcoin Mining Misconceptions (Christopher Bendiksen, Jun. 2018)
- An Honest Explanation of Price, Hashrate & Bitcoin Mining Network Dynamics (Christopher Bendiksen, Nov. 2018)
- Beware of Lazy Research: Let's Talk Electricity Waste & How Bitcoin Mining Can Power A Renewable Energy Renaissance (Christopher Bendiksen, Dec. 2018)
- Surprise: Majority of BTC Energy Sourced from Hydro / Wind / Solar (Christopher Bendiksen, Jun. 2019)
- Bitcoin's Hash Rate Grew More Than 80% Since June — Mostly Within China (Christopher Bendiksen, Dec. 2019)
- Everything You've Heard About Bitcoin Mining and the Environment is Wrong (Christopher Bendiksen, Feb. 2022)
- The Bitcoin Mining Network: Trends, Marginal Creation Costs, Electricity Consumption & Sources (May 2018 Update) (CoinShares Research)
- The Bitcoin Mining Network: Trends, Marginal Creation Costs, Electricity Consumption & Sources (Nov. 2018 Update) (CoinShares Research)
- The Bitcoin Mining Network: Trends, Average Creation Costs, Electricity Consumption & Sources (Jun. 2019 Update) (CoinShares Research)
- The Bitcoin Mining Network: Trends, Average Creation Costs, Electricity Consumption & Sources (Dec. 2019 Update) (CoinShares Research)
- The Bitcoin Mining Network: Energy and Carbon Impact (Jan. 2022) (CoinShares Research)

JA-217

Both Bitcoin and Namecoin also have second–order effects that oppose global heating. For example, Bitcoin decreases the influence of the Petrodollar (the Petrodollar is a major reason why the U.S. establishment opposes renewable energy sources), and Namecoin helps fight surveillance (climate activists are heavily targeted by government surveillance).

JA-218

# EXHIBIT B

**JA-219**



# Namebrow.se
### Namecoin Explorer

## Name
# d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

### Summary

| | |
|---|---|
| Status | Active |
| Expires after block | 634415 ( 15958 blocks to go ) |
| Expiry date | Oct. 17, 2022, 12:45 p.m. (estimate) |
| Last update | Feb. 10, 2022, 3:47 p.m. (block 598415) |
| Registered since | April 5, 2021, 12:14 p.m. (block 553214) |
| First registration | May 2, 2014, 11:33 p.m. (block 37368) |

### Current value

I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of

◄ ████████████████████████ ►

## Name operations

| Date/Time | Block | Transaction | Operation | Value |
|---|---|---|---|---|
| Feb. 10, 2022, 3:47 p.m. | 598415 | 6dd5ceffc... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| June 14, 2021, 12:25 p.m. | 563353 | 93e6db4e6... | NAME_UPDATE | **This original NFT, entitled "Quantum" by Kevin McCoy and minted on May 2, 2014, is currently held by the person who controls the Twitter handle @EarlyNFT. Please direct message all inquires about the artwork there.** |
| June 7, 2021, 4:30 p.m. | 562392 | 84adf2532... | NAME_UPDATE | **An authorized print of this original NFT, entitled "Quantum" by Kevin McCoy, is currently being auctioned off by Sotheby's. Good Luck to all the bidders.** |
| April 30, 2021, 2:53 p.m. | 556942 | e63d18c5b... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |

JA-220

# Namebrow.se
**Namecoin Explorer**

| April 5, 2021, 7 a.m. | 553180 | 8c76ba4ec... | NAME_NEW | fc6a09d1dfa2cbced6fa35e64c3cb001196cdef2 |
| May 3, 2014, 1:27 a.m. | 174923 | fa8b9a6ad... | NAME_FIRSTUPDATE | None |
| May 2, 2014, 11:33 p.m. | 174910 | da66d975e... | NAME_NEW | aa4bcd723e172f0f53cbab9c71a165262334206b |

**Namecoin Block Explorer** - Contact.

JA-221

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FREE HOLDINGS INC., | |
| Plaintiff, | |
| v. | Case No.: 1:22-cv-00881-JLC |
| KEVIN McCOY and SOTHEBY'S INC., | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO SOTHEBY'S INC.'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

**FALCON RAPPAPORT & BERKMAN PLLC**

Moish E. Peltz
Kenneth J. Falcon
Steven Berlowitz
Jessica Moore
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(516) 599-0888
mpeltz@frblaw.com
kfalcon@frblaw.com
sberlowitz@frblaw.com
jmoore@frblaw.com

*Attorneys for Plaintiff*

**JA-222**

## Table of Contents

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 1

ARGUMENT ................................................................................................................... 3

   I.   Plaintiff Has Stated Claims for Slander of Title and Product Disparagement ..................... 4

      A.   The Challenged Statements Are Not Protected Opinion ................................................. 5

      B.   The Challenged Statements Are Not Substantially True ................................................. 9

      C.   Plaintiff Alleges That Sotheby's Acted With Actual Malice ...................................... 12

   II.   Plaintiff Has Properly Plead Unjust Enrichment Against Sotheby's ............................ 14

   III.   Plaintiff Has Properly Plead A Claim For Declaratory Judgment ................................ 16

CONCLUSION .............................................................................................................. 17

i

### Table of Authorities

**Cases**

*Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *17 (E.D.N.Y. July 21, 2010).................. 11

*Bilinksi v. Keith Haring Found., Inc.*, 96 F. Supp.3d 35 (S.D.N.Y. 2015)................................... 14

*Brian v. Richardson*, 87 N.Y.2d 46 (1995)............................................................................. 7

*Burton v. iYogi, Inc.*, 2015 WL 4385665, at *8-9 (S.D.N.Y. Mar 16, 2015) ............................... 5

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000)........................................... 12

*Chamilia, LLC v. Pandora Jewelry, LLC*, 85 U.S.P.Q.3d 1169 (S.D.N.Y. 2007) ........................ 3

*City Waste & Recycling Services, Inc. v. Tswin Bridges Waste & Recycling, LLC*, 72 Misc. 3d
    1217(A), at *12 (Sup. Ct. Albany Co. 2021) ...................................................................... 9

*Clark Consulting, Inc., v. Financial Solutions Partners, LLC*, 2005 WL 3097892, at *2
    (S.D.N.Y. Nov. 17, 2005) ................................................................................................ 2

*Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004) ................................................................ 8

*Conti v. Doe*, 535 F. Supp. 3d 257 (S.D.N.Y. 2021) ...................................................................... 12

*Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777 (2012) ................................................................... 14

*Eidelman v. The Sun Prods. Corp.*, 2017 WL 4277187 * 6 (S.D.N.Y. Sept. 25, 2017).............. 13

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168 (2d Cir. 2004) ....... 3

*Firestone v. Miroth Const. Co.*, 215 A.D. 564 (1st Dep't 1926).................................................... 13

*Giuffre v. Maxwell*, 2017 WL 1536009, at *5 (S.D.N.Y. Mar. 27, 2017) .................................... 9

*Global Packaging Services, LLC v. Global Printing & Packaging*, 248 F. Supp. 3d 487
    (S.D.N.Y. 2017)................................................................................................................ 15

*Gross v. New York Times Co.*, 82 N.Y.2d 146 (1993).................................................................. 6

*Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999)............................................................ 3

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............................... 12

*Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235 (1991) ................................................................ 7

*Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009) ............................................... 13

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348 (S.D.N.Y. 1998) ............................................. 8

*Kehm v. Murtha*, 28 A.D.2d 421 (2d Dep't 2001) ......................................................................... 9

*Prince v. Fox Tel. Stations, Inc.*, 33 Misc. 3d 1225, at *8 (Sup. Ct. N.Y. Co. 2011) .................... 4

*Smartmatic USA Corp. v. Fox Corp.*, No. 151136/2021, 2022 WL 685407, at *20 (Sup. Ct. N.Y.

  Co. Mar. 08, 2022) ..................................................................................................................... 13

*Solstein v. Mirra*, 488 F. Supp. 3d 86 (S.D.N.Y. 2020) ............................................................. 3,4

*Waldman v. New Chapter*, 714 F. Supp. 2d 398 (E.D.N.Y. 2010) .............................................. 14

Plaintiff Free Holdings Inc. ("Plaintiff" or "Free Holdings") respectfully requests that the Court deny Defendant Sotheby's Inc. ("Defendant" or "Sotheby's") motion to dismiss the Amended Complaint ("Am. Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff is separately filing an opposition to Defendant Kevin McCoy's motion to dismiss, and like Defendants, adopts and incorporates herein the arguments raised there.

## PRELIMINARY STATEMENT

Sotheby's motion fails for the same reason as McCoy's. Sotheby's, as a venerable auction house, has a responsibility to emerging blockchain artists and collectors to conduct the proper diligence required to faithfully market and sell early blockchain art. In this instance, Sotheby's failed to exercise that diligence. While Sotheby's now claims that those Challenged Statements are permissible opinion, indeed, as argued below and in the opposition to McCoy's Motion to Dismiss, those Challenged Statements remain literally untrue. As a result, Defendants broadcasted false claims about the first known NFT throughout the world, to the detriment of Free Holdings. As a result, this Court should hold Sotheby's accountable.

## FACTUAL BACKGROUND

In 2014, artist Kevin McCoy ("McCoy") minted a digital artwork on the Namecoin blockchain called *Quantum* (the "Namecoin-*Quantum*"), which is now universally regarded as the world's first NFT. Am. Compl. ¶¶ 36-37. According to McCoy, the Namecoin-*Quantum* represents "birth" and "provenance." Am. Compl. ¶ 56. The artistic principle underlying the Namecoin-*Quantum* was "to use blockchain technology to create ***indelible*** provenance and ownership of digital images of this kind." *See* Am. Compl. ¶ 57 (emphasis added). When he created the Namecoin-*Quantum*, McCoy inserted the following in its metadata description:

1

> I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif
> with the creator's public announcement of it's publishing at the URL
> https://twitter.com/mccoyspace/status/462320426719641600  The file whose
> SHA256            hash            is
> d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a   is
> taken to be the file in question. **Title transfers to whoever controls this
> blockchain entry**.

Am. Compl. ¶ 38 (emphasis added).

After creating *Quantum*, McCoy subsequently let the Namecoin blockchain record that housed *Quantum* expire, rendering the NFT free to claim by anyone who elected to reregister the Namecoin record.  *See* Am. Compl. ¶¶ 39-41.  On or around April 5, 2021, Plaintiff claimed the Namecoin-*Quantum* and remains title holder to the same.  *See* Am. Compl. ¶¶ 42-43.

On May 28, 2021, McCoy minted a second NFT, also called *Quantum*, on the Ethereum blockchain (the "Ethereum-*Quantum*") and began working with Defendant to market and promote the piece for sale in Defendant's upcoming auction titled *Natively Digital: A Curated NFT Sale*.  *See* Am. Compl. ¶¶ 6, 8, 52-54.  The purpose of the *Natively Digital* auction was to showcase and sell some of the earliest NFTs, and Defendant marketed and promoted the Ethereum-*Quantum* as the first NFT ever created.

Defendant issued materially false and misleading statements of fact in the course of marketing and promoting the sale of Ethereum-*Quantum*.  Defendant stated that the Ethereum-*Quantum* was the first NFT "[o]riginally minted on May 3, 2014 on the Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist."  Am. Compl. ¶ 9. Defendant further stated that the Namecoin-*Quantum* had been "burned" or otherwise "removed" from the Namecoin blockchain.  *See* Am. Compl. ¶ 10. These statements are false because the Namecoin-*Quantum* requires no preservation, a Namecoin blockchain record cannot be "removed," and the blockchain record for the Namecoin-*Quantum* has not been "removed" or

"burned" from the Namecoin blockchain.  *See* Am. Compl. ¶ 68.  Defendant issued these

materially false and misleading claims in order to promote and market the Ethereum-*Quantum* as

a highly valuable, first of its kind collectible.  Defendant ultimately sold the Ethereum-*Quantum*

on the basis of these false statements for $1,472,000.  *See* Am. Compl. ¶ 84.

## ARGUMENT

"A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if it appears

beyond doubt that the plaintiff can prove no set of facts in support of its claim which would

entitle it to relief."  *Clark Consulting, Inc., v. Financial Solutions Partners, LLC*, 2005 WL

3097892, at *2 (S.D.N.Y. Nov. 17, 2005) (internal citations omitted); *see also Harris v. City of

New York*, 186 F.3d 243, 247 (2d Cir. 1999) ("Any Rule 12(b)(6) movant for dismissal faces a

difficult (though not insurmountable) hurdle.").  "At the motion to dismiss stage, the issue is not

whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer

evidence to support the claims."  *Clark Consulting*, 2005 WL 3097892, at *2 (internal citation

omitted); *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d

Cir. 2004).   "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the

legal feasibility of the complaint, not to assay the weight of the evidence which might be offered

in support thereof."  *Clark Consulting*, 2005 WL 3097892, at *2 (internal citation omitted).

"Accordingly, a claim can only be dismissed if no relief can be granted under any set of facts

that could be proved consistent with the allegations."  *Id.*; *Eternity Global*, 375 F.3d at 176 ("A

complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff

is entitled to no relief under any state of facts which could be proved in support of the claim.").

I.   **Plaintiff Has Stated Claims for Slander of Title and Product Disparagement**

In New York, a claim for slander of title requires a plaintiff to allege "(1) a communication falsely casting doubt on [the] validity of the complainant's title; (2) reasonably calculated to cause harm; and (3) resulting in special damages." *Chamilia, LLC v. Pandora Jewelry, LLC*, 85 U.S.P.Q.3d 1169, 1179 (S.D.N.Y. 2007).   Under New York law, statements of fact are actionable for claims of defamation and slander, but statements of opinion are not. *See Solstein v. Mirra*, 488 F. Supp. 86, 96 (S.D.N.Y. 2020).   "Determining whether a statement is an allegation of fact or mere opinion is a legal question for the court.   The dispositive inquiry is whether a reasonable reader could have concluded that the statements were conveying facts about the plaintiff."   *Id.* (internal citation omitted).

Under New York law, a claim for product disparagement requires plaintiff to plead (1) a false statement; (2) about the condition, value, or quality of plaintiff's product or property; (3) publication to a third person; (4) actual malice; and (5) special damages. *See Prince v. Fox Tel. Stations, Inc.*, 33 Misc. 3d 1225, at *8 (Sup. Ct. N.Y. Co. 2011).

Defendant argues that Plaintiff has failed to assert well plead claims for slander of title and commercial disparagement on the grounds that the challenged statements are protected opinion, are substantially true, and because Plaintiff fails to allege malice. *See* Br. at 11-20. Each of Defendant's arguments fails.   As outlined below, Plaintiff has adequately pled that the challenged statements are actionable statements of fact, materially false and misleading, and made with malice.   Accordingly, the Court should deny Defendant's motion to dismiss Plaintiff's claims for slander of title and commercial disparagement.

4

**A. The Challenged Statements Are Not Protected Opinion**

Defendant asserts that Plaintiff's claims for slander of title and product disparagement should be dismissed because the statements that the Namecoin-*Quantum* was "preserved," "burned," "effectively burned," or otherwise "removed" are "loose, imprecise language that lacks a defined meaning that is readily understood." Br. at 14. Defendant is wrong. While the Court should not "render statements actionable by giving them a strained or artificial construction" it also need not "interpret writing in their mildest and most inoffensive sense to hold them non-libelous." *See, e.g.*, *Solstein v. Mirra*, 488 F. Supp. 3d 86, 96 (S.D.N.Y. 2020) (internal citations omitted) (upholding defamation claim).

In this case, the challenged statements convey in clear, unambiguous language, that Namecoin-*Quantum* no longer exists on the Namecoin blockchain. Plaintiff alleged that Namecoin-*Quantum* "was removed from the system after not being renewed, and was effectively burned from the chain." *See* Am. Compl. ¶ 65. Sotheby's argument is further belied by the fact that the winner of the auction for the Ethereum-*Quantum* stated that he believed he had purchased the "first ever crypto art nft," indicating that he readily understood – falsely – that the original Namecoin-*Quantum* NFT had been destroyed or no longer existed. *See* Am. Compl. ¶ 86. Both the words of the purchaser and contemporaneous media reports further demonstrate that these statements were broadly understood by the public as incorrect fact, not non-libelous opinion. *See* Am. Compl. ¶¶ 86, 95-97.

Furthermore, contrary to Sotheby's argument, the larger context in which the statements were made supports that the challenged statements are statements of fact, not opinion. Indeed, the auction listing (*See* Rothstein Declaration, Exhibit B) is broken into three sections, including a description of the Ethereum-*Quantum*, the Condition Report, and finally the Catalogue Note.

**JA-230**

The description and Condition Report of the Ethereum-*Quantum* provide highly technical information about the artwork, including the type of NFT (non-fungible token ERC-721), status concerning its file hash, and a history of the Ethereum-*Quantum*'s minting.  These kinds of statements, issued by a well-known, respected auction house and art broker, suggest to the reasonable consumer that the words at issue were statements of fact on which they could reasonably rely in making a determination about whether to place a bid on a valuable and accredited digital collectible.  This finding is further supported by the fact that Defendant issued the challenged statements in conjunction with an NFT consultant and specialist[1] and therefore offered the impression that the statements were the product of well-researched deliberation.  *See Burton v. iYogi, Inc.*, 2015 WL 4385665, at *8-9 (S.D.N.Y. Mar 16, 2015) (finding that "Defendant is presenting statements about customers' computers as facts based on *expert assessment*") (emphasis added); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 156 (1993) (statements presented in "special feature series" in newspaper "were calculated to give the impression that they were the product of some deliberation, not of the heat of the moment") (internal citation and quotation marks omitted).

Sotheby's argues that "[t]he Auction Listing contains pages of highly expressive commentary regarding the visual expression of the Quantum artwork and its historical significance" and that the use of phrases such as "I think" and "In my view" helps render the challenged statements ones of opinion rather than fact.  Br. at 16.  However, this expressive commentary is laid out in an *entirely* different section of the Auction Listing, the Catalogue

---

[1] The challenged statements were initially researched and drafted by nameless, a company that advises on NFTs and NFT projects.  nameless was originally a named defendant in this action, but was voluntarily dismissed (Dkt. No. 46, 48).

Note, whereas the challenged statements are presented in the Condition Report.  The phrases "I think" and "In my view" are conspicuously absent from the Condition Report.

Furthermore, the plain language and tone of the Condition Report, from where all the challenged statements originate, suggests that the statements are ones of fact.  The Condition Report begins with a formal declaration: "[t]he following condition report is provided by nameless."  *See* Rothstein Declaration, Exhibit B.  The Condition Report then methodically outlines information about the Ethereum-*Quantum,* including that (1) the Ethereum-*Quantum* was "stored on the Ethereum blockchain, and therefore cannot be modified"; (2) "Namecoin was designed to include removal of pointers after 36,000 blocks"; and (3) as a result the Ethereum-*Quantum*'s "Namecoin entry was removed from the system after not being renewed, and was effectively burned from the chain."  *See id.*  This information is then followed by additional factual content concerning the Ethereum-*Quantum's* "storage security," the storage of "associated media and additional legal and archival JSON encoded data," and the engagement of "standard ERC-721 practices" for NFT security.  *See id.*  In context, these statements are factual in nature.

In contrast, the Catalogue Note begins with the grandiose statement that "[i]n the long timeline of art, there are few works that serve as genesis blocks to their own chain in history."  *See id.*  The Catalogue Note contains flowery and vivid language ("Pulsing with colour, a riotously raw beacon to a new era, McCoy minted Quantum – unwittingly placing it within this vaulted pantheon of firsts"), rhetorical flourishes ("For what it is [*sic*] a blockchain, when stripped of its bones, but humanity's latest innovation in the humble art of record keeping"), and employs grand themes ("Creation, time, art history and the very idea of blockchains themselves intersect in the ripples of Quantum").  These all lend a qualitative, opinion-based character to the

7

Catalogue Note that is not present in the rote recitation of information concerning minting, storage, and security in the Condition Report.  In sum, a reasonable consumer encountering the auction listing in its entirety would reasonably believe that the challenged statements listed in the Condition Report were statements of fact.

Furthermore, Defendant's reliance on *Immuno* and *Brian* in support of its argument that the challenged statements are nonactionable opinion is misplaced.  In *Immuno*, "the challenged communication was a letter to the editor of a professional journal – a medium that is typically regarded by the public as a vehicle for the expression of individual opinion, rather than 'the rigorous and comprehensive presentation of factual matter.'"  *Brian v. Richardson*, 87 N.Y.2d 46, 52 (1995) *quoting Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 253 (1991).  Similarly, in *Brian*, the challenged statements were contained in an article published in the "Op Ed" page of the New York Times. *Brian*, 87 N.Y.2d at 52.  The audience anticipates and expects to read statements of opinion in a letter to the editor or in an "Op Ed" article.  In contrast, the audience anticipates and expects statements of fact from a respected art broker when it describes the history, pedigree, technical specifications, and existence – or lack thereof – of an artistic work.

Finally, Sotheby's asserts that the statements are not actionable because they fully disclosed the facts that support them.  Again, Sotheby's is wrong.  "[W]hen an author outlines facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader to draw his own conclusions, those statements are generally protected by the First Amendment."  *Condit v. Dunne*, 317 F. Supp. 2d 344, 364 (S.D.N.Y. 2004) (internal citation omitted).  However, "opinions based on disclosed facts which are themselves false" remain actionable.  *See id.* (upholding slander claim where "[t]he facts disclosed by the defendant [were] republications of falsities.")

Here, Defendant argues that it disclosed underlying facts supporting its position because "[i]n multiple locations, [Defendant] disclosed that the Quantum artwork originally had been minted on Namecoin, and it explained in great detail that *the data associated with* that Namecoin entry had been 'preserved' and included in the Ethereum entry." Br. at 17 (emphasis in original). These statements are themselves false because, as plead, the Namecoin-*Quantum* is extant on the Namecoin blockchain, and requires no preservation. *See* Am. Compl. ¶ 73. The process detailed by Defendant is more properly characterized as the creation of a reproduction of *Quantum* on the Ethereum blockchain, not the preservation of a now invalid or obsolete asset. *See Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998) (denying motion to dismiss where challenged statements of opinion were based on disclosed facts alleged to be false); *Condit*, 317 F. Supp. 2d at 364 (same). Moreover, Defendant's claim that it *fully* disclosed all of the facts is wrong because nowhere did Defendant disclose the present existence of the Namecoin-*Quantum* or Plaintiff's re-registration, possession, and control of the same. Accordingly, the Court should deny Defendant's motion to dismiss.

## B. The Challenged Statements Are Not Substantially True

"The tort of trade libel or injurious falsehood requires the knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff, to its demonstrable detriment." *City Waste & Recycling Services, Inc. v. Tswin Bridges Waste & Recycling, LLC*, 72 Misc. 3d 1217(A), at *12 (Sup. Ct. Albany Co. 2021). "[T]ruth is a complete defense to an action to recover damages for libel or slander, and this defense may apply as long as the statement is substantially true." *Kehm v. Murtha*, 28 A.D.2d 421, 421 (2d Dep't 2001) (internal citations omitted). "A statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the

pleaded truth would have produced." *Giuffre v. Maxwell*, 2017 WL 1536009, at *5 (S.D.N.Y. Mar. 27, 2017) (internal citation omitted). "It is only necessary that the gist or substance of the challenged statements be true." *Id.* (internal citation omitted). "Whether a statement is substantially true fall along a broad spectrum." *Id.* (internal quotation marks omitted). Nonetheless, "there are those cases in which a defendant simply asks too much in asserting that a statement is substantially true because the difference between the two is plainly substantial." *Id.* (internal citations omitted).

Defendant's statements are not substantially true because the pleaded truth would have revealed to potential bidders that the Ethereum-*Quantum* was a copy of the presently-extant Namecoin-*Quantum*, rather than the alleged sole surviving vestige of a prized digital collectible. This would have had a different impact on the mind of the reader than the challenged statements. Indeed, in Defendant's own words, the Ethereum-*Quantum* "came first," "usher[ed] in a new art histor[y]" and "occup[ies] a singular position in art history." *See* Rothstein Declaration, Exhibit B.

Defendant offered the impression that the Ethereum-*Quantum*, and only the Ethereum-*Quantum*, holds the title of the world's first still-extant NFT, which is not substantially true if the Namecoin-*Quantum* also exists. Defendant stated that the Namecoin-*Quantum* has been "burned" or "removed" from the Namecoin blockchain, and that *Quantum* has been "preserved" on the Ethereum blockchain. *See* Am. Compl. ¶¶ 9-10, 73-74. However, the Namecoin-*Quantum* NFT remains extant on the Namecoin blockchain, and any purported "preservation" in this context is nothing but reproduction of the still-extant original—facts that Defendant sought to actively conceal. *See* Am. Compl. ¶ 73. Moreover, and regardless of the status of Namecoin-*Quantum*, the Ethereum-*Quantum* is definitively not the world's first NFT,

as marketed and promoted by Defendant.  *See* Am. Compl. 36-43, 54-55.  Nonetheless, the winner of the auction for the Ethereum-*Quantum* demonstrated that he was materially misled by Defendant when he stated that he believed he had purchased the "First ever crypto art NFT – Quantum," despite the fact that the rightful bearer of that title belongs to the Ethereum-*Quantum's* predecessor, Namecoin-*Quantum*.  *See* Am. Compl. ¶ 86.  Accordingly, the challenged statements are not substantially true.

Defendant's argument that it "accurately reported that Quantum was originally minted in 2014 on the Namecoin blockchain, and that McCoy 'moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information," (Br. at 18) does not render the challenged statements substantially true and therefore nonactionable.  Indeed, despite Defendant's disclosures, the overall impression Defendant conveyed in its statements was that the Namecoin-*Quantum* did not exist, but that it had been "preserved" in a separate asset that Defendant was auctioning for sale.  A reasonable consumer might reasonably rely on this impression, as evidenced by the ultimate purchaser of the Ethereum-*Quantum* who stated that he purchased the world's first NFT. *See* Am. Compl. ¶ 86; *see also Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *17 (E.D.N.Y. July 21, 2010) ("The fact that the actual sugar content of vitaminwater was accurately stated in an FDA-mandated label does not eliminate the possibility that reasonable consumers may be misled.")

Defendant's argument that "in the context of the art world, falsity is particularly difficult to prove" is immaterial.  Br. at 18.  Challenges of authenticity to pieces of analogue art are fundamentally different from the same challenge regarding digital art housed on the blockchain because the blockchain serves as an immutable and secure storage and authentication device.

11

**JA-236**

*See* Am. Compl. ¶¶ 27-33.  Plaintiff does not challenge statements concerning the quality or artistic value of the Namecoin-*Quantum*, but rather challenges statements concerning whether the Namecoin-*Quantum* exists or not.  *See* Am. Compl. ¶¶ 62, 68.  The existence of Plaintiff's Namecoin-*Quantum* NFT is readily verifiable on the Namecoin blockchain,[2] rendering Defendant's statement that the Namecoin-*Quantum* was "burned" or "removed" from the blockchain materially false.  *See* Am. Compl. ¶ 38.

Finally, Defendant's claim that Plaintiff admits that the Namecoin-*Quantum* "expired" is likewise incorrect.  *See* Br. at 18.  Plaintiff makes no such allegation.  Instead, Plaintiff alleges that *McCoy's ownership* of the Namecoin-*Quantum* blockchain record expired, which allowed another user to claim ownership of Namecoin-*Quantum* NFT.  *See* Am. Compl. ¶¶ 39-43.  Accordingly, for the reasons cited, the Court should deny Defendant's motion to dismiss Plaintiff's claim for slander of title and product disparagement.

### C.  Plaintiff Alleges That Sotheby's Acted With Actual Malice

To establish actual malice, it is sufficient that Plaintiff plead that Defendant either (1) knew the challenged statements were false; or (2) acted with reckless disregard as to whether the statements were true or false.  *See Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 182 (2d Cir. 2000).  "Actual malice can be established 'through the defendants' own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among other circumstantial evidence."  *Celle*, 209 F.3d at 183 (internal citation and quotation marks omitted).

---

[2] This is all well-pleaded in the Amended Complaint. To the extent the Court relies on extrinsic evidence submitted with Defendants' motions, the Court should carefully scrutinize the primary source, the Namecoin blockchain itself, which demonstrates Defendants' statements are factually incorrect.  *See* Peltz Declaration.

Defendant acted with actual malice because Defendant knew or should have known that the Namecoin-*Quantum* had not been "burned" or "removed" from the Namecoin blockchain. The existence of the Namecoin-*Quantum* is ascertainable to anyone who looks up the blockchain record.  *See* Am. Compl. ¶¶ 27-33.  Indeed, one of the benefits of the blockchain is secure record-keeping and authentication.  *See id.*  Defendant suggests that it sanctioned an exhaustive and thorough investigation to support the challenged statements, but seemingly failed to look at the blockchain - the most obvious place to look if Defendant wanted to confirm that the Namecoin-*Quantum* existed or not.  Additionally, Plaintiff alleges that Plaintiff specifically informed Sotheby's of the existence of the Namecoin-*Quantum* to put Defendant on notice of the same. *See* Am. Compl. ¶¶ 79-80.  Despite notice of Plaintiff's claim, Defendant refused to issue a public corrective statement or even respond to Plaintiff's communications.  *See* Am. Compl. ¶ 79.

Defendant likewise argues that its reliance upon a third-party Condition Report absolves Defendant of liability.  *See* Br. at 20. However, Defendant cannot rely upon a Condition Report while purposefully avoiding information readily available and accessible to anyone with a computer and internet connection.  Defendant's willful blindness extinguishes Defendant's argument for good-faith reliance, and is sufficient to allege malice.  *See Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category") (internal citation omitted); *Smartmatic USA Corp. v. Fox Corp.*, No. 151136/2021, 2022 WL 685407, at *20 (Sup. Ct. N.Y. Co. Mar. 08, 2022) (finding defendant's "blind eye to a litany of outrageous claims . . . so inherently improbable that it evinced a reckless disregard for the truth").  Moreover, Defendant's continued good-faith

reliance on the nameless Condition Report is dubious in light of nameless' retraction of the report. *See* Am. Compl. ¶ 88.

Accordingly, because Plaintiff has plead that Defendant issued the challenged statements with malice, the Court should deny Defendant's motion to dismiss Plaintiff's claims for slander to title and commercial disparagement.

## II.   Plaintiff Has Properly Plead Unjust Enrichment Against Sotheby's

Defendant asserts that Plaintiff's claim for unjust enrichment is deficient because Plaintiff failed to plead that a benefit flowed directly from Plaintiff to Defendant at Plaintiff's expense. *See* Br. at 21. Defendant ignores the fact that it claimed the identity, titles, and prestige associated with the Namecoin-*Quantum* in order to market, promote, and sell its asset.

Under New York law, it is "contrary to equity and good conscience" to enable a party to benefit from misleading representations. *See Firestone v. Miroth Const. Co.*, 215 A.D. 564, (1st Dep't 1926); *see also Eidelman v. The Sun Prods. Corp.*, 2017 WL 4277187 * 6 (S.D.N.Y. Sept. 25, 2017) (noting that the basis for an unjust enrichment claim "is that the defendant has obtained a benefit which 'in equity and good conscience' should be paid to the plaintiff'") (internal citation omitted); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 423 (S.D.N.Y. 2009) (certifying a class action asserting, among other things, an unjust enrichment claim premised on a misleading advertisement). "Today, New York law does not require an unjust enrichment plaintiff to plead 'direct dealing,' or an 'actual, substantive relationship' with the defendant. It merely requires that the plaintiff's relationship with a defendant not be 'too attenuated.'" *Waldman v. New Chapter*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010).

Plaintiff alleged that Defendant issued materially false and misleading statements about the Namecoin-*Quantum* – namely that the NFT no longer exists on the Namecoin blockchain.

*See* Am. Compl. ¶¶ 65, 68, 73.  Defendant was able to promote and market its Ethereum-*Quantum* as the world's first NFT only by branding its progenitor non-existent.  *See* Am. Compl. ¶¶ 73, 92.  By usurping the mantle, titles, and prestige of the Namecoin-*Quantum* in the promotion, marketing, and sale of the Ethereum-*Quantum*, and in using the successful sale to further market and promote subsequent successful auctions in the *Natively Digital* auction series, Defendant obtained a direct benefit at Plaintiff's expense.  Indeed, Defendant's gambit caused the sales price of the Ethereum-*Quantum* to surge to over $1.4 million.  *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) ("The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff"); *Eidelman*, 2017 WL 4277187 * 6 ("Typical [unjust enrichment] cases are those in which the defendant . . . has received money to which he or she is not entitled").

Defendant's reliance on *Bilinksi v. Keith Haring Found., Inc.*, 96 F. Supp.3d 35, 52 (S.D.N.Y. 2015) is misplaced.  In that action, the owners of Keith Haring artwork sued the Keith Haring Foundation (the "Foundation") claiming that, among other things, the Foundation's statement that plaintiff's pieces of art were "fake" interfered with the exhibition and sale of plaintiff's artwork.  *See Bilinski*, 96 F. Supp. 3d at 42.  Defendant asserts that Plaintiff's claim in the action at bar is "indistinguishable from the claim in *Bilinksi* found to be fatally defective," (Br. at 21), but Defendant is wrong.

Critically, and unlike in *Bilinksi*, Defendant claimed, and continues to claim, that it sold a facsimile of a work while falsely stating that the facsimile's original, owned by Plaintiff, was destroyed.  *See* Am. Compl. ¶¶ 65, 68, 73, 75.  However, the question at issue is not merely one of authenticity, as was the case in *Bilinski*, but also of identity.  Defendant claims that it sold the world's first NFT, and also that the NFT that was originally minted on the Namecoin blockchain

was destroyed and had, through a preservation process, been moved to the Ethereum blockchain. *See* Am. Compl. ¶¶ 9, 65, 68, 73, 75.  In contrast, Plaintiff has plead that its NFT remains extant and is rightfully the world's first NFT.  *See* Am. Compl. ¶ 73.  By appropriating the prestige, pedigree, and title of the Namecoin-*Quantum*, in order to sell its reproduction Ethereum-*Quantum*, Defendant directly enriched itself at Plaintiff's expense.

Lastly, Defendant is wrong that Plaintiff's claim for unjust enrichment should be dismissed as duplicative of its injurious falsehood claim.  *See* Br. at 21.  At this stage in the litigation, it is permissible for a party to plead alternative theories of recovery.  *See Global Packaging Services, LLC v. Global Printing & Packaging*, 248 F. Supp. 3d 487, 496 (S.D.N.Y. 2017).  Therefore, the Court should deny Defendant's motion to dismiss Plaintiff's claim for unjust enrichment.

## III.    Plaintiff Has Properly Plead A Claim For Declaratory Judgment

Defendant argues that Plaintiff's claim for declaratory judgment must be dismissed because Plaintiff seeks a court ruling to "an abstract question" and "legal determination about hypothetical facts." Br. at 22.  Defendant is wrong.  Rather, there remains a live question concerning the existence of the Namecoin-*Quantum*, as well as an open dispute regarding whether the statements issued by Sotheby's and McCoy were materially false and misleading.  As alleged in the Amended Complaint, there exists an actual controversy because Defendant marketed, promoted, and sold an NFT by falsely describing the status of its forebearer.  *See* Am. Compl. ¶¶ 1-19.  Moreover, Defendant has used the sale, based on materially false and misleading statements, to establish itself within the NFT marketplace and promote its recurring digital auction series, *Natively Digital*.  *See* Am. Compl. ¶¶ 91-92.  Lastly, given Defendant's stature in the industry, it would be impractical for Plaintiff to achieve a fair market price given

16

the cloud Defendant has placed over the Namecoin-*Quantum*.  Accordingly, there are issues concerning the ownership and even mere existence of the Namecoin-*Quantum*, as well as whether Defendant's statements regarding the Namecoin-*Quantum* and Ethereum-*Quantum* constitute false and misleading advertisements, which Defendant continues to use in order to promote future auctions.  These represent real and concrete questions requiring a judicial determination.

## CONCLUSION

For the foregoing reasons, Free Holdings respectfully requests that the Court deny Defendant Sotheby's motion to dismiss the Amended Complaint and that the Court award Free Holdings such other and further relief as deemed just and proper. Plaintiff requests oral argument.

Dated: Rockville Centre, New York
   August 15, 2022

       Respectfully submitted,


       */s/Moish E. Peltz*
       **FALCON RAPPAPORT & BERKMAN PLLC**
       By: Moish E. Peltz
       Kenneth J. Falcon
       Steven Berlowitz
       Jessica Moore
       265 Sunrise Highway, Suite 50
       Rockville Centre, New York 11570
       (516) 599-0888
       mpeltz@frblaw.com
       kfalcon@frblaw.com
       sberlowitz@frblaw.com
       jmoore@frblaw.com

       *Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREE HOLDINGS INC.,

Plaintiff,

v.                                                        Case No.: 1:22-cv-00881-JLC

KEVIN McCOY and SOTHEBY'S INC.,

Defendants.

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO KEVIN MCCOY'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

**FALCON RAPPAPORT & BERKMAN PLLC**

Moish E. Peltz
Kenneth J. Falcon
Steven Berlowitz
Jessica Moore
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(516) 599-0888

## Table of Contents

PRELIMINARY STATEMENT ............................................................................... 1

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................. 2

ARGUMENT .................................................................................................... 4

   I.    Plaintiff's Claims Are Justiciable........................................................... 4

     A.  A. Plaintiff has Properly Pled Standing Under 12(b)(1) ........................ 4

     B.  B. Plaintiff's Claims are Ripe ........................................................... 10

   II.   Standard of Review for Rule 12(b)(6)................................................... 12

   III.  Plaintiff has Stated a Cause of Action for Unjust Enrichment.................. 13

     C.  A. Plaintiff Plausibly Alleges That Defendant Was Enriched at Plaintiff's Expense ..... 13

     D.  B. Plaintiff Alleges a Connection Between Itself and McCoy ................ 14

   IV.  Plaintiff Has Stated a Cause of Action for Slander to Title ..................... 15

     E.  A. Plaintiff Alleges Malice by McCoy ............................................. 15

     F.  B. Plaintiff Alleges Special Damages ............................................... 17

   V.   Plaintiff Alleges a Cause of Action for Violation of N.Y. G.B.L. § 349 ...... 18

   VI.  Plaintiff Alleges a Cause of Action for Commercial Disparagement .......... 20

   VII.  Plaintiff Alleges a Cause of Action for Violation of Section 43(a) of the Lanham Act 21

     G.  A. Plaintiff Alleged that McCoy Made False and Misleading Statements...................... 21

     H.  B. Plaintiff Alleges Causation .......................................................... 24

   VIII.  Plaintiff Has Alleged a Cause of Action for Declaratory Judgment ........... 24

CONCLUSION ................................................................................................ 25

## Table of Authorities

**Cases**

*Aikens v. Portfolio Recovery Assocs.*, 716 Fed. Appx. 37, 40 (2d Cir. 2017) ............................ 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 15

*Carter v. Healthport Techs.*, LLC, 822 F.3d 47, 57 (2d Cir. 2016) ............................................ 11

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 182 (2d Cir. 2000) .................................. 18

*Chamilia, LLC v. Pandora Jewelry, LLC*, 85 U.S.P.Q.2d 1169, 1179 (S.D.N.Y. 2007) ............. 18

*Clark Consulting, Inc., v. Financial Solutions Partners, LLC*, 2005 WL 3097892, at *2

    (S.D.N.Y. Nov. 17, 2005) .................................................................................................... 15

*Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317-18 (2d Cir.1982) ..................... 24

*Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021) .......................................................... 18

*Cowan v. Costco Wholesale Corp.*, 2017 WL 59080 *2 (E.D.N.Y. Jan. 5, 2017) ...................... 11

*Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (1st Dep't 2004) ........................................................ 17

*Engel v. CBS, Inc.*, 93 N.Y.2d 195, 205 (1999) ........................................................................ 20

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004)

    ............................................................................................................................................ 15

Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) 20,

    21

*Gordon & Breach Science Publishers S.A. v. American Institute of Physics*, 859 F. Supp. 1521,

    1532 (S.D.N.Y. 1994) *modified on other grounds*, *Fashion Boutique of Short Hills, Inc. v.*

    *Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002) ...................................................................... 26

*Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) .................................................. 15

iii

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992) ................................................................................................ 24

*Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 115 (2d. Cir. 2005) .............................. 18

*Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 294 (1999), ................................................. 21

*Karlin, .*, 93 N.Y.2d 282, 294 (1999) ........................................................................ 21

*Katz v. Donna Karan Co. LLC*, 872 F.3d 114, 121 (2d Cir. 2017) .............................. 13

*Mobius Management Systems, Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005, 1020-21 (S.D.N.Y. 1994) ................................................................................ 26

*Morrow v. Ann Inc.*, No. 16-CV-3340 (JPO), 2017 WL 363001, at *3 (S.D.N.Y. Jan. 24, 2017)11

*National Organization for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ........ 13, 15

*Oswego Laborers' Local 214 Pension Fund v. Me. Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (. 1995). ...................................................................................................... 21

*Philips International Investments, LLC v. Pektor*, 117 A.D.3d 1, 3 (1st Dep't 2014) ................ 17

*PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 (2d Cir. 1984). ......................... 25

*Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 341 (S.D.N.Y. 2021) ................................ 11

*Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007) .................... 26

*Vogel v. Boris*, 2021 WL 1668072, at *7 (S.D.N.Y. Apr. 28, 2021) ........................................... 11

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 63 (2d Cir. 1988) .......... 13

*Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010) .............................. 17

Statutes

Federal Rule of Civil Procedure 12 (b)(6) ............................................................................ 5

Federal Rule of Civil Procedure. 8(a). ................................................................................ 16

Federal Rules of Civil Procedure 12(b)(1) ................................................................ 5, 6, 11, 14

iv

JA-246

N.Y. G.B.L. § 349.............................................................................................................. 21, 24

**PRELIMINARY STATEMENT**

Plaintiff Free Holdings Inc. respectfully requests that the Court deny Defendant, Kevin McCoy's, motion (ECF No. 59, 60, the "Motion") to dismiss the Amended Complaint ("Am. Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff also separately opposes the related motion filed by Sotheby's Inc. (ECF No. 54, 55, the "Sotheby's Motion"), and incorporates that opposition herewith. Based on Plaintiff's Opposition to both motions filed by Kevin McCoy and Sotheby's Inc., the Court should deny Defendants' requested relief.

**INTRODUCTION**

The primary purpose of the Namecoin blockchain is to register names. On Namecoin, the "name" is what can be controlled – it is the unique and "non-fungible" part of the now ubiquitous phrase "non-fungible token." However, it is important to understand that because Namecoin was such an early blockchain, modern terminology (including the phrase "non-fungible token" itself), *post*-dates the creation of the Namecoin blockchain and McCoy's creation of *Quantum*. The dispute before the Court is premised upon issues regarding blockchain protocols and emerging vocabulary that have not frequently – if ever – been litigated. To properly understand the nature of the dispute between the parties, the Court requires a rich and technical command of the Namecoin protocol and related transactions.

McCoy and Sotheby's claim to have presented the Court with definitive proof that Plaintiff's case theory is not only wrong, but implausible. However, McCoy and Sotheby's motions provide an incomplete, misleading, and inaccurate description of the Namecoin protocol. Indeed, McCoy and Sotheby's invite this court to misapply modern blockchain processes, frameworks, and terminology to the primitive Namecoin blockchain protocol. This is akin to parsing a modern translation of the old English poem, Beowulf, which would provide the

1

**JA-248**

Court with a glimpse into the tale, but fail to provide the Court with the original, native context necessary for the Court to fully comprehend the requisite nuance. Under the guise of extrinsic evidence under Fed. R. Civ. P. 12(b)(1), Defendants provide the Court with an incomplete and slanted picture of the Namecoin protocol, while simultaneously and inappropriately restating Plaintiff's allegations.  Defendants seek to replace Plaintiff's allegations with facts they find more palatable for their own purposes.  In the process, and by design, Plaintiff's allegations are lost in translation. To properly detect and parse the inaccuracies of Defendants' motions, the Court must learn old English – or the functionality of the Namecoin blockchain – not the modern translation that Defendants misleadingly dress up as the original.

At this stage of the proceeding, as the Court can readily determine from the Amended Complaint, Plaintiff has properly pleaded a short and plain statement of its claim. The Namecoin blockchain provides the ability to register names. McCoy used this system to create a name corresponding to the work *Quantum*, which Plaintiff now controls. The Court should deny Defendants' motions and allow the next chapter in this litigation to commence.

## FACTUAL BACKGROUND

In 2014, artist Kevin McCoy ("McCoy") minted a digital artwork on the Namecoin blockchain called *Quantum* (the "Namecoin-*Quantum*"), which is now universally regarded as the world's first NFT.  Am. Compl. ¶¶ 36-37.  According to McCoy, the Namecoin-*Quantum* represents "birth" and "provenance."  Am. Compl. ¶ 56.  The artistic principle underlying the Namecoin-*Quantum* was "to use blockchain technology to create **indelible** provenance and ownership of digital images of this kind."  *See* Am. Compl. ¶ 57 (emphasis added).[1]  When he created the Namecoin-*Quantum*, McCoy inserted the following in its metadata description:

---

[1] The word indelible is defined as a thing "that cannot be removed, washed away, or erased." Merriam Webster https://www.merriam-webster.com/dictionary/indelible (last visited August 15, 2022).

2

> I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672e8b43235fa16cde98e79825b68709a is taken to be the file in question. **Title transfers to whoever controls this blockchain entry**.

(emphasis added). *See* Am. Compl. ¶ 38. Plaintiff defined Namecoin-*Quantum* as inclusive of "Name d41b8540cbacdf1467cdc5d17316dcb672e8b43235fa16cde98e79825b68709a." *See* Am. Compl. ¶ 38 n.3.

After creating *Quantum*, and indelibly committing it to the Namecoin blockchain, McCoy subsequently let the Namecoin blockchain record that housed *Quantum* expire, rendering the NFT free to claim by anyone who elected to reregister the name. *See* Am. Compl. ¶¶ 39-41. On or around April 5, 2021, Plaintiff claimed the blockchain record which represents Namecoin-*Quantum* and remains title holder to the same. *See* Am. Compl. ¶¶ 42-43.

On May 28, 2021, McCoy minted a <u>second</u> NFT, also called *Quantum*, on the Ethereum blockchain (the "Ethereum-*Quantum*") and began working with Sotheby's Inc. ("Sotheby's") to market and promote the piece for sale in Sotheby's upcoming auction titled *Natively Digital: A Curated NFT Sale*. *See* Am. Compl. ¶¶ 6, 8, 52-54. The purpose of the *Natively Digital* auction was to showcase and sell some of the earliest NFTs, and Defendants marketed and promoted Ethereum-*Quantum* as the first NFT ever created. *See* Am. Compl. ¶¶ 15, 54-55, 57.

Defendants issued materially false and misleading statements of fact in the course of marketing and promoting the sale of Ethereum-*Quantum*. McCoy stated that he "moved the original on chain data from a burned Namecoin token into a modern industry standard ERC-721 token, while preserving all of the original on chain information." Am. Compl. ¶ 66. This statement is false because the Namecoin-*Quantum* was not "burned" or otherwise removed from

3

**JA-250**

the Namecoin blockchain, and requires no preservation.  Am. Compl. ¶ 68, 73.  Defendant issued

these materially false and misleading claims in order to promote and market the

Ethereum-*Quantum* as a highly valuable, first of its kind collectible (and supposed replacement

of the allegedly destroyed Namecoin-*Quantum*).  On the basis of these false statements

Defendant ultimately sold the Ethereum-*Quantum* for $1,472,000.  *See* Am. Compl. ¶ 84.

## ARGUMENT

**I.    Plaintiff's Claims Are Justiciable**

### A.  Plaintiff has Properly Pled Standing Under 12(b)(1)

Defendant asserts that "Plaintiff has not viably or plausibly alleged any injury-in-fact and

standing to sue" because "Plaintiff alleges itself to own a *different* and 'NEW' NFT rather than

the 2014 NFT."  *See* Br. at 12.  Specifically, Defendant mistakenly suggests that Plaintiff's

registration of the Namecoin-*Quantum* name "does nothing more than make Plaintiff the current

user of that *namespace*" and argues that "Plaintiff has not plausibly alleged that its right to use a

Namecoin name granted Plaintiff title to and control over the 2014 NFT itself."  Br. at 12

(emphasis in original).  Defendant is wrong.

To begin with, Plaintiff unambiguously alleges that Defendant created the

Namecoin-*Quantum* in 2014, but subsequently allowed the record to expire. *See* Am. Compl.

¶¶ 36, 41.  Plaintiff further alleges that it claimed Namecoin-*Quantum* on or around April 5,

2021, and currently holds title to it.  *See* Am. Compl. ¶ 42-43.  These are plain allegations that

Plaintiff owns title and control over the Namecoin-*Quantum*.

More specifically, Plaintiff alleges that it owns title to the Namecoin name

"d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a." (hereafter

4

"-709a"). *See* Am. Compl. ¶ 38-43.  Although long and indecipherable,[2] this "name" ending in -709a is the part of the *Quantum* NFT which is capable of being possessed. It is this -709a name that can be registered, created, edited, bought, sold, etc.[3] It is this "name,"-709a, that was initially registered by McCoy in 2014, and then later claimed by Plaintiff in 2021. It is this name that is the "non-fungible token" at issue in this dispute. Defendant's further contention that "Plaintiff has not plausibly alleged that its right to use a Namecoin namespace granted Plaintiff title to and control over the 2014 NFT itself" (Br. at 12) is therefore incorrect.

Prior to registration by McCoy, the -709a name did not exist and the name had no history associated with it. It had no functionality in this primordial state. However, once registered by McCoy, all subsequent activity associated with that name is *indelibly* linked to that name, for so long as the Namecoin blockchain exists. This includes activity by Free Holdings, which can only be *added* to the history of the -709a name as time goes on. But the prior history associated with McCoy cannot be deleted – as it is *indelible*.

Additionally, the -709a name is the only name on the Namecoin blockchain that could have exactly that 64-digit alpha-numeric name. The name is unique, and either while active, semi-expired, or expired, no one else could create a *second* name with the same name on the Namecoin blockchain. Therefore, for example, when Free Holdings sought to acquire the name -709a in 2021, unlike McCoy in 2014, the name already existed on the Namecoin

---

[2] The 64-digit alpha-numeric "name" d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is the "SHA256 hash" of the .gif image file created by McCoy. See Crypto Definitions, https://cryptodefinitions.com/dictionary/sha-256/ (last visited August 15, 2022). The Namecoin protocol allows McCoy to choose a shorter "name," for example he could have chosen the name "Quantum," or "MyFirstNFT," (presuming they were not already registered) but he did not. Relatedly, different "namespaces" (or "name prefixes") can also be chosen, which can be "used by applications to distinguish between different types of names in Namecoin. For example, d/example is the domain name example.bit, and id/example is an identity." See Charron Declaration Exhibit A.

[3] See, e.g., Namecoin, Atomic Name Trading  https://www.namecoin.org/docs/name-owners/atomic-name-trading/ (last visited August 15, 2022)(describing how to buy or sell a Namecoin name "this makes it possible to sell or buy a name") (emphasis added).

blockchain, and it had a preexisting history (namely the history created by McCoy). Once re-registered by Free Holdings, the -709a name then owned by Free Holdings, was inextricably and forever linked to the historical records generated by McCoy, on that name, to create *Quantum*. This was presumably McCoy's intent because, in his own words, McCoy wanted to create "indelible provenance." *See* Am. Compl. ¶ 57.

McCoy apparently does not dispute that Plaintiff controls the -709a name. Instead, McCoy's argument is that Plaintiff's control of that name has a different meaning than what is alleged by Plaintiff in the Amended Complaint. McCoy argues that Plaintiff now controls a "NEW" NFT distinct from the Namecoin-*Quantum*. *See* Br. at 12. This argument is without merit, and not proper on either the 12(b)(1) or 12(b)(6) standard.

Defendant's attempted recharacterization of the Namecoin protocol is misguided and seeks to rewrite the Amended Complaint by inventing allegations (and NFTs) Plaintiff did not plead.  For example, Plaintiff does not plead the existence of a "2014 NFT" and a "2021 NFT," as argued by McCoy. *See* Br. at 12. Indeed, McCoy has <u>invented</u> a <u>new NFT</u> for purpose of its motion. Then, premised upon facts not described in the Amended Complaint – the newly conjured NFT – Defendant invites this Court to summarily rule (without the aid of fact discovery or expert testimony) on the technical and complex processes concerning the functionality of the Namecoin blockchain. Br. at 11-13. The Court should not allow McCoy to rewrite the Amended Complaint to fabricate issues of standing.

Defendant's argument is also misleading because it ascribes undue meaning to the FAQ. In its Motion, McCoy states "[t]he Court may consider Namecoin's <u>actual protocol (referred to as its 'FAQ')</u> on this motion." Br. at 4. However, McCoy mistakes the Namecoin "protocol" (which is decentralized code running autonomously by a peer-to-peer proof-of-work blockchain)

for a FAQ (which is a secondary source, essentially a user-generated instruction manual). *See generally* Charron Declaration, Exhibit A. McCoy also states that "The Namespace Report is conclusive that the 2021 NFT copies, but is nonetheless distinct from, the 2014 NFT – which accords with Plaintiff's admission that 'no two NFTs are the same.'" Br. at 7. This again evidences a misreading of the information presented on the Namebrow.se blockchain explorer. While both the Namecoin FAQ and Namebrow.se website are instructive, they are not necessarily canonical, and they are both are ultimately secondary sources that must be interpreted in context of the primary source.[4] The primary source at issue here – the true "protocol" – is unquestionably the Namecoin blockchain itself.

Most importantly, the Namebrow.se blockchain explorer apparently does not properly display the relevant history of the -709a name. *See* Peltz Declaration, filed herewith. If you looked at only Namebrow.se, the value returned for block 174923 (corresponding to McCoy's indelible creation of Namecoin-*Quantum*) says "none." Crucially, direct interaction with the Namecoin protocol produces a different result – the display of the text from the Namecoin blockchain for the -709a name returns a different value than the Namebrow.se blockchain explorer – presumably because McCoy committed this text in "hex" format instead of "ascii." *Id.* at ¶¶ 14-15.

---

[4] McCoy's motion evidences additional misreading of the FAQ. For example, the Motion quotes "Namecoin states:" and then provides a block quote from the FAQ (the initials F-A-Q stand for "frequently asked questions"). However, the FAQ is not "Namecoin." The FAQ is apparently written by two Namecoin contributors who happen to overlap with some of the Namecoin core team. See: Namecoin/namecoin.org https://github.com/namecoin/namecoin.org/blob/master/docs/faq/index.md (last accessed August 15, 2022). McCoy also states that "Namecoin also states that it 'itself isn't aware of namespaces.'" However, this quote is out of context and misunderstands the meaning of this section of the FAQ. Namecoin recognizes "names." It does not recognize "namespaces." So-called namespaces are the d/ (or "dee-space") or id/ ("eye-dee-space") which are pre-fixes to names, which can provide functionality to third-party applications that do recognize different namespaces (for example, to allow the Namecoin names to function as decentralized domain names). Namespaces are "used by applications to distinguish between different type of names in Namecoin." *See* Charron Declaration Exhibit A.

**JA-254**

To the extent the Court entertains Defendant's erroneous position, it would benefit from specialized knowledge about blockchain technology in general, and the Namecoin blockchain in particular. Indeed, this very issue – defining the legal import of control of digital assets on the Namecoin blockchain – is the subject of differing opinions and is presumably a substantive legal question to be resolved by the Court.[5] Such detailed and contested extrinsic evidence is not yet properly before the Court, even on a 12(b)(1) motion. The Second Circuit has held that a Plaintiff is "entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Carter v. Healthport Techs*., LLC, 822 F.3d 47, 57 (2d Cir. 2016). To the extent the Court finds that any "extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d 47, 57 (reversing and remanding district court judgment which improperly dismissed plaintiff's allegations in complaint sufficient for Rule 12(b)(1)).

Plaintiff alleges ownership of the Namecoin-*Quantum* and a "concrete injury" under each one of its claims. *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 341 (S.D.N.Y. 2021). That injury "is concrete, and while it may ultimately prove insufficient to justify relief under the statutes at issue, it is sufficient to confer constitutional standing. Holding otherwise would convert the mine run of routine challenges under Rule 12(b)(6) —e.g., whether a plaintiff had plausibly alleged the materiality of a misrepresentation, or damages—into attacks on the Article III authority of the reviewing court." *Id. citing Morrow v. Ann Inc.*, No. 16-CV-3340 (JPO), 2017 WL 363001, at *3 (S.D.N.Y. Jan. 24, 2017). Moreover, courts routinely deny motions to dismiss

---

[5] *See, e.g., Defining "NFT" in Historical Context*, June 27, 2022, https://mirror.xyz/chainleft.eth/MzPWRsesC9mQflxlLo-N29oF4iwCgX3lacrvaG9Kjko ("[T]here is an ongoing debate about the age of Namecoin NFTs that expired and then got re-registered.").

8

where dismissal requires the court to issue a fact ruling requiring the aid of fact discovery or expert opinion. *See Cowan v. Costco Wholesale Corp.*, 2017 WL 59080 *2 (E.D.N.Y. Jan. 5, 2017) (rejecting dismissal of claim where court deemed it inappropriate to "definitely determine whether the purported hydrocarbon components, *i.e.*, petroleum gas (liquefied), propane, 2-methyl, and butane are, in fact, hydrocarbons" at the motion to dismiss stage); *Vogel v. Boris*, 2021 WL 1668072, at *7 (S.D.N.Y. Apr. 28, 2021) ("Given the novelty and complexity of the transaction here, the Court finds that a determination . . . involves questions of fact inappropriate for resolution at the pleading stage.")

The information provided by McCoy in its review of the "Name operations" associated with what he misleadingly styles as the "Namespace Report" is technical, and ultimately inappropriate for the court to use as a basis for a ruling at the motion to dismiss stage. But, even so, McCoy is wrong. Defendant's argument relies on the analysis of the history of transactions that correspond with the -709a name.[6] Defendant's argument is effectively that each blockchain transaction is a separate NFT distinct from the name that it is associated with. But this (1) is inapposite to the claims made in the Amended Complaint, and (2) does not make sense (at least on the Namecoin blockchain). Given that the purpose of the Namecoin blockchain is to allow users to own a "name," the "ownable" asset at issue – the NFT – is the name.

The Namecoin FAQ states: "How does Namecoin work? The Namecoin software is used to <u>register names</u> and <u>store associated values in the blockchain</u>, a shared database distributed by a P2P network in a secure way. The software can then be used to query the database and retrieve data." Charron Declaration, Exhibit A, at 2 (emphasis added). In light of this, the only plausible reading of the phrase "Title transfers to whoever controls this blockchain entry" is to read that

---

[6] Note that throughout McCoy's motion, he interchangeably uses the words "name" and "namespace" in a way which is inconsistent with the usage defined in the Namecoin FAQ.

phrase as meaning in this case: "Title transfers to whoever controls [name -709a]." Indeed, Defendant's argument otherwise is nonsensical.  The operation "NAME_NEW" is in fact a misnomer, because as discussed above, in does not create a "new" name every time it is run. In fact, a Namecoin name can only be "created" once.  *See* Charron Declaration, Exhibit A, at 3.

Plaintiff alleges that it owns the -709a name (i.e., it now controls that blockchain entry). *See* Am. Compl. ¶¶ 38-43. This Court's inquiry should end there because Plaintiff has plausibly alleged that Plaintiff's right to use a Namecoin name in fact grants Plaintiff title to and control over the Namecoin-*Quantum*.  *See id.* This is sufficient at this stage of the case.

Lastly, Defendant has moved for dismissal with prejudice.  *See* Br. at 2.  "[W]here a case is dismissed for lack of Article III standing . . . that disposition cannot be entered with prejudice, and instead must be dismissed *without* prejudice."  *Aikens v. Portfolio Recovery Assocs.*, 716 Fed. Appx. 37, 40 (2d Cir. 2017); *Katz v. Donna Karan Co. LLC*, 872 F.3d 114, 121 (2d Cir. 2017).  Therefore, to the extent the Court countenances Defendant's argument, it must dismiss under Rule 12(b)(1) without prejudice.

Accordingly, for the reasons cited above, the Court should deny Defendant's 12(b)(1) motion to dismiss.

### B.   Plaintiff's Claims are Ripe

Next, Defendant asserts that Plaintiff's claims fail because they are hypothetical. Specifically, Defendant argues that Plaintiff's claims are insufficient because Plaintiff fails to allege "any actual, imminent or attempted sale" of its NFT, fails to allege that it marketed its NFT, and fails to "allege any facts demonstrating actual or likely consumer confusion arising out of any statements made by McCoy."  Br. At 14.  Defendant is wrong.

10

Plaintiff's claims are ripe because they plead allegations presenting an injury in fact that is actual or imminent, not conjectural or hypothetical, caused by Defendant, which can be addressed by a favorable court decision. *See National Organization for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). A court must be mindful that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 63 (2d Cir. 1988) (*citing Regional Rail Reorg. Act Cases*, 419 U.S. 102, 138 (1974)).

As alleged in the Amended Complaint, Defendant knowingly issued false and misleading statements about the Ethereum-*Quantum* NFT he sold through Sotheby's by dishonestly and misleadingly trading on the historic name, title, and pedigree of Plaintiff's property. *See* Am. Compl. ¶ 19. Despite his own knowledge that the statements were false and misleading, and notice from Plaintiff of the same, Defendant intentionally promoted the sale of Ethereum-*Quantum* using false and misleading statements. *See id.* Defendant used the false and misleading statements in advertisements, marketing, and promotions in order to deceive consumers and to drive up the number and price of bids for his Ethereum-*Quantum*. *See* Am. Compl. ¶¶ 66-67. Plaintiff additionally shared a Tweet in which it invited McCoy to "participate in the sale of Quantum." Am. Compl. ¶ 48. If McCoy had taken up this offer, the Namecoin-*Quantum could* have been included in McCoy's sale of Ethereum-*Quantum* at the Sotheby's auction (and corrected related marketing statements). Defendant ultimately rejected those offers and prevented Free Holdings from selling the Namecoin-*Quantum* as part of the auction (or otherwise in light of Defendants' continuing false statements). McCoy sold the Ethereum-*Quantum* alone (i.e., separate, and apart from the sale of Namecoin-*Quantum*) for

11

$1,472,000, relying on false claims that Namecoin-*Quantum* had been destroyed.  *See* Am. Compl. ¶ 84.

These actions have directly caused Plaintiff real and non-hypothetical damages. Defendant has enriched himself at Plaintiff's expense, and continues to do so, by perpetuating the materially false and misleading statements at the expense of Plaintiff's property.  *See* Am. Compl. ¶¶ 60-70.  Defendant has repeated the false and misleading statements in news and magazine articles, and on national television.  *See* Am. Compl. ¶¶ 93-97.  Defendant's conduct has forced Plaintiff to expend time and money in order to repair title to his Namecoin-*Quantum*. *See* Am. Compl. ¶¶ 99-100.  Defendants have precluded Plaintiff from including Namecoin-*Quantum* in the Sotheby's sale of Ethereum-*Quantum*, continue to make false statements concerning the status of Namecoin-*Quantum*. Any prospective purchaser of Namecoin-*Quantum* would now have valid reason to doubt the value of the Namecoin-*Quantum* in context of Defendants' continued repetition of these false claims, which are continued in Defendants' motions. This Court has the ability to remedy this situation by declaring Defendants' statements as definitively false. This is a live controversy, which "creates a direct and immediate dilemma," ripe for decision by this Court. *Natl. Org. for Marriage, Inc.,* 714 F.3d at 691.

## II.    Standard of Review for Rule 12(b)(6)

Each of Plaintiff's claims are sufficiently pleaded in the Amended Complaint. Plaintiff has made a "short and plain statement of the claim" as required by Fed. R. Civ. P. 8(a). *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). "A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Clark Consulting, Inc., v. Financial Solutions Partners, LLC*, 2005 WL 3097892, at *2 (S.D.N.Y. Nov.

17, 2005); *see also Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) ("Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle.").  "At the motion to dismiss stage, the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Clark Consulting*, 2005 WL 3097892, at *2; *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Clark Consulting*, 2005 WL 3097892, at *2.  "Accordingly, a claim can only be dismissed if no relief can be granted under any set of facts that could be proved consistent with the allegations." *Id.*; *Eternity Global*, 375 F.3d at 176 ("A complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.").

### III.    Plaintiff has Stated a Cause of Action for Unjust Enrichment

#### A.    Plaintiff Plausibly Alleges That Defendant Was Enriched at Plaintiff's Expense

Defendant's argument that Plaintiff fails to make allegations to support a plausible inference that Defendant was enriched at Plaintiff's is meritless. Furthermore, Defendant asserts that Plaintiff's Namecoin-*Quantum* merely "copies metadata from the 2014 NFT, akin to a forgery." Br. at 15.  Defendant is wrong because as discussed, *supra*, Defendant misunderstands Plaintiff's allegations and misstates the operation of the Namecoin blockchain.

As stated above, Plaintiff has alleged facts to support an inference that McCoy was enriched at Plaintiff's expense because the Amended Complaint alleges Plaintiff has title to Namecoin-*Quantum*. Plaintiff's allegations are based on the fact that the Namecoin-*Quantum* is the original and first NFT Defendant minted in 2014.  Plaintiff's pleading makes clear that Defendant minted the Namecoin-*Quantum* in 2014, but lost control and title to the NFT on or

13

around January 2015.  *See* Am. Compl. ¶¶ 36-41.  Plaintiff then alleges that Plaintiff claimed

Namecoin-*Quantum*.  *See* Am. Compl. ¶¶ 42-43.

Plaintiff also alleges that Defendant enriched himself at Plaintiff's expense. Plaintiff

alleged a diminution in value of its Namecoin-*Quantum* due to Defendants' actions. *See* Am.

Compl. ¶ 98.  By falsely claiming the Namecoin-*Quantum* had been "burned" or "removed"

from the Namecoin Blockchain, Defendant was able to successfully sell his 2021 newly minted

Ethereum-*Quantum* as if it were the original, as opposed to a validly authorized reprint. Indeed,

Defendant enriched himself by appropriating the renown, prestige, and pedigree of the

Namecoin-*Quantum* in order to sell his own NFT, all at Plaintiff's expense.

B.  Plaintiff Alleges a Connection Between Itself and McCoy

"Today, New York law does not require an unjust enrichment plaintiff to plead direct

dealing, or an actual, substantive relationship with the defendant. It merely requires that the

plaintiff's relationship with a defendant not be too attenuated."  *Waldman v. New Chapter, Inc.*,

714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010) (internal citations omitted). A relationship or

connection is sufficient if it could have caused reliance or inducement. *See Philips International*

*Investments, LLC v. Pektor*, 117 A.D.3d 1, 3 (1st Dep't 2014) ("plaintiff properly alleged a

relationship between the parties that could have caused reliance or inducement to support an

unjust enrichment claim") (internal quotation marks omitted); *see also Cox v. Microsoft Corp.*, 8

A.D.3d 39, 40 (1st Dep't 2004) (indirect purchaser of Microsoft software permitted to sue

Microsoft for unjust enrichment).

Plaintiff has alleged facts that describe a sufficiently close relationship in order to state a

claim for unjust enrichment. Specifically, Plaintiff has alleged that Defendant issued statements

upon which Plaintiff relied and induced Plaintiff into re-registering the Namecoin-*Quantum*.

14

When Defendant created the Namecoin-*Quantum*, Defendant placed in the value field of the name the following statement: "Title [to the Namecoin-Quantum] transfers to whoever controls this blockchain entry." Amended Compl. at ¶ 38. Plaintiff relied on this statement when he re-registered the Namecoin-*Quantum*. It is irrelevant that Defendant does not know Plaintiff personally and never responded to his communications because Defendant, by the very creation of the Namecoin-*Quantum*, and with his statement, expressly invited anyone (including Plaintiff) to interact with his NFT, and indeed created the situation where Plaintiff could register the name in order to resume ownership and control of the Namecoin-*Quantum*. Accordingly, because Defendant caused inducement or reliance by Plaintiff, there is a sufficiently close relationship for a claim for unjust enrichment.

**IV.    Plaintiff Has Stated a Cause of Action for Slander to Title**

> A.    Plaintiff Alleges Malice by McCoy

To state a claim for slander to title, Plaintiff must allege that the statements at issue are made with malice or a reckless disregard for their truth or falsity. New York courts apply the "actual malice" standard, which exists "when a speaker makes a statement knowing it is false or while personally harboring serious doubts about its veracity." *Chamilia, LLC v. Pandora Jewelry, LLC*, 85 U.S.P.Q.2d 1169, 1179 (S.D.N.Y. 2007); *see also Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 115 (2d. Cir. 2005). To establish actual malice, it is sufficient that Plaintiff plead that Defendant either (1) knew the challenged statements were false; or (2) acted with reckless disregard as to whether the statements were true or false. *See Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 182 (2d Cir. 2000). "Actual malice can be established "through the defendants' own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among

15

other circumstantial evidence." *Celle*, 209 F.3d at 183 (internal citation and quotation marks omitted).  Plaintiff's allegations meet this requirement.

Plaintiff has plead facts supporting a plausible inference of malice or reckless disregard for the truth or falsity of the statements at issue by Defendant. Plaintiff has alleged that Defendant understood that the holder of the name for the Namecoin-*Quantum* would own and control the Namecoin-*Quantum*. In particular, Defendant wrote in the value field for the Namecoin-*Quantum* blockchain record that "Title [to the Namecoin-*Quantum*] transfers to whoever controls this blockchain entry." *See* Am. Compl. ¶ 38. Later, when Defendant was attempting to sell his 2021 Ethereum-*Quantum*, Plaintiff contacted Defendant to alert Defendant that Plaintiff owned and controlled the blockchain entry that granted title to the Namecoin-*Quantum*. *See* Am. Compl. ¶¶ 44-51.

If the Namecoin-*Quantum* existed and was not "burned" or "removed" from the Namecoin blockchain as Defendant advertised, Defendant would be precluded from promoting his Ethereum-*Quantum* as the world's first NFT. Accordingly, Defendant knew that he had a problem. In Defendant's own words, at the time Defendant created the 2014 Namecoin-*Quantum*, his intent was to use Namecoin's "blockchain technology to create *indelible* provenance and ownership of digital images" such as *Quantum*. *See* Am. Compl. ¶ 57. Indeed, a significant part of the artistic expression underlying *Quantum* is that it is a work that, by its very nature, *cannot* be erased or destroyed.  *See* Am. Compl. ¶¶ 56-57.

Plaintiff has pled that Defendant knew or should have known that the 2014 Namecoin-*Quantum* still existed because he established the Namecoin-*Quantum* as a work that could not be destroyed, and because Plaintiff informed Defendant that the Namecoin-*Quantum* existed and was owned and controlled by Plaintiff.  *See* Am. Compl. ¶¶ 57, 44-51. Plaintiff's

16

about-face proclamations that the Namecoin-*Quantum* had been "burned" or "removed" from the Namecoin blockchain stand in stark contrast to his past statements and the inherently "indelible" nature of the Namecoin-*Quantum*. Accordingly, Plaintiff has plead non-conclusory allegations supporting plausible inferences that Defendant acted with malice or reckless disregard for the truth.

### B.  Plaintiff Alleges Special Damages

Plaintiff has adequately plead special damages by alleging that it expended time and money to repair title to the Namecoin-*Quantum* NFT. Plaintiff alleges that its "Namecoin-*Quantum* NFT has significant value due to its status as the first NFT and such value is being significantly diminished by the false and misleading statements made by McCoy and Sotheby's." Am. Compl. ¶ 98. Plaintiff further detailed that it spent $5,311.49 seeking to have Defendant publicly correct his false and misleading claims.  Am. Compl. ¶ 100.

The New York Court of Appeals has formulated the requirement of "special injury" as follows:

> [B]urdens substantially equivalent to those imposed by provisional remedies are enough. Actual imposition of a provisional remedy need not occur, and a highly substantial and identifiable interference with person, property or business will suffice . . . . Since the role that the special injury requirement fulfills is that of a buffer to insure against retaliatory malicious prosecution claims and unending litigation, we are satisfied that a verifiable burden substantially equivalent to the provisional remedy effect can amount to a special injury. Put another way, what is "special" about special injury is that the defendant must abide some concrete harm that is considerably more cumbersome than the physical, psychological or financial demands of defending a lawsuit.

*Engel v. CBS, Inc.*, 93 N.Y.2d 195, 205 (1999). Plaintiff's allegation that he expended $5,311.49 to have Defendant publicly correct his false statements concerning Plaintiff's ownership of the Namecoin-*Quantum* NFT, alone, satisfies the requirement that Plaintiff plead special damages.

17

Case 23-644, Document 40, 07/25/2023, 3546479, Page122 of 282

Clearly, this additional expense is a concrete harm separate and apart from the financial demand of bringing suit.

## V.    Plaintiff Alleges a Cause of Action for Violation of N.Y. G.B.L. § 349

Defendant argues that Plaintiff's claim under N.Y. G.B.L. § 349 should be dismissed because Plaintiff fails to allege consumer-oriented conduct. In particular, Defendant asserts that "Plaintiff fails to allege how McCoy's statements about the 2014 NFT, in connection with a single auctioned item (*i.e.*, the *Quantum* NFT), would have any impact on McCoy's new 'project' or future 'artwork' or how those statements would specifically harm consumers at large." Br. at 21. Defendant is wrong.

While McCoy cites *Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) for the proposition that a "single shot transaction" cannot support a claim under Section 349, *Genesco* is inapposite. *Genesco* was considered in the context of a Rule 56 motion and dealt with a concert promoter seeking to lease Shea Stadium from New York City during a private negotiation where the contract fell through after a break down in the relationship between the parties. *Id.* at 745. This is not a "[p]rivate contract dispute[], unique to the parties" contemplated by *Genesco* and its progeny.

On the other hand, in *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 294 (1999), the Court of Appeals modified an order of the Appellate Division and allowed a Section 349 claim to proceed, finding that it was not the "physician's treatment of an individual patient" that was actionable, but instead found a Section 349 claim actionable where a Doctor's false advertising activity directed at the "consuming public at large in order to promote business." *Karlin*, 93 N.Y.2d at 294. Indeed, other New York courts have held:

> Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior. The statute itself does not require recurring conduct. Moreover, the legislative history makes plain that this law was intended to 'afford a practical

18

means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds' (*see*, Mem of Governor Rockefeller, 1970 NY Legis Ann, at 472-473). Plaintiff, thus, need not show that the defendant committed the complained-of acts repeatedly — either to the same plaintiff or to other consumers — but instead must demonstrate that the acts or practices have a broader impact on consumers at large.

*Oswego Laborers' Local 214 Pension Fund v. Me. Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).

Here, Plaintiff alleged that McCoy marketed the Ethereum-Quantum to consumers in the context of an auction at Sotheby's. See Am. Compl. ¶ 128-29. The advertising of Sotheby's auction of Ethereum-Quantum was clearly public and broadly consumer-oriented. Numerous consumers had the opportunity to purchase Ethereum-Quantum at the Sotheby's auction and were presumably deceived by Defendants' false advertising notwithstanding the fact that only one purchaser was able to win the auction.

McCoy sets forth new factual assertions that the auction was a "complex arrangement . . . for a large sum of money . . . involving knowledgeable and experienced parties," (Br. at 21) ignoring that the same *Natively Digital* auction marketed at least 27 other "lots," with some selling under $10,000. These assertions, even taken as true, make the § 349 claim especially appropriate in light of the novelty of an NFT sale and the fact that the auction achieved broad mass media dissemination riding on the coattails of the false narrative of Defendants' sale of the so-called "First NFT."

In the Amended Complaint, Plaintiff also alleges that McCoy used his successful sale of his Ethereum-Quantum to promote and market himself and his artwork in successive sales and auctions. Plaintiff alleges that Defendant "touts his sale of the Ethereum-Quantum as the first NFT to establish himself within the NFT community and promote future projects" and then specifically alleges that Defendant went on national television on Fox Business to "announce[] a

19

new NFT project, and declare[] his intent to continue creating NFT artwork as part of his art practice." See Am. Compl. ¶¶ 93, 97. Defendant's false and misleading statements harm consumers by materially deceiving them about Defendant's background and track record. *See* Am. Compl. ¶ 157. Indeed, Defendant is using the false and misleading statements to help establish and polish Defendant's "brand" within the emerging NFT marketplace. *See* Am. Compl. ¶ 93.

The State of New York and the FTC have already indicated that there is a public consumer-protection interest in ensuring truth in advertising for the sale of NFTs.[7] Additionally, McCoy claims Plaintiff failed to plead other details, including McCoy's other planned NFT projects, general consumer awareness of the Quantum sale, and general consumer awareness of NFTs (*see* Br. at 21-22), but these are factual details more appropriate for discovery. Plaintiff's claims are sufficient to state a claim under § 349.

## VI.    Plaintiff Alleges a Cause of Action for Commercial Disparagement

Defendant asserts that Plaintiff's claim for commercial disparagement should be dismissed because Plaintiff failed to allege special damages. Plaintiff has adequately plead special damages, as explained *supra,* Section III.b. Defendant furthermore asserts that "Plaintiff does not allege that McCoy made any statements directed at Plaintiff or at the 2021 NFT." Br. at 22. Defendant also claims that Plaintiff only made allegations about McCoy concerning statements he issued about the "2014 NFT." *Id.* Defendant's argument is meritless.

---

[7] See, e.g. Alex Nguyen, *New York State's Top Financial Cop Plans New Guidance for NFTs,* (June 29, 2022, 2:09 PM EDT)  https://www.bloomberg.com/news/articles/2022-06-29/new-york-state-s-top-financial-cop-plans-new-guidance-for-nfts ("Adrienne Harris, the superintendent of New York's Department of Financial Services, said on Wednesday that her agency was planning to issue new guidance on how its rules apply to NFTs.");*TINA.org Sends Notification Letters to Celebrities Promoting NFTs,* August 8, 2022, https://truthinadvertising.org/articles/tina-org-sends-letters-to-celebrities-promoting-nfts/ (asserting consumer protection role for the Federal Trade Commission in light of celebrity endorsement of consumer-focused NFTs)

As discussed, Plaintiff has plead that it controls Namecoin-*Quantum*. *See supra,* Section I.  Furthermore, Plaintiff's allegations make clear that Defendant made certain false and misleading statements about the Namecoin-*Quantum* in order to help auction his Ethereum-*Quantum*.  Plaintiff specifically alleges that Defendant stated that he "moved [the Namecoin-*Quantum*'s] original on chain data from a burned Namecoin token into a modern industry standard ERC-721 token, while preserving all of the original on chain information." *See* Am. Compl. ¶ 66.  Plaintiff also asserts that Defendant stated that his Ethereum-*Quantum* that was sold at auction is the world's first NFT.  *See* Am. Compl. ¶ 96.  Finally, Plaintiff alleges that these statements are materially false and misleading because the Namecoin-*Quantum* has not been "burned," "removed," or otherwise destroyed from the Namecoin blockchain, and is presently owned and controlled by Plaintiff. *See* Am. Compl. ¶¶ 141-148.   Accordingly, Plaintiff has stated a claim for commercial disparagement.

**VII.    Plaintiff Alleges a Cause of Action for Violation of Section 43(a) of the Lanham Act**

McCoy argues that Plaintiff's false advertising claim under section 43(a) of the Lanham Act should be dismissed for two reasons: first, because Plaintiff failed to allege that McCoy made literally or impliedly false statements, and second, because Plaintiff has not viably pleaded causation of harm, given that it does not own what McCoy defines as the 2014 NFT. As argued below, both claims are incorrect.

A.  Plaintiff Alleged that McCoy Made False and Misleading Statements

Defendant's assertion that Plaintiff failed to plead that Defendant's statements were literally or impliedly false requires a warped view of Plaintiff's allegations.  *See* Br. at 23.  For example, McCoy argues that "Plaintiff's conclusory pleading and 'mere subjective belief' about the impact on consumers is insufficient." Br. at 24. However, Plaintiff has pled sufficient detail for purposes of surviving Defendants' motions.

21

The falsity of advertising is an issue of fact. *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317-18 (2d Cir.1982) (followed in *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992). ("It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive.") Instead, a determination of deceptiveness is made though an evidentiary hearing, consisting of expert testimony and consumer surveys . *See Johnson & Johnson,* at 297-98. Additionally, because Section 43(a) "is remedial and because its words are so clearly expansive it should, generally speaking, be broadly construed." *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 (2d Cir. 1984).

First, Plaintiff pled that Defendant asserted that Plaintiff's NFT had been "burned" or "removed" from the Namecoin blockchain. *See* Am. Compl. ¶¶ 72-75. Plaintiff also alleged that Defendant incorrectly asserted that his Ethereum-*Quantum* NFT was the world's first NFT, and "left a false impression on consumers, namely that the NFT sold in the Natively Digital Auction was the 'first-ever' NFT." Am. Compl. ¶¶ 152, 157. Plaintiff plainly alleged that both of these statements are false. *See id.*

Defendant focuses on the use of the word "burned," but completely ignores that Plaintiff similarly alleged (and Defendant additionally stated) that the Namecoin-*Quantum* had been "moved" from the Namecoin blockchain to the Ethereum blockchain. *See* Am. Compl. ¶ 66. The plain meaning of this statement was meant to convey that the Namecoin-*Quantum* had been removed from the Namecoin blockchain. This statement is literally false. *See* Am. Compl. ¶¶ 66-67.

Regardless, a Lanham claim for false advertising requires that Plaintiff plead a statement that is either literally or impliedly false. If not literally false, the thrust of Defendant's statements

22

that the Namecoin-*Quantum* had been "burned" or removed from the Namecoin blockchain, and

that the Ethereum-*Quantum* was the world's first NFT, implied that the Namecoin-*Quantum* had

been destroyed and that Defendant's Ethereum-*Quantum* had inherited the prestige and renown

originally reserved for the Namecoin-*Quantum* as a highly valuable collectible and artistic work.

Lastly, Defendant argues that "Plaintiff's failure to allege any facts supporting that consumers

were actually or likely to be misled by such statements (such as through a survey) means that

Plaintiff has not alleged implied falsity as a matter of law." Br. at 23.   Defendant is

wrong.   Plaintiff plead allegations of actual consumer confusion when it asserted that the

purchaser of Defendant's NFT stated that he had purchased the world's first NFT.   *See* Am.

Compl. ¶ 86. This allegation of Defendant's false statements causing a single instance of actual

consumer confusion is again sufficient for purposes of stating a claim. For example, in *Mobius*

*Management Systems, Inc. v. Fourth Dimension Software, Inc.*, 880 F.Supp. 1005, 1020-21

(S.D.N.Y. 1994), the Court found that a single letter, addressed to a potential purchaser of

plaintiff's software product was sufficient to meet the requirements of Section 43(a) since the

relevant purchasing market was small.

Further, Plaintiff alleged instances of the news media adopting the false narrative

propounded by Defendants. *See* Am. Compl. ¶ 95-97. At the motion to dismiss stage, it is

premature for Plaintiff to present a consumer survey to the Court. To the extent this Court

questions the veracity of those allegations, Plaintiff should be provided the opportunity to

conduct further discovery on the misleading nature of Defendant's statements. *Gordon & Breach*

*Science Publishers S.A. v. American Institute of Physics*, 859 F. Supp. 1521, 1532 (S.D.N.Y.

1994) *modified on other grounds*, *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314

F.3d 48 (2d Cir. 2002) denying motion to dismiss plaintiff's Lanham Act claim and noting that

23

plaintiff's allegations were "not so meritless on its face that we can dismiss it without giving [plaintiff] an opportunity to present extrinsic evidence of the articles' tendency to mislead.").

Thus, under the Court's "broad construction" of the Lanham Act, Plaintiff has pled facts in the Amended Complaint sufficient to allege that "the challenged advertisement is 'literally false,'" or at minimum that "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007).

### B. Plaintiff Alleges Causation

Defendant argues that "any allegedly false statements about the 2014 NFT could not possibly cause any injury to Plaintiff" on the grounds that "Plaintiff has not viably pleaded that it owns . . . the 2014 NFT." Br. at 25. As explained above, Plaintiff has alleged that it owns the Namecoin-*Quantum*, and that this is the original NFT that Defendant minted in 2014. *See supra*, Section I. Plaintiff has additionally alleged that Defendant's false and misleading statements have caused damage to Plaintiff. *See* Am. Compl. ¶ 158. Lastly, as discussed *supra*, Defendant's dispute that Plaintiff does not own or control the 2014 NFT is a fact intensive dispute that requires discovery and expert testimony to resolve. Therefore, for purposes of this Motion, the Court is required to accept as true Plaintiff's pleading and, it would be inappropriate to resolve this question at the pleading stage.

## VIII.   **Plaintiff Has Alleged a Cause of Action for Declaratory Judgment**

For the reasons discussed above, Defendant's motion to dismiss Plaintiff's claim for declaratory relief should be denied. Plaintiff has alleged an "actual controversy" because it has plead allegations that it owns the Namecoin-*Quantum*, and that Defendant issued materially false and misleading statements about the Namecoin-*Quantum*, and the Ethereum-*Quantum*, so that Defendant could falsely promote and advertise his NFT at auction. Defendant's statements have

24

**JA-271**

damaged Plaintiff and continue to do so as Defendant repeats his false and misleading narrative concerning Namecoin-*Quantum*.  Moreover, Plaintiff's allegations stand in stark contrast to Defendant's motion papers, and only further demonstrate a live controversy concerning Plaintiff's title and ownership to the Namecoin-*Quantum*.  Accordingly, Plaintiff has stated a claim for declaratory relief.

## CONCLUSION

For the foregoing reasons, Free Holdings respectfully requests that the Court deny Defendants', McCoy and Sotheby's motions to dismiss the Amended Complaint and that the Court award Free Holdings such other and further relief as deemed just and proper.

Dated: Rockville Centre, New York
  August 15, 2022

       Respectfully submitted,

       **FALCON RAPPAPORT & BERKMAN PLLC**

       By: */s/ Moish E. Peltz*
       Moish E. Peltz
       Kenneth J. Falcon
       Steven Berlowitz
       Jessica Moore
       265 Sunrise Highway, Suite 50
       Rockville Centre, New York 11570
       (516) 599-0888
       mpeltz@frblaw.com
       kfalcon@frblaw.com
       sberlowitz@frblaw.com
       jmoore@frblaw.com

       *Attorneys for Plaintiff*

JA-272

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREE HOLDINGS INC.,

                        Plaintiff,

v.                                                             Case No.: 1:22-cv-00881-JLC

KEVIN MCCOY and SOTHEBY'S INC.,

                        Defendants.

**DECLARATION OF MOISH E. PELTZ IN SUPPORT OF PLAINTIFF FREE
HOLDINGS INC.'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT**

I, Moish E. Peltz, declare as follows:

1. I am an attorney duly licensed in the State of New York, and a partner at the law firm of

    Falcon Rappaport & Berkman PLLC. I am attorney of record for Plaintiff Free Holdings

    Inc. in connection with the above-captioned matter. I am aware of the facts stated herein.

2. I downloaded and installed on my computer the Namecoin Core client available at

    https://www.namecoin.org/download/ (64-bit x86 installer, Namecoin Core version

    nc0.21.0.1).

3. From the windows command line I ran the command:

    "C:\Program Files\Namecoin\namecoin-qt.exe" -namehistory -reindex

4. I did this in order to enable the usage of the name_history command within the Namecoin

    Core software, to be performed on the Namecoin blockchain. I understand that running

    the name_history command returns all blockchain history associated with a given

    Namecoin name.

1

JA-273

5.   Thereafter, I connected to the Namecoin blockchain protocol, and synced the Namecoin Core software to the Namecoin main network, through the most current "block," block height 625335 (corresponding with Monday August 15, 2022 at 2:58:44pm EST).

6.   The name d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is the name associated with Namecoin-*Quantum*, as alleged in the Amended Complaint.

7.   In the Namecoin Core console, I entered the following command:

name_history d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

8.   This command returned the text listed in **Exhibit A**.

9.   Some of the text returned in Exhibit A returned a "value_error" : "invalid data for ascii." To account for this, I ran an additional command to return "hex" results.

10. In the Namecoin Core console, I entered the following command:

name_history "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a" "{\"valueEncoding\":\"hex\"}"

11. This command returned the text listed in **Exhibit B**.

12. Since some of the text created by McCoy in Exhibit B is in "hex" format, I was required to convert these hex numbers into human readable "ascii" format.

13. Using a "hex" to "ascii" converter (located at: https://www.rapidtables.com/convert/number/hex-to-ascii.html), I converted the first entry return from Exhibit B (corresponding to McCoy's creation of Namecoin-*Quantum*, block 174923) to human readable text.

    a.   This resulted in the conversion of the following "hex" output:

JA-274

4920617373657274207469746c6520746f207468652066696c652061742074
0746865205552444c2068 7474703a2f2f7374617469632e6d63636f797973
7061636652e636f6d2f6769667320616e2f717561746d6e2e6769660000776
2e6769666620776974682074686520637265617469746f722773207075626c
6963206f696720696e617465207075756d656e740000742c69742773207075
5626c696368676e69673e6220617420746865205552444c200a6874747074070
733a2f2f747769747465722e636f6d2f6d63636f79737061636532f737461
7475732f34363233333234033436373139363433163303020205468652066696c65206
f652077686f736520534841323533562062853617361368206861730a617
36820697320643431623835343063626163646631343637636463356431373
33331366436 32363733263338623433323333566613136636465639386
5373938323536236383730396120696973207074146b656 e20746f20626252
067468652066696c6520696e2071756573746574696f6e2e205469746c6520
7472616e736665727320746f2077686f6576657220636f6e74726f6c732074
6869732062 6c6f636b636861696e20656e6572792792e

b.  Into the following human readable ascii text:

I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600  The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry.

14. Thus, as a result, as of today's date, the name_history command for the name:

**d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a**

returns the following text from the Namecoin Blockchain:

**I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600  The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry.**

15. I understand that this result differs from the value returned for block 174923 on the Namebrow.se blockchain explorer, which displays a "value" of "None."

https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a/

3

16. Upon information and belief, once the

d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a name was

registered by McCoy on block 174923, all subsequent activity associated with that name

is forever linked to that name on the Namecoin blockchain. This includes activity by Free

Holdings, which can only be added to the history of the name as time goes on. Upon

information and belief, all prior history associated with that name (including those

blockchain records created by McCoy) cannot be deleted so long as the Namecoin

blockchain continues to operate.

17. Attached hereto as **Exhibit C** is a true and correct copy of the article "**Defining "NFT"**

**in historical context**," *available at*:

https://mirror.xyz/chainleft.eth/MzPWRsesC9mQflxlLo-N29oF4iwCgX3lacrvaG9Kjko

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge, information, and belief.

Dated: August 15, 2022                                            Respectfully submitted,
       New Rochelle, New York

                                                                 By: */s/ Moish E. Peltz*
                                                                 Moish E. Peltz

Case 23-644, Document 40, 07/25/2023, 3546479, Page134 of 282

# Exhibit A

name_history d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

[
 {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value_error": "invalid data for ascii",
    "value_encoding": "ascii",
    "txid": "fa8b9a6ad4d266ffbec4f9a1217e0dbcd657bb1eb3ed49912a2ab1bd3bb48f8d",
    "vout": 0,
    "address": "N2nunKeYiYeqDCunDzJ3EQQh1fbAawegPW",
    "height": 174923,
    "expires_in": -414368,
    "expired": true,
    "ismine": false
 },
 {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value": "None",
    "value_encoding": "ascii",
    "txid": "d81a70169734441beddff38fcd54c18ec14143ea7f1bcdc099ae56d8f5a77fd8",
    "vout": 1,
    "address": "N6VJ91NUaSQDVH1T8JmR5SYBrNzLCzxwvw",
    "height": 553214,
    "expires_in": -36077,
    "expired": true,
    "ismine": false
 },
 {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value": "I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's
public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600
The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is
taken to be the file in question. Title transfers to whoever controls this blockchain entry.",
    "value_encoding": "ascii",
    "txid": "e63d18c5bd26924575baf27bd451dbcdccb7849fb98162ce8f5b710a694bedd7",
    "vout": 1,
    "address": "N2nAt3n6LP1CmVM9Q6dMMb6XBGDRhh3m11",
    "height": 556942,
    "expires_in": -32349,
    "expired": true,
    "ismine": false
 },
 {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value": "**An authorized print of this original NFT, entitled \"Quantum\" by Kevin McCoy, is currently being
auctioned off by Sotheby's. Good Luck to all the bidders.**",

5

```
    "value_encoding": "ascii",
    "txid": "84adf253294aaf88fb9adf35ff7e551545f0b071a6562c40cac6db05a6633079",
    "vout": 1,
    "address": "MwzD9Tv2k82mL1QYP6DPVMkXXfmcT4TwCt",
    "height": 562392,
    "expires_in": -26899,
    "expired": true,
    "ismine": false
  },
  {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value": "**This original NFT, entitled \"Quantum\" by Kevin McCoy and minted on May 2, 2014, is currently
held by the person who controls the Twitter handle @EarlyNFT.  Please direct message all inquires about the
artwork there.**",
    "value_encoding": "ascii",
    "txid": "93e6db4e6c425e57aa14c33b9d1889207ff7e269eede4f991970a00f8958ee59",
    "vout": 0,
    "address": "N1Htz24CXadX5zGQx54dW6fPA7hCFjneiP",
    "height": 563353,
    "expires_in": -25938,
    "expired": true,
    "ismine": false
  },
  {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value": "I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's
public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600
The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is
taken to be the file in question. Title transfers to whoever controls this blockchain entry.",
    "value_encoding": "ascii",
    "txid": "6dd5ceffc06bef3295bc4d42a04a5322ab61b6656b1ad542fb30996f4ac120fe",
    "vout": 1,
    "address": "MyH6KEy9DcAbmUDdTsmK6vB1RgN1VYUyiZ",
    "height": 598415,
    "expires_in": 9124,
    "expired": false,
    "ismine": false
  }
]
```

JA-278

# Exhibit B

name_history "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a"
"{\"valueEncoding\":\"hex\"}"

[
  {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value":
"4920617373657274207469746c6520746f207468652066696e6520617420746865205552c20687474703a2f2f737
4617469696632e6d63636f6f36f7973706163652e636f6d2f676966732f7175616e6e74756d2e667696620776974682074686520
63726561746f6672273207075626c696e696e6e6e66756e6363656d6d6d656e74206f2069736869696
e6720617420746468652055550524c200a68747474733a2f2f747676694465722e636f6d2f6d6d363636f797973706163616534523652f737
4617475732f34363233323230343232363371393663431363030202020546865652066696e6c6652077686f736520534841132353620
68687369736820697320064343161623835353430636626661636466313436373636466335361373333136646362636636372636338623
3433323335666131336366646465353938536153736236383337303339612069732032746616b656e6e20746e4f6520726520746865865
2066696e6c652069696e207175657537374696f6fe2e205469746c64206520746c637c207472616e6e636574207206766e72207536656f6f7266672e
36f66e74726f6f6c6c637320726f6c6c636536363661696696e206563746d6477727279e"
    "value_encoding": "hex",
    "txid": "fa8b9a6ad4d266ffbec4f9a1217e0dbcd657bb1eb3ed49912a2ab1bd3bb48f8d",
    "vout": 0,
    "address": "N2nunKeYiYeqDCunDzJ3EQQh1fbAawegPW",
    "height": 174923,
    "expires_in": -414407,
    "expired": true,
    "ismine": false
  },
  {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value": "4e6f6e65",
    "value_encoding": "hex",
    "txid": "d81a70169734441beddff38fcd54c18ec14143ea7f1bcdc099ae56d8f5a77fd8",
    "vout": 1,
    "address": "N6VJ91NUaSQDVH1T8JmR5SYBrNzLCzxwvw",
    "height": 553214,
    "expires_in": -36116,
    "expired": true,
    "ismine": false
  },
  {
    "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
    "name_encoding": "ascii",
    "value":
"4920617373657274207469746c6520746f207468652066696e6520617420746865205552c20687474703a2f2f737
4617469696632e6d63636f6f36f7973706163652e636f6d2f676966732f7175616e6e74756d2e667696620776974682074686520
63726561746f6672273207075626c696e696e6e6e66756e6363656d6d6d656e74206f2069736869696
e6720617420746468652055550524c200a68747474733a2f2f747676694465722e636f6d2f6d6d363636f797973706163616534523652f737
461747573732f34363233323230343232363371393663431363030202020546865652066696e6c6652077686f736520534841132353620
68687369736820697320064343161623835353430636626661636466313436373636466335361373333136646362636636372636338623343
3"

3233356661313663646539386537393832356236383730396120697320746166656e656e20746f206265207468656520666696c6520696e6e656e2071756573737469696f6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e6e696c6520696e6e6e2e205469746469696f6e6e20747269676765720742077686f6576756574727220636f6e74726726f6c73207074686973720626c6f636b636861696e6e65696e6e206e6e56e747472792e"
  "value_encoding": "hex",
  "txid": "e63d18c5bd26924575baf27bd451dbcdccb7849fb98162ce8f5b710a694bedd7",
  "vout": 1,
  "address": "N2nAt3n6LP1CmVM9Q6dMMb6XBGDRhh3m11",
  "height": 556942,
  "expires_in": -32388,
  "expired": true,
  "ismine": false
},
{
  "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
  "name_encoding": "ascii",
  "value":
"2a2a416e2061757468656f72697a6564207072696e6e74206f662074686973206f726967696e616c204e46542c20656e7469697269696e6e656e206e656e6572206572617765722d6f662d66637273207072696375646465726572656764e6e20746865206572206f61207374617465736e6574696d6f6e6569206d20746865206f6f6720646f66666d652e2a2a",
  "value_encoding": "hex",
  "txid": "84adf253294aaf88fb9adf35ff7e551545f0b071a6562c40cac6db05a6633079",
  "vout": 1,
  "address": "MwzD9Tv2k82mL1QYP6DPVMkXXfmcT4TwCt",
  "height": 562392,
  "expires_in": -26938,
  "expired": true,
  "ismine": false
},
{
  "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
  "name_encoding": "ascii",
  "value":
"2a2a54686973206f726967696e6e616c204e46542c20656e7469697269696e6e656e656e656e20656e6572206572617765722d6f662d6637275206172795461726e6f6e656e6572746578746f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f2a2a",
  "value_encoding": "hex",
  "txid": "93e6db4e6c425e57aa14c33b9d1889207ff7e269eede4f991970a00f8958ee59",
  "vout": 0,
  "address": "N1Htz24CXadX5zGQx54dW6fPA7hCFjneiP",
  "height": 563353,
  "expires_in": -25977,
  "expired": true,
  "ismine": false
},
{
  "name": "d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a",
  "name_encoding": "ascii",
  "value":
"492061737365727274207469746c6520746f206574686573206f6666696c6520746f207468685206566696e6e6e6565206572746f68656573616e6e636536363636373736716316316352e636f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f6f"

63726561746f722773207075626c696963320616e6e6f756e63656d656e74206f662069742773207075626c6973686969
e672061742074686652055524c2068747470733a2f2f747769747465722e636f6d2f6d2f6d63636f6f63636f6f63636f6f6363f73746
17475732f34363233323034323637313936343136303020545468652066696c652c652077686f7365205348641235362068
61736820697320643431623833534306362616364663134363763646335643137333313664636236373263338623433
3233356661313663646539865373938323562363837303961206973207074616b656e20746f62065207468652066
696c6520696e20717155657374746696f6e2e205469746f65205207472616e27366667320746f2077686f6576657220636f6e
74726f6c73207074686973206c2c6f6f63636f6f636f6f636f6f63636f6f6c6c6f6f636f6f6c6c6f6f63636f6f6c6c6f6f63636f6f6c
74726f6c73207468697320626c6f6b6b6f636e20656e6572472792e",
    "value_encoding": "hex",
    "txid": "6dd5ceffc06bef3295bc4d42a04a5322ab61b6656b1ad542fb30996f4ac120fe",
    "vout": 1,
    "address": "MyH6KEy9DcAbmUDdTsmK6vB1RgN1VYUyiZ",
    "height": 598415,
    "expires_in": 9085,
    "expired": false,
    "ismine": false
  }
]

Case 23-644, Document 40, 07/25/2023, 3546479, Page139 of 282

# Exhibit C

Page 1
Defining "NFT" in historical context — Chainleft
https://mirror.xyz/chainleft.eth/MzPW8snsC9mQlblLs-RZ9uF4iwCgX3lacrvaG9KJko
August 15, 2022 at 15:57 EST



# Defining "NFT" in historical context

NFT is a weird three-letter acronym. Even the people who are involved in NFTs are not exactly sure how to define an NFT. No wonder the normie world is confused. Expanding the acronym just makes things worse: Non-Fungible Token is still ambiguous.

> When I decided to introduce the term "NFT" in ERC-721 because "it would be more approachable" than the technical term "non-fungible token", I could have NEVER guessed how approachable it would eventually become... 😆

Is NFT just a receipt? Is it the actual artwork? What about editions? What even is a token?

These details are being discussed even more among Historical / Vintage NFT communities because early NFTs have antique value. These early assets also indicate pioneering achievements, which collectors love to celebrate. But what if what you collected is not an NFT? Or what if there are way more, earlier NFTs than the ones you already collected? Financial motives are sometimes at the center of these debates.

In this article, I'll go through how we've come to adopt the term "NFTs" and how the semantics of "non-fungibility" and "tokenness" are shaping the debates in the Historical NFT community today.

Before we go into the technicals, let's look at what NFTs enable that cannot be enabled otherwise.

## What's So Significant About an NFT

What have NFTs specifically brought to the digital art scene (or to the digital collectibles scene)?

Digital art has been around for a while. But they never attracted collectors at large, at least not the way NFTs did. Beyond digital art, even cryptographic artworks were around for a while.

I'll go one step further.

In 2011, someone put messages on the Bitcoin blockchain and created ASCII art with those messages. This was a tribute to early Bitcoin dev Len Sassaman who had recently died. It contained two ASCII images, one of Len Sassaman and one of Ben Bernanke, the Chairman of the United States Federal Reserve at the time.

Case 1:22-cv-00881-JLC   Document 66-1   Filed 08/16/22   Page 12 of 17

Page 2
Defining "NFT" in historical context — Chainleft
https://mirror.xyz/chainleft.eth/MzPWiIsnsC9mQBxdLs-R29oF4iwCgICllacrva6i9KJko
August 15, 2022 at 15:57 EST

BitLen ASCII

"BitLen ASCII" is a remarkable artwork in blockchain history that will forever be remembered. It beautifully resides on the blockchain for everyone to see. But we are back to the original question: Why are NFTs more popular than blockchain entry artworks?

Let's finally answer it: With NFTs, digital artworks became "OWNABLE". While "BitLen ASCII" was significant, it wasn't ownable. The philosophy of ownership deserves its own article but the fact is, blockchains for the first time allowed decentralized ownership of digital collectibles. The stark differences from "corporation-issued collectibles" such as Beanie Babies or Pokemon Cards made NFTs (or decentralized digital collectibles, or blockchain collectibles) a huge deal for collectors. This, in return, helped more digital artists and creators onboard into NFTs. This is why NFT historians tend to consider this decentralized collectibility as the main characteristic that started the movement.



> 6529  @punk6529
>
> **If you don't like NFTs, in which company's database do you recommend we store our digital objects?**
>
> 4:59 PM · Mar 21, 2022 · Twitter Web App
>
> 383 Retweets   67 Quote Tweets   2,798 Likes

https://twitter.com/punk6529/status/1505937266762466533

This is also why -for better or worse- the concept of "token" was brought up.

"Token" is an abstract term. Tokens do not physically exist. It's a shorthand way to call the 1s and 0s of the software that determines an ownable asset. "The owned asset" is represented by the "token".

Join tokens with humans' innate desire to own unique things, we ended up having non-fungible tokens, or NFTs. And so the infighting began...

## Debates

### Semi-fungibility

If you join discord servers of some projects, you will see people objecting to significant collectibles (such as Rare Pepes, Curio Cards, or JakNFT editions) being called "NFTs" because they are semi-fungible.

Of course, these assets are still different from completely fungible tokens, as they are non-fungible within a collection. But it is also true that different editions of the same token can be exchanged without losing any value.



Collection

Assets are fungible within the same editioned group

But non-fungible within the collection

Semi-fungible tokens

If we would not be stuck with the term "NFTs", all of these would probably be called "Decentralized Digital Collectibles". But since we are stuck with the term "NFTs", it makes more sense to focus on NFTs' spirit, i.e. what NFTs brought to the collectors and art scene.

Technical terms aside, these artworks certainly represent the blockchain revolution's benefits to artists and collectors; because they are "ownable collectibles whose ownership can be verified in a decentralized way". This is why I think it's fair to call them NFTs.

Disclaimer: As of this writing, I own three semi-fungible tokens in my collection of 80+ NFTs.

### Collectibility

There are also fully-fungible tokens that claim an "NFT" status. They are interchangeable amongst themselves equally, and they are not part of a collection. Critics argue that since they are fully fungible tokens, they do not deserve the NFT status.

Definitions get blurry here. Technically these are fully fungible tokens, and critics are right that some of them are created for fully fungible purposes. On the other hand, some of these tokens still have collectibility value, and they are on decentralized networks. So the question then becomes, "what is a collectible?"

Page 3
Defining "NFT" in historical context — Chainleft
https://mirror.xyz/chainleft.eth/MzPWihsnsC9mQBxlLn-N29oF4iwCgX3IacrvaG9KJko
August 15, 2022 at 15:57 EST

Defining "collectible" is a speculative attempt, so I will only write my observations of other collectors.

People seem to attach a "collectibility value" to the scarce assets that either had some collectibility intention when issued or were a milestone in the NFT timeline.

One such example is the JOLLYROGER on Dogearchy, from 2014. It is a Dogearchy token with an image attached to it at issuance. It's not part of a collection and each token is fully fungible within the JOLLYROGER; but due to having an image attached at issuance, it displays colectability intention during its creation.

But what if there was no image attached?

- Prominent blockchain artist Rhea Myers created MYSOUL in 2014 as a conceptual art piece. She is not selling this piece, but it was an ownable & tradable art, and this makes it a collectible (even when we cannot collect it).

- NLIcoins on Counterparty was issued with prescribed artistic intentions despite not having an image attached. The early timestamp and the fact that it was a declared art project so long ago make the project significant.

- Also on Counterparty are XCPinata assets which were too issued with artistic intentions. Even though the actual images were attached in 2021, the original intentions make this project a significant collectible.

Sometimes an asset becomes a collectible retroactively, even if it was not intended that way originally. TEST token on Counterparty (2014) is the first Counterparty token and has a supply of 400. Due to its nature of being the first on a chain that gave birth to the crypto art movement (Rare Pepes) and due to its scarcity, it seems to have a collectible status for collectors.

One could also argue Bitcoins mined in early blocks could have a "collectible" status. These coins were explicitly created for monetary reasons, they do not have images and they are not scarce at large. Also, the only thing that makes them unique is their UTXOs which are forced to burn when transferred. Perhaps the uniqueness and therefore collectible value of these coins can be excavated when the events on the chain are tracked to their source. Casey Rodarmor is currently working on a scheme called ordinals, where satoshis are numbered and tracked across transactions. Time will tell how early ordinals are viewed by collectors.

| Asset | JOLLYROGER | MYSOUL | XCPINATA | TEST | Early Satoshis |
|---|---|---|---|---|---|
| Chain | Dogearchy | Counterparty | Counterparty | Counterparty | Bitcoin |
| Year | 2014 | 2014 | 2015 | 2014 | 2009 |
| Fungibility | Fully fungible | Fully fungible | Semi-fungible | Fully fungible | Fully fungible |
| Supply | 550 | 100 | 10-300 | 400 | High / open-to-debate |
| Image at issuance | Yes | No | No | No | No |
| Purpose | Collectible | Art | Art | Testing | Financial transactions |
| Decentralized | Yes | Yes | Yes | Yes | Yes |
| Ownable | Yes | Yes | Yes | Yes | Yes |

Some fungible and semi-fungible tokens with collectibility claim

Disclaimer: As of this writing, I don't own any fungible collectibles in my collection of 80+ NFTs.

## Namecoin NFTs

Debate on Namecoin NFTs focuses on another aspect of non-fungible tokens: The token.

Namecoin NFTs are the first NFTs. Minted on April 21st, 2011; the simple text "d/bitcoin" domain name became the first NFT.

Namecoin assets are non-fungible and they are ownable, transferable tokens. There is no debate on this definition specifically. Vitalik Buterin, the founder of Ethereum, referred to Namecoin NFTs on the first page of the Ethereum whitepaper (he used the term "non-fungible assets" but bear in mind that the term "NFT" was only adopted in 2017).

The fact that Namecoin NFTs are the first NFTs is largely accepted. The bigger debate is about their expiration. Yes, Namecoin domains expire after ~9 months if the owner does not renew them.

Some argue that if you have to renew your NFT, this feels like renting and does not represent real ownership which is what web3 is about.

This analogy would be false, as Namecoin NFTs provide the owner with complete ownership. Unlike renting, the decision to continue the ownership solely relies on the owners themselves. The renewal is akin to paying an extremely low infrastructure tax to the miners for the maintenance of the network (not unlike the tax you pay for the house you own, which would be taken away from you if you don't pay it). As of this writing, 50 years of renewals cost ~$1.

But the bigger question on Namecoin NFTs is about provenance because there is an ongoing debate about the age of Namecoin NFTs that expired and then got re-registered (To be clear, there are Namecoin NFTs from 2011 that never expired. This debate does not apply to them).

## Namecoin NFT Provenance - Technical

*What happens to Namecoin domains when the domain name ownership expires and gets re-registered after a while?*

Namecoin is designed around domain names, but when a domain name gets registered the first time, it is represented by a particular identifier (UTXO design) to allow its trading. The chain of these identifiers (UTXOs) can be considered a special coin, which we will call a **colored coin** in this article. Rhea Myers extensively wrote about



Page 4
Defining "NFT" in historical context — Chainleft
https://mirror.xyz/chainleft.eth/MzPWliseoC9mQfb8Lo-N29oF4iwCgX3Iacrva69Kjko
August 15, 2022 at 15:57 EST

Namecoin's UTXO design here.

When a Namecoin domain expires, the colored coin becomes unspendable. In practice, it can be called "burnt", because when the domain name is re-registered later, a new UTXO chain starts. This would mean that when a domain name expires, the chain of events where that domain was represented breaks. During the re-registration, the Namecoin protocol does not make a distinction between a never-used domain name and a previously expired domain name. This fact may support the argument that the expiration is philosophically burning the original token.

On the other hand, as mentioned before, Namecoin is designed around domain names. Domain names are unique themselves and the history of the unique domain name, previous updates and transactions remain on-chain, as is the case with blockchains.

The aforementioned "UTXO chains" are actually formed of individual UTXO stations. Each UTXO has an address and domain names are attached to these UTXOs. When Bob makes a standard domain name transfer to Alice, a 0.01NMC is burnt on Bob's side where the domain name is attached, and a new 0.01NMC is created on Alice's side where the domain name is attached. The thing that physically (for lack of a better term) moves from one address to another during a typical transfer is the domain name, not UTXOs. The design choice of a typical domain name transfer supports the argument that the domain name is the unique identifier and the token, and it never burns even after expiration.

This domain-first design can be seen not only in block explorers but also in functions to utilize the domain names. There's a built-in RPC method since the beginning of Namecoin called name_show which returns the information about the domain name even during the expired period. This function does not return anything for never-registered domains.



name_show function

In fact, an expired domain can still be functional. When expired, Namecoin Core will still have the name and return its local state with name_show (just indicating the expired status). If the resolver setup accepts it, the domain will still work. Similarly, expired "id" names in Namecoin still work as logins, which indicates the usefulness of the name_show function.

Another built-in RCP method since the early days is name_history. This function allows pulling all the metadata and history of a domain name. The existence of this function also indicates the intentions behind Namecoin design: The domain name's history will always come with the domain name itself, so the domain name itself has a provenance.

As mentioned in the introduction of this article, "token" is an abstract term. In Namecoin's context, it is better to offer all interpretations of the terms "token" and "asset".

The lifetime of a Namecoin domain name. Note that this image is a summary representation. In reality, this data is stored in transactions.

Interpretation 1: "The token is the colored coin, and that is the asset. Domain names may be unique but they are cryptographically represented by tokens. Since a newly registered domain name is assigned to an entirely new colored coin, the provenance from the earlier UTXO chain is broken, therefore this is a new asset and cannot claim historical value."

Interpretation 2: "The token is the domain name and that is the asset. Namecoin is designed around domain names where domain names are the main unique identifiers. This is supported by the technical design when you do a typical domain name transfer. Further, when the domain name expires, the data of the name remains on the blockchain. If the blockchain is designed around names, when the domain name is re-registered you are simply reactivating the old token, therefore provenance is not broken."

Case 1:22-cv-00881-JLC   Document 66-1   Filed 08/16/22   Page 15 of 17

Page 5.
Defining "NFT" in historical context — Chainleft
https://mirror.xyz/chainleft.eth/MzPW8xmsC9mQfbiLn-R29oF4iwCgX3lacrva69KJko
August 15, 2022 at 15:57 EST

**Interpretation 3:** "The token is the colored coin because it is a cryptographic representation of the domain name. But the main collectible asset is the domain name itself because Namecoin is designed around domain names as unique identifiers. This is further proven by the existence of name_show and name_history RPC methods. Therefore when the domain name is re-registered, the new colored coin (UTXO chain) can be assumed as a new NFT, but it represents the old decentralized collectible asset which was intact and ownable since its birth."

This third interpretation separates the record into multiple parts:

- Cryptographic token
- Cryptographic asset
- Off-chain asset (For the cases when there is a reference to an external asset, such as Twitter Eggs, Blockheads, Quantum, etc.. Does not exist for Punycodes, Damselfly, Identities, Bit Domains)

According to Interpretation #3, if "NFT" is a cryptographic receipt of ownership, then re-registered Namecoin NFTs are "new" receipts of ownership for the "old" blockchain assets. If you recently re-registered a Namecoin name; you minted a new token to own an old asset. Not a tribute, not a replica; but the actual, old, collectible asset.

**Disclaimer:** As of this writing, I own 11 Namecoin assets in my collection of 80+ NFTs. Those who like collecting Namecoin NFTs mostly accept Interpretation #2, and those who disagree mostly accept Interpretation #1. I am more inclined towards Interpretation #3. It fits my understanding of "unique identifiers" for objects in data tables (I'm a data scientist IRL) and how the history of a Namecoin name is determined. To be clear, this interpretation is not in favor of my assets if I want to strictly call them "old NFTs", but it is in favor of my assets if I am happy to call them "old blockchain collectibles".

The argument made in this article is that **meanings matter, not the terms.** For collectors and decentralization enthusiasts, what matters is "owning collectible things in a decentralized way". An expired Namecoin domain (ignoring token or asset definitions for a second) physically exists on a decentralized blockchain at least as historical data with its own provenance, even when expired. That data can be owned in a decentralized way. This is what makes it a decentralized collectible.

Part of the debate specifically arises from the term "non-fungible token" itself, which should not limit us if we are aware of the point of NFTs.



Someone who understands the point of NFTs in 2013

The focus so far has been technical, but there is more at play when we start considering the ethical, philosophical, and legal angles. These angles are more subjective but they are worth talking about.

**Namecoin NFT Provenance - Ethical & Philosophical**

2021 NFT bull run convinced a lot of web3 participants that web3 is a paradigm shift, and ownership philosophy will never be the same. Proponents of this view are strictly pro-CC0, accept the blockchain as the ultimate source of truth, and care much less about the arguments outside the blockchain (even legal arguments).

Critics of this view argue that blockchains can bring a lot of value to creators and collectors but physical, ethical, and universal truths cannot be ignored.

The conflict between Larva Labs vs v1Punks reflects these two distinct opinions. Larva Labs as the original creator of the CryptoPunks had long argued that the buggy v1 contract did not represent their genuine artworks (artist declaration & intention), while v1Punks owners argued that blockchain timestamp reflected that v1s are the original punks.

A similar debate is occurring for Namecoin NFTs too, but it gets even more philosophical for Namecoin art NFTs.



https://twitter.com/rheaplex/status/1537887270074971649

Ignoring blockchain technicals; if an artwork is created on Namecoin by a creator, then expires, and then gets re-registered by the same artist, philosophically speaking the provenance remains.

15 August 2022, 15:57:10

Page 6:
Defining "NFT" in historical context — Chainleft
https://mirror.xyz/chainleft.eth/MzPWlIxsssC9mQBsli.o-R29oF4iwCgICIlac1va69IGjko
August 15, 2022 at 15:57 EST

This is fairly agreed on; but what if an artwork is created on Namecoin by a creator, then expires, and then gets re-registered by someone else? Here the camps are again split with different interpretations.

**Interpretation 1 arguments:**

- Philosophically, the link between the artist's hand and the work is broken, therefore the re-registration by another person cannot claim philosophical provenance.
- It is unethical to squat someone else's work and sell it.

**Interpretation 2 arguments:**

- Namecoin provides 100% ownership and it is up to the owner to prolong the ownership or not. Philosophically, if the artist does not prolong their ownership, they are making a conscious decision to leave their artwork in public for anyone to claim.
- If the claimers did the marketing around the work and increased its recognition, it is ethical for them to benefit financially.

It gets more complicated when the artwork is not on-chain like Punycodes or Damselfly but instead linked to a file in an external server where the original creator has the control. Because in this case, we are already taking off-chain information into account. What is the asset? Is it the off-chain file, is it the domain name to which the link is attached, or is it the colored coin that corresponds to the domain name?

The philosophical and legal side of the debate turned into a lawsuit for Kevin McCoy's Quantum where there are even more interpretations than the ones outlined above. The wording used in the initial minted NFT and the sale of the Quantum re-minted on Ethereum make this specific debate even more complex. Due to this complexity and lack of legal knowledge on my part, I will not go into further details on Quantum in this article.

**Compromise on Ethical Provenance?**

Perhaps there is a way to achieve ethical provenance. Recently Punycodes community (a fairly large one thanks to the fair distribution during rediscovery) was able to find the original creator of 968 Punycodes. The creator was a known artist, **hallucipixie**, who had also created (or contributed to) 15 Rare Pepes, 12 Mafia Wars, 7 Bitcorns, and 19 Kaleidoscopes in the past. Punycodes community rallied around the artist and gave him a warm welcome. Punycodes DAO immediately made halucipixie a DAO member (membership cost ~1E at the time), gifted multiple Punycodes from DAO wallet, and committed to assigning a substantial part of the royalties when Punycodes own vault contract would go live on Ethereum (this is dependent on the development work of a 3rd party service called Emblem Vault). Meanwhile, hallucipixie expressed happiness that his work found a new life with a large community.

Following this feel-good story, Punycodes announced a manifesto:

*If an original creator of a historical Punycode ever proves that they're the original creator via the wallet verification message process, Punycodes DAO commits to doing its best to ensure that the original creator receives value. An example of this could be to receive a substantial part of the royalties forever if & when Emblem Vault launches individual contracts for historical collections. Another example could be gifting Punycode assets to the original creator from the DAO wallet, as per the DAO vote (depending on the creator's contribution to the collection).*

Similar manifesto announcements are being planned by other Namecoin communities too. Perhaps by combining the works of the original creators and marketing efforts of the larger communities, Namecoin NFTs can find peace from an ethical and philosophical perspective too.

**Collectible Value**

The final debate in the historical NFT space seems to be around how much historical NFTs "should be valued". This is often financially motivated, speculative, and subjective, so I prefer not to get into the details. Here I will list some fundamentals and metrics people seem to prioritize (while not necessarily corresponding to financial value):

- **Timestamp:** The unchangeable, objective data on the blockchain.
- **Scarcity:** The number of assets within a collection or an edition.
- **Creativity:** Artistic and conceptual intentions.
- **Technical achievements:** Technical efforts that push the boundaries of the NFT space.
- **Blockchain they're minted on:** For NFTs that require interoperability and composability (such as gaming NFTs), the chain an NFT is minted on can be critical. This is less relevant for historical NFTs but decentralization still matters, as long as maximalism does not blind us. It is important to note that we have seen several examples of significant NFTs making chains more mainstream and relevant, so perhaps the significance of the NFT itself may be much more important than the chain it's minted on.

## Conclusion

Debates of semi-fungibility, collectibility, or ownership expiration are less meaningful and more semantic, considering how arbitrarily we landed on the term "NFTs". As mentioned in the first section of this article, the spirit of the entire NFT movement is "**decentralized collectibility**". As long as a collectible asset satisfies the criteria of "being ownable in a decentralized way", they qualify and contribute to the NFT movement.

Case 1:22-cv-00881-JLC   Document 66-1   Filed 08/16/22   Page 17 of 17



JA-289



FALCON
RAPPAPORT &
BERKMAN PLLC

August 15, 2022

***VIA CM/ECF***

Hon. James L. Cott
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Room 1360
New York, NY 10007-1312

    ***Re:***   ***Plaintiff Free Holdings Inc. Opposition to Defendants' Motion to Dismiss the
Amended Complaint in Free Holdings Inc. v. McCoy, et al., 1:22-cv-00881-JLC***

Dear Judge Cott:

    We represent Free Holdings Inc. in the above-referenced action.    Pursuant to your
Honor's Individual Rules and Practices, Rule II. H, Free Holdings respectfully requests oral
argument in support of its Opposition to Defendants' Motions to Dismiss.

                    Sincerely,

                    **FALCON RAPPAPORT & BERKMAN PLLC**

                    */s/ Moish E. Peltz*

                    **by: Moish E. Peltz, Esq.**
                    Moish E. Peltz, Esq.
                    Falcon Rappaport & Berkman PLLC
                    1185 Avenue of the Americas, Third Floor
                    New York, New York 10036
                    T: (212) 203-3255 x10124
                    mpeltz@frblaw.com

cc:    All Counsel of Record (via ECF)

1185 AVENUE OF THE AMERICAS | FLOOR 3
NEW YORK, NEW YORK 10036
P: (212) 203-3255 F: (212) 203-3215

265 SUNRISE HIGHWAY | SUITE 50
ROCKVILLE CENTRE, NEW YORK 11570
P: (516) 599-0888 F: (516) 599-0889

JA-290

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FREE HOLDINGS INC., <br><br> *Plaintiff,* <br><br> -against- <br><br> KEVIN McCOY and SOTHEBY'S INC., <br><br> *Defendants.* | ECF CASE <br><br> Case No.: 1:22-cv-00881-JLC |

## DEFENDANT SOTHEBY'S INC.'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

Theresa M. House
Marcus A. Asner
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
T: +1 212.836.8000
F: +1 212.836.8689
Theresa.House@arnoldporter.com
Marcus.Asner@arnoldporter.com

Evan M. Rothstein (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2569
T: +1 303.863.2308
F: +1 303.863.1000
Evan.Rothstein@arnoldporter.com

*Attorneys for Defendant Sotheby's Inc.*

JA-291

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

I.   THE FIRST AMENDMENT COUNSELS CAREFUL GATEKEEPING
     AT THE PLEADINGS STAGE ....................................................................... 1

II.  PLAINTIFF ADMITS THAT THE WORDS AT ISSUE IN THE
     CHALLENGED STATEMENTS ARE AMBIGUOUS AND
     UNSETTLED, AND MISCONSTRUES BLACK LETTER LAW
     ON OPINION ................................................................................................. 2

III. PLAINTIFF ARGUES THE WRONG STANDARD FOR FALSITY,
     AND ADMITS FACTUAL PREDICATES ..................................................... 7

IV.  PLAINTIFF'S ACTUAL MALICE ALLEGATIONS DO NOT SURVIVE
     PLAUSIBILITY SCRUTINY ........................................................................ 8

V.   PLAINTIFF CANNOT MAINTAIN ITS UNJUST ENRICHMENT CLAIM ... 9

VI.  PLAINTIFF FAILS TO ALLEGE A "CONCRETE AND SUBSTANTIAL"
     CONTROVERSY, AS REQUIRED ................................................................ 10

CONCLUSION ..................................................................................................... 10

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld,*
   80 N.Y.2d 130 (1992) ................................................................................5

*Ackerman v. Coca-Cola Co.,*
   No. CV-09-0395 (JG), 2010 WL 2925955 (E.D.N.Y. July 21, 2010) ....................7

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders*
   *Ass'n, Inc.,*
   796 F. Supp. 2d 458 (S.D.N.Y. 2011) .............................................................1

*Bensch v. Est. of Umar,*
   2 F.4th 70 (2d Cir. 2021) ...........................................................................2

*Bilinski v. Keith Haring Found., Inc.,*
   96 F. Supp. 3d 35 (S.D.N.Y. 2015) ...........................................................2, 9

*Brian v. Richardson,*
   87 N.Y.2d 46 (1995) ..........................................................................4, 5, 6

*Burton v. iYogi, Inc.,*
   No. 13-CV-6926 DAB, 2015 WL 4385665 (S.D.N.Y. Mar 16, 2015) ....................5

*In re Columbia Tuition Refund Action,*
   523 F. Supp. 3d 414 (S.D.N.Y. 2021) ..........................................................10

*Corsello v. Verizon New York, Inc.,*
   18 N.Y.3d 777 (2012) .............................................................................10

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.,*
   551 F. Supp. 3d 320 (S.D.N.Y. 2021) ...........................................................1

*Ganske v. Mensch,*
   480 F. Supp. 3d 542 (S.D.N.Y. 2020) ...........................................................3

*Georgia Malone & Co. v. Rieder,*
   19 N.Y.3d 511 (2012) ..............................................................................9

*Gross v. New York Times Co.,*
   82 N.Y.2d 146 (1993) ...........................................................................5, 7

*Hengjun Chao v. Mount Sinai Hosp.,*
   476 F. App'x 892 (2d Cir. 2012) ...............................................................10

*Immuno AG. v. Moor-Jankowski,*
    77 N.Y.2d 235 (1991) ................................................................................4, 5, 6, 7

*Jacobus v. Trump,*
    55 Misc. 3d 470 (Sup. Ct., N.Y. Cnty. 2017) ....................................................4, 5

*James v. Gannett Co.,*
    40 N.Y.2d 415 (1976) ...............................................................................................4

*Kipper v. NYP Holdings Co.,*
    12 N.Y.3d 348 (2009) ...............................................................................................8

*Mann v. Abel,*
    10 N.Y.3d 271 (2008) ...............................................................................................3

*McDougal v. Fox News Network, LLC,*
    489 F. Supp. 3d 174 (S.D.N.Y. 2020).....................................................................3

*McKesson v. Pirro,*
    No. 160992/2017, 2019 WL 1330910 (Sup. Ct., N.Y. Cnty. Mar. 25, 2019) ...........3

*Rakofsky v. Washington Post,*
    39 Misc. 3d 1226(A) (Sup. Ct., N.Y. Cnty. 2013)...................................................7

*Sandals Resorts Int'l Ltd. v. Google, Inc.,*
    86 A.D.3d 32 (1st Dep't 2011) ................................................................................7

*Silverman v. Daily News, L.P.,*
    129 A.D.3d 1054 (2d Dep't 2015) ...........................................................................7

*Smartmatic USA Corp. v. Fox Corp.,*
    No. 151136/2021, 2022 WL 685407 (Sup. Ct., N.Y. Cnty. Mar. 8, 2022) ..............9

*Soter Techs., LLC v. IP Video Corp.,*
    523 F. Supp. 3d 389 (S.D.N.Y. 2021)....................................................................2

*Steinhilber v. Alphonse,*
    68 N.Y.2d 283 (1984) ...............................................................................................7

*Suozzi v. Parente,*
    202 A.D.2d 94 (1st Dep't 1994) ..............................................................................9

*Themed Restaurants, Inc. v. Zagat Surv., LLC,*
    21 A.D.3d 826 (1st Dep't 2005) ..............................................................................2

*U.S. Dep't of Treasury v. Off. Comm. of Unsecured Creditors of Motors*
    *Liquidation Co.,*
    475 B.R. 347 (S.D.N.Y. 2012)...............................................................................10

*Valley Electronics AG v. Polis*,
    No. 21-2108-cv, 2022 WL 893674 (2d. Cir. Mar. 28, 2022)....................................................6

Defendant Sotheby's[1] submits this reply in further support of its Motion to Dismiss and the McCoy Motion, and joins, adopts, and incorporates the reply by Defendant McCoy.

## PRELIMINARY STATEMENT

This case presents the precise slander of title/product disparagement case against which the First Amendment and the New York Constitution strongly guard. Plaintiff's Opposition ("Opp.") both distorts the factual allegations in the FAC and ignores controlling law. When the statements at issue are viewed in proper context, including by considering the materials Plaintiff itself submitted, and then juxtaposed against applicable legal guidance, the claims fail. The unjust enrichment and declaratory judgment claims likewise do not survive even the most liberal pleading standards, because Plaintiff did not plead any nexus with Sotheby's regarding the challenged conduct, nor any actual dispute between the parties. The FAC should be dismissed with prejudice.

### I.    The First Amendment Counsels Careful Gatekeeping at the Pleadings Stage

Plaintiff's claims directly implicate Sotheby's free speech rights to participate in public debate. Because a lawsuit "may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *See, e.g.*, *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 325-26 (S.D.N.Y. 2021), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, No. 21-2068-CV, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) (citation omitted). These principles warrant gatekeeping for slander of title/product disparagement claims, which are held to an even higher degree of proof than traditional defamation claims and are routinely dismissed at the pleadings stage. *See, e.g.*, *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 796 F. Supp. 2d 458, 471 (S.D.N.Y. 2011) (dismissing trade libel claim

---

[1] Defined terms used herein have the same meaning as those used in the Opening Brief ("Br.").

because statements were "non-actionable statements of opinion"); *Themed Restaurants, Inc. v. Zagat Surv., LLC*, 21 A.D.3d 826, 827 (1st Dep't 2005) (same); *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 51 (S.D.N.Y. 2015) (same); *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 411 (S.D.N.Y. 2021) (dismissing product disparagement claim).[2]

## II.    Plaintiff Admits that the Words at Issue in the Challenged Statements Are Ambiguous and Unsettled, and Misconstrues Black Letter Law on Opinion

Plaintiff does not offer any meaningful argument against Sotheby's showing that the Challenged Statements are protected opinion.  Indeed, Plaintiff confirms several key components.

First, Plaintiff confirms that the Challenged Statements' references to "effectively burned," "removed" and "preserved" are not clearly defined[3]; i.e., that they are too loose, imprecise, and ambiguous in meaning to qualify as statements of fact.  In opposing the McCoy Motion, Plaintiff admits that "this very issue—defining the legal import of control of digital assets on the Namecoin blockchain—**is the subject of differing opinions**," and even goes so far as to characterize the dispute before the Court as involving "**emerging vocabulary**."  (ECF #66, at 1, 8.)

Plaintiff also cites and puts before the Court an article titled "Defining 'NFT' in Historical Context" (the "Defining NFT Article"), which eviscerates its own case.  (ECF #66 at 8, n.5; ECF #66-1.)  The central thesis of the Defining NFT Article is that NFT terminology is ambiguous:

> NFT is a weird three-letter acronym. Even the people who are involved in NFTs are not exactly sure how to define an NFT. No wonder the normie world is confused. Expanding the acronym just makes things worse: Non-Fungible Token is still ambiguous.

(ECF #66-1 at 11 (emphases added).)  But the Defining NFT Article does not stop there.  It further discusses exact terms that Plaintiff puts at issue—that is, "expire" and "burn"—in the specific

---

[2] Plaintiff urges the Court to apply the "no set of facts" standard to this Rule 12 motion, but this is the wrong standard.  *See, e.g.*, *Bensch v. Est. of Umar*, 2 F.4th 70, 78-79 (2d Cir. 2021) (explaining that the Supreme Court in *Twombly* and *Iqbal* abrogated the "no set of facts" standard and replaced it with the "plausibility" standard).

[3] Plaintiff repeatedly claims that the Challenged Statements are false because they state that the Namecoin-*Quantum* does not "exist."  (Opp. 5, 8-17.)  None of the Challenged Statements make that claim, nor does the Auction Listing.

JA-297

context of NFTs on the Namecoin blockchain.  When answering the question, "*What happens to Namecoin domains when the domain name ownership **expires** and gets re-registered*," it states:

> When a Namecoin domain expires, the colored coin becomes unspendable. In practice it can be called "burnt", because when the domain name is re-registered later, a new UTXO chain starts. This would mean that when a domain name expires, the chain of events where that domain was represented breaks. During the re-registration, the Namecoin protocol does not make a distinction between a never-used domain name and a previously expired domain name. This fact may support the argument that the expiration is philosophically burning the original token.
>
> Ignoring blockchain technicals; if an artwork is created on Namecoin by a creator, then expires, and then gets re-registered by the same artist, philosophically speaking the provenance remains.

(*Id.* at 13-14 (same).)  It further describes a debate over provenance of expired Namecoin assets:

> This is fairly agreed on; but what if an artwork is created on Namecoin by a creator, then expires, and then gets re-registered by *someone else*? Here the camps are again split with different interpretations.

(*Id.* at 16 (same).)  Thus, based on Plaintiff's own submissions,[4] it is clear that, in context, the terms "expire" and "burn" are ambiguous, with ill-defined and competing definitions, and the subject of ongoing  "philosophical[]" debate and "emerging vocabulary."

Yet, Plaintiff inexplicably ignores its own authorities by pointing to "the words of the purchaser and contemporaneous media reports" which purportedly "demonstrate that these statements were broadly understood by the public as incorrect fact, not non-libelous opinion." (Opp. 5.)  But it is *this Court* that decides the meaning of the Challenged Statements.  *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008) (whether statement is "an opinion or an objective fact is a question of law"); *McKesson v. Pirro*, No. 160992/2017, 2019 WL 1330910, at *12 (Sup. Ct., N.Y. Cnty. Mar. 25, 2019) (statements are opinion as a matter of law; rejecting "argument that

---

[4] Plaintiff is wrong that publicly available materials that illustrate the context of the Challenged Statements cannot be considered.  *See, e.g., Ganske v. Mensch*, 480 F. Supp. 3d 542 (S.D.N.Y. 2020); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 183-84 (S.D.N.Y. 2020).

numerous media articles 'understood [the] statements as defamatory'" as "unavailing"); *Jacobus v. Trump*, 55 Misc. 3d 470, 484 (Sup. Ct., N.Y. Cnty.) ("[T]hat others may infer a defamatory meaning from the statements does not render the inference reasonable under these circumstances."), *aff'd*, 156 A.D.3d 452 (1st Dep't 2017).

In addressing the statements' immediate context, Plaintiff focuses on the Auction Listing having three subheadings, but this argument is misplaced.  (Opp. 5-6.)  The Challenged Statements come from all three sections of the Auction Listing.  (*See* Br. 4 (First Challenged Statement in Condition Report; Second Challenged Statement in video posted in Catalogue Note; and Third Challenged Statement in Description).)  Further, Plaintiff asks the Court to slice and dice the Auction Listing, but the cases make plain that the publication must be read in full.  *E.g., Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) (courts "begin[] by looking at the content of the whole communication, its tone and apparent purpose").  Plaintiff's attempt to dissect, for example, the Condition Report to read it in isolation from the other sections of the Auction Listing is contrary to the law.  *Id.*; *James v. Gannett Co.*, 40 N.Y.2d 415, 419 (1976) ("[T]he court will not pick out and isolate particular phrases but will consider the publication as a whole.").

But Plaintiff engages in exactly this kind of selective reading.  In addition to reading each subheading in a vacuum, Plaintiff points to individual statements about "storage security" and the like to argue that, because the Auction Listing contains other statements that are "factual in nature," the Challenged Statements also must be regarded as fact statements.  (Opp. 7.)  This approach is widely and expressly rejected.  *E.g.*, *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995) ("[R]ather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis 'whether the reasonable reader would have believed that the challenged statements were

**JA-299**

conveying facts…'"); *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 145 (1992); *Jacobus*, 55 Misc. 3d at 484 (dismissing where "a reasonable reader would recognize" statements "as opinion, even if some of the statements, viewed in isolation, could be found to convey facts").

Plaintiff also argues that the fact Sotheby's included content from "an NFT consultant and specialist" (in the Condition Report section of the Auction Listing) belies the law's strong protections for statements of opinion.  Statements by experts are commonly regarded as opinion, particularly where (as here) the opinion is being offered by a party expressing a point of view in a debate.  Both *Immuno* and *Brian*, for example, involved statements offered by experts who expressed protected opinions.  *Immuno*, 77 N.Y.2d at 240 (statements by professor in a medical journal); *Brian*, 87 N.Y.2d at 53 (statements by attorney involved in case).

Plaintiff's citations to *Burton v. iYogi, Inc.*, No. 13-CV-6926 DAB, 2015 WL 4385665 (S.D.N.Y. Mar 16, 2015), and *Gross v. New York Times Co.*, 82 N.Y.2d 146 (1993), to avoid *Immuno* and *Brian* are unavailing.  *iYogi* involved fraudulent inducement, which does not receive the same free speech protections.  *See iYogi*, 2015 WL 4385665, at *8.  Further, the plaintiff there alleged that the defendant's *statement that it offers "expert" advice* was false, because whether defendants "provides the services it claims … can be proven true or false."  *Id.*  But whether defendant's employees were accurately described as "tech experts" has no application here, where the *opinions* are alleged to be factual *because they are offered by an expert*.  In *Gross*, the court found that a reader would not understand the statements as "rhetorical flourish" or part of a "debate," because the publication appeared to be the product of "thorough investigation" and did not appear in the "editorial" sections.  *Gross*, 82 N.Y.2d at 155-56.  The Challenged Statements here were published in an Auction Listing, which was legion with hyperbole and flourish[5] and had

---

[5] Indeed, Plaintiff admits that certain statements "lend a qualitative, *opinion-based* character to the Catalogue Note …" (*See, e.g.*, Opp. at 7-8 (emphasis added).)

5

**JA-300**

an *express disclaimer* that the statements were "opinion." (Rothstein Decl., Ex. B, at 4.)

For this same reason, Plaintiff's further attempts to distinguish *Immuno* and *Brian* by arguing the Auction Listing is not a "letter to the editor" or an "Op Ed" article, are groundless – the Auction Listing's express disclaimer, particularly when combined with its overall context, tenor, and impression easily places it within the same ambit as similar editorial content. (Opp. 8.) Nor does Plaintiff offer any argument to rebut Sotheby's showing that the Challenged Statements were (as Plaintiff concedes) offered in the course of a public debate about the meaning of NFT terminology and expired Namecoin records, which further shows that the Challenged Statements are opinion. *See, e.g., Valley Electronics AG v. Polis*, No. 21-2108-cv, 2022 WL 893674, *2 (2d. Cir. Mar. 28, 2022) (statements by expert understood as opinion, despite touting of "her scientific credentials," where offered as part of debate and readers are "put on alert that she is sharing her opinions by the statement at the top of the webpage").

Plaintiff also attempts to evade the doctrine of "pure opinion," by contending that Sotheby's disclosures that "the Quantum artwork originally had been minted on Namecoin" and the "data associated with that Namecoin entry had been 'preserved' and included in the Ethereum entry" are allegedly false. (Opp. 13.) Plaintiff argues that these statements are false because "the Namecoin-Quantum is extant on the Namecoin blockchain, and *requires no preservation*," claiming "[t]he process detailed by Defendant [Sotheby's] is *more properly characterized* as the creation of a reproduction of *Quantum* on the Ethereum blockchain, not the preservation of a now invalid or obsolete asset." (*Id.* (emphasis added.)) But the Namecoin data *was* included in the Ethereum entry; Plaintiff only quibbles with describing that fact as "preserv[ing]" that data. This wordsmithing merely reflects Plaintiff's differing view on the conclusion to be drawn – the hallmark of pure opinion.

6

**JA-301**

Plaintiff also argues that Sotheby's did not "fully" disclose all relevant facts because it purportedly did not acknowledge "the present existence of the Namecoin-*Quantum* or Plaintiff's re-registration, possession, and control of the same." (*Id.* at 9.)  To qualify as a pure opinion, however, the author need disclose only *the facts upon which its opinion is based* and not imply there are additional, defamatory facts that also support that opinion but which are not disclosed. *Gross*, 82 N.Y.2d at 153-54; *Silverman v. Daily News, L.P.*, 129 A.D.3d 1054, 1055 (2d Dep't 2015) (statement is nonactionable so long as there is "full disclosure *of the facts supporting [it].*" (emphasis added)).  Plaintiff does not argue that the statements implied that there were additional, *undisclosed* facts that would support its opinion.  And there is no requirement that the speaker disclose all facts that Plaintiff deems relevant to Sotheby's opinion.[6]

If Plaintiff feels that additional facts would refute Sotheby's conclusion, its solution is to take part in the debate – not to try to silence Sotheby's with a lawsuit.  *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1984) ("However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas"); *Immuno*, 77 N.Y.2d at 255 (allowing "some latitude" to express opinions "free of defamation litigation" serves the "oversight and informational values" served by protecting the "marketplace of ideas").

### III.     Plaintiff Argues the Wrong Standard for Falsity, and Admits Factual Predicates

Plaintiff's assertion that the Challenged Statements are actionable because they are "literally untrue" applies the wrong standard.  Plaintiff's reliance on *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG), 2010 WL 2925955 (E.D.N.Y. July 21, 2010) is, accordingly, inapposite.

---

[6] Sotheby's did disclose the existence of the Namecoin-*Quantum* by providing the address to the Namecoin listing. (Rothstein Decl., Ex. B ("Minted on 2nd May 2014 21:27:34, or more precisely **Namecoin Block 174923**, the NFT era quietly dawned.") (emphasis added); Opp. at 7 (screenshot with same).)  Citations to source materials by references the materials or web addresses are a recitation of supporting facts. *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 43 (1st Dep't 2011); *Rakofsky v. Washington Post*, 39 Misc. 3d 1226(A) at *12 (Sup. Ct., N.Y. Cnty. 2013).

The false advertising claim at issue in *Ackerman* concerned whether an actor made a "misleading" statement.  *Id.*  That is distinct from the First Amendment-mandated standard here, requiring Plaintiff to show that the Challenged Statements were not "substantially true."  (Br. at 17-18.)

The Challenged Statements *are* substantially true, and Plaintiff's efforts to argue otherwise contradict its own briefing and FAC.  Plaintiff asserts that "[Sotheby]'s claim that Plaintiff admits that the Namecoin-Quantum 'expired' is … incorrect," contending that Plaintiff alleged only that "*McCoy's ownership* of the Namecoin-*Quantum* blockchain record expired" and not the blockchain record itself.  (Opp. 12.)  Yet Plaintiff earlier states: "After creating Quantum, McCoy subsequently let **the Namecoin blockchain record** that housed Quantum **expire** … ."  (*Id.* at 2 (emphasis added) (citing FAC ¶¶ 39-41; *see also* ECF # 66, at 3-4.)  The FAC alleges that McCoy "let **the record for the Namecoin-*Quantum* expire** …."  (FAC ¶ 3 (emphasis added).)

Because Plaintiff's preferred wording of "expire" would have no different effect on the mind of the reader than the text of the First Challenged Statement – "[The Namecoin-Quantum entry] was removed from the system after not being renewed, and was effectively burned from the chain" – the statement is substantially true and cannot support Plaintiff's claims.  And because Plaintiff does not and cannot contest that data from the Namecoin entry was in fact copied into the Ethereum listing, it offers no serious argument that Sotheby's Second and Third Challenged Statements that data from the Namecoin entry was "preserv[ed]" are not substantially true.

## IV.   Plaintiff's Actual Malice Allegations Do Not Survive Plausibility Scrutiny

Plaintiff alleges that it presented Sotheby's with supposedly contradictory evidence and that Sotheby's "continued" to rely on the nameless report, but only *after* the Auction Listing was published.  (*See* FAC ¶¶ 76-82; Opp. 13.)  Actual malice "focus[es] upon the state of mind of the publisher of the allegedly libelous statements at the time of publication," not afterwards.  *Kipper*

*v. NYP Holdings Co.*, 12 N.Y.3d 348, 354-55 (2009).[7]  Plaintiff also claims that Sotheby's ignored the Namecoin-*Quantum* blockchain entry, but as discussed in the McCoy Motion, a legal disagreement does not show actual malice either.  (ECF #60 at 17.)

Plaintiff argues that "actual malice" can be shown where a libel defendant published "a litany of outrageous claims … so inherently improbable that it evinced a reckless disregard for the truth," citing *Smartmatic USA Corp. v. Fox Corp.*, No. 151136/2021, 2022 WL 685407 (Sup. Ct., N.Y. Cnty. Mar. 8, 2022).  There is no indication, however, that nameless's report contained any claims that appeared "inherently improbable."  In fact, Plaintiff's allegations that Sotheby's relied on nameless's research *negates* actual malice.  *See, e.g., Suozzi v. Parente*, 202 A.D.2d 94, 102 (1st Dep't 1994) ("[I]n the absence of substantial reasons to question the accuracy of their work, a good faith reliance on the activities of others cannot give rise to a finding of actual malice.").[8]

## V.     Plaintiff Cannot Maintain its Unjust Enrichment Claim

The alleged benefit to Sotheby's by "claim[ing] the identity, titles, and prestige associated with the Namecoin-*Quantum*," (Opp. 14), is too "indirect" and "hypothetical."  *See Bilinski*, 96 F. Supp. 3d at 52.  Plaintiff insists that "the question at issue [here] is not merely one of authenticity, as in *Bilinski*, but also of identity," (Opp. 15), but that makes no difference.  The *Bilinski* court found that "the alleged increase in value of [defendants'] works … is not a benefit flowing directly to the defendants at plaintiffs' expense." 96 F. Supp. 3d at 52.  The "indirect and hypothetical" nature of that benefit had nothing to do with whether the defendants challenged the authenticity or the identity of the works (if there is such a difference).  *See id.*  Plaintiff and Sotheby's "had no [alleged] dealings with each other," and the parties' alleged "relationship" is simply "too attenuated."  *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 517-18 (2012).

---

[7] Even if Plaintiff had reached out before publication, mere denials are not enough to show actual malice.  (Br. 19.)

[8] Plaintiff offers no rebuttal to Sotheby's showing that it was motivated by "perceived economic interests."  (Br. 19.)

**JA-304**

Plaintiff's unjust enrichment claim also should be dismissed as duplicative of its injurious falsehood claims. *See Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012). Nor can Plaintiff "plead" a duplicative unjust enrichment claim as an "alternative theor[y] of recovery." (Opp. 16.) *See In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 430 (S.D.N.Y. 2021); *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012).

## VI.     Plaintiff Fails to Allege a "Concrete and Substantial" Controversy, as Required

Plaintiff argues, citing no case law, that a substantial controversy exists because of alleged disputes regarding its ownership of the Namecoin-*Quantum* and the truth of Sotheby's statements. But "[t]he mere fact that there is a dispute over some question … is not dispositive"; "if it were, the Declaratory Judgment Act could be invoked to answer any and every hypothetical question." *U.S. Dep't of Treasury v. Off. Comm. of Unsecured Creditors of Motors Liquidation Co.*, 475 B.R. 347, 359 (S.D.N.Y. 2012). Sotheby's is not adverse to Plaintiff's claim to own Namecoin-*Quantum*, and any determination of the alleged "falsity" of the Ethereum-*Quantum* would not result in relief for Plaintiff against Sotheby's. Plaintiff therefore poses "abstract, hypothetical or academic question[s]" that cannot support declaratory judgment. (*See* Br. at 21-22.)

## CONCLUSION

For these reasons and those in the McCoy Reply, Sotheby's Motion should be granted.

Dated:   New York, New York
            September 1, 2022

Theresa M. House
Marcus A. Asner
250 West 55th Street
New York, NY 10019-9710
T: +1 212.836.8000
F: +1 212.836.8689
Theresa.House@arnoldporter.com
Marcus.Asner@arnoldporter.com

Respectfully submitted,
**ARNOLD & PORTER KAYE SCHOLER LLP**

By: /s/ Evan Rothstein
            Evan M. Rothstein (*pro hac vice*)
            1144 Fifteenth Street | Suite 3100
            Denver, CO 80202-2569
            T: +1 303.863.2308
            F: +1 303.863.1000
            Evan.Rothstein@arnoldporter.com

*Attorneys for Defendant Sotheby's Inc.*

10

JA-305

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FREE HOLDINGS INC.,<br><br>                    Plaintiff,<br><br>          -against-<br><br>KEVIN McCOY and SOTHEBY'S INC.,<br><br>                    Defendants. | ECF CASE<br><br>Case No.: 1:22-cv-00881 (LGS) (JLC) |

**DEFENDANT KEVIN McCOY'S REPLY MEMORANDUM OF**
**LAW IN FURTHER SUPPORT OF HIS MOTION TO DISMISS**

William L. Charron
Robert J. deBrauwere
Nicholas Saady
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 798-6307

*Attorneys for Defendant Kevin McCoy*

JA-306

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT .................................................................................................................. 1

    I.     PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE ....................................... 1

        A.   Plaintiff Lacks Standing ......................................................................... 1

        B.   Plaintiff's Claims Are Not Ripe .............................................................. 4

    II.    PLAINTIFF'S CLAIMS ARE NOT VALIDLY STATED ............................. 5

        A.   Plaintiff Fails To State An Unjust Enrichment Claim ............................. 5

           1.   Plaintiff Does Not Allege Enrichment
               At Its "Expense" ........................................................................... 5

           2.   Plaintiff Does Not Allege A "Sufficiently Close"
               Relationship ................................................................................. 5

        B.   Plaintiff Fails To State A Slander Of Title Claim ................................... 6

           1.   Plaintiff Does Not Allege Malice ................................................ 6

           2.   Plaintiff Does Not Allege Special Damages ................................ 7

        C.   Plaintiff Fails To State A Claim Under NY GBL § 349 .......................... 7

        D.   Plaintiff Fails To State A Commercial Disparagement Claim .................. 9

        E.   Plaintiff Fails To State A False Advertising Claim ................................. 9

           1.   Plaintiff Does Not Plausibly Allege Literal Falsity ..................... 9

           2.   Plaintiff Does Not Plausibly Allege Implied Falsity .................... 9

        F.   Plaintiff Fails To State A Declaratory Judgment Claim ........................ 10

    CONCLUSION ................................................................................................... 10

i

## TABLE OF AUTHORITIES

**CASES**                                                                                   **Page(s)**

*Engel v. CBS, Inc.*,
   93 N.Y.2d 195 (1999) ...................................................................................7

*Genesco Ent., Div. of Lymutt Indus., Inc. v. Koch*,
   593 F. Supp. 743 (S.D.N.Y. 1984) ...............................................................7

*Karlin v. IVF Am., Inc.*,
   93 N.Y.2d 282 (1999) ................................................................................7, 8

*Lokai Holdings, LLC v. Twin Tiger USA LLC*,
   306 F. Supp. 3d 629 (S.D.N.Y. 2018) .......................................................9, 10

*Mandarin Trading Ltd. v. Wildenstein*,
   16 N.Y.3d 173 (2011) ...................................................................................6

*Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*,
   880 F. Supp. 1005 (S.D.N.Y. 1994) ...........................................................10

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
   85 N.Y.2d 20 (1995) ....................................................................................8

*RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*,
   No. 14CV6294-LTS-HBP, 2015 WL 5008762 (S.D.N.Y. Aug. 24, 2015) ...........8

*Teller v. Bill Hayes, Ltd.*,
   213 A.D.2d 141 (2d Dep't 1995) .................................................................8

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
   857 F.2d 55 (2d Cir. 1988) ...........................................................................4

*Vossbrinck v. Eckert Seamans Cherin, and Mellott, LLC*,
   301 F. Supp. 3d 381 (D. Conn. 2018) .......................................................3, 4

**STATUTES AND RULES**

Fed. R. Civ. P. 11(b)(3) ......................................................................................4

Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ................................................................1

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014) ..............................................................3

Rhea Myers, "Regarding Quantum," *rhea art: Essays*
   (https://rhea.art/regarding-quantum) (last accessed on September 1, 2022) ..................4

**JA-308**

Defendant Kevin McCoy ("McCoy") respectfully submits this reply memorandum of law in further support of his motion to dismiss the Amended Complaint (ECF No. 47) of plaintiff Free Holdings Inc. ("Plaintiff"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiff's opposition to McCoy's motion to dismiss is deliberately obtuse and misleading. The opposition is primarily designed to obscure both Plaintiff's lack of standing as well as the fact that there is nothing more at hand here than blatant attempted piracy or forgery.

Namecoin's rules of operation form the foundation of Plaintiff's claims. But Plaintiff now argues that Namecoin's rules should be only selectively followed. In so doing, Plaintiff effectively acknowledges that its claims against McCoy are invalid because Namecoin's rules unambiguously state that use of a name does not grant ownership of the associated NFTs. Plaintiff's response that a Namecoin name "is" the NFT is also flatly refuted by Namecoin's rules.

Plaintiff has not plausibly stated that it holds title to McCoy's 2014 NFT. Nor has Plaintiff stated ripe claims. Plaintiff also fails to plead necessary claim elements. Dismissal is warranted.

## ARGUMENT

## I.    PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE

### A.    Plaintiff Lacks Standing

Plaintiff's ownership theory is wholly based upon the FAQ's rules requiring a Namecoin user "to periodically update the [namespace] record every 35,999 blocks" or "approximately 200-250 days." (ECF No. 47 ¶ 39.) Plaintiff did not invent that requirement – it comes directly from the Namecoin FAQ. (ECF No. 61 Ex. A at p.3/35.) Plaintiff points to *no* other source. Plaintiff alleges that it "claimed" McCoy's 2014 NFT because McCoy did not update his namespace record

---

[1] Defined terms have the same meanings ascribed in McCoy's June 30, 2022 brief (ECF No. 60).

within the time prescribed by Namecoin.  (ECF No. 47 ¶¶ 41-42.)

Plaintiff's theory fails because it conveniently ignores other elements of Namecoin's rules. In particular, the FAQ also establishes that only "registered names" and "namespaces" (*i.e.*, the "arbitrary binary blobs"), not the NFTs associated with those names and namespaces, are what can expire and be claimed by others if not periodically updated.  (ECF No. 61 Ex. A at pp.3/35, 6/35.)

Plaintiff does not deny this, but it now asserts that a Namecoin name "*is the 'non-fungible token' at issue.*"  (ECF No. 66 at 5 (emphasis supplied).)  Namecoin's FAQ, in plain English, debunks this position as well.  The Namecoin FAQ distinguishes between "names" and the tokens that control them (referred to as "special coins" measured in Namecoin values of "NMC"):

> *Names* and values are *attached to special coins* with a value of 0.01 NMC.  Updates are performed by creating a transaction with the *name's* previous *coin* as input.

(ECF No. 61 Ex. A at p.6/35 (emphases supplied).)

"Names" are not "coins."  Names are "*attached to*" coins (tokens).  Plaintiff's assertion that its right to a Namecoin "name" gives it title to and control over all of the coins/non-fungible tokens that were ever associated with that name or namespace is implausible.  If Plaintiff were correct, then McCoy's creation of a Namecoin name in 2014 could not have been the "first NFT ever created," as Plaintiff alleges; *the first Namecoin user would have created the first ever NFT under Plaintiff's theory*, and Plaintiff does not allege that McCoy was Namecoin's first user (Namecoin was introduced in 2011).  (ECF No. 47 ¶ 37; https://en.bitcoinwiki.org/wiki/Namecoin.)

Plaintiff relies on McCoy's language that the 2014 NFT's "[t]itle transfers to whoever controls this blockchain entry."  (ECF No. 47 ¶ 38.)  McCoy did *not* state that title transfers to whoever controls this "name" or "namespace."  As McCoy previously explained, Namecoin is a digital public ledger that records unique and sequentially distinct transactions, with each NFT including a unique transaction identification number and unique date and time stamp.  (ECF No.

2

60 at 3-4.)  Plaintiff conveniently skips over the fact that the NFT it allegedly created, the 2021 NFT, includes an identification number and date and time stamp that are *distinct* from those of McCoy's 2014 NFT.  (ECF No. 61 Ex. B.)  Plaintiff merely claimed and copied the same "name" that McCoy had attached to his 2014 NFT.  The name, however, is *not* the NFT/special coin.

Plaintiff's attempt to distance itself from the Namespace Report, upon which Plaintiff's pleading specifically relies, is also disingenuous.  (ECF No. 47 ¶ 38 n.3; ECF No. 66 at 7.)  That report confirms that Plaintiff created its own, "NEW" special coin (the 2021 NFT), distinct from the special coin that McCoy had created, with unique data but copying, verbatim, the same metadata that McCoy had used seven years earlier.  (ECF No. 61 Ex. B.)

The Namespace Report also identifies *two* "FIRSTUPDATE" operations – one in connection with McCoy's 2014 NFT, and another seven years later in connection with Plaintiff's 2021 NFT.  (*Id.*)  As previously explained, there could not have been two "FIRST" updates to the same NFT.  (ECF No. 60 at 6-7.)  And as Plaintiff admits, "no two NFTs are the same."  (ECF No. 47 at ¶ 30.)  Plaintiff is conspicuously silent on this salient point.

Plaintiff is similarly silent in response to McCoy's previous point that Plaintiff fails to allege that it *ever* had – let alone has today – the ability to control McCoy's 2014 NFT as its purported titleholder.  (ECF No. 60 at 5.)  Plaintiff relies on McCoy's language that the 2014 NFT's "[t]itle transfers to whoever controls this blockchain entry."  (ECF No. 47 ¶ 38.)  Plaintiff must plausibly allege that it "controls" the *blockchain entry* constituting the 2014 NFT, not merely the associated name.  The absence of the basic and essential allegation that Plaintiff has the ability to control *the data constituting the 2014 NFT itself* renders Plaintiff's title claim to the 2014 NFT implausible.  *See* Ownership, *Black's Law Dictionary* (10th ed. 2014) (defining "ownership" as "[t]he bundle of rights allowing one to use, manage, and enjoy property"); *cf. Vossbrinck v. Eckert*

3

*Seamans Cherin, and Mellott, LLC*, 301 F. Supp. 3d 381, 390-91 (D. Conn. 2018) (dismissing conversion claim because "[t]he Complaint does not provide a plausible basis to conclude [the defendant] ever had control or exercised *its* right of ownership over [the plaintiff's property]. For example, there is no indication [the defendant] … controlled the [property]."). [2]

Plaintiff's claims should accordingly be dismissed for lack of standing.

**B.    Plaintiff's Claims Are Not Ripe**

Plaintiff correctly states that, "[i]f the injury is certainly impending, that is enough" to establish ripeness.  (ECF No. 66 at 11 (citations omitted).)  But Plaintiff has not pleaded facts to show that any injury upon it is "certainly impending."

In *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 63-64 (2d Cir. 1988), upon which Plaintiff relies, the court found an antitrust claim concerning a proposed but unadopted rule to be ripe because the plaintiff had alleged the proposed rule was already "having a present anti-competitive effect."  Plaintiff alleges no such injury.  As previously submitted, Plaintiff does not allege even an attempted sale of its NFT, let alone allege that it would "certainly" be unable to successfully market and sell its NFT due to McCoy's sale of his *Quantum* NFT.

Instead of addressing that point, Plaintiff tries to paint its claim as ripe because it had, through "a Tweet," unsuccessfully "invited McCoy" to co-sell his *Quantum* NFT with Plaintiff. (ECF No. 66 at 11.)  That is a *non sequitur*.  McCoy's decision not to respond to Plaintiff's "Tweet" does not validate a claim of "certainly impending" market-based injury.  Plaintiff has not alleged

---

[2] Plaintiff fails to allege that it can control the 2014 NFT because Plaintiff knows it does not possess the cryptographic "private key" needed to control the NFT (*McCoy* possesses it).  *See* Rhea Myers, https://rhea.art/regarding-quantum (discussing creation of McCoy's 2014 NFT and explaining that, "[i]n order to successfully create such a transaction, *you must be able to sign it with the private cryptographic key for the nameCoin address …*.  Any recreation of the same name and metadata key/value pair on NameCoin will *not* be the same special coin ….  It will therefore not be the same blockchain entry referred to by the text of Quantum.").  *See also* Fed. R. Civ. P. 11(b)(3).

anything beyond conclusory speculation that it will be unable to market and sell its 2021 NFT.[3]

## II.   PLAINTIFF'S CLAIMS ARE NOT VALIDLY STATED

### A.   Plaintiff Fails To State An Unjust Enrichment Claim

#### 1.   Plaintiff Does Not Allege Enrichment At Its "Expense"

As McCoy previously explained, Plaintiff alleges no facts to show that McCoy was enriched by the sale of the *Quantum* NFT at Plaintiff's "expense." Plaintiff alleges no involvement in McCoy's creation and sale of the *Quantum* NFT; on the contrary, Plaintiff alleges that its "Tweeted" request to McCoy to participate in that sale was not answered. (ECF No. 47 ¶¶ 48, 51.) Nor does Plaintiff allege that it was involved in McCoy's creation of the 2014 NFT.

Plaintiff also fails to allege why the value of its 2021 NFT – which does no more than forge metadata from McCoy's 2014 NFT – should be deemed of equal value to the *Quantum* NFT, which, unlike Plaintiff's NFT, is authentically by McCoy and authentically ties to McCoy's *Quantum* artwork. Plaintiff's conclusory and speculative response that its NFT *passively* suffered a "diminution in value" because of the sale of the *Quantum* NFT does not establish that the *Quantum* NFT was sold at Plaintiff's "expense." (ECF No. 66 at 14.) On the contrary, Plaintiff's theory is that McCoy "enriched himself by appropriating the renown, prestige and pedigree" of *McCoy's own prior work* that *he* expended to create the 2014 NFT. (*Id.*)

#### 2.   Plaintiff Does Not Allege A "Sufficiently Close" Relationship

As also previously shown, Plaintiff must allege a non-attenuated connection between itself and McCoy sufficient to have caused Plaintiff's detrimental reliance. (ECF No. 60 at 15 (citations

---

[3] As previously explained, Plaintiff used its time between its two pleadings to engineer Nameless's publicized retraction of its condition report concerning McCoy's *Quantum* NFT. (ECF No. 60 at 8 & n.6.) Yet, despite including allegations about Nameless's retraction, (ECF No. 47 ¶ 88), Plaintiff fails to allege why it has suffered a concrete injury *despite* that retraction. Plaintiff is notably silent on this point now as well.

omitted).)  Plaintiff does not deny that it is a stranger to McCoy, whose only connection has been

to troll McCoy through "Tweets," from an anonymous account, which McCoy "never" answered.

(ECF No. 47 ¶¶ 44-51.)  There is *no* connection between Plaintiff and McCoy.

Plaintiff's assertion that it has the requisite "sufficiently close" connection to McCoy

because it alleges that McCoy "issued statements" over a public platform (Namecoin) when

McCoy created the 2014 NFT is baseless.  (ECF No. 66 at 14-15.)  Plaintiff does not allege that

any statement by McCoy was directed *at Plaintiff* (who was a stranger to McCoy).  Plaintiff would

have this Court announce new and disturbing law that anytime a defendant makes a public

statement, and a stranger to the defendant purports to rely on that statement, then the defendant

may be liable to that stranger for unjust enrichment.  That is not, and should not be, the law.  *See*

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182-83 (2011) ("[U]nder the facts alleged,

there are no indicia of an enrichment that was unjust where the pleadings failed to indicate a

relationship between the parties that could have caused reliance or inducement.… [T]he mere

existence of a letter that happens to find a path to a prospective purchaser does not render this

transaction one of equitable injustice requiring a remedy to balance a wrong.").[4]

**B.    Plaintiff Fails To State A Slander Of Title Claim**

**1.    Plaintiff Does Not Allege Malice**

Having failed to actually allege "malice" by McCoy, Plaintiff now contends that it pleaded

sufficient facts to support a plausible inference of malice because it alleges that McCoy was aware

of Plaintiff's (spurious) claim to own the 2014 NFT.  (ECF No. 66 at 15-16.)  This argument

---

[4] Plaintiff's cited authorities are inapposite and concern manufacturers who are unjustly enriched
by false descriptions of their products that induce ultimate, indirect purchasers to buy those
products, thereby resulting in profits to the manufacturers.  (ECF No. 66 at 14 (citations omitted).)
Plaintiff does not allege that it paid McCoy anything, either directly or indirectly.

merely alleges a legal disagreement between McCoy and Plaintiff.  Plaintiff fails to address, let alone rebut, the law previously cited by McCoy that a legal dispute between parties does not establish "malice" or "reckless disregard for the truth."  (ECF No. 60 at 17 (citations omitted).)

Plaintiff likewise fails to address the point that McCoy's use of the same word, "burned," that Nameless had used in its *independent* condition report, does not establish a plausible basis to infer malice or reckless disregard for the truth.  (*Id.*)

### 2.   Plaintiff Does Not Allege Special Damages

Plaintiff completely misapprehends the meaning of "special damages."  Plaintiff inaptly relies on cases concerning the "special injury" pleading requirement in malicious prosecution cases.  (ECF No. 66 at 17 (citation omitted).)  A malicious prosecution plaintiff who successfully defeated an earlier lawsuit as a defendant must, to state a viable malicious prosecution claim under New York law, allege a "special injury" beyond the financial, physical and psychological costs of its prior successful defense.  *E.g.*, *Engel v. CBS, Inc.*, 93 N.Y.2d 195, 205 (1999).  That doctrine has nothing to do with the "special damages" pleading requirement for a slander of title claim (or for a commercial disparagement claim, as Plaintiff also invalidly asserts).  Plaintiff fails to address any of McCoy's previously cited authorities concerning the meaning of "special damages."

### C.   Plaintiff Fails To State A Claim Under NY GBL § 349

Plaintiff's GBL § 349 claim is invalid because Plaintiff has pleaded only a one-off dispute concerning a one-time sale of a single item, which was conducted between sophisticated parties through a complex arrangement involving an outside consultant's condition report and opinion.  All of the authorities cited by both sides hold that "single-shot transactions" that are complex and sophisticated are not the stuff of GBL § 349.  *Genesco Ent., Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 752 (S.D.N.Y. 1984); *accord Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 294 (1999)

("[V]ictims of deception in a single transaction in which the only parties truly affected by the alleged misrepresentations were plaintiffs and defendants" do not implicate § 349); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995) (same); *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147 (2d Dep't 1995) ("[C]learly not cognizable under the statute, are large, private, single-shot contractual transactions.").

Plaintiff's assertion that it has not alleged such a localized dispute, and that it has alleged generalized consumer misconduct, is meritless. (ECF No. 66 at 18.) Plaintiff's claim is that McCoy's and Sotheby's sale of the *Quantum* NFT, aided by Nameless's independent condition report, supposedly fooled one particular buyer, "Sillytuna," into thinking that the *Quantum* NFT was the same as McCoy's 2014 NFT. Even assuming Plaintiff's speculation about what Sillytuna believed were correct, that sale is consummated (and Sillytuna has not complained). This case is thus unlike the situations in *Karlin* and *Oswego*, relied upon by Plaintiff, where defendants offered their services (for *in vitro* fertilization and banking, respectively) to numerous and broad ranges of customers for continuing periods, including well after the specific transactions at issue in those cases. *Karlin*, 93 N.Y.2d at 294; *Oswego*, 85 N.Y.2d at 25; *accord RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294-LTS-HBP, 2015 WL 5008762, at *4 (S.D.N.Y. Aug. 24, 2015) (§ 349 conduct "has 'significant ramifications for the public at large'").

Plaintiff's contention that the sale of the *Quantum* NFT "help[ed] establish and polish Defendant's 'brand' within the emerging NFT marketplace" is misguided. (ECF No. 66 at 20.) Again, regardless of whether or not that vague and speculative characterization is true, Plaintiff does not allege that McCoy and/or Sotheby's are trying to re-sell the *Quantum* NFT. Plaintiff cites no law that it may bootstrap its § 349 claim in this case, concerning the sale of the *Quantum* NFT, on alleged possible, and *different*, NFT activities by McCoy and/or Sotheby's in the future.

**D.**     **Plaintiff Fails To State A Commercial Disparagement Claim**

Plaintiff's commercial disparagement claim should be dismissed for the same reasons that Plaintiff's slander of title claim should be dismissed:  Plaintiff fails to allege malice or special damages.  This claim should also be dismissed because Plaintiff does not allege any statements directed "at" Plaintiff or its 2021 NFT.  (ECF No. 60 at 22.)  McCoy's statement about *the 2014 NFT* being "burned" is unrelated to Plaintiff's *2021 NFT*, which, once more, is a sequentially distinct NFT with unique data.  (*Supra* pp.2-3.)  Plaintiff cannot deny that fact in good faith.

**E.**     **Plaintiff Fails To State A False Advertising Claim**

**1.**     **Plaintiff Does Not Plausibly Allege Literal Falsity**

McCoy previously demonstrated that his use of the term, "burned," was not literally false. (ECF No. 60 at 24-25.)  Plaintiff does not contest this point.  (*See* ECF No. 66 at 22.)

McCoy never referred to the 2014 NFT as having been "removed" from the Namecoin blockchain, either.  (ECF No. 60 at 24.)  That statement was made by Nameless, whom Plaintiff voluntarily dismissed from the case.  (ECF No. 47 ¶¶ 65-66.)  Plaintiff tries to 'massage' this point by now contending that McCoy's use of the term "moved" was literally false.  (ECF No. 66 at 22.) Nevertheless, as alleged in the Amended Complaint, McCoy did not say that the 2014 NFT was "moved" from Namecoin to Ethereum; he stated that he "moved the original *on chain data* from the burned Namecoin token" to the *Quantum* NFT.  (ECF No. 47 ¶ 66 (emphasis supplied).) Because McCoy's use of the term, "burned," was not literally false, his corollary description of *data* being "moved" from his burned Namecoin token to his Ethereum token is not literally false.

**2.**     **Plaintiff Does Not Plausibly Allege Implied Falsity**

"At the pleading stage," to actionably demonstrate implied falsity, "the plaintiff must allege that consumers or retailers were misled or confused by the challenged advertisement and offer

9

facts to support that claim." *Lokai Holdings, LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 639 (S.D.N.Y. 2018). Plaintiff's response that "falsity of advertising is a question of fact" is another *non sequitur*: Plaintiff must still *allege sufficient facts* in the first place to support a plausible inference of implied falsity. (ECF No. 66 at 22-23.)

Plaintiff alleges *no* facts to support its conclusory and speculative allegation that McCoy and Sotheby's made impliedly false statements that confused consumers. Plaintiff's assertion that it alleges confusion by Sillytuna, the single buyer of the *Quantum* NFT, is immaterial because, contrary to Plaintiff's suggestion, no law holds that implied falsity may be inferred because of the alleged confusion of a single customer. Plaintiff's reliance solely on *Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1021-22 (S.D.N.Y. 1994), is misplaced, as that case concerned a claim of *literal falsity*, not implied falsity. The court in *Mobius* made clear that, when implied falsity is at issue, "deception is usually shown with consumer surveys and other such evidence," but "when the misrepresentation is 'literally or explicitly false,' as in this case, 'the court may grant relief without reference to the advertisement's impact on the buying public."

**F.   Plaintiff Fails To State A Declaratory Judgment Claim**

As previously explained, there is no actual controversy here. Plaintiff's 2021 NFT is not the same as the 2014 NFT. Plaintiff's request to have this Court "declare" *Namecoin's* rules in a way that would transmogrify Plaintiff's 2021 NFT into the 2014 NFT is wholly inappropriate.

**CONCLUSION**

After two, lengthy attempts by Plaintiff to contrive claims, this case should be dismissed. For the foregoing reasons, and all the reasons previously submitted, and all of the reasons further submitted by Sotheby's in support of its motion to dismiss (fully incorporated herein), McCoy

respectfully requests that all of Plaintiff's claims be dismissed with prejudice, and that McCoy be

awarded such other and further relief as deemed just and proper.

Dated: New York, New York
      September 1, 2022

PRYOR CASHMAN LLP

By: _____

    William L. Charron
    wcharron@pryorcashman.com
    Robert J. deBrauwere
    rdebrauwere@pryorcashman.com
    Nicholas Saady
    nsaady@pryorcashman.com
7 Times Square
New York, New York  10036
(212) 421-4100

*Attorneys for Defendant Kevin McCoy*

Skip to main content

 **Help Center** (https://help.twitter.com/)

- **Using Twitter** (https://help.twitter.com/en/using-twitter)
- **Managing your account** (https://help.twitter.com/en/managing-your-account)
- **Safety and security** (https://help.twitter.com/en/safety-and-security)
- **Rules and policies** (https://help.twitter.com/en/rules-and-policies)
- Resources ⌄
    - **New user FAQ** (https://help.twitter.com/en/resources/new-user-faq)
    - **Glossary** (https://help.twitter.com/en/resources/glossary)
    - **A safer Twitter** (https://help.twitter.com/en/resources/a-safer-twitter)
    - **Accessibility** (https://help.twitter.com/en/resources/accessibility)
    - **Our rules** (https://help.twitter.com/en/resources/rules)
    - **My privacy** (https://help.twitter.com/en/resources/how-you-can-control-your-privacy)
    - **How we address misinformation on Twitter** (https://help.twitter.com/en/resources/addressing-misleading-info)

**Sign in** (https://twitter.com/login?redirect_after_login=https://help.twitter.com/en/using-twitter/twitter-conversations)

🔍

**Contact Us** (https://help.twitter.com/forms.html)



1. About conversations on Twitter

# About conversations on Twitter

▬

1. **Help Center** ⌃ (https://help.twitter.com/)
2. **Tweets** ⌃ (https://help.twitter.com/en/using-twitter#tweets)

# About conversations on Twitter

Conversations are happening all the time on Twitter—and it all starts with just one reply to a Tweet.

Cited in FTX Holdings, Inc. v. McCoy
No. 22Cv88 Document - 3/31/23
Archived on date - 3/31/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Feedback

JA-320

Popular conversations are easy to find and join. We show you the most interesting content first, and when you join in, you will have the full character limit to craft your reply with. Below we've outlined some basics about conversations on Twitter, and how best to participate in them.

# Replies in conversations

A reply is a response to another Tweet, and is one of the easiest ways to join in a conversation as it's happening on Twitter.

When you reply to a Tweet, you can see the full list of participant usernames in the conversation by clicking or tapping the prompt above the Tweet. Usernames will not automatically be added to the beginning of the reply, giving you all available characters to use in your response.

How to post a reply
1. Find the Tweet you want to reply to.
2. Click or tap the **reply** icon.
   **Note:** A composer screen will pop up, where you will see the name of the person(s) you are directly replying to.
3. Type in your message and click or tap **Reply** to post it.

Choose who can reply to your Tweet
When you start a new Tweet, you can choose who will be able to reply to it. You'll see a default setting of **Everyone can reply** next to a **globe** icon in the compose Tweet box. Clicking or tapping this prior to posting your Tweet allows you to choose who can reply to you.

To help minimize unwanted replies and improve meaningful conversations, you'll also be able to change who can reply to your Tweet midway through a conversation.

How to adjust your conversation settings

X Corp. v. Bright Data Ltd., No. 23-cv-03698 — Holding Inc v McCoy — Decided 3/17/23 — Filed 04/23/23 — A view of this document is protected by copyright. Reproduction is prohibited without permission.

1. From twitter.com or the Twitter for iOS or Android app, tap on the compose Tweet button.

2. Click or tap **Everyone can reply** next to the **globe** icon to choose who can reply to your Tweet.

   ○ **Everyone** -- this is the current default option. For public accounts, it means that everyone will continue to be able to reply. If your Tweets are protected, it means only people who follow you will continue to be able to reply.

   ○ **People you follow** -- only people who you follow, as well as anyone you mention in the Tweet, will be able to reply.

   ○ **Only people you mention** -- only people who you mention in the Tweet will be able to reply.

3. When you're ready, click or tap **Tweet** to send.

4. After you Tweet, you can change who replies by navigating to the top right of the Tweet and tapping the **More ●●●** icon.

5. Tap **Change who can reply** ⬭ from the list of options.

6. Select who you'd like to reply to your Tweet.

   <u>A few things to note:</u>

Cited in Free Holdings v. Tweet
22Cv881 Decided on 3/23/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

- When your Tweet is live, people will see that you've limited who can reply to your Tweet.
- When you've invited certain people to reply, they will see a line of context right below the Tweet from their Home timeline letting them know that they (and anyone else selected) can reply and join the conversation. They will also receive a mention push notification (https://help.twitter.com/managing-your-account/notifications-on-mobile-devices) if they have that setting on.
- Restrictions you place on your Tweets will only apply to the ability for others to reply to your Tweet. Others can still engage with your Tweet by, for example, liking or Retweeting it, or voting on a poll you include in your Tweet.
- Once you've published a Tweet, you can manage your conversations by changing who replies to your Tweet or deleting the original Tweet. Replies and Retweets of your Tweet will inherit the restrictions you placed on the root Tweet, but Quote Tweets will not inherit your restrictions.
- If a Tweet is deleted, Retweets will also be deleted and  replies will lose any previous restrictions.
- If you deactivate your account, any reply restrictions your Tweets currently have will lift, and if you reactivate your account during the reactivation window, all previous reply restrictions will be reapplied. However, during the window when your reply restrictions were lifted, it's possible that replies that would have otherwise been restricted could have been added to your conversation.

# Who am I replying to?

From the compose screen, you can see the people in the conversation you will reply to. Click or tap **Replying to…** to bring up an editing screen with a list of everyone who is a part of the conversation.

**Reply editing screen basics:**

Case 23-644, Document 40, 07/25/2023, 3546479, Page181 of 282

- Up to 50 people who are in the conversation will be displayed.
- **Adding people:** To add additional people to a conversation, swipe down to close the editing screen, and then simply type their username into your Tweet. A manually-typed username in the text box will count towards your character limit.
- **Removing people:** The people listed on the editing screen can be removed (except for the author of the original Tweet to whom you are directly replying). To remove people from the conversation in the editing screen, simply click or tap on the **checkmark** icon ⊘ to deselect participants. Once someone is unselected, the checkmark icon will be unchecked.
- **Blocked accounts:** Accounts you have blocked will be visible to you in the recipient list, and will indicate that you have blocked them. From the editing screen, you can choose to remove the blocked account from the conversation by clicking or tapping on the **checkmark** icon ⊘ Blocked accounts will not know you have removed them from the conversation and that you won't see their replies.
    - **Note:** If an account you have blocked visits your profile, they will see a message alerting them of the block.

Note: If your Tweets are not protected, then all replies are public, but only relevant people, such as those who follow you and someone who is part of the conversation, will see your reply in their Home timeline, even if you begin your reply with ".@". If you would like all of your followers to see your reply, the best way to do so is by Retweeting or Quote Tweet.

Read more about replies and mentions and types of Tweets for more information.

# Notifications for conversations

When you receive a notification for a conversation, it will indicate whether it is a reply or a mention:

https://help.twitter.com/en/using-twitter/twitter-conversations#:~:text=A reply is a response,the prompt above the Tweet    5/9

- If your username appears within the body of a Tweet, you will receive a mention notification.
- When someone replies to you, you will receive a reply notification.
- When you receive a notification, click or tap on it to view the conversation and who else is participating in it.

# Who is a part of the conversation?

You can also view participants of a conversation from Tweets you see in your Home timeline, profile page, notifications, or from a Tweet detail. To view participants' names, bio, and @usernames:

1. Click or tap **Replying to...**
2. From here you can see everyone who is included in this reply. You can also follow or unfollow people in this list.

Note: An account that you have blocked will still be visible to you in the list of people in the conversation, indicating they are blocked, but without their profile information displayed. You may choose to unblock them from this list by tapping on the **blocked** icon ⊘

# Conversation ranking

You may notice that some replies in a conversation are not shown in chronological order. Replies are grouped by sub-conversations because we strive to show you the content that we think you'd be most interested in and contributes to the conversation in a meaningful way, such as content that is relevant, credible, and safe. For example, when ranking a reply higher, we consider factors such as if the original Tweet author has replied, if a reply is from someone you follow, or if the person is a Twitter Blue subscriber.

Cited in Freshfields Inc. v. McCoy 22Cv881

Archived on 7/23

This document is protected.

Reproduction is prohibited without permission.

Case 23-644, Document 40, 07/25/2023, 3546479, Page183 of 282

JA-325

# Direct reply count

Just like you can see the total number of likes and Retweets for any Tweet, you can also see how many people are participating in the conversation by the reply count.

You'll see a number next to the **reply** icon  indicating how many direct replies the original Tweet has received. This number is not the total number of replies in the entire conversation.

Note: Learn about muting notifications for a conversation

## Share this article

Tweet

## Was this article helpful?[*]

◯ Yes    ◯ No

Submit

© 2023 Twitter, Inc.

Cookies (https://help.twitter.com/rules-and-policies/twitter-cookies)

Privacy (https://twitter.com/privacy)

Terms and conditions (https://twitter.com/tos)

English

Help Center (https://help.twitter.com/)

Cited in Free Holdings Inc v McCoy 22Cv881 Decided 3/17/23 Archived on 3/23/23 This document is protected by copyright. Further reproduction is prohibited without permission.

- English (https://help.twitter.com/en/using-twitter/twitter-conversations)
- Español (https://help.twitter.com/es/using-twitter/twitter-conversations)
- 日本語 (https://help.twitter.com/ja/using-twitter/twitter-conversations)
- 한국어 (https://help.twitter.com/ko/using-twitter/twitter-conversations)
- Português (https://help.twitter.com/pt/using-twitter/twitter-conversations)
- Deutsch (https://help.twitter.com/de/using-twitter/twitter-conversations)
- Türkçe (https://help.twitter.com/tr/using-twitter/twitter-conversations)
- Français (https://help.twitter.com/fr/using-twitter/twitter-conversations)
- Italiano (https://help.twitter.com/it/using-twitter/twitter-conversations)
- العربية (https://help.twitter.com/ar/using-twitter/twitter-conversations)
- Nederlands (https://help.twitter.com/nl/using-twitter/twitter-conversations)
- Bahasa Indonesia (https://help.twitter.com/id/using-twitter/twitter-conversations)
- Русский (https://help.twitter.com/ru/using-twitter/twitter-conversations)
- हिंदी (https://help.twitter.com/hi)
- (https://help.twitter.com/ta.html)
- עברית (https://help.twitter.com/he)
- 简体中文 (https://help.twitter.com/zh-cn)
- 繁體中文 (https://help.twitter.com/zh-tw)
- ภาษาไทย (https://help.twitter.com/th)
- Tiếng Việt (https://help.twitter.com/vi)
- Melayu (https://help.twitter.com/ms)
- Filipino (https://help.twitter.com/fil)
- فارسی (https://help.twitter.com/fa)
- Dansk (https://help.twitter.com/da)
- Suomi (https://help.twitter.com/fi)
- Svenska (https://help.twitter.com/sv)
- Norsk (https://help.twitter.com/no)
- Polski (https://help.twitter.com/pl)
- Magyar (https://help.twitter.com/hu)
- Română (https://help.twitter.com/ro)
- (https://help.twitter.com/cs.html)
- (https://help.twitter.com/el.html)
- Українська (https://help.twitter.com/uk)
- (https://help.twitter.com/mr.html)
- Български (https://help.twitter.com/bg)
- Català (https://help.twitter.com/ca)
- Hrvatski (https://help.twitter.com/hr)
- Српски (https://help.twitter.com/sr)
- Slovenčina (https://help.twitter.com/sk)
- (https://help.twitter.com/kn.html)

X Corp. f/k/a Twitter, Inc. and Twitter Holdings Inc v McCoy decided 3/17/23

Archived on 3/23/23

Please note that this document is protected by copyright. Further reproduction is prohibited without permission.

JA-327

- ವಾಮ್ಸೆ‌ತ್ರ್ (https://help.twitter.com/ps)
- Dari (https://help.twitter.com/fa-af)
- (https://help.twitter.com/am.html)
- Oromo (https://help.twitter.com/om)
- Tigrinya (https://help.twitter.com/ti)
- (https://help.twitter.com/ha.html)
- (https://help.twitter.com/ig.html)
- (https://help.twitter.com/yo.html)
- (https://help.twitter.com/ha-NG.html)
- Kurdish (https://help.twitter.com/ckb)
- (https://help.twitter.com/ur.html)

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.



# Defining "NFT" in historical context

0xbA8E    June 27th, 2022

Cited in Free Holdings Inc. v. McCoy
22-cv-00881-JLC, Decided 3/17/23
Around the historical context on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.

THIS IS A TEST

NFT is an odd three-letter acronym. Even the people who are involved in NFTs are not exactly sure how to define an NFT. No wonder the normie world is confused. Expanding the acronym just makes things worse: Non-Fungible Token is still ambiguous.



Confusion intensifies

Is NFT just a receipt? Is it the actual artwork? What about editions? What even is a token?

These details are being discussed even more among Historical / Vintage NFT communities because early NFTs have antique value. These early assets also indicate pioneering achievements, which collectors love to celebrate. But what if what you collected is not an NFT? Or what if there are way more, earlier NFTs than the ones you already collected? Financial motives are sometimes at the center of these debates.

In this article, I'll go through how we've come to adopt the term "NFTs" and how the semantics of "non-fungibility" and "tokenness" are shaping the debates in the Historical NFT community today.

Before we go into the technicals, let's look at what NFTs enable that cannot be enabled otherwise.

## What's So Significant About an NFT

What have NFTs specifically brought to the digital art scene (or to the digital collectibles scene)?

Digital art has been around for a while. But they never attracted collectors at large, at least not the way NFTs did. Beyond digital art, even cryptographic artworks were around for a while.

I'll go one step further.

In 2011, someone put messages on the Bitcoin blockchain and created ASCII art with those messages. This was a tribute to early Bitcoin dev Len Sassaman who had recently died. It contained two ASCII images, one of Len Sassaman and one of Ben Bernanke, the Chairman of the United States Federal Reserve at the time.

Cited Free Holdings Inc. v. McCoy
22-cv-881 Decided 3/23/23
Archived 3/17/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Case 23-644, Document 40, 07/25/2023, 3546479, Page188 of 282

JA-330

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Reproduction is prohibited without permission.

### BitLen ASCII

"BitLen ASCII" is a remarkable artwork in blockchain history that will forever be remembered. It beautifully resides on the blockchain for everyone to see. But we are back to the original question: Why are NFTs more popular than blockchain entry artworks?

Let's finally answer it: With NFTs, digital artworks became "OWNABLE". While "BitLen ASCII" was significant, it wasn't ownable. The philosophy of ownership deserves <u>its own article</u> but the fact is; `blockchains for the first time allowed decentralized ownership of digital collectibles`. The stark differences from "corporation-issued collectibles" such as Beanie Babies or Pokemon Cards made NFTs (or decentralized digital collectibles, or blockchain collectibles) a huge deal for collectors. This, in return, helped more digital artists and creators onboard into NFTs. This is why NFT historians tend to consider this decentralized collectibility as the main characteristic that started the movement.

https://twitter.com/punk6529/status/1505937266782486533

This is also why -for better or worse- the concept of "token" was brought up.

"Token" is an abstract term. Tokens do not physically exist. It's a shorthand way to call the 1s and 0s of the software that determines an ownable asset. "The owned asset" is represented by the "token".

Join tokens with humans' innate desire to own unique things, we ended up having non-fungible tokens, or NFTs. And so the infighting began.

# Debates

## Semi-fungibilty

If you join discord servers of some projects, you will see people objecting to significant collectibles (such as Rare Pepes, Curio Cards, or JakNFT editions) being called "NFTs" because they are semi-fungible

Of course, these assets are still different from completely fungible tokens, as they are non-fungible within a collection. But it is also true that different editions of the same token can be exchanged without losing any value.

See Holding Inst. McCoin
Decided: 3/23/23
Cited 06/06/23
22-cv-
Archived 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Ace in Free Holdings Inc v McCoy
22 V 881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Semi-fungible tokens

If we would not be stuck with the term "NFTs", all of these would probably be called "Decentralized Digital Collectibles". But since we are stuck with the term "NFTs", it makes more sense to focus on NFTs' spirit, i.e. what NFTs brought to the collectors and art scene.

Technical terms aside, these artworks certainly represent the blockchain revolution's benefits to artists and collectors; because they are "ownable collectibles whose ownership can be verified in a decertralized way". This is why I think it's fair to call them NFTs.

Disclaimer: As of this writing, I own three semi-fungible tokens in my collection of 80+ NFTs.

## Collectibility

There are also fully-fungible tokens that claim an "NFT" status. They are interchangeable amongst themselves equally, and they are not part of a collection. Critics argue that since they are fully fungible tokens, they do not deserve the NFT status.

Defintions get blurry here. Technically these are fully fungible tokens, and critics are right that some of them are created for fully fungible purposes. On the other hand, some of these tokens still have collectibility value, and they are on decertralized networks. So the question then becomes, "what is a collectible?"

Defining "collectible" is a speculative attempt, so I will only write my observations of other collectors.

```
People seem to attach a "collectibility value" to the scarce assets that
either had some collectibility intention when issued or were a milestone in
the NFT timeline.
```

One such example is the JOLLYROGER on Dogeparty, from 2014. It is a Dogeparty token with an image attached to it at issuance. It's not part of a collection and each token is fully fungible within the JOLLYROGER; but due to having an image attached at issuance, it displays collectability intention during its creation.

But what if there was no image attached?

- Prominent blockchain artist Rhea Myers created MYSOUL in 2014 as a conceptual art piece. She is not selling this piece, but it was an ownable & tradable art, and this makes it a collectible (even when we cannot collect it).

  NILLcoins on Counterparty was issued with a proscribed artistic intentions, despite not having an image attached. The early timestamp and the fact that it was a declared art project so long ago make the project significant.

- Also on Counterparty are XCPinate assets which were too issued with artistic intentions. Even though the actual images were attached in 2021, the original intentions make this project a significant collectible.

Sometimes an asset becomes a collectible retroactively, even if it was not intended that way originally. TEST token on Counterparty (2014) is the first Counterparty token and has a supply of 400. Due to its nature of being the first on a chain that gave birth to the cryptoart movement (Rare Pepes) and due to its scarcity, it seems to have a collectible status for collectors.

One could also argue Bitcoins mined in early blocks could have a "collectible" status. These coins were explicitly created for monetary reasons, they do not have images and they are not scarce at large. Also, the only thing that makes them unique is their UTXOs which are forced to burn when transferred. Perhaps the uniqueness and therefore collectible value of these coins can be excavated when the events on the chain are tracked to their source. Casey Rodarmor is currently working on a scheme called ordinals, where satoshis are numbered and tracked across transactions. Time will tell how early ordinals are viewed by collectors.

Cited in Free Holdings v. McCoy, 22-Cases Decided on 3/23/23. Archived on 3/23/23. This document is protected by copyright. Further reproductions prohibited without permission.

JA-334

Some fungible and semi-fungible tokens with collectibility claim

Disclaimer: As of this writing, I don't own any fungible collectibles in my collection of 80+ NFTs.

## Namecoin NFTs

Debate on Namecoin NFTs focuses on another aspect of non-fungible tokens: The token.

Namecoin NFTs are the first NFTs. Minted on April 21st, 2011, the simple text "d/bitcoin" domain name became the first NFT.

Namecoin assets are non-fungible and they are ownable, transferable tokens. There is no debate on this defintion specifically. Vitalik Buterin, the founder of Ethereum, referred to Namecoin NFTs on the first page of the Ethereum whitepaper (he used the term "non-fungible assets" but bear in mind that the term "NFT" was only adopted in 2017).

The fact that Namecoin NFTs are the first NFTs is largely accepted. The bigger debate is about their *expiration*. Yes, Namecoin domains expire after ~9 months if the owner does not renew them.

Some argue that if you have to renew your NFT, this feels like renting and does not represent real ownership which is what web3 is about.

This analogy would be false, as Namecoin NFTs provide the owner with complete ownership. Unlike renting, the decision to continue the ownership solely relies on the owners themselves. The renewal is akin to paying an extremely low infrastructure tax to the miners for the maintenance of the network (not unlike the tax you pay for the house you own, which would be taken away from you if you don't pay it). As of this writing, 50 years of renewals cost ~$1.

Cited in Free Holdings Inc v McCoy
22CV881 Decided 3/17/23
Archived on 3/23/23
This is a protected copyright.
Unauthorized reproduction is prohibited without permission.

But the bigger question on Namecoin NFTs is about the provenance because there is an ongoing debate about the age of Namecoin NFTs that expired and then got re-registered (To be clear, there are Namecoin NFTs from 2011 that never expired. This debate does not apply to them).

**Namecoin NFT Provenance - Technical**

*What happens to Namecoin domains when the domain name ownership expires and gets re-registered after a while?*

Namecoin is designed around domain names, but when a domain name gets registered the first time, it is represented by a particular identifier (UTXO design) to allow its trading. The chain of these identifiers (UTXOs) can be considered a special coin, which we will call a "***colored coin***" in this article. Rhea Myers extensively wrote about Namecoin's UTXO design here.

When a Namecoin domain expires, the UTXO becomes unspendable. In practice, it is often called "burnt" (in reality it is simply unspendable), because when the domain name is re-registered later, a new UTXO chain starts. This would mean that when a domain name expires, the chain of events where that domain was represented breaks. During the re-registration, the Namecoin protocol does not make a distinction between a never-used domain name and a previously expired domain name. This fact may support the argument that the expiration is philosophically burning the original token.

On the other hand, as mentioned before, Namecoin is designed around names. Names are unique identifiers themselves and they function that way immutably in a cryptographically secured blockchain. The history of the unique name, previous updates and transactions remain on-chain, as is the case with blockchains.

The aforementioned "UTXO chains" are actually formed of individual UTXO stations. Each UTXO has an address and domain names are attached to these UTXOs. When Bob makes a standard domain name transfer to Alice, a 0.01 NMC is spent on Bob's side where the domain name is attached, and a new 0.01 NMC is created on Alice's side where the domain name is attached. The thing that physically (for lack of a better term) moves from one address to another during a typical transfer is the domain name, not UTXOs. The design choice of a typical domain name transfer supports the argument that the domain name is the unique identifier and the token, and it never burns even after expiration.

In fact, the treatment of names as unique identifiers is visible directly in Namecoin's consensus code.

If the names are the primary identifiers of the blockchain, the only way to interpret the blockchain data is by using that entity to track its provenance.

Cited in Free Holdings Inc. v. ...
No. 22-cv-881 Decided 3/23/2023
Archived on 3/23/2023
This document is protected by copyright.
Its reproduction is prohibited without permission.

JA-336

This name-first design can be seen not only in the consensus code and in the ecosystem's block explorers, but also in functions to utilize the domain names. There's a built-in RPC method (not in the protocol, but on every software around it) since the beginning of Namecoin called *name_show* which returns the information about the domain name even during the expired period. This function does not return anything for never-registered domains.

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23
This document is archived on 3/23/23
This document is protected by copyright.
Unauthorized reproduction is prohibited without permission.

In fact, an expired domain can still be functional. When expired, Namecoin Core will still have the name and return its local state with *name_show* (just indicating the expired status). If the resolver setup accepts it, the domain will still work. Similarly, expired "id/" names in Namecoin still work as logins, which indicates the usefulness of the *name_show* function.

Another built-in RCP method since the early days is *name_history*. This function allow pulling all the metadata and history of a domain name. The existence of this function also indicates the intentions behind Namecoin design: The domain name's history will always come with the domain name itself, so the domain name itself has a provenance.

As mentioned in the introduction of this article, "token" is an abstract term. In Namecoin's context, it is better to offer all interpretations of the terms "token" and "asset".

Case 23-644, Document 40, 07/25/2023, 3546479, Page195 of 282

JA-337

Cited in Free Holdings Inc v McCoy
CV881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

The lifetime of a Namecoin domain name. Note that this image is a summary representation. In reality, this data is stored in transactions.

**Interpretation 1:** "The token is the colored coin and that is the asset. Names may be unique but they are cryptographically represented by tokens and only that representation matters. Since a re-registered name is assigned to an entirely new colored coin, the provenance from the earlier UTXO chain is broken, therefore this is a new asset and cannot claim historical value."

**Interpretation 2:** "The token is the name, and that is the asset. Namecoin is designed around names where names are the main unique identifiers. This is supported by the technical design when you do a typical name transfer or assign a value field to the name. These are all visible on-chain. Further, when the name expires, the data of the name remains on the blockchain. If the blockchain is designed around names and their whole history is on-chain, when the name is re-registered you are simply reactivating the old token, therefore provenance is not broken."

**Interpretation 3:** "The token is the colored coin because it is a cryptographic representation of the name. But the main collectible asset is the name itself and these names have their own provenance because Namecoin is designed around names as unique identifiers. A name's history and UTXO assignments are all visible on-chain. This is further proven by the existence of *name_show* and *name_history* RPC methods. Therefore when the name is re-registered, the new

colored coin (UTXOchain) can be assumed as a new NFT, but it represents the old decentralized collectible asset which was intact and ownable since its birth."

This third interpretation separates the record into <u>multiple parts</u>:

- Cryptographic token
- Cryptographic asset
- Off-chain asset (For the cases when there is a reference to an external asset, such as Twitter Eggs, Blockheads, Quantum, etc.. Does not exist for Punycodes, Damselfly, Identities, Bit Domains)

According to interpretation #3, if "NFT" is a cryptographic receipt of ownership, then re-registered Namecoin NFTs are "new" receipts of ownership for the "old" blockchain assets. If you recently re-registered a Namecoin name; you minted a new token to own an old asset. Not a tribute, not a replica; but the actual, old, collectible asset.

**Disclaimer:** As of this writing, I own 11 Namecoin assets in my collection of 80+ NFTs. Those who like collecting Namecoin NFTs mostly accept interpretation #2, and those who disagree mostly accept interpretation #1. I am more inclined to accept interpretation #3. It fits my understanding of "unique identifiers" for objects in data tables (I'm a data scientist IRL) and how the history of a Namecoin name is determined. To be clear, this interpretation is not in favor of my assets if I want to strictly call them "old NFTs", but it is in favor of my assets if I am happy to call them "old blockchain collectibles".

The argument made in this article is that **meanings matter, not terms**. For collectors and decentralization enthusiasts, what matters is *"owning collectible things in a decentralized way"*. An expired Namecoin name (ignoring token or asset defintions for a second) physically exists on a decentralized blockchain *at least* as historical data with its own provenance, even when expired. That data can be owned in a decentralized way. This is what makes it a decentralized collectible.

Part of the debate specifically arises from the term "non-fungible token" itself, which should not limit us if we are aware of the point of NFTs.

Someone who understands the point of NFTs in 2013

So far, the focus has been technical, but there is more at play when we consider the ethical, philosophical, and legal angles. These angles are more subjective but they are worth talking about.

**Namecoin NFT Provenance - Ethical & Philosophical**

The 2021 NFT bull run convinced a lot of web3 participants that web3 is a paradigm shift and that the ownership philosophy will never be the same. Proponents of this view are strictly pro-CC0, accept the blockchain as the ultimate source of truth, and care much less about the arguments outside the blockchain (even legal arguments).

Critics of this view argue that blockchains can bring a lot of value to creators and collectors but physical, ethical, and universal truths cannot be ignored.

The conflict between Larva Labs vs v1Punks reflects these two distinct opinions. Larva Labs as the original creator of the CryptoPunks had long argued that the buggy v1 contract did not represent their genuine artworks (artist declaration & intention). In contrast, v1Punks owners argued that blockchain timestamp reflected that v1s are the original punks.

A similar debate is occurring for Namecoin NFTs too, but it gets even more philosophical for Namecoin art NFTs.

https://twitter.com/rheaplex/status/1537987279074971649

Ignoring blockchain technicals; if an artwork is created on Namecoin by a creator, then expires, and then gets re-registered by the same artist, philosophically speaking the provenance remains.

This is fairly agreed on; but what if an artwork is created on Namecoin by a creator, then expires, and then gets re-registered by *someone else*? Here the camps are again split with different interpretations.

**Interpretation 1 arguments:**

- Philosophically, the link between the artist's hand and the work is broken, therefore the re-registration by another person cannot claim philosophical provenance.

- It is unethical to squat someone else's work and sell it.

**Interpretation 2 arguments:**

- Namecoin provides 100% ownership and it is up to the owner to prolong the ownership or not. Philosophically, if the artist does not prolong their ownership, they are making a conscious decision to leave their artwork in public for anyone to claim.

- If the claimers did the marketing around the work and increased its recognition, it is ethical for them to benefit financially.

It gets more complicated when the artwork is not on-chain like Punycodes or Damselfly but instead linked to a file in an external server where the original creator has control. Because in this

Cited in Free Holdings Inc. v. McCoy
220 F.Supp.3d __ Decided 3/17/23
Archived on 3/23/23 at mirror.xyz
This document is protected by copyright.
Further reproduction is prohibited without permission.

case, we are already taking off-chain information into account. What is the asset? Is it the off-chain file, is it the domain name to which the link is attached, or is it the colored coin that corresponds to the domain name?

The philosophical and legal side of the debate turned into a lawsuit for Kevin McCoy's Quantum where there are even more interpretations than the ones outlined above. The wording used in the initial minted NFT and the sale of the Quantum re-minted on Ethereum make this specific debate even more complex. Due to this complexity and lack of legal knowledge on my part, I will not go into further detail on Quantum in this article.

**Compromise on Ethical Provenance?**

Perhaps there is a way to achieve ethical provenance. Recently Punycodes community (a fairly large one thanks to the fair distribution during red discovery) was able to find the original creator of 966 Punycodes. The creator was a known artist, *halluciphile*, who had also created (or contributed to) 15 Rare Pepes, 12 Mafia Wars, 7 Bitcorns, and 19 Kaliedoscopes in the past. Punycodes community rallied around the artist and gave him a warm welcome. Punycodes DAO immediately made halluciphile a DAO member (membership cost ~1E at the time), gifted multiple Punycodes from DAO wallet, and committed to assigning a substantial part of the royalties when Punycodes own vault contract would go live on Ethereum (this is dependent on the development work of a 3rd party service called Emblem Vault). Meanwhile, *halluciphile* expressed happiness that his work found a new life with a large community.

Following this feel-good story Punycodes announced a manifesto:

*If an original creator of a historical Punycode ever proves that they're the original creator via the wallet verification message process, Punycodes DAO commits to doing its best to ensure that the original creator receives value. An example of this could be to receive a substantial part of the royalties forever if & when Emblem Vault launches individual contracts for historical collections. Another example could be gifting Punycode assets to the original creator from the DAO wallet, as per the DAO vote (depending on the creator's contribution to the collection).*

Similar manifesto announcements are being planned by other Namecoin communities too. Perhaps by combining the works of the original creators and marketing efforts of the larger communities, Namecoin NFTs can find peace from an ethical and philosophical perspective too.

# Collectible Value

The final debate in the historical NFT space seems to be around how much historical NFTs "should be valued". This is often financially motivated, speculative, and subjective, so I prefer not to get into the details. Here I will list some fundamentals and metrics people seem to prioritize (while not necessarily corresponding to financial value):

JA-342

- **Timestamp:** The unchangeable, objective data on the blockchain.

- **Scarcity:** The number of assets within a collection or an edition.

- **Creativity:** Artistic and conceptual intentions.

- **Technical achievements:** Technical efforts that push the boundaries of the NFT space.

- **Blockchain they're minted on:** For NFTs that require interoperability and composability (such as gaming NFTs), the chain an NFT is minted on can be critical. This is less relevant for historical NFTs but decentralization still matters, as long as maximalism does not blind us. It is important to note that we have seen several examples of significant NFTs making chains more mainstream and relevant, so perhaps the significance of the NFT itself may be much more important than the chain it's minted on.

## Conclusion

Debates of semi-fungibility, collectibility, or ownership expiration are less meaningful and more semantic, considering how arbitrarily we landed on the term "NFTs". As mentioned in the first section of this article, the spirit of the entire NFT movement is "*decentralized collectibility*". As long as a collectible asset satisfies the criteria of "being ownable in a decentralized way", they qualify and contribute to the NFT movement.

One can only hope that with mass adoption, we can move on from the confusing "NFT" term to a less confusing "Decentralized Digital Collectibles" or "Blockchain Collectibles".

*Special thanks to Rhea Myers, XCPinata, Daniel Kraft, Casey Rodarmor, Doggfather, and many others who provided feedback and contributions while I was working on this article.*

*If you'd like to learn more about these early collectibles, I highly suggest 0xSchatz's oldnft.com website. I have no financial or administrative relation to the website, I only provided feedback & data to 0xSchatz when asked.*

**Subscribe to Chainleft**
Receive new entries directly to your inbox.

Subscribe

**5 Collectors**                                                                 View

Citadel Freee Holdings LLC v. Mccoy
22-881 Decided 4/13/23
Archived Document is preserved.
This Document is protected by copyright law.
Any further reproduction is prohibited without permission.
Archived on 3/23/23

JA-343

#2                    #1                #3

0xeOdF

### Collect Entr

This entry has been permanently stored on-chain and signed by its creator.

ARWEAVE TRANSACTION
YCc_1kekMZTBKxt…boJTcK-xUc63HUA

AUTHOR ADDRESS
0xbA8E220834c32…820C001f022d72E

NFT ADDRESS
0xCc6134BCf32d1…D0FFf54EcC1bD7a

CONTENT DIGEST
MzPWRsesC9mQflx…gX3lacrvaG9Kjko

**More from Chainleft**

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.



Cited in Tree Holdings Inc v Mc
22C... ... Decided 3/17/23
Archived on 3/17/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

interaction  ☒

-

Hello,

Case 23-644, Document 40, 07/25/2023, 3546479, Page204 of 282

JA-346

Username
Log In Sign Up

- Username
  - My Words
  - Recents
  - Settings
  - Log Out

- Games & Quizzes
- Thesaurus
- Features
- Word of the Day
- Shop
- Join MWU
- More
  - Shop M-W Books ↗
  - Join MWU ↗
    - Log In
    - Username
    - My Words
    - Recents
    - Account
    - Log Out
  - Settings
  - My Words
  - Recents
  - Account
  - Log Out

Est. 1828

Dictionary

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.



- Definition
- Definition
- 
- Synonyms
- Example Sentences
- Word History
- Entries Near

  - Cite this EntryCitation
  - Share

JA-347

- ○  Kids DefinitionKids 
- ○  Medical DefinitionMedical
- ○  More from M-W
- ⋮ Show more⌄
- • Show more⌄
  - ○ Citation
  - ○ Share
  - ○ Kids
  - ○ Medical
  - ○ More from M-W

- • [Save Word ✚]
  - ○ To save this word, you'll need to log in.
    Log In

# interaction

## noun

in·ter·ac·tion ˌin-tər-ˈak-shən ◀))
Synonyms of *interaction* ⟩
: mutual or reciprocal action or influence
interactional
ˌin-tər-ˈak-sh(ə-)nəl ◀))
adjective

## Synonyms

- • commerce
- • dealings
- • intercourse
- • relation

See all Synonyms & Antonyms in Thesaurus ⟩

## Example Sentences

she guessed from the friendly *interaction* that they were close to the other parents in the organization
Recent Examples on the Web The Canadian neighbors had developed a distaste for each other after arguing for months, but an *interaction* in May 2021 upped the ante. —. Kyle Melnick, *Washington Post*, 10 Mar. 2023 Stress

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.

JA-348

and anxiety, along with PTSD, can also put people at risk for these kinds of thoughts, Vasan says, and anything from a dream to an overwhelming *interaction* at work can set them off. — Alexa Mikhail, *Fortune Well*, 8 Mar. 2023 An even more notable *interaction* between the two occurred in November, during a World Cup event in Heerenveen. — Kevin Draper, *New York Times*, 2 Mar. 2023 See More

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'interaction.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

# Word History

First Known Use

1832, in the meaning defined above

Time Traveler
The first known use of *interaction* was in 1832
See more words from the same year

# Dictionary Entries Near *interaction*

interactant

interaction

interactionism

See More Nearby Entries ›

Cited in Free ...gs Inc v McCoy
22Cv881 De...d 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

# Cite this Entry

Style
MLA

"Interaction." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/interaction. Accessed 23 Mar. 2023.

Copy Citation

# Share

Case 23-644, Document 40, 07/25/2023, 3546479, Page207 of 282

JA-349

Post the Definition of interaction to Facebook    Facebook

Share the Definition of interaction on Twitter    Twitter

## Kids Definition

interaction

noun

in·ter·ac·tion  ˌint-ə-ˈrak-shən ◄))
: the action or influence of people, groups, or things on one another
interactional
-shnəl ◄))
-shən-ᵊl
adjective

## Medical Definition

interaction

noun

in·ter·ac·tion  ˌint-ə-ˈrak-shən ◄))
: mutual or reciprocal action or influence
interaction of the heart and lungs
interactional
-shnəl, -shən-ᵊl ◄))
adjective

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.

## More from Merriam-Webster on *interaction*

Nglish: Translation of *interaction* for Spanish Speakers

Britannica English: Translation of *interaction* for Arabic Speakers

Last Updated: 13 Mar 2023 - Updated example sentences

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

Case 23-644, Document 40, 07/25/2023, 3546479, Page208 of 282

JA-350

**MERRIAM-WEBSTER UNABRIDGED**



**WORD OF THE DAY**

# symbiosis

<u>See Definitions and Examples</u> »

Get Word of the Day daily email!

Your email...          **SUBSCRIBE**

Test Your Vocabulary

Challenging Standardized Test
Words, Vol. 2

- The business's new
  computer system proved
  not to be a *panacea*.

| Costly burden | Cure-all |
|---|---|
| Obstacle | Secure space |

ed in Free Holdings v McCoy
22Cv881 Decided 3/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Case 23-644, Document 40, 07/25/2023, 3546479, Page209 of 282

JA-351

Hear a word and type it out.
How many can you get right?

TAKE THE QUIZ

Can you make 12 words with
7 letters?

PLAY

**WORDS AT PLAY**

### 'Apricity' and Other Rare Wintry Words

'Hiemal,' 'brumation,' & other rare wintry words

### 'Complement' vs. 'Compliment'

The distinction between the two is clear (now).

### 8 Words for Introverts

Don't be surprised if none of them want the spotl...

Cited in Free Holdings Inv. v. McCoy
22CV881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction prohibited without permission.

Case 23-644, Document 40, 07/25/2023, 3546479, Page210 of 282

# When Were Words First Used?

- Look up any year to find out

## ASK THE EDITORS

### Weird Plurals

- One goose, two geese. One moose, two... moose. Wh...

Cited in Free Holdings Inc v McCoy
22cv881 Decided 3/17/23
Archived on 3/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

### Irregardless

- It's in fact a real word (but that doesn't mean...

### Bring vs. Take

- Both words imply motion, but the difference may b...

### Defenestration

- The fascinating story behind many people's favori...

Case 23-644, Document 40, 07/25/2023, 3546479, Page211 of 282

**WORD GAMES**

---

## Are You Feeling Lucky?

A charming quiz about fortunate
and unfortunate w...

- **TAKE THE QUIZ**

## Famous Novels, First Lines Quiz

Can you identify these novels by
their famous fir...

- **TAKE THE QUIZ**

## Spell It

Hear a word and type it out. How
many can you get...

- **TAKE THE QUIZ**

## Spelling Bee Quiz

Can you outdo past winners of the
National Spelli...

- **TAKE THE QUIZ**

Cited in Free Holdings v. McCoy
22Cv881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction prohibited without permission.

**Learn a new word every day. Delivered to your inbox!**

Case 23-644, Document 40, 07/25/2023, 3546479, Page212 of 282

JA-354

Your email address

_____

**OTHER MERRIAM-WEBSTER DICTIONARIES**

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY

- SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER DICTIONARY API

- NGLISH - SPANISH-ENGLISH TRANSLATION

- BRITANNICA ENGLISH - ARABIC TRANSLATION

**FOLLOW US**

Browse the Dictionary:    A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U
V  W  X  Y  Z  0-9  BIO  GEO

Home  |  Help  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |  Contact Us  |
Join MWU  |  Videos  |  Word of the Year  |  Kid's Dictionary  |  Law Dictionary  |
Medical Dictionary  |  Privacy Policy  |  Terms of Use

Browse the Thesaurus  |  Browse the Medical Dictionary  |
Browse the Legal Dictionary  |  Browse the Kid's Dictionary

© 2023 Merriam-Webster, Incorporated

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Case 1:22-cv-00384-JSR   Document 75   Filed 04/12/23   Page 1 of 2

3/23/23, 9:49 AM



JA-356

3/23/23, 9:49 AM

Explore

Settings

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in     S



# Namebrow.se
**Namecoin Explorer**

## Name
### d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

### Summary

| | |
|---|---|
| Status | Active |
| Expires after block | 669125 ( 11450 blocks to go ) |
| Expiry date | June 11, 2023, 1:46 a.m. (estimate) |
| Last update | Oct. 7, 2022, 1:24 p.m. (block 633125) |
| Registered since | April 5, 2021, 12:14 p.m. (block 553214) |
| First registration | May 2, 2014, 11:33 p.m. (block 37368) |

### Current value

An important distinction between property & deed must be made when considering Namecoin NFTs. A UTXO, the thing that transfers

◄                                                  ►

### Name operations

| Date/Time | Block | Transaction | Operation | Value |
|---|---|---|---|---|
| Oct. 7, 2022, 1:24 p.m. | 633125 | b9d71b2cd... | NAME_UPDATE | An important distinction between property & deed must be made when considering Namecoin NFTs. A UTXO, the thing that transfers ownership b/w holders of public/private key pairs, is a DEED to property but NOT property itself. The property that the Namecoin blockchain was built to cryptographically secure ownership of, provided all recurring fees have been paid to the protocol, is a unique plot of digital space known as a Name. As such, Names, along with the history of Values associated to them, are the NFT property. |
| Feb. 10, 2022, 3:47 p.m. | 598415 | 6dd5ceffc... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| June 14, 2021, 12:25 p.m. | 563353 | 93e6db4e6... | NAME_UPDATE | **This original NFT, entitled "Quantum" by Kevin McCoy and minted on May 2, 2014, is currently held by the person who controls the Twitter handle @EarlyNFT. Please direct message all inquires about the artwork there.** |
| June 7, 2021, 4:30 p.m. | 562392 | 84adf2532... | NAME_UPDATE | **An authorized print of this original NFT, entitled "Quantum" by Kevin McCoy, is currently being auctioned off by Sotheby's. Good Luck to all the bidders.** |

Cited in Free Holdings Inc v McCoy 22-CV881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Case 23-644, Document 40, 07/25/2023, 3546479, Page216 of 282

JA-358



# Namebrow.se
### Namecoin Explorer

https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry.

| | | | | |
|---|---|---|---|---|
| April 5, 2021, 12:14 p.m. | 553214 | d81a70169... | NAME_FIRSTUPDATE | None |
| April 5, 2021, 7 a.m. | 553180 | 8c76ba4ec... | NAME_NEW | fc6a09d1dfa2cbced6fa35e64c3cb001196cdef2 |
| May 3, 2014, 1:27 a.m. | 174923 | fa8b9a6ad... | NAME_FIRSTUPDATE | None |
| May 2, 2014, 11:33 p.m. | 174910 | da66d975e... | NAME_NEW | aa4bcd723e172f0f53cbab9c71a165262334206b |

Namecoin Block Explorer - Contact.

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

Case 1:22-cv-00881-JLR   Document 77   Filed 04/13/23   Page 4 of 9

3/23/23, 9:50 AM

Natively Digital: A Curated NFT Sale



‹   Lot 2 ⌄   ›                                                         ♡   •••



Cited in Free Holdings Inc v. McCoy
22Cv881 Decided 3/17/23
Archived on 3/23/23
This document is protected by copyright.
Further reproduction is prohibited without permission.

# Kevin McCoy

Quantum

∞   Cryptocurrency Payments

Lot Closed
June 10, 10:51 AM EDT

Estimate
Upon Request

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated
Privacy Policy. You can change your preferences at any time.                                              ✕

https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum                                1/9

Case 23-644, Document 40, 07/25/2023, 3546479, Page218 of 282

JA-360

# Lot Details

⭐ Authenticity guaranteed

## Description

Owner: Kevin McCoy

Kevin McCoy
b. 1967
*Quantum*
2014-21

Non-fungible token ERC-721
Token ID: 0
9 mb Tif + file archive with documentation
Originally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on
May 28, 2021 by the artist
Calls to https://ipfs.io/ipfs/QmRWhsnDKBwWDozDzLp8Te25KD4Dcfz83zDs7ykR1x995 for
supporting documentation
Smart Contract Address: 0xe81a45430f9bc58f1202ce4b2949e578f8771d9

## Condition Report       +

### Catalogue Note

Free Holdings v McCoy
22-CV-881 D / filed 3/3/23
Cited on 3/23/23
Archived on 3/23/23
This document is provided by copyright
Further reproduction is prohibited without permission.

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated
**Privacy Policy**.

JA-361

In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history. They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers occupy a singular position in art history. They came first. Kevin McCoy's Quantum is such a work. **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block 174923, the NFT era quietly dawned. What a noise it makes today.

Pulsing with colour, a riotously raw beacon to a new era, McCoy minted Quantum - unwittingly placing it within this vaulted pantheon of firsts. Timestamped July 1907, Picasso's Les Demoiselles ushered in the chain of Cubism. December 1917, Malevich's Black Square stands as the genesis block of Abstraction. April 1917, Duchamp timestamps the era of the idea. 2nd May 2014 21:27:34, Quantum stands alone in the precision of its timestamp - immutably, verifiably, trustlessly pure. If blockchain's themselves are a radical recalibration of the concept of time, then the timing of Quantum takes on a pantheon position within this new art history. For what it is a blockchain, when stripped to its bones, but humanity's latest innovation in the humble art of record keeping. And if blockchains stand as the Gutenberg Bible of the 21st century, then how do we prize the first of these records? In my view, Quantum will always be the most art historically important work in the history of NFTs.

Creation, time, art history and the very idea of blockchains themselves intersect in the ripples of Quantum. It is a work to meditate not just on the genesis of art history's newest chain but on the founding principles that

Cited in: In re Holdings Inc / McCoy
22-CV-881 Decided 4/17/23
Archived: 3/23/2023
This document is protected by copyright.
Further reproduction is prohibited without permission.

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated **Privacy Policy**.

JA-362

network itself expanding and contracting as the world processes the place they want to give this radical new technology.

---

*"How to picture the moment of creation. A spark, a seed, a particle. We have narratives that describe it as an interval of days or as a cryptic alphabet that divides the earth from the firmament. [Kevin McCoy's] Quantum takes its place alongside other original icons replacing their aura and gilding with a pulsating luminous heartbeat. To call this a mandala would not be an understatement, since what is a mandala if not a allegory for a universe, its revolutions, breath and winking into being out of nothingness?"*

DAVID GREER, 2021.

---

If Quantum stands tall as a mandala for a new age, what so of its aesthetics? Its pulsating riot of raw colour forebears not just the generative, code-based works that now sit at the cutting edge of the NFT space, but encapsulate in no small part the palette of this new era. Bold, brash, unfiltered, acid green vibrates into cool blue. Flat aggressive reds bleed into fluorescent pinks. One's eye meditates on this unapologetic celebration of digital colour, a hexadecimal testimony that encodes the full spectrum of colours endless possibilities - remixed and reassembled by every digital creative that follows McCoy's first steps into the world of blockchain based art.

Beyond their formal concerns, there is a musicality to Quantum. As pixels iteratively jostle for position and color as they execute their algorithmic form, extends through to ideas expressed by John Cage around the nature of rehearsal, execution and repetition. To Cage, 4' 33' was a different score every time, reflecting the environment and subtleties of the audience's

Cited in Free Holdings Inc v McCoy
Archived 3/2/23
Archived/Deleted 3/17/23
This document is protected by copyright.
Its reproduction is prohibited without permission.

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated **Privacy Policy.**

**JA-363**

Pauline Oliveros. It was here that McCoyl learnt to develop his creative coding as a form of musical play, using real time live systems to test, or tune, as he has discussed. This sense of tuning a visual artwork through code finds commonality with the conceptual musical experiments of LaMonte Young's Composition #7, held in the MOMA's collection.



La Monte Young, *Composition 1960 No. 7* (excerpt 1961)

In the work, Young finds a note and then once played its reverberates out as a single entity. Young's thoughts of the conflict of flux versus stasis, act as a manifesto for the formal visual tropes expressed in Quantum. "Change or flux is inevitable" Young wrote, "Stasis, or remaining the same, is impossible. Therefore, to achieve the static state is the goal, while the state of flux, variation, or contrast, is unavoidable and thus unnecessary as a goal." Quantum, formatted in endless looping repetition is work both in the stasis of its originality but the flux of its repetition. The GIF file format stands as the ultimate standard bearer for the ideas so elegantly expressed by Young

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated **Privacy Policy**.

in direct conversation with the idea of the NFT themselves. In thinking of Quantum as a type of tuning, its final form minted on Namecoin stands not as the experience proper, but the record of that experience, further drawing parallels between the work itself and the core principles of the blockchain. While code equals flux, records equal stasis. There is a comi-tragic nature to this idea of freezing flux, an idea expressed elegantly in both the writings of Cage and that other conceptual touchstone that NFTs are starting to reexamine, Walter Benjamin. The blockchain as a decentralised clock is limited to seeing time in the rear view mirror, it is not a clock of the future but an archive of the past. In his 1940 essay, "Theses on the Philosophy of History", Benjamin discusses the idea of a Paul Klee painting named *Angelus Novus,*

---

*"looking as though he is about to move away from something he is fixedly contemplating. His eyes are staring, his mouth is open, his wings are spread. This is how one pictures the angel of history. His face is turned toward the past. Where we perceive a chain of events, he sees one single catastrophe which keeps piling wreckage upon wreckage and hurls it in front of his feet. The angel would like to stay, awaken the dead, and make whole what has been smashed. But a storm is blowing from Paradise....The storm irresistibly propels him into the future to which his back is turned, while the pile of debris before him grows skyward. This storm is what we call progress"*

---



By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated **Privacy Policy**.



SOL LEWITT, *WALL DRAWING #1111 CIRCLE WITH BROKEN BANDS OF COLOR*, 2003, PRIVATE COLLECTION
© THE LEWITT ESTATE / ARTISTS RIGHTS SOCIETY (ARS), NEW YORK

In surveying the past as a sum of actions seen from the last link in the chain, what other of art history's chains does Quantum fork out from? Any discussion around the generative ideas inherent to Quantum, as in most code based art, must link back to Sol LeWitt's instruction-based art. The minimal simplicity of Quantum's formal aesthetic borrows as much from America's history of minimalist music as it does to the ideas of LeWitt in whose work one can easily see how the permutations of instructions create new formal compositions. LeWitt's instructional drawings, John's Target

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated
**Privacy Policy**.

Case 23-644, Document 40, 07/25/2023, 3546479, Page224 of 282

Quantum | Natively Digital: A Curated NFT Sale 2 | Sotheby's

music—what of literature? In discussions with McCoy it is revealing to note that the emanating, mesmerizing, light source was to him inspired by the work of science fiction writers like Philip K. Dick and Stanislaw Lem.



JOHN WHITNEY Permutations

Cited in See Holdings Inc v McCoy 22CV881 Decided 3/17/23 Archived on 3/23/23 This document is protected by copyright. Further reproduction is prohibited without permission.

John Whitney - *Permutations*, 1968

In Philip K. Dick's novel, *VALIS* (or Vast Active Living Intelligence System), the main character sees history as a simultaneous event as communicated through a mysterious pink light. Earlier works by Jennifer and Kevin McCoy that engage with this idea include *Pink Light* from 2001 and both *Priests of the Temple* and *Chysalis* from 2012. In *Pink Light,* the McCoys quote passages from the novel as a pink light blinks through the doors of a miniature elevator. In *Priests of the Temple* a yellow pulsating sun is overlayed onto projected images of sculptures depicting Gordon Moore as an early Silicon Valley holy man. *Chysalis* employs the same pulsing star projected over a sculpture of a building that is hatching from an amorphous rubbery skin. This is a trope that the McCoys have turned to time and time again, it is deeply embedded in their artistic lexicon and now into the history

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated **Privacy Policy**.

JA-367

enlightenment philosophers back to the star of Bethlehem. The beams of Quantum, and the conceptual maneuver to fix its own "coming into being" into the record of the blockchain, represents the chronicling of the birth of ideas themselves into the record of human activity.

— ROBERT ALICE

Cited in Free Holdings Inc v McCoy
22Cv881 Decided 3/17/23

Archived on 3/23/23

This document is protected by copyright.
Further reproduction is prohibited without permission.

By continuing to use our Site, you consent to our use of cookies and to the practices described in our updated **Privacy Policy**.

JA-368





**JA-370**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __03/17/2023__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FREE HOLDINGS INC.,                                :
                                                                       :
                              Plaintiff,                      :     **OPINION AND**
                                                                       :     **ORDER**
                                                                       :
         -v-                                                      :     22-CV-881 (JLC)
                                                                       :
KEVIN MCCOY and SOTHEBY'S, INC.,      :
                                                                       :
                                                                       :
                              Defendants.                  :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

     Free Holdings, Inc. has brought this action involving the digital artwork,

*Quantum*, and the first non-fungible token ("NFT") ever created.  It has sued

*Quantum*'s creator, artist Kevin McCoy, and auction house Sotheby's Inc.

(collectively, "defendants").  Free Holdings alleges multiple claims stemming from

statements made by defendants in promotional material for an auction of *Quantum*

and its digital record.  Defendants have each moved to dismiss the amended

complaint.  For the reasons set forth below, the motions are granted.

## I.    BACKGROUND

### A.    Factual Background

     The following facts, drawn from the amended complaint ("AC"), Dkt. No. 47,

sources cited therein, exhibits attached by Free Holdings to its motion papers, and

judicially noticeable matters, are assumed true for the purposes of this motion.  *See,*

*e.g., Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 344–45 (S.D.N.Y. 2020),

1

*aff'd*, 2022 WL 274507 (2d Cir. Jan. 31, 2022).   In evaluating whether the claims are

cognizable, the Court also considers Natively Digital: A Curated NFT Sale, "the

challenged publication" cited in the amended complaint.  *See, e.g., Biro v. Condé*

*Nast*, No. 11-CV-4442 (JPO), 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014) ("In

a defamation case, [documents incorporated by reference or considered integral to

the complaint] may include the entirety of a challenged publication that is

excerpted in the complaint."), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F.

App'x 67 (2d Cir. 2015).

### 1. NFTs and Namecoin

As alleged in the amended complaint, an NFT is a unique identifier that

"authenticate[s] digital content" on the blockchain, which is "a digital public ledger

maintained on a decentralized computer system and consisting of records called

blocks."  AC ¶¶ 27, 29.  "The blockchain's record-keeping and authentication

technology serves to provide public certificates of authenticity or proof of ownership

of NFTs."  *Id.* ¶ 31.  "[C]ontent linked to NFTs can take the form of digital images of

physical objects, music, text, and more."  *Id.* ¶ 32.

Namecoin, an early blockchain, is a system of "names"—unique combinations

of numbers and letters—that can be claimed and traded by users.  *See id.* ¶ 35; *see*

*also* Monolithbrah.eth, *et al.*, *Defining "NFT" in Historical Context* ("Defining NFT")

(Jun. 27, 2022) https://mirror.xyz/chainleft.eth/MzPWRsesC9mQflxlLo-

N29oF4iwCgX3lacrvaG9Kjko.[1]  Ownership of every name periodically expires, at

---

[1] As Free Holdings cites to and attaches this article as an exhibit to its

**JA-372**

which point any user "may freely claim [it] on the Namecoin blockchain" by re-registering the expired name.  AC ¶ 4; Defining NFT.  In the community of blockchain users, "there is an ongoing debate" about the status of names that expire and are then re-registered: namely, whether re-registered names become new NFTs or are the same NFTs that were previously claimed.  The debate is summarized in the Defining NFT article as follows:

> Namecoin is designed around domain names, but when a domain name gets registered the first time, it is represented by a particular identifier (UTXO design) to allow its trading.  The chain of these identifiers (UTXOs) can be considered a special coin, which we will call a "colored coin" in this article. . . .

> When a Namecoin domain expires, the colored coin becomes unspendable.  In practice, it can be called "burnt", because when the domain name is re-registered later, a new UTXO chain starts.  This would mean that when a domain name expires, the chain of events where that domain was represented breaks.  During the re-registration, the Namecoin protocol does not make a distinction between a never-used domain name and a previously expired domain name.  This fact may support the argument that the expiration is philosophically burning the original token.

> On the other hand, as mentioned before, Namecoin is designed around names.  Names are unique identifiers themselves and they function that way immutably in a cryptographically secured blockchain.  The history of the

---

memorandum of law and declaration in opposition to McCoy's motion, *see* Plaintiff's Memorandum of Law in Opposition to Kevin McCoy's Motion to Dismiss the Amended Complaint ("Pl. Mem. McCoy"), Dkt. No. 66, at 8 n.5; Dkt. No. 66-1, Exhibit ("Ex.") C, the Court considers it part of the record in this case.  *See, e.g., Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007) (consideration of allegations and exhibits outside complaint permissible because plaintiff "knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions").

unique name, previous updates and transactions remain on-chain, as is the case with blockchains.

The aforementioned "UTXO chains" are actually formed of individual UTXO stations.  Each UTXO has an address and domain names are attached to these UTXOs.  When Bob makes a standard domain name transfer to Alice, a 0.01NMC is spent on Bob's side where the domain name is attached, and a new 0.01NMC is created on Alice's side where the domain name is attached.  The thing that physically (for lack of a better term) moves from one address to another during a typical transfer is the domain name, not UTXOs.  The design choice of a typical domain name transfer supports the argument that the domain name is the unique identifier and the token, and it never burns even after expiration.

This domain-first design can be seen not only in block explorers but also in functions to utilize the domain names.  There's a built-in [remote procedure call ("RPC"), a software communication protocol] method since the beginning of Namecoin called name_show which returns the information about the domain name even during the expired period.  This function does not return anything for never-registered domains.

In fact, an expired domain can still be functional.  When expired, Namecoin Core will still have the name and return its local state with name_show (just indicating the expired status).  If the resolver setup accepts it, the domain will still work.  Similarly, expired "id/" names in Namecoin still work as logins, which indicates the usefulness of the name_show function.

Consequently, as the article explains, there are three different interpretations of the significance of ownership of a re-registered name on Namecoin:

Interpretation 1: *The token is the colored coin, and that is the asset.*  Names may be unique but they are cryptographically represented by tokens and only that representation matters.  Since a re-registered name is

4

assigned to an entirely new colored coin, the provenance from the earlier UTXO chain is broken, therefore *this is a new asset and cannot claim historical value.*

Interpretation 2: *The token is the name, and that is the asset.* Namecoin is designed around names where names are the main unique identifiers. This is supported by the technical design when you do a typical name transfer or assign a value field to the name. These are all visible on-chain. Further, when the name expires, the data of the name remains on the blockchain. If the blockchain is designed around names and their whole history is on-chain, when the name is re-registered you are simply reactivating the old token, therefore *provenance is not broken.*

Interpretation 3: *The token is the colored coin because it is a cryptographic representation of the name.* But the main collectible asset is the name itself and these names have their own provenance because Namecoin is designed around names as unique identifiers. A name's history and UTXO assignments are all visible on-chain. This is further proven by the existence of name_show and name_history RPC methods. Therefore when the name is re-registered, *the new colored coin (UTXO chain) can be assumed as a new NFT, but it represents the old decentralized collectible asset which was intact and ownable since its birth.*

*Id.* (emphasis added). To summarize, as the Defining NFT article makes clear,

some believe that when a new user re-registers an available name previously

claimed by someone else, it has claimed the same NFT claimed by the previous

user. Others, who believe that the NFT is the UTXO chain, not the name, believe

that when a new user re-registers an expired name, the new UTXO chain it creates

signifies a new NFT. A third group ascribes to a combination of the two theories:

that the UTXO chain becomes a new NFT that retains the entire history of the

name.

### 2. Mccoy's Creation and Preservation of *Quantum*

In 2014, digital artist Kevin McCoy created *Quantum* (viewable at
https://static.mccoyspace.com/gifs/quantum.gif). AC ¶¶ 2, 37. McCoy was
interested in experimenting with the blockchain to store his work because he
"thought about how the scarcity mechanism that bitcoin presented could be a way
for digital artists to create provenance and ownership systems around digital
works." Declaration of Evan M. Rothstein dated June 30, 2022 ("Rothstein Decl."),
Dkt. No. 56, Ex. C, Ex. D ("Kevin McCoy – *Quantum* Tr.") at 3:24–4:3.[2] Because of
this interest, McCoy created the digital record of *Quantum* on Namecoin on May 2,
2014—"the first NFT." AC ¶¶ 2, 98; *see* Namebrow.se, Namecoin Explorer,
https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde
98e79825b68709a/ [https://perma.cc/N4J6-5Y3U] ("-709a Record Page") (last visited
Mar. 16, 2023) (also viewable at Declaration of William L. Charron dated June 30,
2022 ("Charron Decl."), Dkt. No. 61, Ex. B).[3] To do this, McCoy entered the
"NAME_NEW" and "NAME_FIRSTUPDATE" functions on Namecoin to register the
name d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

---

[2] The cited exhibits display a video and corresponding transcript. The video
appears in the "challenged publication" cited by Free Holdings in the amended
complaint, *see* AC ¶¶ 52–66, n.5–14. The Court deems these exhibits to be
incorporated by reference in, or otherwise integral to, the amended complaint, and
therefore properly considered here. *See, e.g., Biro*, 2014 WL 4851901, at *4.

[3] The Court considers the -709a Record Page in adjudicating the pending motions,
as Free Holdings refers to it in the amended complaint and "relied upon [it] in
framing the complaint." *See* AC ¶ 38 n.3; *see also McLennon v. City of New York*,
171 F. Supp. 3d 69, 88–89 (E.D.N.Y. 2016) (discussing when documents are
considered "integral" to complaint).

("-709a") as a digital record of *Quantum*.  -709a Record Page.  The -709a Record

Page provides the following disclaimer:

> An important distinction between property & deed must
> be made when considering Namecoin NFTs.  A UTXO, the
> thing that transfers ownership [between] holders
> of public/private key pairs, is a DEED to property but NOT
> property itself.  The property that the Namecoin
> blockchain was built to cryptographically secure
> ownership of, provided all recurring fees have been paid
> to the protocol, is a unique plot of digital space known as
> a Name.  As such, Names, along with the history of
> Values associated to them, are the NFT property.

-709a Record Page.  On May 28, 2021, McCoy "minted another NFT" to record the

same moving image of *Quantum*, "this time on the Ethereum blockchain."  AC ¶ 6.

### 3. Claims on Namecoin and Communications on Twitter

In January 2015, name -709a expired.  AC ¶ 3.  On April 5, 2021, a new user

entered "NAME_NEW" and "NAME_FIRSTUPDATE" on the -709a name entry.

-709a Record Page.  On April 30, 2021, a user entered "NAME_UPDATE" and wrote

a message that appears under the "Value" column of that entry:

> I assert title to the file at the URL
> http://static.mccoyspace.com/gifs/quantum.gif with the
> creator's public announcement of it's publishing at the
> URL
> https://twitter.com/mccoyspace/status/4623204267196416
> 00 The file whose SHA256 hash is
> d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde9
> 8e79825b68709a is taken to be the file in question.  Title
> transfers to whoever controls this blockchain entry.

-709a Record Page; AC ¶ 5.  Free Holdings reports that on Namecoin.org, the

command "name_history

d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a,"

7

returns the same message.  Declaration of Moish E. Peltz dated August 15, 2022 ("Peltz Decl."), Dkt No. 66-1 ¶¶ 2–14.[4]

As is displayed on the -709a Record Page and reproduced in the chart below, above the April 30, 2021 entry, several more "NAME_UPDATE" entries appear with dates, codes, and messages.  -709a Record Page.  The entries do not identify authors, but delineate "block" numbers.  *Id.*  For instance, the block number associated with the "NAME_NEW" operation performed on May 2, 2014 is 174910; the block number associated with the "NAME_FIRSTUPDATE" operation performed on May 3, 2014 is 174923.  *Id.*  Then, the "NAME_NEW" operation performed on April 5, 2021 appears at block 553180, and subsequent entries appear next to higher block numbers.  *Id.*  Thus, according to Free Holdings, "all subsequent activity associated with [-709a] is forever linked to that name on the Namecoin blockchain" and "all prior history associated with that name . . . cannot be deleted so long as the Namecoin blockchain continues to operate."  Peltz Decl. ¶ 16.

---

[4] Free Holdings also asserts that the Namecoin Explorer does not "properly display the relevant history of the -709a name" but a "direct interaction with the Namecoin protocol produces . . . a different value . . .  presumably because McCoy committed this text in [a different format]."  Pl. Mem. McCoy at 7; *see also* Peltz Decl. ¶¶ 2–14. Because Free Holdings cited to the -709a Record Page on Namecoin Explorer in the amended complaint, *see* AC ¶ 38 n.3, the Court considers it here.

| Date/Time | Block | Transaction | Operation | Value |
|---|---|---|---|---|
| Oct. 7, 2022, 1:24 p.m. | 633125 | b9d71b2cd... | NAME_UPDATE | An important distinction between property & deed must be made when considering Namecoin NFTs. A UTXO, the thing that transfers ownership b/w holders of public/private key pairs, is a DEED to property but NOT property itself. The property that the Namecoin blockchain was built to cryptographically secure ownership of, provided all recurring fees have been paid to the protocol, is a unique plot of digital space known as a Name. As such, Names, along with the history of Values associated to them, are the NFT property. |
| Feb. 10, 2022, 3:47 p.m. | 596415 | 6dd5ceffc... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL. https://twitter.com/mccoyspace/status/462320426719341600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcbb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| June 14, 2021, 12:25 p.m. | 563353 | 93e6db4e6... | NAME_UPDATE | **This original NFT, entitled "Quantum" by Kevin McCoy and minted on May 2, 2014, is currently held by the person who controls the Twitter handle @EarlyNFT. Please direct message all inquires about the artwork there.** |
| June 7, 2021, 4:30 p.m. | 562392 | 84adf2532... | NAME_UPDATE | **An authorized print of this original NFT, entitled "Quantum" by Kevin McCoy, is currently being auctioned off by Sotheby's. Good Luck to all the bidders.** |
| April 30, 2021, 2:53 p.m. | 556942 | e63d18c5b... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL. https://twitter.com/mccoyspace/status/462320426719341600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcbb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| April 5, 2021, 12:14 p.m. | 553214 | d81a70169... | NAME_FIRSTUPDATE | None |
| April 5, 2021, 7 a.m. | 553180 | 8c76ba4ec... | NAME_NEW | fc6a09d1dfa2cbced6fa35e64c3cb001196cdef2 |
| May 3, 2014, 1:27 a.m. | 174923 | fa8b9a6ad... | NAME_FIRSTUPDATE | None |
| May 2, 2014, 11:33 p.m. | 174910 | da66d975e... | NAME_NEW | aa4bed723e172f0f53cbab9c71a165262334206b |

Beginning in April 2021, Free Holdings alleges that it attempted to contact McCoy on Twitter (@mccoyspace) using the handle @EarlyNFT. AC ¶¶ 44–45. On April 6, 2021, @EarlyNFT tweeted: "Would you mind enabling PM for me, @mccoyspace? There's a matter regarding your work 'Quantum' I'd like to discuss with you . . ." *Id.* ¶ 45. On April 12, 2021, @EarlyNFT replied to one of @mccoyspace's tweets: "Kevin, would you mind allowing me to send you a private message (this option is currently turned off on your end)? This concerns your NFT artwork with Monograph back in 2014." *Id.* ¶ 46.[5] On April 30, 2021, @EarlyNFT

---

[5] The Court takes judicial notice that on Twitter, a "reply" is a "response to another tweet." *See* Twitter, About Conversations on Twitter, https://help.twitter.com/en/using-twitter/twitter-

replied to @mccoyspace: "I am in possession of Quantum NFT (the record is found

here [link inaccessible by the Court]).  Can we discuss this over messaging

(currently your messaging is turned off)?"  *Id.* ¶ 47.  Later on April 30, @EarlyNFT

tweeted: "Take a look . . . I just updated the record today: [link inaccessible by the

Court]."  *Id.*  On May 3, @EarlyNFT tweeted:



*Id.* ¶ 48.[6]  On May 6, 2021, @EarlyNFT replied to @mccoyspace: "Kevin we

---

conversations#:~:text=A%20reply%20is%20a%20response,the%20prompt%20above
%20the%20Tweet (last visited Mar. 16, 2023).  *See also Satan Wears Suspenders,
Inc. v. Jaar*, No. 21-CV-812 (ER), 2022 WL 2181449, at *3 n.6 (S.D.N.Y. June 16,
2022) (taking judicial notice of "Twitter post and reply tweets"); *Knight First
Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 552 (S.D.N.Y. 2018)
(taking judicial notice of information on Twitter webpage), *dismissed as moot on
other grounds*, 2021 WL 5548367 (2d Cir. May 26, 2021).  The amended complaint
does not indicate to which of McCoy's tweets @EarlyNFT replied.

[6] Free Holdings alleges that this tweet was "to McCoy."  AC ¶ 48.  The screenshot of
the tweet included in the Amended Complaint does not show whether it was a
"reply" to one of McCoy's tweets, or otherwise indicate how McCoy would have been

10

**JA-380**

ABSOLUTELY need to talk . . . Namecoin records expire; I own the Quantum NFT. I can demonstrate it if you give me a chance . . ." *Id.* ¶ 50.  McCoy never responded to the Twitter communications.  *Id.* ¶ 51.

### 4. The Auction and Sale of *Quantum*

In May 2021, the well-known auction house Sotheby's began marketing *Quantum* for an auction entitled *Natively Digital: A Curated NFT Sale*, scheduled for June 2021.  AC ¶¶ 8, 52; *see* Sotheby's, Natively Digital: A Curated NFT Sale, https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum [https://perma.cc/B3YA-A9HP]("Natively Digital") (last visited Mar. 16, 2023) (videos and moving image not preserved on Permalink, videos attached as exhibits C and E, with corresponding transcripts at exhibits D and F, to the Rothstein Declaration).[7]  Natively Digital includes the following description below the moving image, *Quantum*:

> Owner: Kevin McCoy
>
> Kevin McCoy
> b. 1967
> *Quantum*
> 2014-21
>
> Non-fungible token ERC-721
> Token ID: 0
> 9 mb Tif + file archive with documentation
> Originally minted on May 3, 2014 on Namecoin

---

made aware of it.

[7] As Natively Digital is cited and discussed extensively in the amended complaint and is "the challenged publication," the Court considers it as part of the record in adjudicating the pending motions.  *See, e.g.*, *Ebomwonyi*, 473 F. Supp. 3d at 344–45; *Biro*, 2014 WL 4851901, at *4.

blockchain, and preserved on a token minted on May 28,
2021 by the artist.

Sotheby's marketed *Quantum* as "the most art historically important work in the

history of NFTs." AC ¶ 59 (quoting Natively Digital). The Catalogue Note for

*Quantum* provides the following description:

> In the long timeline of art, there are few works that serve
> as genesis blocks to their own chain of history. They are
> seismic forks in direction; forks that usher in new
> movements that block by block, mint by mint, usher in
> new art histories. These works close chapters on the art
> histories that came before, while anchoring a new
> flowering of human creativity. These prime movers
> occupy a singular position in art history. They came first.
> Kevin McCoy's *Quantum* is such a work. Minted on 2nd
> May 2014 21:27:34, or more precisely Namecoin Block
> 174923, the NFT era quietly dawned. What a noise it
> makes today.

AC ¶ 58 (quoting Natively Digital, Catalogue Note).

A "Condition Report" on Natively Digital, authored by nameless TM, explains

*Quantum*'s digital history, in relevant part:

> The hash and all the information about [*Quantum*] are
> stored on the Ethereum blockchain, and therefore cannot
> be modified. This token was minted May 2021, but the
> referenced pieces were originally made public in 2014,
> with a link to the image hosted on the Namecoin network.
> The token is a very early example of utilizing a blockchain
> token to identify the provenance of a piece of art.
> Documents contained within the media bundle hosted on
> [the InterPlanetary File System] indicate the date and
> block location that the Namecoin DNS pointer was set to
> point to mccoyspace.com, and shows the transactions used
> at the time to create this trail. To avoid domain
> squatting, Namecoin was designed to include removal of
> pointers after 36,000 blocks. Accordingly, this specific
> Namecoin entry was removed from the system after not
> being renewed, and was effectively burned from the chain.

Natively Digital; AC ¶¶ 64–65.

McCoy appears in two videos on Natively Digital.  *See* Rothstein Decl., Ex. C–F.  In one video, McCoy describes the "restoration and preservation efforts that [he] made to bring this early work back into the present day."  *Id.*, Ex. E, Ex. F ("*Quantum* Token – McCoy Tr.") at 2:4–6.  On his computer screen, McCoy shows the viewer how he "moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information."  *Id.*, Ex. E, *Quantum* Token – McCoy Tr. at 2:8–12; *see also* AC ¶ 66 (quoting same).  McCoy explains that the "provenance chain . . . begins on Namecoin but now is irrevocably transferred to this more modern and stable specification on the Ethereum blockchain."  *Quantum* Token – McCoy Tr. at 3:23–4:2.  McCoy displays

> an archive called 'wallet documentation[,]' that contains a set of screenshots taken from the original Namecoin wallet showing the original transaction set, the original on-chain data, and a signed message proving that [he] ha[s] continued possession of the private key for the address that originally sent *Quantum*'s minting transaction.  That signed message appears separately in the archive as a text file and the data of which can be used in a contemporary Namecoin wallet to independently verify the message's validity.

Rothstein Decl., Ex. E, *Quantum* Token – McCoy Tr. at 4:3–15.  McCoy concludes: "[a]s we enter into this new era of tokenization, I think we will increasingly be faced with issues of cross-chain translation, preservation, and archiving and conservation. In fact, we're already there with *Quantum*."  *Quantum* Token – McCoy Tr. at 5:3–8.

Sotheby's held the auction for *Quantum* from June 3–10, 2021.  AC ¶¶ 77–78.

13

**JA-383**

On June 17, 2021, Free Holdings allegedly spoke to Caroline Moustakis ("Moustakis"), Sotheby's Senior Vice President, and told her "that the description that Sotheby's posted . . . was inaccurate and misleading because [the record of *Quantum* on Namecoin] had not been 'burned' or 'removed' from the Namecoin blockchain, but rather was still active and controlled by Free Holdings."  AC ¶ 79. "Free Holdings requested that Sotheby's make public statements to correct the record, including making a statement that the [the record of *Quantum* on Namecoin] remains active and in private hands, was not listed for sale as part of Sotheby's auction, and that the item Sotheby's auctioned was in fact an authorized print of the Namecoin-*Quantum* token."  *Id.*  Free Holdings then emailed Moustakis, memorializing the conversation and requesting that the public record be corrected, but neither Moustakis nor any other Sotheby's representative responded. *Id.* ¶¶ 80–81.

On August 23, 2021, McCoy and Sotheby's sold the "re-minted" *Quantum* to Alex Amsel ("Amsel"), who uses the Twitter name @Sillytuna, for a reported sum of $1,472,000.  AC ¶ 84.  Amsel tweeted: "First ever crypto art nft – Quantum has arrived chez Sillytuna. Take that VISA!"  AC ¶ 86.

After the sale, an article in the *New York Times* reported that the "first NFT that Kevin [McCoy] created . . . sold last June at Sotheby's for $1.4 million."  AC ¶ 95; ¶ 95 n.15 (citing Blake Gopnik, *One Year After Beeple, the NFT Has Changed Artists. Has It Changed Art?*, N.Y.TIMES (Mar. 3, 2022) https://www.nytimes.com/2022/03/03/arts/design/nft-art-

14

beeple.html?msclkid=eacb622dcf0a11ec93b64ee394548d56 ("Gopnik")).[8]  A segment

on Fox Business ran the banner: "FIRST-EVER NFT 'QUANTUM' SOLD FOR

$1.47 MILLION."  AC ¶ 97.  Free Holdings alleges that it expended $5,311.49

"seeking to have McCoy and Sotheby's issue public statements correcting their false

and misleading claims."  *Id.* ¶ 100.

On May 6, 2022, nameless tweeted:

> "Last year, nameless prepared a condition report in
> connection with the Sotheby's auction of Kevin McCoy's
> Ethereum-based 'Quantum' NFT [(hyperlink to Natively
> digital)].  McCoy's 'Quantum' NFT was originally created
> on the Namecoin blockchain.  The condition report
> included a statement that Quantum's 'specific Namecoin
> entry was removed from the system after not being
> renewed, and was effectively burned from the chain.'  In
> light of subsequent allegations challenging this
> statement, nameless has decided to retract its condition
> report.  [N]ameless expresses no opinion about the merits
> of the allegations.

AC ¶ 88.

## B.   Procedural History

Free Holdings, a Canadian corporation, originally brought this action against

McCoy; Sotheby's; nameless, a corporation based in Colorado; and Alex Amsel, the

buyer of the *Quantum* NFT, on February 1, 2022, challenging their

characterizations that they were involved with the first NFT, and that the

Namecoin record associated with *Quantum* had been "burned" or "removed."

---

[8] Where it is not otherwise incorporated in the pleadings, a court may "take judicial
notice that an article was published," but may "not take judicial notice of the truth
of the facts in the article."  *Karol v. City of New York*, 396 F. Supp. 3d 309, 318
(S.D.N.Y. 2019) (citing *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425
(2d Cir. 2008)).

JA-385

Complaint ("Compl."), Dkt. No. 1; *see also* AC ¶¶ 60–70.  On March 8, 2022, Free

Holdings voluntarily dismissed its claims against Amsel.  Dkt. No. 24.  On April 6,

2022, the parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C.

§ 636(c).  Dkt. No. 38.  On May 9, 2022, Free Holdings filed an amended complaint,

in which it asserts five causes of action: (1) unjust enrichment (¶¶ 110–16); (2)

slander (¶¶ 117–26); (3) deceptive and unlawful trade practices under New York

General Business Law ("G.B.L.") § 349 (¶¶ 127–39); (4) commercial disparagement

(¶¶ 140–48); and (5) false or misleading representations under 15 U.S.C. § 1125(a)

(¶¶ 149–58).[9]  Dkt. No. 47.  It further requests that the Court:

> declar[e] and adjudicat[e] that (i) Free Holdings is the
> rightful owner of the Namecoin-based *Quantum*; (ii) the
> Namecoin-*Quantum* has not been burned or otherwise
> removed from the Namecoin blockchain; and (iii) the
> statements issued by McCoy and Sotheby's in connection
> with their sale of the Ethereum-*Quantum* were false and
> misleading[:]

and seeks damages and injunctive relief.  *Id.* at 24–25.[10]

On May 10, 2022, Free Holdings dismissed its claims against nameless.  Dkt.

No. 48.  On June 30, 2022, McCoy and Sotheby's both moved to dismiss the

amended complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure, Dkt. Nos. 54, 59, and filed accompanying memoranda of law,

---

[9] As its first cause of action, Free Holdings asserts "Declaratory Judgment," which
is not a cause of action but rather a form of relief.  *See, e.g., Cisco Sys., Inc. v.
Synamedia Ltd.*, 557 F. Supp. 3d 464, 474 (S.D.N.Y. 2021) ("A request for relief in
the form of a declaratory judgment does not constitute an independent cause of
action.") (citing *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 14 F.3d 726,
731 (2d Cir. 1993)).

[10] This citation refers to page numbers of the amended complaint as the paragraphs
seeking relief are not numbered.

declarations, and exhibits of various sources cited in the amended complaint.  *See*

Defendant Sotheby's Inc.'s Memorandum of Law in Support of its Motion to Dismiss

the Amended Complaint ("Sotheby's Mem."), Dkt. No. 55; Rothstein Decl., Dkt. No.

56; Defendant Kevin McCoy's Memorandum of Law in Support of his Motion to

Dismiss ("McCoy Mem."), Dkt. No. 60; and Charron Decl., Dkt. No. 61.[11]  On July 7,

2022, the Court accepted video footage as exhibits to the motion papers, including

those filed by Sotheby's, annexed to the Rothstein Declaration.  Dkt. No. 62.  On

August 16, 2022, Free Holdings filed memoranda of law in opposition to both

motions to dismiss and an accompanying declaration.  *See* Pl. Mem. McCoy; Peltz

Decl., Dkt No. 66-1; Plaintiff's Memorandum of Law in Opposition to Sotheby's

Inc.'s Motion to Dismiss the Amended Complaint ("Pl. Mem. Sotheby's"), Dkt. No.

64.  On September 1, 2022, Sotheby's and McCoy each filed a reply memorandum of

law.  Dkt. Nos. 68, 69.

## II.   DISCUSSION

In their respective motions, defendants contend that Free Holdings has failed

to allege an injury sufficient for standing or a claim that is ripe for review,

warranting dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).  In

the alternative, they argue that all of Free Holdings' claims should be dismissed

under Rule 12(b)(6) for failure to state a claim.  For the following reasons, the Court

concludes that Free Holdings has not alleged an injury sufficient for standing to

---

[11] While they filed separate motion papers, Sotheby's and McCoy joined in each
other's motions as well.  Dkt. Nos. 54, 55 at 1; Dkt. No. 60 at 1.

sue.  The Court further concludes that even if Free Holdings had standing, it has failed to state a claim upon which relief can be granted.

### A. Legal Standards

#### 1. Motion To Dismiss For Lack Of Subject Matter Jurisdiction

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Gelmart Indus., Inc. v. Everready Battery Co., Inc.*, No. 13-CV-6310 (PKC), 2014 WL 1512036, at *2 (S.D.N.Y. Apr. 15, 2014) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)).  In deciding such a motion, the Court construes the complaint in the plaintiff's favor and accepts all factual allegations as true.  *Id.*  However, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Ryan v. United States*, No. 15-CV-2248 (GHW), 2015 WL 7871041, at *3 (S.D.N.Y. Dec. 3, 2015) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).

In evaluating a Rule 12(b)(1) motion, "the Court may consider evidence outside the pleadings." *Id.*  "[P]laintiffs [may] come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems in the assertion of jurisdiction." *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 57 (2d Cir. 2016) (quotations omitted).  "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it

does not contradict plausible allegations that are themselves sufficient to show standing."  *Id.*

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined."  *L.M., et al. v. Johnson*, No. 14-CV-3833 (NGG) (VMS), 2015 WL 8540876, at *2 (E.D.N.Y. Dec. 7, 2015) (quoting *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)); *see also Gunn v. Ambac Assur. Corp.*, No. 11-CV-5497 (PAC) (JLC), 2012 WL 2401649, at *10 (S.D.N.Y. June 26, 2012), *adopted by* 2012 WL 3188849 (S.D.N.Y. Aug. 6, 2012).

### 2. Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted

Rule 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In considering a Rule 12(b)(6) motion, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

To survive dismissal, the plaintiff must allege enough facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility exists when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### 3.     Evidentiary Standard On A Motion To Dismiss Under Rule 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), "district courts must limit their consideration to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; or (4) documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Ebomwonyi*, 473 F. Supp. 3d at 344–45 (quoting *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014)) (cleaned up).

For a document "[t]o be incorporated by reference, the complaint must make a clear, definite and substantial reference to [it]." *McLennon*, 171 F. Supp. 3d at 88 (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010)) (citation omitted). "Limited quotation does not constitute

incorporation by reference." *Id.* at 88–89 (quoting *Looney v. Black*, 702 F.3d 701, 716 n.2 (2d Cir. 2012)).  "Even where a document is not incorporated by reference, it may be considered if it is integral to the complaint." *Id.* at 89.  "A document is integral to the complaint where the plaintiff (1) has actual notice of the document and its information and (2) has relied upon the documents in framing the complaint." *Id.* (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (cleaned up).  "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (cleaned up).

The Federal Rules of Evidence establish that judicial notice may be taken of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  "To that end, dictionaries and encyclopedia may be consulted." *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988).  A court need not convert a motion to dismiss for failure to state a claim to one for summary judgment merely because it has considered extrinsic evidence for purposes of resolving a motion to dismiss for lack of subject matter jurisdiction. *See, e.g., Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 161 (E.D.N.Y. 1998).

### B. The Court Lacks Subject Matter Jurisdiction Over Free Holdings' Claims

The gravamen of Free Holdings' amended complaint is that its alleged

**JA-391**

proprietary interest in "Namecoin-*Quantum*"—its term for the NFT it claims on Namecoin—was injured by defendants' allegedly false statements that the record of *Quantum* on Namecoin was "burned" or "removed" and their allegedly false representation that the "NFT they sold at auction was the first NFT ever created." AC ¶¶ 119–20, 142–43, 151–52.[12]  Defendants counter that those statements and characterizations were not false, and that Free Holdings has failed to allege a concrete injury resulting from them.  McCoy Mem. at 2; Sotheby's Mem. at 1, 17–18. Thus, defendants move to dismiss for lack of subject matter jurisdiction.

### 1.  Free Holdings' Claims Are Not Justiciable

The Court first analyzes whether Free Holdings has alleged an injury sufficient for standing under Article III of the U.S. Constitution.  As discussed below, Free Holdings has alleged no concrete or particularized injury sufficient for standing to sue in federal court.

#### a.  Article III Standing and Ripeness

The Constitution limits the judicial power of federal courts to decide cases or controversies.  *See* U.S. Const. art. III, § 2, cl. 1.  "Constitutional standing thus is the threshold question in every federal case, determining the power of the court to

---

[12] Free Holdings's choice of terminology—"Namecoin-*Quantum*" and "Ethereum-*Quantum*"—supports its view that there are two NFTs called *Quantum* and that it has ownership rights to the one on Namecoin.  AC ¶¶ 1–2, 6.  This terminology is not used in any of the exhibits Free Holdings attaches or in the sources to which it cites.  Defendants alternatively refer to two Namecoin NFTs—a "2014 NFT" and a "2021 NFT"—to support their position that Free Holdings' proprietary interest is in a new, distinct NFT it created on Namecoin in 2021 when it claimed -709a.  *See, e.g.*, McCoy Mem. at 19 n.7.  At the motion to dismiss stage, the Court, construing the pleadings in Free Holdings' favor, refers to its terminology where it would not cause confusion.

22

entertain the suit." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 339
(S.D.N.Y. 2021) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal
quotations omitted)).  "The ripeness doctrine is drawn both from Article III
limitations on judicial power and from prudential reasons for refusing to exercise
jurisdiction." *NYCLU v. Grandeau*, 528 F.3d 122, 130 (2d Cir. 2008).

Article III requires a plaintiff first to allege that it "suffered an injury in
fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and
particularized and (b) actual or imminent, not conjectural or hypothetical." *Wilhelm
v. Beasley*, No. 15-CV-4029 (LAK), 2016 WL 94254, at *2 (S.D.N.Y. Jan. 7, 2016)
(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also SC
Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 525
(E.D.N.Y. 2013) ("If a plaintiff has not yet suffered a concrete injury-in-fact, he or
she . . .  could also be said to suffer from a lack of ripeness . . . ."), *aff'd*, 548 F. App'x
741 (2d Cir. 2014).  Injury-in-fact requires a "personal stake in the outcome of the
controversy"—at a minimum, "a proprietary interest in[ ]the claim." *Cortlandt St.
Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 417, 420 (2d
Cir. 2015) (citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549
F.3d 100, 108 (2d Cir. 2008) ("[T]he minimum requirement for an injury-in-fact is
that the plaintiff have legal title to, or a proprietary interest in, the claim.")).  The
remaining requirements for Article III standing are "a causal connection between
the injury and the conduct complained of" and a likelihood, "as opposed to mere[
]speculati[on], that the injury will be redressed by a favorable decision." *Wilhelm*,

2016 WL 94254, at *2 (quoting *Lujan*, 504 U.S. at 560–61).

"Although the plaintiff must independently establish that it has standing to bring this action, and that its claim is ripe, the Court will analyze these inquir[i]es together because this case concerns whether plaintiff's injury is currently concrete, and not hypothetical, which implicates both standing and ripeness." *SC Note Acquisitions*, 934 F. Supp. 2d at 526.  At the pleading stage, "[e]ach element of standing must be supported" at least by "general factual allegations of injury resulting from the defendant's conduct." *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir. 2020) (cleaned up).  As Free Holdings' allegations rely on its proprietary interest in *Quantum qua* name -709a, the analysis begins there.

### i.   Free Holdings Has Failed To Allege A Proprietary Interest In *Quantum*

Free Holdings claims a proprietary interest in "[t]he blockchain record for the Namecoin-*Quantum*," which, it alleges, "remains active and under [its] control." AC ¶ 69.  The claim to -709a, under Free Holdings' theory of NFT ownership, confers a property interest in *Quantum* itself.  *Id.*; *see also id.* ¶¶ 103–07.  Notably, Free Holdings nowhere alleges an interest in the NFT minted on Ethereum that McCoy and Sotheby's sold.  Indeed, it alleges that the two "are different NFTs." *Id.* ¶ 7.  McCoy disputes Free Holdings' theory of ownership, arguing that a name on Namecoin is distinct from the underlying NFT.  McCoy Mem. at 3 n.2.  Thus, according to McCoy, Free Holdings merely claimed -709a, creating a distinct NFT, which confers no proprietary interest in *Quantum* itself.  *See* McCoy Mem. at 4–7.

24

Case 23-644, Document 40, 07/25/2023, 3546479, Page252 of 282

Free Holdings does provide an adequate factual basis to support a plausible proprietary interest in -709a—that is, assertions of title displayed on the -709a Record Page and by Twitter user @EarlyNFT.  *See* AC ¶¶ 38, 42–43.  Free Holdings has thus alleged a proprietary interest in -709a sufficient for standing.  However, Free Holdings has not articulated any facts to support its claim to ownership of *Quantum* vis-à-vis its claim to -709a.  As McCoy points out, Free Holdings "never alleges that it can or could control" *Quantum*.  McCoy Mem. at 5.  As factual support, Free Holdings provides only its own alleged statements on Namecoin that it "assert[ed] title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif" and that "[t]itle transfers to whoever controls this blockchain entry," -709a Record Page, along with an article explaining that the significance of name ownership on Namecoin is open to debate.  *See* Pl. Mem. McCoy at 8 n.5 (citing Defining NFT); Dkt. No. 66, Ex. C (same); McCoy Mem. at 5, 12.  Even taken together, they are insufficient to give rise to a legally-protected interest in *Quantum*.

### ii.   Free Holdings Has Failed To Allege Injury-In-Fact

Setting aside conclusory statements that merely recite the elements of the claims in the pleadings, the harm that Free Holdings alleges as a result of defendants' statements in Natively Digital, the challenged publication, consists of three theories: (1) loss of opportunity to profit from Sotheby's and McCoy's $1,472,000 sale; (2) damage to the value of its claimed Namecoin property; and (3) the expense of "$5,311.49 seeking to have McCoy and Sotheby's issue public

statements correcting their false and misleading claims."  AC ¶¶ 48, 139, 148, 158;
*see also, e.g., Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions'
or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting
*Twombly*, 550 U.S. at 555).

In support of the first theory, Free Holdings points to the tweet from
@EarlyNFT that it allegedly directed at McCoy's Twitter account asking, "Are you
interested in the sale of Quantum or not then?"  AC ¶ 48.  Free Holdings argues
that "[i]f McCoy had taken up this offer," its claimed Namecoin NFT "could have
been included in McCoy's sale . . .  at the Sotheby's auction (and corrected related
marketing statements)."  Pl. Mem. McCoy at 11.  But the pleadings raise no
suggestion that defendants either were legally obligated to include Free Holdings in
their auction sale, or that McCoy even responded to (or should have responded to)
the cryptic offer made by an anonymous Twitter user.  And because no facts are
alleged to suggest that Free Holdings had any claim to a share in the sale in the
first place, there is no basis to support an inference that an injury occurred.

Regarding the second theory—damage to the value of its claimed Namecoin
property—as McCoy points out, Free Holdings "does not allege any actual,
imminent or attempted sale of [its claimed] NFT," nor that it "even *tried* to market
it[ ]."  McCoy Mem. at 13–14 (emphasis in original).  Free Holdings' vague
speculation that "[a]ny prospective purchaser of Namecoin-*Quantum* would now
have valid reason to doubt [its] value," Pl. Mem. McCoy at 12, is legally insufficient.
*See, e.g., ATSI Commc'ns*, 493 F.3d at 98 ("plaintiff must provide . . . factual

**JA-396**

allegations . . . above the speculative level") (quoting *Twombly*, 550 U.S. at 555).

As to Free Holdings' alleged expenditure of $5,311.49 to have defendants issue public statements to correct the record, it is well-established that a plaintiff may not "manufacture standing merely by inflicting harm on [itself] based on . . . fears of hypothetical future harm that is not certainly impending." *Steven v. Carlos Lopez & Assocs., LLC*, 422 F. Supp. 3d 801, 807 (S.D.N.Y. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)), *aff'd sub nom.*, *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295 (2d Cir. 2021). This expenditure thus fails to give rise to standing.

While the Court is mindful that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," Free Holdings has not pleaded *any* actual or imminent harm to its alleged proprietary interest. *Sonterra Cap. Master Fund*, 954 F.3d at 534 (citation omitted). Thus, Free Holdings has no Article III standing to bring the claims it has alleged in its amended complaint.

## C. The Amended Complaint Fails To State A Claim

Having concluded that Free Holdings has not alleged injury sufficient for standing, the Court does not need to consider, as a matter of law, whether the amended complaint states any claims. Nonetheless, both for completeness' sake and because of the novelty of the issues presented here, it will analyze each of Free Holdings' claims for relief to determine if any of them are cognizable. *See, e.g., Desir v. Fla. Cap. Bank, N.A.*, 377 F. Supp. 3d 168, 174 (E.D.N.Y. 2019) (finding no

**JA-397**

subject matter jurisdiction, but even assuming jurisdiction, analyzing whether complaint failed on 12(b)(6) grounds).[13]  For the reasons set forth below, the Court concludes that none are.  Free Holdings has not pleaded any viable cause of action against defendants that would otherwise survive a motion to dismiss, even if it were to establish standing.

### 1.  Free Holdings Has Failed To State A Claim Of Unjust Enrichment

As to its unjust enrichment claim, Free Holdings alleges that its Namecoin NFT "has significant value due to its status as the first NFT and such value is being significantly diminished by [defendants'] false and misleading statements."  AC ¶ 98; *see also id.* ¶¶ 110–16.  It argues that defendants were unjustly enriched when they "claimed the identity, titles, and prestige associated with the Namecoin-*Quantum* in order to market, promote, and sell [their own, separate] asset."  Pl. Mem. Sotheby's at 14.

"An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another."  *Georgia*

---

[13] Defendants have requested that all of Free Holdings' claims be dismissed with prejudice.  If the Court were to dismiss solely on subject matter jurisdiction grounds, the dismissal would be "without prejudice" as a matter of law.  *See, e.g.*, *Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021) (dismissals for lack of subject matter jurisdiction "must be without prejudice, rather than with prejudice").  However, dismissals for failure to state a claim are considered to be "with prejudice."  *See, e.g.*, *Lynch v. Hanley*, No. 21-CV-25 (GTS) (ML), 2021 WL 2309688, at *2 n.4 (N.D.N.Y. June 7, 2021) (dismissal for failure to state a claim viewed as adjudication "on the merits" of the action, and thus dismissal "with prejudice" appropriate) (collecting cases).

*Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (cleaned up).[14]  "Thus, in order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Id.* (cleaned up).  While there is no dispute that defendants were enriched (they made a $1,472,000 sale), Free Holdings does not allege that it has any proprietary interest in the NFT that McCoy and Sotheby's sold.  McCoy Mem. at 15; AC ¶ 136.  Moreover, Free Holdings has made no specific allegations that defendants' sale of an NFT (it does not even claim to own) was at its expense.  *See* AC ¶ 113 (alleging only that "McCoy and Sotheby's profits are obtained at Free Holdings' expense").

A viable unjust enrichment claim also requires some sort of connection between the plaintiff and defendants that would make the enrichment unjust. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. 2011) ("Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated.").  In *Georgia Malone & Co.*, for example, the court concluded that "arm's length business interactions" between the parties were "too attenuated" to meet this requirement.  19 N.Y.3d at 517–18.

The only connections alleged between the parties are based on Free Holdings' unsuccessful attempts to contact McCoy on Twitter using the handle @EarlyNFT,

---

[14] As Free Holdings brings New York law claims and the parties rely on New York law in their briefs, the Court will apply New York law. *See, e.g., Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026, at *17 n.17 (S.D.N.Y. June 22, 2020) (parties' agreement on applicable law "may be implied by the parties' reliance on [it] in their briefs") (citation omitted).

and its alleged phone conversation with Sotheby's' Moustakis, memorialized in an email to which she did not respond.  AC ¶¶ 44–50, 79–81.  The pleadings provide no information as to why McCoy should have even known who @EarlyNFT was, much less that it was Free Holdings.  *See generally* AC ¶¶ 44–51.  A single phone call followed by an unanswered email may safely be characterized as an "arm's length business interaction" and anonymous unanswered replies on one social media network constitutes no interaction at all.[15]  Nothing in the amended complaint can be construed as describing a sufficiently close relationship between the parties to support an unjust enrichment claim.

In addition, Free Holdings argues that it would be "against equity and good conscience" to allow "McCoy and Sotheby's to retain the profits they obtained through the sale of the Ethereum-*Quantum*."  AC ¶ 19.  From the pleadings, however, Free Holdings has demonstrated nothing more than an attempt to exploit open questions of ownership in the still-developing NFT field to lay claim to the profits of a legitimate artist and creator.  It does not allege that it took any part in the creation of *Quantum* or the blockchains used to record it.  Free Holdings has thus failed to plausibly allege that unjust enrichment occurred in these circumstances.

---

[15] *See, e.g.*, Merriam-Webster, "Interaction", https://www.merriam-webster.com/dictionary/interaction (last visited Mar. 16, 2023) ("mutual or reciprocal action or influence"); *see also, e.g.*, *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 52 (S.D.N.Y.) (connection insufficient for unjust enrichment purposes between owner of artwork and foundation refusing to authenticate it), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015).

### 2. Free Holdings Has Failed To State Claims Of Slander Of Title Or Commercial Disparagement

Free Holdings next alleges claims of slander of title and commercial disparagement based on its purported title on Namecoin.  AC ¶¶ 117–26, 140–48. For a viable slander of title claim, a plaintiff must adequately plead: "(1) a communication falsely casting doubt on the validity of [its] title, (2) reasonably calculated to cause harm [(in other words, malice)], and (3) resulting in special damages."  *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *11 (S.D.N.Y. Sept. 24, 2007); *see also Wei Su v. Sotheby's, Inc.*, No. 17-CV-4577 (VEC), 2019 WL 4917609, at *3 (S.D.N.Y. Oct. 4, 2019) ("[T]he claimant must plausibly allege that the offending party maliciously used false statements to cast doubt upon another's property interest, causing special damages, typically in the form of a lost sale resulting from the cloud on the claimant's title.").  Likewise, "product disparagement consists of: (1) a false statement; (2) published by Defendant to a third party; (3) with malice; and (4) with special damages." *Chamilia*, 2007 WL 2781246, at *18 (citing cases).  Where a plaintiff "has merely parroted the applicable legal standard" or fails to plead any facts suggesting malice, a slander of title claim will be dismissed. *Horton v. Wells Fargo Bank N.A.*, No. 16-CV-1737 (KBF), 2016 WL 6781250, at *7 (S.D.N.Y. Nov. 16, 2016), *aff'd*, 703 F. App'x 23 (2d Cir. 2017); *see also Aleem v. Experience Hendrix, L.L.C.*, No. 16-CV-9206 (ER), 2017 WL 3105870, at *7 (S.D.N.Y. July 20, 2017) (plaintiffs failed to "submit any facts to suggest . . . purported communications . . . made with malice"). For either claim to survive, Free Holdings must therefore plausibly allege falsity,

malice, and special damages.  The Court analyzes them seriatim.

### i.    Free Holdings Has Not Alleged Falsity

The burden is on a plaintiff to allege "that the complained of statement is

substantially false."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d

236, 242 (2d Cir. 2017); *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st

Dep't 2015) (if statement "is substantially true," claim should be dismissed)

(quotation omitted).  "[E]xpressions of pure opinion . . . are not actionable."  *Restis v.*

*Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718 (S.D.N.Y. 2014)

(citing *Torain v. Liu*, 279 Fed. App'x 46, 46 (2d Cir. 2008)).

Free Holdings has failed to meet its burden for several reasons.  First, it

concedes that the representations it challenges—that *Quantum* was "burned" or

"removed" from the Namecoin blockchain and that the NFT sold at auction "was the

first NFT ever created," AC ¶¶ 119–20—are topics of debate.  It alleges that

"Namecoin-*Quantum* . . . has not been 'burned,' and is currently controlled and

owned by Free Holdings," AC ¶¶ 123, 146, but goes on to contradict that allegation

in its own pleadings and in the materials it cites.  Specifically, Free Holdings

admits that the NFT McCoy created on Namecoin "expire[d]," AC ¶¶ 3, 40, yet it

also observes that "defining the legal import of control of digital assets on the

Namecoin blockchain[ ]is the subject of differing opinions."  Pl. Mem. McCoy at 8.[16]

---

[16] Sotheby's urges the Court to take judicial notice of "news articles showing there is
an existing debate about the range of potential definitions of these terms."
Sotheby's Mem. at 14 n.6 (citing *Condit v. Dunne*, 317 F. Supp. 2d 344, 357
(S.D.N.Y. 2004) (in granting dismissal motion, taking judicial notice of newspaper
articles showing public controversy in order "to place [defendants'] comments in the

Further, it cites and attaches to its motion papers an article explaining that "[w]hen a Namecoin domain expires, . . . it can be called 'burnt.'"  Defining NFT.

Second, Free Holdings uses terminology that is misleading and fails to show falsity.  It alleges that as "Namecoin-*Quantum* is considered the first NFT ever created," AC ¶ 37, Sotheby's falsely marketed "Ethereum-*Quantum* by Kevin McCoy . . . as the first NFT ever created."  AC ¶ 120; *see also* Pl. Mem. Sotheby's at 10 ("the pleaded truth would . . . reveal[ ] to potential bidders that the Ethereum-*Quantum* was a copy of the presently-extant Namecoin-*Quantum*, rather than the alleged sole surviving vestige of a prized digital collectible.").  Its allegations never quote defendants—or anyone else—stating that "Ethereum-*Quantum*" was the first NFT created.  *See, e.g.*, AC ¶¶ 54–74.  "Ethereum-*Quantum*" and "Namecoin-*Quantum*" are terms Free Holdings employs in its pleadings, and there is no evidence to suggest that defendants or anyone else ever used them in any public statements or challenged materials.  Indeed, the statements Free Holdings cites to in its amended complaint—by defendants and others—characterize *Quantum* as the first NFT ever created, and do not distinguish between an "Ethereum-*Quantum*" and "Namecoin-*Quantum*."  *See* AC ¶ 58 ("Kevin McCoy's *Quantum* is such a work.  Minted on 2nd May 2014 21:27:35, or more precisely Namecoin block 174923, the NFT era quietly dawned."); ¶ 86 ("First ever crypto art nft – Quantum has arrived chez Sillytuna"); ¶ 95 ((citing Gopnik) ("That first NFT that Kevin created, which he'd attached to a modest digital abstraction titled 'Quantum,' sold last June at Sotheby's for $1.4

broader social context.")).  The Court need not do so because, as noted, Free Holdings has conceded as much.

million."); ¶ 97 ("FIRST-EVER NFT 'QUANTUM' SOLD FOR $1.47 MILLION").

Furthermore, Free Holdings nowhere disputes that "McCoy and Sotheby's accurately reported that *Quantum* was originally minted in 2014 on the Namecoin blockchain, and that McCoy 'moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information.'" Sotheby's Mem. at 18 (citing Rothstein Decl., Ex. F.). Instead, it argues only that defendants purveyed a false "overall impression" that "Namecoin-*Quantum* did not exist," without citing any authority for its position that the "overall impression" of defendants' statements is to be considered in the falsity analysis. *See* Pl. Mem. Sotheby's at 11 (citing only *Ackerman v. Coca-Cola Co.,* No. 09-CV-395 (JG), 2010 WL 2925955, at *17 (E.D.N.Y. July 21, 2010) (does not address slander of title or commercial disparagement claims)). Moreover, defendants did not convey an "overall impression . . . that Namecoin-*Quantum* did not exist," because they actually explained *Quantum*'s blockchain history multiple times in Natively Digital. Pl. Mem. Sotheby's at 11. For instance, the description explains that the work was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist," Natively Digital—a recounting consistent with Free Holdings' view that "Ethereum-*Quantum* is definitively not the world's first NFT." Pl. Mem. Sotheby's at 10. The Condition Report on Natively Digital explains that the NFT for auction "was minted May 2021, but the referenced pieces were originally made public in 2014, with a link to the image hosted on the

34

**JA-404**

Namecoin network," and in one of his videos on Natively Digital, McCoy explains precisely how the "provenance chain . . . begins on Namecoin but now is irrevocably transferred to this more modern and stable specification on the Ethereum blockchain." *Quantum* Token – McCoy Tr. at 3:23–4:2.

Moreover, by Free Holdings' own allegations, it was not false for McCoy to explain that "the nature of [*Quantum*] lies in the immutable engraving of information to the Namecoin blockchain" and that it was based on his "idea to use blockchain technology to create indelible provenance and ownership of digital images of this kind." AC ¶¶ 56–57. In fact, Free Holdings acknowledges that *Quantum* was created by McCoy, and that it was the first NFT. AC ¶¶ 36–37. Its position is that it claims title to an "indelible" record of *Quantum* on Namecoin, Pl. Mem. McCoy at 16–17, but, as discussed above, it does not claim title to the record of *Quantum* maintained on Ethereum. AC ¶ 38. Free Holdings has thus failed to sufficiently allege that any statements made by McCoy or Sotheby's were substantially false.

### ii. Free Holdings Has Not Alleged Malice

As applicable here, malice requires a showing that defendants "either knew [their] statements were false or acted with reckless disregard as to whether they were false." *Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021); *see also Chamilia*, 2007 WL 2781246, at *11 (New York courts apply "actual malice" standard to slander of title claims). A plaintiff fails to allege malice where it has not submitted any facts to suggest that the challenged statements were "made with

35

malice or that they were false." *Aleem*, 2017 WL 3105870, at *7.

Free Holdings has not pleaded any facts supporting even an inference of malice on the part of Sotheby's or McCoy. The allegations that defendants have not "issue[d] corrective public statements" and that they "maintain that" their statements are not false do not suggest malice because, as discussed, defendants do not believe their statements were false. AC ¶¶ 121, 144. As previously observed, Free Holdings concedes that reasonable minds believe defendants' understanding of *Quantum*'s ownership. *See* Defining NFT ("When a Namecoin domain expires, . . . it can be called 'burnt.'") (one of three interpretations of re-registered name on Namecoin). This falls well short of malice. *See, e.g. Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 756 (3d Dep't 2005) ("We find no evidence of the malicious intent necessary to support a cause of action for slander of title and, given our conclusion that defendant had probable cause to claim title to the disputed property, these public assertions cannot be said to have been made 'with a reckless disregard for their truth or falsity.'").

### iii.   Free Holdings Has Not Alleged Damages

Finally, a valid cause of action for slander of title or commercial disparagement requires an allegation of special damages, "typically . . . a lost sale resulting from the cloud on the claimant's title." *Wei Su*, 2019 WL 4917609, at *3; *see also, e.g. Kirby v. Wildenstein,* 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992) ("The rules surrounding the pleading and proof of special damages are stringent and well-articulated[: they] are limited to losses having pecuniary or economic value, and

must be fully and accurately stated, with sufficient particularity to identify actual losses." (cleaned up)); *Rosenbaum v. City of New York*, 8 N.Y.3d 1, 12 (N.Y. 2006) ("[A] cause of action does not arise until special damages actually result."). A plaintiff must both name "the individuals who ceased to be customers, or who refused to purchase, and itemize the exact damages." *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015) (citations omitted). Free Holdings has done neither. It alleges only that the "value" of its Namecoin property "is being significantly diminished by the false and misleading statements made by McCoy and Sotheby's," AC ¶ 98, and that it "expended $5,311.49 seeking to have McCoy and Sotheby's issue public statements correcting their false and misleading claims." AC ¶¶ 100, 126. It does not state a specific lost value, an estimated worth of its claimed NFT, or any specific lost sales opportunities. Moreover, "legal fees and executive time, standing alone[,] do not comprise special damages." *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989). Free Holdings has thus "not provide[d] sufficient factual support to establish [it is] entitled to special damages." *Aleem*, 2017 WL 3105870, at *7.[17] For all these reasons, it has failed to state a claim for slander of title or commercial disparagement.

### 3. Free Holdings Has Failed To State A Claim For Deceptive And Unlawful Trade Practices Under N.Y. G.B.L. § 349

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the

---

[17] Sotheby's further argues that its statements are protected opinions under the First Amendment. *See, e.g.*, Sotheby's Mem. at 11–17. As the Court concludes that Free Holdings has failed to state claims for slander of title and commercial disparagement on other grounds, it need not reach the constitutional issue.

**JA-407**

furnishing of any service." N.Y. G.B.L. § 349(a).  It requires a showing that "(1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury." *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294 (LTS) (HBP), 2015 WL 5008762, at *3 (S.D.N.Y. Aug. 24, 2015) (citation omitted).  It is well-established that a "single shot transaction involving complex arrangements, knowledgeable and experienced parties and large sums of money is not a consumer-oriented transaction." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 548 (S.D.N.Y. 2014) (collecting cases) (cleaned up).

Furthermore, the scope of § 349 is "limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety." *DO Denim, LLC v. Fried Denim, Inc.,* 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003) ("It is clear that the gravamen of the complaint must be consumer injury or harm to the public interest." (cleaned up) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  Corporate competitors may bring a claim under this statute "so long as some harm to the public at large is at issue," but "courts routinely reject" such claims where "the gravamen of the complaint is harm to plaintiff's business as opposed to the public interest in New York at large." *Gucci Am.,* 277 F. Supp. 2d at 273–74.

Free Holdings presses that there are exceptions to the bar on "single-shot"

38

transactions and that this suit presents a harm to the public interest because "New York's Department of Financial Services, . . . [is] planning to issue new guidance on how its rules apply to NFTs." Pl. Mem. McCoy at 20 n.7. But it provides no applicable authority as to why the "single-shot" transaction here nor the sale of fine art at a preeminent auction house is the kind of harm to the public interest contemplated by § 349. In fact, courts have routinely declined to apply § 349(a) in analogous circumstances. *See, e.g.*, *4 K & D Corp.*, 2 F. Supp. 3d at 549 (competitor failed to allege "facts to show . . . luxury real estate transactions" affected "consumers at large"); *904 Tower Apartment LLC v. Mark Hotel LLC*, 853 F. Supp. 2d 386, 400 (S.D.N.Y. 2012) ("A transaction over $10 million in real estate, about which the alleged deceptive practices sound primarily in breach of, and fraudulent inducement into, contracts negotiated by counsel, is too unlike a typical consumer violation to be covered under the statute."); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 637 (S.D.N.Y. 2008) ("Although [plaintiff] insists [defendant's] conduct has ramifications for consumers at large, it has not furnished anything more than conclusory and speculative allegations about how the public will be deceived as to the affiliation or endorsement of its products.").

Additionally, the "gravamen" of Free Holdings' amended complaint is plainly the alleged harm to its business, not to the public. *See, e.g.*, AC ¶ 139 ("The value of the Namecoin-*Quantum* NFT owned by Free Holdings has been significantly damaged as a result of all Defendants' statements and conduct."). It has thus failed to state a claim under § 349.

### 4. Free Holdings Has Failed To State A Claim Under Section 43(a) Of The Lanham Act

To bring a claim under § 43(a) of the Lanham Act, a plaintiff must allege that (1) the statement it challenges is either "literally false" or "likely to confuse or deceive consumers;" (2) the "defendant misrepresented an inherent quality or characteristic of a good or service;" (3) "the defendant placed the false or misleading statement in interstate commerce;" and (4) "the plaintiff was injured as a result of the defendant's misrepresentation, either by a diversion of business or a loss of goodwill associated with the plaintiff's goods or services." *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 539–40 (S.D.N.Y. 2018) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)).

A statement is "literally false" only if its message is "unambiguous" and not "susceptible to more than one reasonable interpretation." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (citations omitted); *Lokai Holdings, LLC v. Twin Tiger USA, LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018) ("[I]f the representation is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false, and the advertisement is actionable only upon a showing of actual consumer confusion." (citation omitted)). As has already been discussed, it was not literally false to say that *Quantum* was the "first-ever" NFT, nor that the NFT McCoy created was "burned" or "removed" from the Namecoin blockchain because, by Free Holdings' own submissions, that is only one interpretation of what happens when names expire on Namecoin. *See, e.g.*, Pl. Mem. McCoy at 8 ("defining the legal import of control of digital assets on the

Namecoin blockchain[ ]is the subject of differing opinions"); Defining NFT (three interpretations of re-registered name on Namecoin).

Moreover, Free Holdings has not alleged any "diversion of business or a loss of goodwill" in its own proprietary interest, because it does not allege to have had any business or goodwill in *Quantum* in the first place. *See* AC ¶¶ 149–58; ¶ 158 (alleging only that statements "caused damage to Free Holdings in an amount to be determined at trial, but not less than $1,472,000"); *see also, e.g., Davis*, 345 F. Supp. 3d at 544 (no fact allegations of any lost business, *inter alia*, resulting in failed § 43(a) claim. It has thus failed to state a claim under § 43(a).

### 5. The Court Declines To Issue A Declaratory Judgment

Finally, Free Holdings requests a declaratory judgment that: "(a) [it] is the rightful owner of the Namecoin-*Quantum*; (b) [that] Namecoin-*Quantum* has not been 'burned' or otherwise 'removed' from the Namecoin blockchain; and [that] (c) the statements issued by McCoy and Sotheby's in connection with their sale of the Ethereum-*Quantum* were false and misleading." AC ¶ 109. But a court may only exercise its declaratory judgment authority where there is an "actual controversy" and where the plaintiff "provide[s] a substantive claim to relief based on a law other than the Declaratory Judgment Act." *Hello I Am Elliot, Inc. v. Sine*, No. 19-CV-6905 (PAE), 2020 WL 3619505, at *11 (S.D.N.Y. July 2, 2020); *see also Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), ("[Declaratory judgment] actions are justiciable only in cases in which an 'actual controversy' exists." (citing 28 U.S.C. § 2201(a))), *aff'd*, 346 F.3d 357 (2d Cir. 2003).

41

An actual controversy requires a "disagreement [that has] taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *AARP v. 200 Kelsey Assocs., LLC*, No. 06-CV-81 (SCR), 2009 WL 47499, at *4 (S.D.N.Y. Jan. 8, 2009) (cleaned up).  It may not involve claims relying on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

As the Court has already discussed, Free Holdings' pleadings fail to give rise to an "actual controversy" because it has not alleged any concrete or particularized injury stemming from defendants' representations.  *See KM Enterprises, Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012) ("[T]he statute that authorizes the declaratory judgment remedy expressly incorporates the Article III case or controversy limitation."), *aff'd*, 518 F. App'x 12 (2d Cir. 2013).  Moreover, there is no "independent substantive claim to support a declaratory judgment" here, as Free Holdings has failed to state any plausible legal claim.  *See, e.g., Johnson v. Magnolia Pictures LLC*, No. 18-CV-9337 (VB), 2019 WL 4412483, at *3 (S.D.N.Y. Sept. 16, 2019) (no independent substantive basis for declaratory judgment where court dismissed claim); *KM Enterprises*, 2012 WL 4472010, at *19 ("As . . . the only remaining causes of action in the Amended Complaint [are] for a declaratory judgment and an injunction[,] Plaintiff cannot survive a motion to dismiss by relying on these claims as independent causes of action." (cleaned up)).  Declaratory relief is thus inappropriate.

### III.  CONCLUSION

For the reasons stated herein, the Court grants the motions to dismiss the amended complaint.  Accordingly, the Clerk is directed to mark the motions at docket numbers 54 and 59 as "granted" and enter judgment for defendants.

**SO ORDERED.**

Dated: March 17, 2023
      New York, New York

JAMES L. COTT
United States Magistrate Judge

JA-413

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
FREE HOLDINGS INC.,

                                         Plaintiff,

                   -against-                                                   22 **CIVIL** 0881 (JLC)

                                                                                    **JUDGMENT**

KEVIN MCCOY and SOTHEBY'S, INC.,

                                         Defendant.
------------------------------------------------------------X


        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated March 17, 2023, the Court grants the motions to

dismiss the amended complaint; accordingly, the case is closed.


**Dated:** New York, New York

        March 20, 2023


                                                        **RUBY J. KRAJICK**

                                                    _____
                                                           **Clerk of Court**

                                    **BY:**
                                                    _____
                                                           **Deputy Clerk**

JA-414



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

| The Daniel Patrick Moynihan | The Charles L. Brieant, Jr. |
|---|---|
| United States Courthouse | United States Courthouse |
| 500 Pearl Street | 300 Quarropas Street |
| New York, NY 10007-1312 | White Plains, NY 10601-4150 |

Rev. 5/23/14

JA-415

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the      ☐ judgment   ☐ order    entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____       _____
Dated                                  Signature*

_____
Name (Last, First, MI)

_____       _____
Address          City          State          Zip Code

_____       _____
Telephone Number                       E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

JA-416

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time to file a notice of appeal in this action. I would like to appeal the judgment entered in this action on _____ but did not file a notice of appeal within the required
                                                    date
time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

Dated: _____          _____
                                              Signature

_____
Name (Last, First, MI)

_____  _____  _____  _____
Address                       City        State       Zip Code

_____          _____
Telephone Number                       E-mail Address (if available)

Rev. 3/27/15

JA-417

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____
Dated

_____
Name (Last, First, MI)

_____
Address                           City

_____
Telephone Number

_____
Signature

_____

_____
State                           Zip Code

_____
E-mail Address (if available)

Rev. 12/23/13

JA-418

## Application to Appeal In Forma Pauperis

_____ **v.** _____     Appeal No. _____

District Court or Agency No. _____

| **Affidavit in Support of Motion** | **Instructions** |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)   Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.   Date: _____ |

My issues on appeal are: (<u>required</u>):

1. _For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise._

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

**JA-419**

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2. *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3. *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

- 2 -

JA-420

4.     *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.     *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

JA-421

6. *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7. *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8. *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included?        [   ] Yes [   ] No<br>    Is property insurance included?        [   ] Yes [   ] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

JA-422

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|     Homeowner's or renter's: | $ | $ |
|     Life: | $ | $ |
|     Health: | $ | $ |
|     Motor vehicle: | $ | $ |
|     Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
|     Motor Vehicle: | $ | $ |
|     Credit card (name): | $ | $ |
|     Department store (name): | $ | $ |
|     Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9. *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

    [  ] Yes      [  ] No    If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending — any money for expenses or attorney fees in connection with this lawsuit?* [  ] Yes [  ] No

    *If yes, how much?* $ _____

JA-423

11.   *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.   *Identify the city and state of your legal residence.*

City _____   State _____

Your daytime phone number: _____

Your age: _____   Your years of schooling: _____

Last four digits of your social-security number: _____

- 6 -

**JA-424**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FREE HOLDINGS INC.,

Plaintiff,

-v-

KEVIN MCCOY and SOTHEBY'S INC.,

Defendants.

Case No.: 1:22-cv-00881-JLC

## NOTICE OF APPEAL

Notice is hereby given that Free Holdings Inc., plaintiff in the above-named case, appeals to the United States Court of Appeals for the Second Circuit from the Court's Opinion and Order, entered in this action on March 17, 2023 [D.E. 70], that granted defendants' Kevin McCoy and Sotheby's Inc's motions to dismiss plaintiff's amended complaint.

Dated: Rockville Centre, New York
     April 17, 2023

**FALCON RAPPAPORT & BERKMAN LLP**

By: */s/ Moish E. Peltz*

Moish E. Peltz, Esq.
Paul M. O'Brien, Esq.
Steven C. Berlowitz, Esq.
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(516) 599-0888
mpeltz@frblaw.com
pobrien@frblaw.com
sberlowitz@frblaw.com

*Attorneys for Free Holdings Inc.*

cc: Counsel of Record (via ECF)