# 23-644

## In the
## United States Court of Appeals
### For the Second Circuit

---

FREE HOLDINGS, INC.,

*Plaintiff-Appellant,*

– v. –

KEVIN MCCOY and SOTHEBY'S INC.,

*Defendants-Appellees,*

– and –

NAMELESS CORPORATION and ALEX AMSEL,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

FALCON RAPPAPORT & BERKMAN LLP
*Attorneys for Plaintiff-Appellant*
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(212) 203-3255


APPELLATE INNOVATIONS
(914) 948-2240

19735

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1. and to enable the Circuit Court Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for Free Holdings Inc. (a private non-governmental party) certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which part publicly held.

None

Date: July 25, 2023     /s/ Moish E. Peltz
          **Signature of Attorney**
          **Attorney Bar Code:** MP3333

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION .................................................................................1

BACKGROUND ...................................................................................4

    A. Non-Fungible Tokens, or NFTs, and Blockchains .......................................4

    B. Kevin McCoy Creates the *Quantum* NFT ....................................................5

    C. McCoy Does Not Maintain the *Quantum* NFT, Making It Free to Claim....6

    D. Free Holdings Claims the *Quantum* NFT ...............................................7

    E. Sotheby's Announces the "Natively Digital" Sale, and Promotes the Sale of *Quantum*, "The First NFT Ever Minted"................................................9

    F. Sotheby's Releases the Catalog for "Natively Digital," and Markets *Quantum* as a "2014" Work That "Came First" ...............................................10

    G. After Sotheby's Announces and Promotes the Sale of *Quantum*, McCoy Creates a New NFT on the Ethereum Blockchain .............................13

    H. Sotheby's Changes the Catalog Entry to Mention the New NFT, But Continues to Emphasize That *Quantum* "Came First" Among NFTs.............16

    I. McCoy Records a New Video Attempting to Explain the "Preservation" of *Quantum* by Minting a New NFT on a Different Blockchain....................17

    J. Sotheby's and McCoy Ignore Free Holdings' Ownership of the *Quantum* NFT, and Proceed to Sell the Brand-New, 2021 NFT for $1.47 Million ........................................................................................................19

    K. The District Court Dismissed Free Holdings' Claims for Lack of Standing...........................................................................................................20

ARGUMENT

I.    Standard of Review ........................................................................20

II.   The District Court Erred by Failing to Take Appellant's
      Allegations of Fact as True and Draw All Reasonable
      Inferences in Favor of Appellant ..................................................22

      A. The District Court Erroneously Resolved the Disputed Factual Issue
         of Who Owns the Quantum GIF Against the Plaintiff Free Holdings .....23

      B. The District Court Erroneously Resolved the Disputed Factual Issue
         of Whether McCoy's and Sotheby's Statements Were False .................27

III.  Free Holdings Has Standing to Pursue Its Claims .........................................31

IV.   The Amended Complaint Stated Proper Claims for Relief ...........................33

      A. Free Holdings Stated a Claim for Unjust Enrichment ...........................33

      B. Free Holdings Stated Claims for Slander of Title and Commercial
         Disparagement; the District Court's Dismissal Relied on Error .............35

      C. Free Holdings Stated a Claim Under § 43(a) of the Lanham Act ...........38

      D. Free Holdings Stated a Claim for Deceptive and Unlawful Trade
         Practices Under N.Y. GBL § 349............................................................42

V.    On Remand, the District Court Should Allow Free Holdings'
      Declaratory Judgment Claim to Proceed ......................................................44

VI.   Should This Court Be Inclined Not to Allow Free Holdings'
      Claims to Proceed, At Minimum It Should Remand With
      Instructions to Allow Free Holdings Leave to Amend Its
      Complaint ......................................................................................................45

CONCLUSION .........................................................................................................46

iii

# <u>TABLE OF AUTHORITIES</u>

**Page**

## <u>Cases:</u>

*Anderson News, LLC v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012)........................................................................21, 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..........................................................................................20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................20, 21, 22

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
    750 F.3d 227 (2d Cir. 2014)............................................................................20, 22

*Carter v. HealthPort Techs., LLC,*
    822 F.3d at 56........................................................................................................32

*Celle v. Filipino Reporter Enters., Inc.,*
    209 F.3d 163 (2d Cir. 2000)..............................................................................37

*Charles Atlas, Ltd. v. Time-Life Books, Inc.,*
    570 F. Supp. 150 (S.D.N.Y. 1983)....................................................................37

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH,*
    843 F.3d 48 (2d Cir. 2016)................................................................................39

*Consumers Union of U.S., Inc. v. New Regina Corp.,*
    664 F. Supp. 753 (S.D.N.Y. 1987)....................................................................41

*Conti v. Doe,*
    535 F. Supp. 3d 257 (S.D.N.Y. 2021)..............................................................36

*Dependable Sales & Service, Inc. v. TrueCar, Inc.,*
    377 F. Supp. 3d 337 (S.D.N.Y. 2019)..............................................................41

*Dhinsa v. Krueger,*
    917 F.3d 70 (2d Cir. 2019)................................................................................31

*Foman v. Davis,*
  371 U.S. 178 (1962) ..........................................................................45

*Harry v. Total Gas & Power N. Am., Inc.,*
  889 F.3d 104 (2d Cir. 2018)..............................................................31

*International Code Council, Inc. v. UpCodes Inc.,*
  43 F.4th 46 (2d Cir. 2022)....................................................38, 39, 41

*Koch v. Greenberg,*
  626 Fed. Appx. 335 (2d Cir. 2015) ......................................42, 43, 44

*Koenig v. Boulder Brands, Inc.,*
  995 F. Supp. 2d 274 (S.D.N.Y. 2014)...............................................42

*Lexmark Intern., Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ..........................................................................41

*Lynch v. City of New York,*
  952 F.3d 67 (2d Cir. 2020)..........................................20, 21, 23, 25

*Mandarin Trading Ltd. v. Wildenstein,*
  16 N.Y.3d 173 (N.Y. 2011).........................................................33, 34

*Merck Eprova AG v. Gnosis S.p.A.,*
  760 F.3d 247 (2d Cir. 2014)...........................................................39, 40

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
  85 N.Y.2d 20 (1995) .........................................................................42

*Ronzani v. Sanofi S.A.,*
  899 F.2d 195 (2d Cir. 1990)..............................................................45

*S.C. Johnson & Son, Inc. v. Clorox Co.,*
  241 F.3d 232 (2d Cir. 2001)..............................................................39

*Toretto v. Donnelley Fin. Solutions, Inc.,*
  523 F. Supp. 3d 464 (S.D.N.Y. 2021)...............................................31

*Turret Labs USA, Inc. v. CargoSprint, LLC,*
    No. 19-CV-6793, 2021 WL 535217 (E.D.N.Y. Feb. 12, 2021) .......................37

## Rules, Laws and Statutes:

15 U.S.C. § 1125 ..........................................................................................38

Fed. R. Civ. P. 12 ........................................................................................20

Fed. R. Civ. P. 15 ........................................................................................45

GBL § 349 ........................................................................................42, 43, 44

Lanham Act Section 43 ................................................................................38

**INTRODUCTION**

This case raises novel and interesting questions of law and fact applied to the new world of cryptocurrency and non-fungible tokens. But the District Court's opinion did not grapple with any of these questions. Instead, it resolved factual disputes against the plaintiff—improperly at the pleading stage—and used those flawed findings of fact to dismiss all of plaintiff Free Holding's claims for lack of standing. The District Court's ruling was erroneous, and this Court should reverse it.

In 2014, Kevin McCoy created a cryptographically secure entry on the Namecoin blockchain, staking out an area of that blockchain that he controlled. McCoy then posted to his new blockchain entry text stating that he "assert[ed] title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif," and that "[t]itle transfers to whoever controls this blockchain entry." McCoy thus created what we now call an NFT, or non-fungible token: a cryptographically secure entry on a blockchain, controlled by only one person, which signifies ownership of something else, usually a picture. McCoy's NFT was the very first, and developed value as a result. In 2021, McCoy and Sotheby's prepared to cash in on that value through an auction.

But McCoy made a critical mistake: he failed to maintain his NFT. The Namecoin blockchain requires entry owners to update their records periodically; if they do not, entries become available for anyone to claim. McCoy did not update his entry, so it became available to anyone less than a year after he created it. It lay fallow for a while, until eventually Free Holdings, the plaintiff here, claimed it. Blithely unaware of all of this, McCoy and Sotheby's planned their sale of his NFT, recording a video talking about its creation in 2014, and creating a catalog and press release doing the same.

Only *after* releasing the catalog, video and press release did McCoy discover that he no longer owned the NFT he was imminently planning to sell. Without discovery, Free Holdings cannot be certain when McCoy realized this, but it appears to have been during the week before the auction opened. Desperate to salvage the sale, McCoy and Sotheby's improvised a plan: McCoy would create a *new* NFT, the Thursday before the auction opened, and they would simply sell that NFT instead. They would not worry about McCoy's previous statement that "[t]itle transfers to whoever controls this blockchain entry," and that someone else—Free Holdings—now controlled the blockchain entry. Instead, they would simply ignore that commitment, and would tell everyone that McCoy's new NFT, created in

– 2 –

2021, was somehow equivalent to his original NFT, created in 2014. They would market and sell the new NFT, along with the GIF file, as being the "first" NFT ever created. And that is precisely what McCoy and Sotheby's did, auctioning the 2021 NFT for $1,472,000—a happy ending for everyone.

Except, of course, for Free Holdings. Free Holdings still owned the original NFT from 2014, and thus according to its terms set forth by McCoy himself, still held "title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif"—the same GIF file that Sotheby's and McCoy sold at auction. And, in the lead-up to that auction, Sotheby's and McCoy stated repeatedly that they were selling the first NFT—which they were not, because McCoy no longer owned it and Free Holdings did. It is not difficult to understand McCoy and Sotheby's motivation for these false statements: they had prepared to auction the first NFT, and advertised the value of the first NFT, before they realized that they no longer owned the first NFT. And an auction of 'the first NFT' would surely yield far more than an auction of 'a five-day-old NFT created by the guy who made the first NFT, who just found out he couldn't sell the first NFT because it turns out he did not do the maintenance necessary to keep it, so he made this one instead and we're selling that, don't worry about it.' But at least the second description would have been correct.

In their rush to cash in on their auction, McCoy and Sotheby's harmed Free Holdings, resulting in this litigation to vindicate its rights. Unfortunately, the District Court dismissed Free Holdings' claims after improperly finding facts against the plaintiff at the pleading stage of the case and, more troublingly, appeared to conclude that Free Holdings was a bad actor who did not deserve to win against a "legitimate artist." The District Court's dismissal rests on a bed of error, and this Court should reverse it and remand, so that Free Holdings can test its claims in discovery and on the merits.

## BACKGROUND

### A. Non-Fungible Tokens, or NFTs, and Blockchains

This case revolves around a non-fungible token, or NFT. "NFTs are tokens that authenticate digital content via blockchain technology." JA-48, ¶ 29. "A blockchain is a digital public ledger maintained on a decentralized computer system and consist[s] of records called blocks." JA-48, ¶ 27. "Blockchains are known for their roles in cryptocurrency systems, and are valued for their ability to maintain secure and decentralized records of transactions." JA-48, ¶ 28.

"The content linked to NFTs can take the form of digital images of physical objects, music, text, and more." JA-48, ¶ 32. "NFTs are

non-fungible, which means that no two NFTs are the same." JA-48, ¶ 30.

"The blockchain's record-keeping and authentication technology serves to

provide public certificates of authenticity or proof of ownership of NFTs."

JA-48, ¶ 31.

### B. Kevin McCoy Creates the *Quantum* NFT

In 2014, digital artist Kevin McCoy created a GIF file of a moving

image, which remains available on the Internet at

https://static.mccoyspace.com/gifs/quantum.gif. JA-44, ¶ 2. On May 2,

2014, McCoy also created—"minted," in crypto parlance—an NFT on the

Namecoin blockchain, called *Quantum*, which "is considered the first NFT

ever created." JA-49, ¶¶ 36-37. McCoy used the following text:

> I assert title to the file at the URL
> http://static.mccoyspace.com/gifs/quantum.gif with the creator's
> public announcement of it's publishing at the URL
> https://twitter.com/mccoyspace/status/462320426719641600 The file
> whose SHA256 hash is
> d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b
> 68709a is taken to be the file in question. Title transfers to whoever
> controls this blockchain entry.

JA-50, ¶ 38; JA-273-74, ¶¶ 12-14. McCoy hex-encoded this text and

recorded it, irrevocably, on the Namecoin blockchain. JA-50 ¶ 38;

JA-273-74, ¶¶ 12-14. It is still there. *See* JA-272-74, ¶¶ 2-14; JA-278-80,

Ex. B.

In McCoy's own words, in May 2014, he "assert[ed] title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif."  JA-49, ¶ 38; JA-274, ¶¶ 13, 14, Ex. B.  McCoy further confirmed that "the file in question" has a SHA256 hash, or a particular mathematical identifier that corresponds to the contents of a file and thus can identify it, of d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a.  JA-49, ¶ 38.  McCoy used that same number ending in -709a as the unique identifier for the "name" of the record he created on the Namecoin blockchain.  *See* JA-49, ¶ 38.  Also in McCoy's own words, in May 2014, he confirmed that "[t]itle transfers to whoever controls this blockchain entry."  JA-49, ¶ 38; JA-274, ¶¶ 13, 14, Ex. B.

## C.  McCoy Does Not Maintain the *Quantum* NFT, Making It Free to Claim

To keep control of a Namecoin record, the owner of the record must maintain their property by updating the record periodically—at least every 35,999 blocks added to the chain.  *See* JA-50, ¶ 39.  Once there are 36,000 blocks on the chain after the most recent update of a record, the owner loses control of that record, and anyone can claim it.  *See* JA-50, ¶ 40.  The rate at which the chain adds blocks depends on demand, but it will generally take 200-250 days to add 36,000 blocks to the chain.  *See* JA-50, ¶ 39.  Thus, to

keep control of a Namecoin record, its owner must update it periodically, more often than every 200 days.  *See* JA-50, ¶¶ 39-40.

Despite his statement that "[t]itle transfers to whoever controls this blockchain entry," McCoy did not update the *Quantum* NFT often enough to keep control of it.  *See* JA-50, ¶ 41.  Indeed, after his series of transactions in May 2014, *see supra* § B, McCoy did not update the *Quantum* NFT at all. *See id.*; JA-274, ¶¶ 13, 14; JA-278-80, Ex. B.  Thus, under the rules of Namecoin, enforced by the code running the blockchain itself, in January 2015 McCoy surrendered control of the *Quantum* NFT, the -709a record on the Namecoin blockchain where he had recorded his "title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif."  *See* JA-50, ¶¶ 39-41; JA-274, ¶¶ 13, 14.  Under the Namecoin rules, the *Quantum* NFT was now available for anyone to claim.  JA-50, ¶¶ 40-41.  Drawing all inferences for the plaintiff, as one must at the pleading stage, one can explain these events only by concluding either that McCoy intentionally renounced his claim to the *Quantum* NFT, or that he did not care enough about his rights to undertake the periodic ministerial updates that would have preserved them.

### D.  Free Holdings Claims the *Quantum* NFT

McCoy left *Quantum* unclaimed for more than six years.  *See* JA-50, ¶¶ 40-42.  Then, on April 5, 2021, Free Holdings claimed the *Quantum* NFT.

*See* JA-50, ¶ 42.  On April 30, 2021, Free Holdings added the following text to the NFT:

> I assert title to the file at the URL
> http://static.mccoyspace.com/gifs/quantum.gif with the creator's
> public announcement of it's publishing at the URL
> https://twitter.com/mccoyspace/status/462320426719641600 The file
> whose SHA256 hash is
> d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b
> 68709a is taken to be the file in question. Title transfers to whoever
> controls this blockchain entry.

JA-219, Ex. B.  Free Holdings copied verbatim—word for word, extra apostrophe for extra apostrophe, and missing period for missing period—the text McCoy originally entered in May 2014.  Free Holdings thus "assert[ed]" the same "title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif," subject to the same proviso that "[t]itle to whoever controls this blockchain entry"—not only by taking control of the -709a record itself, but also by repeating the words of McCoy's previous claim in a new entry on that record.  *See id.*

Since then, Free Holdings has periodically updated the *Quantum* NFT, always doing so before the chain has added 36,000 blocks, maintaining its control over the *Quantum* NFT.  *See* JA-50, ¶ 43.  Free Holdings continues to control the -709a blockchain entry, and thus continues to own the *Quantum* NFT.

**E.  Sotheby's Announces the "Natively Digital" Sale, and Promotes the Sale of *Quantum*, "The First NFT Ever Minted"**

One month after Free Holdings claimed the *Quantum* NFT, on May 6, 2021, Sotheby's announced an art auction titled "Natively Digital: A Curated NFT Sale."  https://www.sothebys.com/en/press/sothebys-to-present-natively-digital, archived at https://archive.is/NjrIa.  The landing page for the press release showed a still from the image file claimed by the *Quantum* NFT, http://static.mccoyspace.com/gifs/quantum.gif, and stated that the auction was "*Highlighted By*: The First NFT Ever Minted, Kevin McCoy's 'Quantum.'"  *Id.*  The press release repeated that "the curated auction will be highlighted by Kevin McCoy's *Quantum*, the first NFT ever minted," dated the work as occurring in "2014," and expounded on its provenance in detail:

> KEVIN MCCOY, *QUANTUM*, 2014
>
> Leading the sale is one of the most historically significant artworks of the NFT movement, *Quantum*, which was created by Kevin McCoy – one of the leading new media artists of his generation. Universally regarded as the first NFT ever created, the animated *Quantum* is timestamped 05-03-2014 09:27:34. Reflecting the immutability of the blockchain timestamp, Quantum offers an unrivalled opportunity to acquire the very genesis of the NFT space. In 2014, during a Rhizome conference, McCoy created what he and his collaborator, Anil Dash, called at the time 'monetized graphics' – or monographs — by

– 9 –

codifying provenance into an original digital work using blockchain technology. *Quantum* was the first work minted in this way.[1]

The press release confirmed that the auction "will be open for bidding from 3 – 10 June."  *Id.*  Both the press release and its landing page remain available on the Internet.  *See id.*

### F.  Sotheby's Releases the Catalog for "Natively Digital," and Markets *Quantum* as a "2014" Work That "Came First"

Sometime between the May 6 press release and May 20, 2021, Sotheby's released the catalog for "Natively Digital" on its website.  On May 20, 2021, the Internet Archive captured the then-current version of the "Natively Digital" catalog, including its listing for *Quantum*.[2]  In this version of the "Natively Digital" catalog, the oldest version that Free Holdings has located without discovery, McCoy and Sotheby's gave *Quantum* a 2014 date and identified Kevin McCoy as the current "Owner" of the NFT:

Owner: Kevin McCoy

Kevin McCoy
b. 1967
*Quantum*
2014

---

[1] https://sothebys-com.brightspotcdn.com/92/ca/
d1bb341246ef818612d9cf65a527/sothebys-natively-digital-a-curated-nft-sale-pr.pdf
[2] https://web.archive.org/web/20210520041156/https://www.sothebys.com/en/
buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum.

*Id.* The "Natively Digital" catalog emphasized that *Quantum* "came first"; indeed, the first two paragraphs of the entry describing *Quantum* expounded on this theme at length, using memorable and somewhat purple prose:

> In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history. They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers occupy a singular position in art history. They came first. Kevin McCoy's Quantum is such a work. **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block 174923, the NFT era quietly dawned. What a noise it makes today.
>
> Pulsing with colour, a riotously raw beacon to a new era, McCoy minted Quantum - unwittingly placing it within this vaulted pantheon of firsts. Timestamped July 1907, Picasso's Les Demoiselles ushered in the chain of Cubism. December 1917, Malevich's Black Square stands as the genesis block of Abstraction. April 1917, Duchamp timestamps the era of the idea. 2nd May 2014 21:27:34, Quantum stands alone in the precision of its timestamp - immutably, verifiably, trustlessly pure. If blockchain's [sic] themselves are a radical recalibration of the concept of time, then the timing of Quantum takes on a pantheonic position within this new art history. For what it is a blockchain, when stripped to its bones, but humanity's latest innovation in the humble art of record keeping. And if blockchains stand as the Gutenberg Bible of the 21st century, then how do we prize the first of these records? In my view, Quantum will always be the most art historically important work in the history of NFTs.

JA-109-10 (emphasis in original). With the exception of one short phrase—"[p]ulsing with colour, a riotously raw beacon to a new era"—these paragraphs address only *Quantum*'s status as the first NFT. *Id.* And even

that one short phrase describes *Quantum* as "a . . . beacon to a new era,"
noting yet again its status as the first NFT. *Id.*

The *Quantum* page of the "Natively Digital" catalog also linked to a
video of McCoy, with metadata showing a post date of May 17, 2021, in
which McCoy discussed *Quantum* for two minutes and thirty-two seconds.
JA-116, Ex. D. During this video, which appears to be professionally
recorded and edited, McCoy stated that "The work in the show is called
*Quantum*, and it's from 2014." JA-116, Ex. D at 2:23-24. He also described
*Quantum* as "the first artwork that was inscribed into a blockchain, and that
happened in May of 2014." JA-118, Ex. D at 3:20-22. McCoy explained
that "when I discovered Bitcoin and blockchain technology, and I thought
about how the scarcity mechanism that Bitcoin presented could be a way for
digital artists to create provenance and ownership systems around digital
works." JA-118, Ex. D 3:23-4:3.

The catalog itself and McCoy in the video both treat the *Quantum*
they have put up for sale as synonymous with the *Quantum* NFT that was by
then owned by Free Holdings—and understandably so, because by this point
in mid-May 2021, there was *no other NFT* that even claimed to relate to
*Quantum*. Both the catalog and McCoy in the video describe *Quantum* as
important because it was first. Drawing all inferences for the plaintiff, as the

Court must at the pleading stage, one must conclude that both Sotheby's and McCoy were talking about the *Quantum* NFT that Free Holdings had claimed, although they believed at this time that McCoy still owned it, and further believed that a substantial portion of *Quantum*'s value arose from its status as the earliest NFT.

### G. After Sotheby's Announces and Promotes the Sale of *Quantum*, McCoy Creates a New NFT on the Ethereum Blockchain

Sometime after the press release of May 6 and the catalog of May 20, Sotheby's and McCoy evidently realized that McCoy did not, in fact, "control[] this blockchain entry" for what was, in their words, "[u]niversally regarded as the first NFT ever created." *See* JA-49, ¶ 38; *supra* § E; *see also, e.g.*, "Natively Digital: A Curated NFT Sale," https://www.sothebys.com/en/press/sothebys-to-present-natively-digital, archived at https://archive.is/NjrIa (marketing *Quantum* as "The First NFT Ever Minted"). On May 28, 2021—the Thursday before bidding started on Monday, June 3—McCoy minted a new NFT on the Ethereum blockchain, using the ERC-721 standard for registering NFTs. *See* JA-45, ¶ 6; JA-54, ¶ 61. This new NFT had a smart contract address of 0xe81a45439ff9bc5841202ce4b2049e578f8771d9, and pointed to a new URL,

https://ipfs.io/ipfs/QmRWhsnDKBwWDozDgDp8Te25KDViDcfz83zDs7yk
R1x995/.  *See* JA-360.  At this new ipfs.io URL, McCoy provided various

files still available on the Internet today, including a copy of "quantum.gif,"

identical to "the file at the URL

http://static.mccoyspace.com/gifs/quantum.gif" that McCoy "assert[ed] title

to" in the *Quantum* NFT, down to the hash value ending in -709a.  *See*

JA-360, "Quantum Rights Agreement."  McCoy also provided a file called

"signed_message.txt," which included the text: "I Kevin McCoy ceated [sic]

the artwork Quantum and recorded it on the namecoin blockchain from this

wallet on May 2, 2014, making it the first of what we now call NFTs.  I still

own this artwork and control the originating address."  *See* JA-360,

"signed_message.txt."

McCoy's statement in the new, 2021 NFT thus contradicted his

statement in the original *Quantum* NFT.  In 2014, McCoy stated that "[t]itle

transfers to whoever controls this blockchain entry," and on April 30, 2021,

Free Holdings repeated this language to show its control of that blockchain

entry and thus the *Quantum* NFT.  *See* JA-273, ¶¶ 12-14; JA-219, Ex. B.

But in the new, 2021 NFT, McCoy claimed that he still "own[s] this artwork

and control[s] the originating address."

https://ipfs.io/ipfs/QmRWhsnDKBwWDozDgDp8Te25KDViDcfz83zDs7yk

R1x995/signed_message.txt.  He then stated in the "Quantum Rights
Agreement" that "[c]ontrol over on-going provenance, ownership of and
rights corresponding to this artwork is hereby assigned to this contract and
this blockchain entry"—meaning the new, 2021 NFT, and using the passive
voice, likely to obfuscate his by-fiat reassignment of title to himself.

https://ipfs.io/ipfs/QmRWhsnDKBwWDozDgDp8Te25KDViDcfz83zDs7yk
R1x995/Quantum%20Rights%20Agreement.pdf, ¶ 3.3.

     McCoy did not explain why he minted this new NFT after promoting
*Quantum* as "the first NFT ever created" and "timestamped 05-03-2014
09:27:34" (*supra* § E)—not when he did it, and not in response to this
litigation.  When McCoy did refer to the 2014 NFT, he did so incorrectly,
stating that "[a]fter 36000 blocks elapsed from this transaction the namecoin
protocol automatically and permanently locked the entry which prevents any
further changes or updates."  Quantum Rights Agreement, *supra*, ¶ 3.2.  This
statement was transparently false, and McCoy knew it—by the time McCoy
made this statement on May 28, Free Holdings had already claimed the 2014
*Quantum* NFT by updating the same blockchain entry that McCoy claimed
was "automatically and permanently locked," as McCoy figured out
sometime after the May 20 catalog but before he minted the May 28 NFT.
Drawing all inferences for the plaintiff, as one must at the pleading stage,

– 15 –

one must conclude that McCoy realized that he no longer owned "the first NFT ever created," which he had just offered to sell, scrambled to create a new NFT so that he could claim that this new NFT was connected to "the first NFT ever created" and thus salvage his sale, and misrepresented the 2014 *Quantum* NFT as "automatically and permanently locked" even though he knew that Free Holdings owned it and had recently updated it.

### H. Sotheby's Changes the Catalog Entry to Mention the New NFT, But Continues to Emphasize That *Quantum* "Came First" Among NFTs

Sometime after McCoy minted the new NFT on May 28, but before the Internet Archive again captured the "Natively Digital" catalog on June 3, 2021, McCoy and Sotheby's updated the catalog to refer to the new NFT, and to modify the date of the work from "2014" to "2014-2021."[3]  The June 3 revision of the catalog read:

Owner: Kevin McCoy

Kevin McCoy
b. 1967
*Quantum*
2014-21

Non-fungible token ERC-721
Token ID: 0
9 mb Tif + file archive with documentation
Originally minted on May 3, 2014 on Namecoin blockchain, and

---

[3] https://web.archive.org/web/20210603070655/https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum.

preserved on a token minted on May 28, 2021 by the artist
Calls to
https://ipfs.io/ipfs/QmRWhsnDKBwWDozDgDp8Te25KDViDcfz83z
Ds 7ykR1x995 for supporting documentation
Smart Contract Address:
0xe81a45439ff9bc5841202ce4b2049e578f8771d9

JA-360.  This revision of the catalog remains available on the Internet.

JA-359-60; https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-2/quantum.  The June 3 revision claimed that *Quantum*'s date was "2014-21," not "2014," and added references to the new NFT's smart contract address and URL.  *Id.*  It also acknowledged that *Quantum* was "[o]riginally minted on May 3, 2014 on Namecoin blockchain," but claimed without explanation that *Quantum* was somehow "preserved on a token minted on May 28, 2021 by the artist."  *Id.*  The June 3 revision to the "Natively Digital" catalog kept the memorable and somewhat purple prose describing how Quantum "came first," noting that: "Kevin McCoy's Quantum is such a work.  **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block 174923, the NFT era quietly dawned. What a noise it makes today."  JA-361.

## I.  McCoy Records a New Video Attempting to Explain the "Preservation" of *Quantum* by Minting a New NFT on a Different Blockchain

In addition to updating the catalog page to refer to the new NFT, McCoy also recorded a new video, with metadata showing a post date of

June 1, 2021, that appeared below the original video from May 17.  JA-103-04, ¶¶ 6-7, Ex. E-F.  Although shot in the same space as the original video, the new video appeared to rely on a mobile phone camera, and did not appear to be professionally edited.  *See id.*  The new video, attempting to explain McCoy's "preservation" efforts, was almost twice as long as that original video explaining *Quantum* itself.  *Compare* JA-103, ¶¶ 4-5 & Ex. D *with* JA-103, ¶¶ 6-7 & Ex. F.  In the new video, McCoy introduced himself as "the artist that created *Quantum* and minted it in 2014."  JA-125, Ex. F at 2:1-3.  As McCoy explained: "I've moved the original on-chain data from a burned NameCoin token into" what he admits is "the newly issued token." *Id.* at 2:8-14.  McCoy did not explain how he had "moved the original on-chain data" when it was still available through Namecoin; did not explain how the Namecoin token was "burned" when Free Holdings was still writing to it; and did not explain why he was authorized to do any of this when he committed in 2014 that "[t]itle transfers to whoever controls this blockchain entry."  *See supra* § B; JA-49, ¶ 38; JA-273-74, ¶¶ 13, 14, Ex. B.

Although he did not connect the dots explicitly, McCoy in the video implied that he was authorized to take all these actions because he was the originator of the *Quantum* NFT.  He provided and validated "a signed message proving that I have continued possession of the private key for the

address that originally sent Quantum's minting transaction." JA-127, Ex. F, at 4:7-11. And that was true. But McCoy did not explain why that matters, because it does not: the *Quantum* NFT did not give the originator any ability to transfer title once he no longer owned it; to the contrary, it confirmed that "[t]itle transfers to whoever controls this blockchain entry." If McCoy had sold the *Quantum* NFT to another person and transferred control through the Namecoin protocol, he surely would not claim he could later sell it again; the result is no different when the Namecoin protocol itself facilitated the transfer, as happened here.

### J. Sotheby's and McCoy Ignore Free Holdings' Ownership of the *Quantum* NFT, and Proceed to Sell the Brand-New, 2021 NFT for $1.47 Million

Free Holdings attempted to communicate with McCoy to coordinate a mutually beneficial sale. JA-50-52, 56, ¶¶ 44-51, 76. McCoy never responded. JA-52, ¶ 52. Although by that time McCoy and Sotheby's knew that Free Holdings had control of the 2014 NFT and thus, according to McCoy's own words in the NFT itself, "title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif" (*see supra* § B), they went ahead with the "Natively Digital" auction including the "*Quantum*" lot of the 2021 NFT and rights to the GIF file, which sold to Alex Amsel for $1,472,000. JA-57, ¶¶ 84-86.

– 19 –

**K. The District Court Dismissed Free Holdings' Claims for Lack of Standing**

Free Holdings brought this action and voluntarily amended its complaint. *See* JA-384-86. Defendants McCoy and Sotheby's moved to dismiss the Amended Complaint. *See id.* The parties briefed these motions, and the District Court dismissed all claims for lack of standing under Fed. R. Civ. P. 12(b)(1), and also found that "even if Free Holdings had standing, it has failed to state a claim upon which relief can be granted" under Fed. R. Civ. P. 12(b)(6). JA-386-87. The Court ordered the Clerk to "mark the motions at docket numbers 54 and 59 as 'granted' and enter judgment for defendants." JA-412; *see generally* JA-370-413. Free Holdings timely noticed this appeal. *See* JA-424.

## **ARGUMENT**

### I. **Standard of Review**

This Court reviews the granting of a motion to dismiss for failure to state a claim *de novo*. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Iqbal*, 556 U.S. 662 at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch,* 952 F.3d at 75 (internal citations omitted).

"Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Id*. (quoting *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012)).

"Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Lynch,* 952 F.3d at 75 (quoting *Twombly*, 550 U.S. at 556). "A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events because the court finds a different version more plausible." *Anderson News,*

*LLC*, 680 F.3d at 185; *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.").

## II. The District Court Erred by Failing to Take Appellant's Allegations of Fact as True and Draw All Reasonable Inferences in Favor of Appellant

When assessing a complaint on a motion to dismiss, Courts must "accept as true the factual allegations of the complaint and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, LLC*, 680 F.3d at 185 ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."). This is particularly so here, where the case turns on a fact-specific and highly technical issue, such as the operation of blockchain technology and claims of title under it. *See Carpenters Pension Trust Fund of St. Louis*, 750 F.3d at 235 ("[G]iven the fact-specific nature of the question raised here, it would be inappropriate to dismiss upon a Rule 12(b)(6) motion"). Unfortunately, in granting the motions to dismiss, the District Court failed to follow these rules. To the contrary, the District Court adopted several of McCoy and Sotheby's factual allegations, while brushing off Free Holdings' plausible claims. This Court can and should correct the

District Court's errors.  *See, e.g.*, *Lynch,* 952 F.3d at 76-77 (reversing order dismissing claims where district court failed to discuss or cite factual allegations that were required to be accepted as true).

### A. The District Court Erroneously Resolved the Disputed Factual Issue of Who Owns the Quantum GIF Against the Plaintiff Free Holdings

The District Court erroneously found that Free Holdings has no claim to the GIF file at http://static.mccoyspace.com/gifs/quantum.gif, which the District Court called "*Quantum* itself."  JA-393-94.  The District Court acknowledged that "Free Holdings does provide an adequate factual basis to support a plausible proprietary interest in -709a," that is, the *Quantum* NFT from 2014.  JA-394.  The Court further acknowledged that "[t]he claim to -709a, under Free Holdings' theory of NFT ownership, confers a property interest in Quantum itself."  JA-393 (citing Am. Compl. ¶¶ 69, 103-07).  And the Court likewise found that this matter was under dispute: "McCoy disputes Free Holdings' theory of ownership, arguing a name on Namecoin is distinct from the underlying NFT.  Thus, according to McCoy, Free Holdings merely claimed -709a, creating a distinct NFT, which confers no proprietary interest in Quantum itself."  JA-393 (citations omitted).

Having set forth this dispute, the District Court proceeded to resolve it *against plaintiff* Free Holdings, thus committing legal error on a motion to

dismiss.  The District Court rested this legal error on a factual error, apparently misunderstanding what McCoy himself wrote in the original *Quantum* NFT.  The District Court stated that, "[a]s factual support, Free Holdings provides only its own alleged statements on Namecoin that it 'assert[ed] title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif' and that '[t]itle transfers to whoever controls this blockchain entry.'"  JA-394.  The District Court evidently failed to understand that *McCoy himself*, in May 2014, wrote not only that "I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif," but also that "[t]itle transfers to whoever controls this blockchain entry."  *See supra* § B; JA-49, ¶ 38; JA-273-74, ¶¶ 13, 14, Ex. B.  Free Holdings merely copied McCoy's language.  *See supra* § D.

McCoy's 2014 statement that "Title transfers to whoever controls this blockchain entry" is, by itself, sufficient to prevent the District Court from resolving, on a motion to dismiss, that "[t]he claim to -709a, under Free Holdings' theory of NFT ownership," cannot and does not "confer[] a property interest in Quantum itself."  *See* JA-393.  But there are many more facts to support the sufficiency of Free Holdings' pleading, including:

- McCoy's and Sotheby's original intention to sell the 2014 *Quantum* NFT, shown by the May 6 press release, the May 20

version of the "Natively Digital" catalog, and McCoy's original, professionally produced video, which mentioned only the 2014 *Quantum* NFT (*see supra* §§ E-F);

● McCoy's and Sotheby's repeated references to the 2014 *Quantum* NFT as "first," and their repeated statements that the 2014 *Quantum* NFT was important because it was first, before they realized that McCoy no longer owned the 2014 *Quantum* NFT (*see supra* §§ E-F);

● McCoy's and Sotheby's scrambling to save their sale once they realized McCoy no longer owned the 2014 *Quantum* NFT, including McCoy's last-minute minting of the new NFT, Sotheby's modification of the catalog to refer to the new NFT, and McCoy's recording of a second, self-filmed video describing his minting of the new NFT (*see supra* §§ G-I); and

● McCoy's transparently incorrect statement that the Namecoin protocol had "permanently locked the entry which prevents any further changes or updates," even while Free Holdings was continuing to update the NFT (*see supra* § G).

Any of these facts, alone, would be enough to support Free Holdings' allegation that "[t]he claim to -709a, under Free Holdings' theory of NFT ownership, confers a property interest in Quantum itself" and defeat a motion to dismiss. *See* JA-393-94. As such, the District Court's contrary finding was in error. *See Lynch,* 952 F.3d at 76-77 (reversing order dismissing claims where district court failed to discuss or cite factual allegations that were required to be accepted as true).

The infection caused by this error spreads throughout the District Court's ruling. For example, in concluding that Free Holdings has "failed to

allege injury-in-fact," the District Court states that "no facts are alleged to suggest that Free Holdings had any claim to a share in the sale in the first place, there is no basis to support an inference that an injury occurred." JA-395. But if Free Holdings has successfully alleged—as it has, *see supra*—that its "claim to -709a . . . confers a property interest in Quantum itself," then McCoy and Sotheby's cannot sell "Quantum itself" without Free Holdings' permission and participation, and their sale against Free Holdings' wishes harms Free Holdings. *See* JA-393 (citing Am. Compl. ¶¶ 69, 103-07); *see also* JA-395.

Similarly, in ruling against Free Holdings' unjust enrichment claim, the District Court found that "Free Holdings does not allege that it has any proprietary interest in the NFT that McCoy and Sotheby's sold." JA-398. But Free Holdings does allege that its "claim to -709a . . . confers a property interest in Quantum itself," *supra*, and Sotheby's and McCoy sold not only the new 2021 NFT but also, purportedly, *ownership of Quantum*, which they claimed was now controlled by the 2021 NFT, instead of the original 2014 *Quantum* NFT. *See* JA-45-46, 50, ¶¶ 9, 14, 15, 42-43.

**B. The District Court Erroneously Resolved the Disputed Factual Issue of Whether McCoy's and Sotheby's Statements Were False**

The District Court also erred by resolving against plaintiff Free Holdings the disputed factual issue of whether McCoy and Sotheby's statements—specifically, as the Court summarized, "that Quantum was 'burned' or 'removed' from the Namecoin blockchain and that the NFT sold at auction 'was the first NFT ever created'"—were false. JA-401. The District Court first found that "Free Holdings admits that the NFT McCoy created on Namecoin 'expire[d]'" (*Id.* (citing Am. Compl. ¶¶ 3, 40), but the portions of the complaint it cited say the opposite. Paragraph 3 of the Amended Complaint states: "McCoy subsequently let the record for the Namecoin-*Quantum* expire on or around January 2015. This left the Namecoin-*Quantum* free to claim." JA-45. Although the first sentence includes the word "expire" quoted by the District Court, the second sentence confirms Free Holdings' allegation that, after the expiration of McCoy's rights to the 2014 NFT, the NFT itself still existed and was "free to claim" by Free Holdings. If there is any lingering doubt over what Free Holdings meant by "expire," Paragraph 40 of the Amended Complaint resolves it: "If a user fails to update their record, control of that particular block record expires and can be claimed by another user." JA-50. The District Court's

– 27 –

selective reading of these paragraphs—extracting the word "expire" and separating it from its meaning—would have been unseemly at any stage of the litigation, but represents clear error in ruling against the plaintiff on a motion to dismiss.

Next, the District Court found that Defendants' statements could not be false because they are "topics of debate" on which people may hold "differing opinions." JA-401. But this conclusion dodges the Court's responsibility to find the facts beneath litigants' competing claims. Consider the following hypothetical: Allison, Beatrice, Clara, and Dana enter into a real-estate development agreement covering a property. Allison then sells the property. Beatrice sues Allison for slander of title, claiming that Allison was not authorized to sell the property. Clara supports Allison; Dana supports Beatrice. The question of whether Allison could unilaterally sell the property is thus—like so much in litigation—a "topic[] of debate" on which people may hold "differing opinions." But a court would still resolve this question, because the very purpose of courts is to pierce the cloud of "differing opinions" and resolve questions on their merits. If the District Court were correct in dismissing Free Holdings' claims here, then *any* litigant could avoid *any* litigation probing the truth of *any* statement simply

by finding someone who agrees with them.  That cannot be the law, and it is
not here.

Finally, the District Court misunderstood both Free Holdings'
allegations and McCoy and Sotheby's statements in its conclusion that they
accurately claimed to sell "the first NFT ever created."  JA-402.  The
District Court found that "the statements Free Holdings cites to in its
Amended Complaint—by defendants and others—characterize *Quantum* as
the first NFT ever created, and do not distinguish between an
'Ethereum-*Quantum*' and 'Namecoin-*Quantum.* '"[4]  *Id.*  Assuming for the
moment that this summary is accurate—and it is not—it would still represent
error by the District Court.  Free Holdings alleges *precisely* that McCoy and
Sotheby's *should have distinguished* between the 2014 NFT owned by Free

---

[4] The District Court also appeared to punish Free Holdings for attempting to
speak clearly through use of defined terms.  In its Amended Complaint, Free Holdings
defined "Namecoin-*Quantum*" to mean the 2014 NFT, and "Ethereum-*Quantum*" to
mean the 2021 NFT.  JA-44-45, ¶¶ 2, 6.  It then used those terms throughout its papers in
the District Court.  In its ruling, the District Court noted that Free Holdings' "allegations
never quote defendants—or anyone else—stating that 'Ethereum-*Quantum*' was the first
NFT created.  *See, e.g.*, AC ¶¶ 54–74.  'Ethereum-*Quantum*' and 'Namecoin-*Quantum*'
are terms Free Holdings employs in its pleadings, and there is no evidence to suggest that
defendants or anyone else ever used them in any public statements or challenged
materials."  JA-402.  But of course, it does not matter whether defendants used the
defined terms selected by Free Holdings' counsel; what matters is the substance of their
statements.  The District Court's punishment of Free Holdings for its use of defined terms
was both unseemly and unnecessary, and gives the appearance of bias against Free
Holdings by the District Court.  Nevertheless, to avoid any potential confusion between
defined terms and actual statements, Free Holdings has discontinued its use of that
terminology in favor of references to the GIF file, the 2014 NFT, and the 2021 NFT.

Holdings and the 2021 NFT rushed to mint the week before the auction, because the 2014 NFT holds title to the *Quantum* GIF file and the 2021 NFT does not, and so McCoy and Sotheby's spoke falsely when they claimed that their sale of the 2021 NFT included title to the *Quantum* GIF file. *See* JA-45-46, 55-57, 58, ¶¶ 9, 13, 70, 71, 73, 79, 87 and 89; *see also supra* §§ G-I. Even on its own terms, the District Court's ruling was in error.

The District Court's ruling also failed to correctly summarize defendants' statements. McCoy and Sotheby's repeatedly stated that McCoy "transferred" or "preserved" some undefined essence of the 2014 NFT into McCoy's new 2021 NFT, and that McCoy's choice to do so imbued the 2021 NFT with the provenance of the 2014 NFT. *See supra* §§ H, I. But McCoy and Sotheby's never explained *how* this is so—the closest they came was to say that McCoy minted both NFTs, although not why this matters—but simply proceeded to a series of claims that the only thing they were selling, the 2021 NFT, was actually first, including:

- "the curated auction will be highlighted by Kevin McCoy's Quantum, the first NFT ever minted" (*supra* § G);

- "Universally regarded as the first NFT ever created, the animated Quantum is timestamped 05-03-2014 09:27:34." (*supra* § G);

- "the first artwork that was inscribed into a blockchain, and that happened in May of 2014." (*supra* § F); and

- "These prime movers occupy a singular position in art history. They came first. Kevin McCoy's *Quantum* is such a work. **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block <u>174923</u>, the NFT era quietly dawned. What a noise it makes today." (*supra* § H).

There are many more such statements, *see generally supra* §§ G-I, but that is enough. Free Holdings alleged that McCoy and Sotheby's claimed they sold the first NFT, and that those statements were false. The District Court's contrary conclusion was error.

## III. Free Holdings Has Standing to Pursue Its Claims

"The 'irreducible constitutional minimum of standing consists of three elements': the individual initiating the suit 'must have (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision.'" *Toretto v. Donnelley Fin. Solutions, Inc.*, 523 F. Supp. 3d 464, 471 (S.D.N.Y. 2021) (quoting *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (internal citation omitted)). The requirement that one "clearly alleg[e]" facts demonstrating standing "is a lower threshold" than that for "sustaining a valid cause of action." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018) (internal quotation marks and citation omitted).

"When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it

(collectively the "Pleading"), the plaintiff has no evidentiary burden," and the Court must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff. *Carter v. HealthPort Techs., LLC*, 822 F.3d at 56. "The task of the district court is to determine whether the Pleading allege facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (internal quotation marks and citation omitted). On appeal, this Court will review the District Court's determination *de novo*. *Id.*

In this action, the District Court's finding of no standing depends on its erroneous resolution of disputed factual issues against Free Holdings. The District Court found that Free Holdings alleged no injury-in-fact, because it failed to allege "a proprietary interest in *Quantum* itself," by which it meant the GIF file that McCoy and Sotheby's sold as part of the "Natively Digital" auction. JA-393. But Free Holdings has alleged *precisely* "a proprietary interest in *Quantum* itself," *see supra* § II.A, and the District Court's contrary conclusion was error. Free Holdings thus alleged that McCoy and Sotheby's *sold something it owns*, a classic injury-in-fact providing standing. The District Court's opinion does not find otherwise, instead resting its ruling on its erroneous factual conclusion. *See supra*

– 32 –

§ II.A.  Without this conclusion, the District Court's opinion is clear error, and Free Holdings' claims can and should proceed.

## IV.  The Amended Complaint Stated Proper Claims for Relief

### A.  Free Holdings Stated a Claim for Unjust Enrichment

The District Court rejected Free Holdings' claim for unjust enrichment on three grounds, all of which represent error.  First, the District Court found that "Free Holdings does not allege that it has any proprietary interest in the NFT that McCoy and Sotheby's sold."  JA-398.  But Free Holdings *did* allege a proprietary interest in "*Quantum* itself," the GIF file that McCoy and Sotheby's *also* sold, to their undisputed enrichment.  *See supra* § II.A.  The District Court's contrary conclusion thus rests on its factual error.

Next, the District Court found no "connection between the plaintiff and defendants that would make the enrichment unjust."  JA-398 (citing *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. 2011)).  But this conclusion also rests on a factual error:  the District Court's failure to understand that *McCoy*, not Free Holdings, first inscribed the 2014 *Quantum* NFT with the words: "Title transfers to whoever controls this blockchain entry."  *See supra* §§ B, II.A.  With the proper understanding that McCoy made this offer in the blockchain itself, and Free Holdings accepted

it by taking "control[]" of the "blockchain entry," the Court would have understood that the connection between them is not "too attenuated" for an unjust enrichment claim. *Mandarin*, 16 N.Y.3d at 182.

Finally, and troublingly, the District Court applied *sua sponte* factual findings to conclude it would be "against equity and good conscience" to allow Free Holdings' claims to proceed. JA-399. This finding depended entirely on the District Court's statement that "Free Holdings has demonstrated nothing more than an attempt to exploit open questions of ownership in the still-developing NFT field to lay claim to the profits of a legitimate artist and creator." *Id.*[5] That statement, in turn, depended entirely on the District Court's erroneous resolution against Free Holdings of the dispute regarding whether Free Holdings has a "property interest in Quantum itself." *See* JA-393. If Free Holdings does have a "property interest in Quantum itself," as it has properly pleaded and thus the Court must assume at the pleading stage, Free Holdings cannot be the illegitimate intermeddler portrayed by the District Court, and can proceed to the merits on its claim that it would be "against equity and good conscience" to allow

---

[5] This conclusion, made without citation, appears to be a pure statement of the District Court's own opinion, resolved against the plaintiff at the pleading stage, and gives a further appearance of bias against Free Holdings by the District Court.

McCoy and Sotheby's to keep their enrichment from selling the *Quantum* GIF file to which Free Holdings has title.

### B. Free Holdings Stated Claims for Slander of Title and Commercial Disparagement; the District Court's Dismissal Relied on Error

The District Court again erred in rejecting Free Holdings' claims for slander of title and commercial disparagement.  Considering these claims together, the District Court rejected them on three grounds, each of which depended on improper and erroneous findings of fact at the pleading stage. The District Court first found that Free Holdings had not alleged falsity. JA-401-04.  But this finding depends on the District Court's selective quotation of Free Holdings' complaint, as well as its dismissal of factual questions as matters of opinion.  *See supra* § II.B.  Free Holdings has sufficiently alleged falsity to survive the pleading sage.

Next, the District Court found that "Free Holdings has not pleaded any facts supporting even an inference of malice on the part of Sotheby's or McCoy."  JA-405.  But that is not so.  Among other facts showing malice, or at minimum leading to an inference of malice, are these:

- McCoy's and Sotheby's original intention to sell the 2014 *Quantum* NFT, shown by the May 6 press release, the May 20 version of the "Natively Digital" catalog, and McCoy's original, professionally produced video, which mentioned only the 2014 *Quantum* NFT (*see supra* §§ E-F);

– 35 –

- McCoy's and Sotheby's repeated references to the 2014 *Quantum* NFT as "first," and their repeated statements that the 2014 *Quantum* NFT was important because it was first, before they realized that McCoy no longer owned the 2014 *Quantum* NFT (*see supra* §§ E-F);

- Even after they realized that McCoy no longer owned the 2014 NFT and scrambled to mint a new one, McCoy's and Sotheby's continuing to describe their sale as "highlighted by Kevin McCoy's Quantum, the first NFT ever minted," when they knew that the only NFT they offered for sale was minted in 2021 (*see supra* §§G-H);

- Even after they realized that McCoy no longer owned the 2014 NFT and scrambled to mint a new one, McCoy's and Sotheby's continuing to describe their sale using the same memorable and somewhat purple prose in the catalog, including the statement that "These prime movers occupy a singular position in art history. They came first. Kevin McCoy's Quantum is such a work. **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block <u>174923</u>, the NFT era quietly dawned. What a noise it makes today." (*see supra* § H (emphasis in original));

- McCoy's second, self-filmed video, in which he appears somewhat scattered and distracted, and describes his minting of the new NFT using the Orwellian term of "preservation" (*see supra* § I); and

- McCoy's transparently incorrect statement that the Namecoin protocol had "permanently locked the entry which prevents any further changes or updates," even while Free Holdings was continuing to update the NFT (*see supra* § G).

Drawing all inferences for the plaintiff, as one must at the pleading stage, these facts are sufficient for a "showing that defendants 'either knew [their] statements were false or acted with reckless disregard as to whether they were false.'" JA-404 (quoting *Conti v. Doe*, 535 F. Supp. 3d 257, 279

(S.D.N.Y. 2021) (alteration in original)). The District Court erred by finding the contrary at the pleading stage.

Finally, the District Court found that Free Holdings failed to allege special damages. This, too, was in error. Special damages consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation" caused by the slander. *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (internal quotation and citation omitted). Special damages may be a loss of customers, the inability to sell property, or even expenses "incurred to counteract the alleged product disparagement." *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 155 (S.D.N.Y. 1983). That has happened here: once McCoy and Sotheby's sold the *Quantum* GIF file at auction, Free Holdings lost the ability to sell the same file or even to participate in its sale, and thus suffered a loss to its "property interest in Quantum itself." JA-393 (citing Am. Compl. ¶¶ 69, 103-07). And Free Holdings further lost its ability to sell the 2014 NFT to the auction buyer, Alex Amsel, who wanted to buy "the world's first NFT" and was willing to pay $1,472,000 for it. JA-57-58, ¶¶ 84-86. "[A] loss of a named customer is sufficient to plead special damages." *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 19-CV-6793, 2021 WL 535217, at *8 (E.D.N.Y. Feb. 12, 2021). Free Holdings lost

– 37 –

Mr. Amsel, who will surely not pay an additional $1,472,000 for "the world's first NFT" when McCoy and Sotheby's have convinced him he already owns it. Free Holdings has thus alleged the "special damages" required by New York law.

### C. Free Holdings Stated a Claim Under § 43(a) of the Lanham Act

"Section 43(a) of the Lanham Act prohibits the use of any 'false or misleading description of fact' in promotional statements that 'misrepresent the nature, characteristics, or qualities' of products or services." *International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56 (2d Cir. 2022) (citing 15 U.S.C. § 1125(a)(1)). Again, the District Court's dismissal of this claim at the pleading stage rested on error.

The District Court held that "it was not literally false to say *Quantum* was the 'first-ever' NFT, nor that the NFT McCoy created was 'burned' or 'removed' from the Namecoin blockchain." JA-409. This was an error for two reasons. First, the District Court should not, at the pleading stage, have concluded that any of these statements were not "literally false"; instead, it should have allowed Free Holdings' claims to proceed to discovery and the merits. *See supra* § II.B.

Second, and unacknowledged by the District Court, the Lanham Act also allows recovery if, "'although the advertisement is literally true, it is

– 38 –

likely to deceive or confuse customers.'" *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir. 2001)). "[A]n 'impliedly false' message 'leaves an impression on the listener or viewer that conflicts with reality.'" *International Code Council,* 43 F.4th at 57 (quoting *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016)).

That is so here: once they realized that McCoy no longer owned the 2014 NFT, McCoy and Sotheby's did everything possible to leave the "impression on the listener or viewer" considering bidding in the "Natively Digital" auction that Sotheby's and McCoy were selling "the first NFT ever minted," when they were not. *International Code Council,* 43 F.4th at 57; *see supra* §§ II.B, IV.B. McCoy's second, self-filmed video is a masterclass in obfuscation, using "restoration and preservation efforts" to describe his actions in minting the entirely new, 2021 NFT. *See supra* § I. This obfuscation was furthered by Sotheby's updating of the "Natively Digital" catalog to refer to the 2021 NFT, without changing the memorable and somewhat purple prose describing how *Quantum* "came first," noting that: "Kevin McCoy's Quantum is such a work. **Minted on 2nd May 2014 21:27:34**, or more precisely Namecoin Block 174923, the NFT era quietly

dawned. What a noise it makes today." *See supra* § H (emphasis in original). Even if the Court found these messages to be "literally true"—and it should not have, *see supra*—they are at minimum "likely to deceive or confuse customers" and thus meet the Lanham Act's pleading standard. *Merck Eprova*, 760 F.3d at 255.

But these messages were not merely "likely to deceive or confuse customers"—they actually did so. The winner of Sotheby's auction of McCoy's 2021 NFT believed he had purchased the world's first NFT, and other news and media outlets likewise adopted and perpetuated this false characterization:

- Alex Amsel, the winning bidder at Sotheby's auction of the 2021 NFT, published that he had purchased the world's first NFT: "First ever crypto art nft – Quantum has arrived chez Sillytuna." JA-58, ¶ 86.

- The *New York Times* published an article stating: "That first NFT that Kevin created, which he'd attached to a modest digital abstraction titled 'Quantum,' sold last June at Sotheby's for $1.4 million." JA-60, ¶ 95.

- Fox published a chyron that stated: "FIRST EVER NFT 'QUANTUM' SOLD FOR $1.47 MILLION." JA-60, ¶ 97.

Free Holdings thus successfully alleged implied falsity for the purposes of stating a Lanham Act claim. To the extent that the District Court sought to balance Free Holdings' well-pleaded claims with other statements made by McCoy and Sotheby's in the context of the sale, those are "factual questions

not well suited for resolution on a motion to dismiss." *International Code Council,* 43 F.4th at 62; *see also Consumers Union of U.S., Inc. v. New Regina Corp.,* 664 F. Supp. 753, 772 (S.D.N.Y. 1987).

Finally, the District Court found that "Free Holdings has not alleged any 'diversion of business or a loss of goodwill' in its own proprietary interest, because it does not allege to have had any business or goodwill in *Quantum* in the first place." JA-410. Once again, however, the District Court's ruling rests on factual error. The District Court acknowledged that "[t]he claim to -709a, under Free Holdings' theory of NFT ownership, confers a property interest in Quantum itself." JA-393 (citing Am. Compl. ¶¶ 69, 103-07). But the District Court, based on its misunderstanding of the facts before it, resolved this disputed issue against plaintiff Free Holdings. On a motion to dismiss, this was error. Without that error, Free Holdings has properly alleged a claim under the Lanham Act.[6]

---

[6] Although it is not necessary to resolve this case, where the parties are in direct competition as they are here, the Court may presume loss of goodwill. "[D]iversion of sales from a direct competitor is the paradigmatic direct injury from false advertising." *Lexmark Intern., Inc. v. Static Control Components*, Inc., 572 U.S. 118, 138 (2014). "We hold that where, as here, a plaintiff has met its burden of proving deliberate deception in the context of a two-player market, it is appropriate to utilize a presumption of injury." *Merck*, 760 F.3d 247, 260-261. "In a two-player market, where an advertisement makes false comparative statements about a plaintiff's product, injury may be presumed." *Dependable Sales & Service, Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 342 (S.D.N.Y. 2019).

**D. Free Holdings Stated a Claim for Deceptive and Unlawful Trade Practices Under N.Y. GBL § 349**

A claim for violation of New York General Business Law § 349 requires a plaintiff to plead "that the defendant engaged in (1) a consumer-oriented business practice or act that was (2) materially misleading and (3) the plaintiff suffered an injury thereby." *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 287 (S.D.N.Y. 2014). "[C]onsumer-oriented conduct within the meaning of the NYGBL is broadly interpreted and requires merely that the conduct at issue 'have a broader impact on consumers at large.'" *Koch v. Greenberg*, 626 Fed. Appx. 335, 340 (2d Cir. 2015) (internal citation omitted). A plaintiff "need not show that the defendant committed the complained-of acts repeatedly – either to the same plaintiff or to other consumers – but instead must demonstrate that the acts or practices have a broader impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). "So long as the conduct at issue can potentially affect similarly situated consumers, the requirement of consumer-oriented conduct is met." *Koch*, 626 Fed. Appx. at 340.

The District Court found that Free Holdings failed to allege a claim for GBL § 349 on the grounds that Free Holdings' pleadings did not allege harm to the public at large. JA-408. In particular, the District Court further

– 42 –

found that Free Holdings' allegations failed to allege a GBL § 349 claim because Free Holdings had purportedly alleged a "single-shot transaction" that was not eligible for protection under GBL § 349. JA-407-08. The District Court is wrong.

Free Holdings alleged consumer-oriented conduct sufficient for GBL § 349 because it pleaded that McCoy and Sotheby's issued false and misleading statements to the general public in order to market, promote, and advertise their sale of the 2021 NFT. Specifically, Free Holdings alleged that McCoy and Sotheby's materially false and misleading statements were issued to the general public on McCoy and Sotheby's website, which invited all consumers to place a bid on the piece. *See, e.g.*, JA-55, ¶ 70. This is sufficient to allege consumer-oriented conduct because the false and misleading statements would have caused all similarly-situated consumers to falsely believe they were bidding on the world's first NFT. McCoy and Sotheby's likewise used the sale of *Quantum*, a popular and headline grabbing transaction, to burnish their reputations in the NFT space and develop their platforms for future consumer sales of NFTs. *See* JA-59-60, ¶¶ 91-97.

This case is similar to *Koch*, where this Court held that, for the purposes of GBL § 349, selling high-end collectible wine through an auction

– 43 –

house qualified as consumer-oriented conduct. *Koch*, 626 Fed. App'x at 340.

In *Koch*, a plaintiff who had purchased the high-end collectible wine sued

the auction house under GBL § 349 alleging that a portion of the wine sold

was counterfeit. *Id.* The defendant argued that its conduct was not

consumer-oriented because "the wine was a high-end collectible" that "sold

at immodest prices, precluding the involvement of the general public . . . ."

*Id.* This Court disagreed, holding that the sale constituted

consumer-oriented conduct because "defendant provided wine to be sold at

auction to other consumers similarly situated to Koch." *Id.* ("So long as the

conduct at issue can potentially affect similarly situated consumers, the

requirement of consumer-oriented conduct is met.") (internal quotations and

citation omitted). Likewise, here, McCoy and Sotheby's falsely marketed an

NFT to be sold at auction to prospective consumers at large, namely art and

NFT collectors and dealers, such as Free Holdings. Because Free Holdings

sufficiently alleged consumer-oriented conduct, the District Court's

dismissal of Free Holdings' GBL § 349 claim was in error.

## V. On Remand, the District Court Should Allow Free Holdings' Declaratory Judgment Claim to Proceed

The District Court declined to allow Free Holdings' declaratory

judgment claim to proceed, finding that "Free Holdings' pleadings fail to

give rise to an 'actual controversy' because it has not alleged any concrete or

particularized injury stemming from defendants' representations." JA-411.

But that is not so; *see supra* §§ II-III. For the same reasons that Free

Holdings has standing and a well-pleaded complaint, the District Court

should allow Free Holdings' declaratory judgment claim to proceed.

**VI.  Should This Court Be Inclined Not to Allow Free Holdings' Claims to Proceed, At Minimum It Should Remand With Instructions to Allow Free Holdings Leave to Amend Its Complaint**

Although the District Court ruled on the first motions to dismiss in

this action, it did not grant Free Holdings leave to amend its complaint, but

directed the Clerk to "enter judgment for defendants." JA-412. The Clerk

promptly did so, Docket No. 71, leading to this appeal. JA-413.

Fed. R. Civ. P. 15(a) requires that "leave [to amend] shall be freely

given when justice so requires." *See also, Foman v. Davis*, 371 U.S. 178,

182 (1962) ("Of course, the grant or denial of an opportunity to amend is

within the discretion of the District Court, but outright refusal to grant the

leave without any justifying reason appearing for the denial is not an

exercise of discretion; it is merely abuse of that discretion and inconsistent

with the spirit of the Federal Rules"); *Ronzani v. Sanofi S.A.*, 899 F.2d 195,

198–99 (2d Cir. 1990).

The District Court did not explain its rationale in denying amendment,

but it likely arose from the same errors that otherwise pervaded its ruling.

– 45 –

Should the Court affirm the District Court's Order in any respect, it should

remand with instructions to permit Free Holdings leave to amend.

## **CONCLUSION**

For all the foregoing reasons, the Court should reverse the District

Court's order dismissing the Amended Complaint, and remand so that Free

Holdings' claims can proceed on their merits.

Dated: July 25, 2023

*/s/ Moish Peltz*
Moish Peltz
Falcon Rappaport & Berkman LLP
*Attorneys for Plaintiff-Appellant*
265 Sunrise Highway, Suite 50
Rockville Centre, New York 11570
(212) 203-3255

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS
AND TYPE STYLE REQUIREMENTS**

1.  This brief complies with the type-volume limitation of
    Fed.R.App.P.32(a)(7)(B) because:

    This brief contains 10, 371 words, excluding the parts of the brief exempted by
    Fed.R.App.32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5)
    and the type style requirements of Fed.R.App.P32(a)(6) because:

    This brief has been prepared in Proportionally-Space typeface using
    Microsoft Word, in Times New Roman, Font Size 14.

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Opinion and Order of Honorable James L. Cott,
    Dated March 17, 2023...............................................................SPA-1

Judgment of The United States District Court,
    Southern District of New York, Dated March 20, 2023,
    with Attachments .....................................................................SPA-44

SPA-1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __03/17/2023____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
FREE HOLDINGS INC.,                                    :
                                                       :
                              Plaintiff,               :     **OPINION AND**
                                                       :     **ORDER**
                                                       :
        -v-                                            :     22-CV-881 (JLC)
                                                       :
KEVIN MCCOY and SOTHEBY'S, INC.,                       :
                                                       :
                                                       :
                              Defendants.              :
---------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Free Holdings, Inc. has brought this action involving the digital artwork,

*Quantum*, and the first non-fungible token ("NFT") ever created.  It has sued

*Quantum*'s creator, artist Kevin McCoy, and auction house Sotheby's Inc.

(collectively, "defendants").  Free Holdings alleges multiple claims stemming from

statements made by defendants in promotional material for an auction of *Quantum*

and its digital record.  Defendants have each moved to dismiss the amended

complaint.  For the reasons set forth below, the motions are granted.

## I.     BACKGROUND

### A.     Factual Background

The following facts, drawn from the amended complaint ("AC"), Dkt. No. 47,

sources cited therein, exhibits attached by Free Holdings to its motion papers, and

judicially noticeable matters, are assumed true for the purposes of this motion.  *See,*

*e.g., Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 344–45 (S.D.N.Y. 2020),

1

SPA-2

*aff'd*, 2022 WL 274507 (2d Cir. Jan. 31, 2022). In evaluating whether the claims are

cognizable, the Court also considers Natively Digital: A Curated NFT Sale, "the

challenged publication" cited in the amended complaint. *See, e.g.*, *Biro v. Condé

Nast*, No. 11-CV-4442 (JPO), 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014) ("In

a defamation case, [documents incorporated by reference or considered integral to

the complaint] may include the entirety of a challenged publication that is

excerpted in the complaint."), *aff'd in part*, 807 F.3d 541 (2d Cir. 2015), *aff'd*, 622 F.

App'x 67 (2d Cir. 2015).

### 1. NFTs and Namecoin

As alleged in the amended complaint, an NFT is a unique identifier that

"authenticate[s] digital content" on the blockchain, which is "a digital public ledger

maintained on a decentralized computer system and consisting of records called

blocks." AC ¶¶ 27, 29. "The blockchain's record-keeping and authentication

technology serves to provide public certificates of authenticity or proof of ownership

of NFTs." *Id.* ¶ 31. "[C]ontent linked to NFTs can take the form of digital images of

physical objects, music, text, and more." *Id.* ¶ 32.

Namecoin, an early blockchain, is a system of "names"—unique combinations

of numbers and letters—that can be claimed and traded by users. *See id.* ¶ 35; *see

also* Monolithbrah.eth, *et al.*, *Defining "NFT'" in Historical Context* ("Defining NFT")

(Jun. 27, 2022) https://mirror.xyz/chainleft.eth/MzPWRsesC9mQflxlLo-

N29oF4iwCgX3lacrvaG9Kjko.[1] Ownership of every name periodically expires, at

_____

[1] As Free Holdings cites to and attaches this article as an exhibit to its

2

which point any user "may freely claim [it] on the Namecoin blockchain" by re-registering the expired name. AC ¶ 4; Defining NFT. In the community of blockchain users, "there is an ongoing debate" about the status of names that expire and are then re-registered: namely, whether re-registered names become new NFTs or are the same NFTs that were previously claimed. The debate is summarized in the Defining NFT article as follows:

> Namecoin is designed around domain names, but when a domain name gets registered the first time, it is represented by a particular identifier (UTXO design) to allow its trading. The chain of these identifiers (UTXOs) can be considered a special coin, which we will call a "colored coin" in this article. . . .

> When a Namecoin domain expires, the colored coin becomes unspendable. In practice, it can be called "burnt", because when the domain name is re-registered later, a new UTXO chain starts. This would mean that when a domain name expires, the chain of events where that domain was represented breaks. During the re-registration, the Namecoin protocol does not make a distinction between a never-used domain name and a previously expired domain name. This fact may support the argument that the expiration is philosophically burning the original token.

> On the other hand, as mentioned before, Namecoin is designed around names. Names are unique identifiers themselves and they function that way immutably in a cryptographically secured blockchain. The history of the

---

memorandum of law and declaration in opposition to McCoy's motion, *see* Plaintiff's Memorandum of Law in Opposition to Kevin McCoy's Motion to Dismiss the Amended Complaint ("Pl. Mem. McCoy"), Dkt. No. 66, at 8 n.5; Dkt. No. 66-1, Exhibit ("Ex.") C, the Court considers it part of the record in this case. *See, e.g., Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir. 2007) (consideration of allegations and exhibits outside complaint permissible because plaintiff "knew additional factual considerations were being considered and, in fact, responded with its own evidentiary submissions").

unique name, previous updates and transactions remain on-chain, as is the case with blockchains.

The aforementioned "UTXO chains" are actually formed of individual UTXO stations.  Each UTXO has an address and domain names are attached to these UTXOs.  When Bob makes a standard domain name transfer to Alice, a 0.01NMC is spent on Bob's side where the domain name is attached, and a new 0.01NMC is created on Alice's side where the domain name is attached.  The thing that physically (for lack of a better term) moves from one address to another during a typical transfer is the domain name, not UTXOs.  The design choice of a typical domain name transfer supports the argument that the domain name is the unique identifier and the token, and it never burns even after expiration.

This domain-first design can be seen not only in block explorers but also in functions to utilize the domain names.  There's a built-in [remote procedure call ("RPC"), a software communication protocol] method since the beginning of Namecoin called name_show which returns the information about the domain name even during the expired period.  This function does not return anything for never-registered domains.

In fact, an expired domain can still be functional.  When expired, Namecoin Core will still have the name and return its local state with name_show (just indicating the expired status).  If the resolver setup accepts it, the domain will still work.  Similarly, expired "id/" names in Namecoin still work as logins, which indicates the usefulness of the name_show function.

Consequently, as the article explains, there are three different interpretations of the significance of ownership of a re-registered name on Namecoin:

Interpretation 1: *The token is the colored coin, and that is the asset*.  Names may be unique but they are cryptographically represented by tokens and only that representation matters.  Since a re-registered name is

4

assigned to an entirely new colored coin, the provenance from the earlier UTXO chain is broken, therefore *this is a new asset and cannot claim historical value.*

Interpretation 2: *The token is the name, and that is the asset.* Namecoin is designed around names where names are the main unique identifiers. This is supported by the technical design when you do a typical name transfer or assign a value field to the name. These are all visible on-chain. Further, when the name expires, the data of the name remains on the blockchain. If the blockchain is designed around names and their whole history is on-chain, when the name is re-registered you are simply reactivating the old token, therefore *provenance is not broken.*

Interpretation 3: *The token is the colored coin because it is a cryptographic representation of the name.* But the main collectible asset is the name itself and these names have their own provenance because Namecoin is designed around names as unique identifiers. A name's history and UTXO assignments are all visible on-chain. This is further proven by the existence of name_show and name_history RPC methods. Therefore when the name is re-registered, *the new colored coin (UTXO chain) can be assumed as a new NFT, but it represents the old decentralized collectible asset which was intact and ownable since its birth.*

*Id.* (emphasis added). To summarize, as the Defining NFT article makes clear, some believe that when a new user re-registers an available name previously claimed by someone else, it has claimed the same NFT claimed by the previous user. Others, who believe that the NFT is the UTXO chain, not the name, believe that when a new user re-registers an expired name, the new UTXO chain it creates signifies a new NFT. A third group ascribes to a combination of the two theories: that the UTXO chain becomes a new NFT that retains the entire history of the name.

5

SPA-6

### 2.   Mccoy's Creation and Preservation of *Quantum*

In 2014, digital artist Kevin McCoy created *Quantum* (viewable at https://static.mccoyspace.com/gifs/quantum.gif).  AC ¶¶ 2, 37.  McCoy was interested in experimenting with the blockchain to store his work because he "thought about how the scarcity mechanism that bitcoin presented could be a way for digital artists to create provenance and ownership systems around digital works."  Declaration of Evan M. Rothstein dated June 30, 2022 ("Rothstein Decl."), Dkt. No. 56, Ex. C, Ex. D ("Kevin McCoy – *Quantum* Tr.") at 3:24–4:3.[2]  Because of this interest, McCoy created the digital record of *Quantum* on Namecoin on May 2, 2014—"the first NFT."  AC ¶¶ 2, 98; *see* Namebrow.se, Namecoin Explorer, https://namebrow.se/name/d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde 98e79825b68709a/ [https://perma.cc/N4J6-5Y3U] ("-709a Record Page") (last visited Mar. 16, 2023) (also viewable at Declaration of William L. Charron dated June 30, 2022 ("Charron Decl."), Dkt. No. 61, Ex. B).[3]  To do this, McCoy entered the "NAME_NEW" and "NAME_FIRSTUPDATE" functions on Namecoin to register the name d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a

---

[2] The cited exhibits display a video and corresponding transcript.  The video appears in the "challenged publication" cited by Free Holdings in the amended complaint, *see* AC ¶¶ 52–66, n.5–14.  The Court deems these exhibits to be incorporated by reference in, or otherwise integral to, the amended complaint, and therefore properly considered here.  *See, e.g., Biro*, 2014 WL 4851901, at *4.

[3] The Court considers the -709a Record Page in adjudicating the pending motions, as Free Holdings refers to it in the amended complaint and "relied upon [it] in framing the complaint."  *See* AC ¶ 38 n.3; *see also McLennon v. City of New York,* 171 F. Supp. 3d 69, 88–89 (E.D.N.Y. 2016) (discussing when documents are considered "integral" to complaint).

("-709a") as a digital record of *Quantum*.  -709a Record Page.  The -709a Record

Page provides the following disclaimer:

> An important distinction between property & deed must
> be made when considering Namecoin NFTs.  A UTXO, the
> thing that transfers ownership [between] holders of
> public/private key pairs, is a DEED to property but NOT
> property itself.  The property that the Namecoin
> blockchain was built to cryptographically secure
> ownership of, provided all recurring fees have been paid
> to the protocol, is a unique plot of digital space known as
> a Name.  As such, Names, along with the history of
> Values associated to them, are the NFT property.

-709a Record Page.  On May 28, 2021, McCoy "minted another NFT" to record the

same moving image of *Quantum*, "this time on the Ethereum blockchain."  AC ¶ 6.

### 3.  Claims on Namecoin and Communications on Twitter

In January 2015, name -709a expired.  AC ¶ 3.  On April 5, 2021, a new user

entered "NAME_NEW" and "NAME_FIRSTUPDATE" on the -709a name entry.

-709a Record Page.  On April 30, 2021, a user entered "NAME_UPDATE" and wrote

a message that appears under the "Value" column of that entry:

> I assert title to the file at the URL
> http://static.mccoyspace.com/gifs/quantum.gif with the
> creator's public announcement of it's publishing at the
> URL
> https://twitter.com/mccoyspace/status/4623204267196416
> 00 The file whose SHA256 hash is
> d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde9
> 8e79825b68709a is taken to be the file in question.  Title
> transfers to whoever controls this blockchain entry.

-709a Record Page; AC ¶ 5.  Free Holdings reports that on Namecoin.org, the

command "name_history

d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a,"

7

SPA-8

returns the same message.  Declaration of Moish E. Peltz dated August 15, 2022

("Peltz Decl."), Dkt No. 66-1 ¶¶ 2–14.[4]

As is displayed on the -709a Record Page and reproduced in the chart below,

above the April 30, 2021 entry, several more "NAME_UPDATE" entries appear with

dates, codes, and messages.  -709a Record Page.  The entries do not identify

authors, but delineate "block" numbers.  *Id.*   For instance, the block number

associated with the "NAME_NEW" operation performed on May 2, 2014 is 174910;

the block number associated with the "NAME_FIRSTUPDATE" operation

performed on May 3, 2014 is 174923.  *Id.*  Then, the "NAME_NEW" operation

performed on April 5, 2021 appears at block 553180, and subsequent entries appear

next to higher block numbers.  *Id.*  Thus, according to Free Holdings, "all

subsequent activity associated with [-709a] is forever linked to that name on the

Namecoin blockchain" and "all prior history associated with that name . . . cannot

be deleted so long as the Namecoin blockchain continues to operate."  Peltz Decl.

¶ 16.

---

[4] Free Holdings also asserts that the Namecoin Explorer does not "properly display
the relevant history of the -709a name" but a "direct interaction with the Namecoin
protocol produces . . . a different value . . .  presumably because McCoy committed
this text in [a different format]."  Pl. Mem. McCoy at 7; *see also* Peltz Decl. ¶¶ 2–14.
Because Free Holdings cited to the -709a Record Page on Namecoin Explorer in the
amended complaint, *see* AC ¶ 38 n.3, the Court considers it here.

8

SPA-9

| Date/Time | Block | Transaction | Operation | Value |
|---|---|---|---|---|
| Oct. 7, 2022, 1:24 p.m. | 633125 | b9d71b2cd... | NAME_UPDATE | An important distinction between property & deed must be made when considering Namecoin NFTs. A UTXO, the thing that transfers ownership b/w holders of public/private key pairs, is a DEED to property but NOT property itself. The property that the Namecoin blockchain was built to cryptographically secure ownership of, provided all recurring fees have been paid to the protocol, is a unique plot of digital space known as a Name. As such, Names, along with the history of Values associated to them, are the NFT property. |
| Feb. 10, 2022, 3:47 p.m. | 598415 | 6dd5ceffc... | NAME_UPDATE | I assert title to the file at the URL https://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| June 14, 2021, 12:25 p.m. | 563353 | 93e6db4e6... | NAME_UPDATE | **This original NFT, entitled "Quantum" by Kevin McCoy and minted on May 2, 2014, is currently held by the person who controls the Twitter handle @EarlyNFT. Please direct message all inquires about the artwork there.** |
| June 7, 2021, 4:30 p.m. | 562392 | 84adf2532... | NAME_UPDATE | **An authorized print of this original NFT, entitled "Quantum" by Kevin McCoy, is currently being auctioned off by Sotheby's. Good Luck to all the bidders.** |
| April 30, 2021, 2:53 p.m. | 556942 | e63d18c5b... | NAME_UPDATE | I assert title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif with the creator's public announcement of it's publishing at the URL https://twitter.com/mccoyspace/status/462320426719641600 The file whose SHA256 hash is d41b8540cbacdf1467cdc5d17316dcb672c8b43235fa16cde98e79825b68709a is taken to be the file in question. Title transfers to whoever controls this blockchain entry. |
| April 5, 2021, 12:14 p.m. | 553214 | d81a70169... | NAME_FIRSTUPDATE | None |
| April 5, 2021, 7 a.m. | 553180 | 8c76ba4ec... | NAME_NEW | fc6a09d1dfa2cbced6fa35e64c3cb001196cdef2 |
| May 3, 2014, 1:27 a.m. | 174923 | fa8b9a6ad... | NAME_FIRSTUPDATE | None |
| May 2, 2014, 11:33 p.m. | 174910 | da66d975e... | NAME_NEW | aa4bcd723e172f0f53cbab9c71a165262334206b |

Beginning in April 2021, Free Holdings alleges that it attempted to contact McCoy on Twitter (@mccoyspace) using the handle @EarlyNFT.  AC ¶¶ 44–45.  On April 6, 2021, @EarlyNFT tweeted: "Would you mind enabling PM for me, @mccoyspace?  There's a matter regarding your work 'Quantum' I'd like to discuss with you . . . "  *Id.* ¶ 45.  On April 12, 2021, @EarlyNFT replied to one of @mccoyspace's tweets: "Kevin, would you mind allowing me to send you a private message (this option is currently turned off on your end)?  This concerns your NFT artwork with Monegraph back in 2014."  *Id.* ¶ 46.[5]  On April 30, 2021, @EarlyNFT

---

[5] The Court takes judicial notice that on Twitter, a "reply" is a "response to another tweet."  *See* Twitter, About Conversations on Twitter, https://help.twitter.com/en/using-twitter/twitter-

SPA-10

replied to @mccoyspace: "I am in possession of Quantum NFT (the record is found here [link inaccessible by the Court]).  Can we discuss this over messaging (currently your messaging is turned off)?"  *Id.* ¶ 47.  Later on April 30, @EarlyNFT tweeted: "Take a look . . . I just updated the record today: [link inaccessible by the Court]."  *Id.*  On May 3, @EarlyNFT tweeted:



*Id.* ¶ 48.[6]  On May 6, 2021, @EarlyNFT replied to @mccoyspace: "Kevin we

---

conversations#:~:text=A%20reply%20is%20a%20response,the%20prompt%20above%20the%20Tweet (last visited Mar. 16, 2023).  *See also Satan Wears Suspenders, Inc. v. Jaar*, No. 21-CV-812 (ER), 2022 WL 2181449, at *3 n.6 (S.D.N.Y. June 16, 2022) (taking judicial notice of "Twitter post and reply tweets"); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 552 (S.D.N.Y. 2018) (taking judicial notice of information on Twitter webpage), *dismissed as moot on other grounds*, 2021 WL 5548367 (2d Cir. May 26, 2021).  The amended complaint does not indicate to which of McCoy's tweets @EarlyNFT replied.

[6] Free Holdings alleges that this tweet was "to McCoy."  AC ¶ 48.  The screenshot of the tweet included in the Amended Complaint does not show whether it was a "reply" to one of McCoy's tweets, or otherwise indicate how McCoy would have been

ABSOLUTELY need to talk . . . Namecoin records expire; I own the Quantum NFT.

I can demonstrate it if you give me a chance . . ." *Id.* ¶ 50. McCoy never responded

to the Twitter communications. *Id.* ¶ 51.

### 4. The Auction and Sale of *Quantum*

In May 2021, the well-known auction house Sotheby's began marketing

*Quantum* for an auction entitled *Natively Digital: A Curated NFT Sale*, scheduled

for June 2021. AC ¶¶ 8, 52; *see* Sotheby's, Natively Digital: A Curated NFT Sale,

https://www.sothebys.com/en/buy/auction/2021/natively-digital-a-curated-nft-sale-

2/quantum [https://perma.cc/B3YA-A9HP]("Natively Digital") (last visited Mar. 16,

2023) (videos and moving image not preserved on Permalink, videos attached as

exhibits C and E, with corresponding transcripts at exhibits D and F, to the

Rothstein Declaration).[7]  Natively Digital includes the following description below

the moving image, *Quantum*:

> Owner: Kevin McCoy
>
> Kevin McCoy
> b. 1967
> *Quantum*
> 2014-21
>
> Non-fungible token ERC-721
> Token ID: 0
> 9 mb Tif + file archive with documentation
> Originally minted on May 3, 2014 on Namecoin

---

made aware of it.

[7] As Natively Digital is cited and discussed extensively in the amended complaint
and is "the challenged publication," the Court considers it as part of the record in
adjudicating the pending motions. *See, e.g.*, *Ebomwonyi*, 473 F. Supp. 3d at 344–45;
*Biro*, 2014 WL 4851901, at *4.

blockchain, and preserved on a token minted on May 28, 2021 by the artist.

Sotheby's marketed *Quantum* as "the most art historically important work in the history of NFTs." AC ¶ 59 (quoting Natively Digital). The Catalogue Note for *Quantum* provides the following description:

> In the long timeline of art, there are few works that serve as genesis blocks to their own chain of history. They are seismic forks in direction; forks that usher in new movements that block by block, mint by mint, usher in new art histories. These works close chapters on the art histories that came before, while anchoring a new flowering of human creativity. These prime movers occupy a singular position in art history. They came first. Kevin McCoy's *Quantum* is such a work. Minted on 2nd May 2014 21:27:34, or more precisely Namecoin Block 174923, the NFT era quietly dawned. What a noise it makes today.

AC ¶ 58 (quoting Natively Digital, Catalogue Note).

A "Condition Report" on Natively Digital, authored by nameless TM, explains *Quantum*'s digital history, in relevant part:

> The hash and all the information about [*Quantum*] are stored on the Ethereum blockchain, and therefore cannot be modified. This token was minted May 2021, but the referenced pieces were originally made public in 2014, with a link to the image hosted on the Namecoin network. The token is a very early example of utilizing a blockchain token to identify the provenance of a piece of art. Documents contained within the media bundle hosted on [the InterPlanetary File System] indicate the date and block location that the Namecoin DNS pointer was set to point to mccoyspace.com, and shows the transactions used at the time to create this trail. To avoid domain squatting, Namecoin was designed to include removal of pointers after 36,000 blocks. Accordingly, this specific Namecoin entry was removed from the system after not being renewed, and was effectively burned from the chain.

12

SPA-13

Natively Digital; AC ¶¶ 64–65.

McCoy appears in two videos on Natively Digital.  *See* Rothstein Decl., Ex. C–F.  In one video, McCoy describes the "restoration and preservation efforts that [he] made to bring this early work back into the present day."  *Id.*, Ex. E, Ex. F ("*Quantum* Token – McCoy Tr.") at 2:4–6.  On his computer screen, McCoy shows the viewer how he "moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information."  *Id.*, Ex. E, *Quantum* Token – McCoy Tr. at 2:8–12; *see also* AC ¶ 66 (quoting same).  McCoy explains that the "provenance chain . . . begins on Namecoin but now is irrevocably transferred to this more modern and stable specification on the Ethereum blockchain."  *Quantum* Token – McCoy Tr. at 3:23–4:2.  McCoy displays

> an archive called 'wallet documentation[,]' that contains a set of screenshots taken from the original Namecoin wallet showing the original transaction set, the original on-chain data, and a signed message proving that [he] ha[s] continued possession of the private key for the address that originally sent *Quantum*'s minting transaction.  That signed message appears separately in the archive as a text file and the data of which can be used in a contemporary Namecoin wallet to independently verify the message's validity.

Rothstein Decl., Ex. E, *Quantum* Token – McCoy Tr. at 4:3–15.  McCoy concludes: "[a]s we enter into this new era of tokenization, I think we will increasingly be faced with issues of cross-chain translation, preservation, and archiving and conservation. In fact, we're already there with *Quantum*."  *Quantum* Token – McCoy Tr. at 5:3–8.

Sotheby's held the auction for *Quantum* from June 3–10, 2021.  AC ¶¶ 77–78.

SPA-14

On June 17, 2021, Free Holdings allegedly spoke to Caroline Moustakis ("Moustakis"), Sotheby's Senior Vice President, and told her "that the description that Sotheby's posted . . . was inaccurate and misleading because [the record of *Quantum* on Namecoin] had not been 'burned' or 'removed' from the Namecoin blockchain, but rather was still active and controlled by Free Holdings." AC ¶ 79. "Free Holdings requested that Sotheby's make public statements to correct the record, including making a statement that the [the record of *Quantum* on Namecoin] remains active and in private hands, was not listed for sale as part of Sotheby's auction, and that the item Sotheby's auctioned was in fact an authorized print of the Namecoin-*Quantum* token." *Id.* Free Holdings then emailed Moustakis, memorializing the conversation and requesting that the public record be corrected, but neither Moustakis nor any other Sotheby's representative responded. *Id.* ¶¶ 80–81.

On August 23, 2021, McCoy and Sotheby's sold the "re-minted" *Quantum* to Alex Amsel ("Amsel"), who uses the Twitter name @Sillytuna, for a reported sum of $1,472,000. AC ¶ 84. Amsel tweeted: "First ever crypto art nft – Quantum has arrived chez Sillytuna. Take that VISA!" AC ¶ 86.

After the sale, an article in the *New York Times* reported that the "first NFT that Kevin [McCoy] created . . . sold last June at Sotheby's for $1.4 million." AC ¶ 95; ¶ 95 n.15 (citing Blake Gopnik, *One Year After Beeple, the NFT Has Changed Artists. Has It Changed Art?*, N.Y.TIMES (Mar. 3, 2022) https://www.nytimes.com/2022/03/03/arts/design/nft-art-

beeple.html?msclkid=eacb622dcf0a11ec93b64ee394548d56 ("Gopnik")).[8]  A segment

on Fox Business ran the banner: "FIRST-EVER NFT 'QUANTUM' SOLD FOR

$1.47 MILLION."  AC ¶ 97.  Free Holdings alleges that it expended $5,311.49

"seeking to have McCoy and Sotheby's issue public statements correcting their false

and misleading claims."  *Id.* ¶ 100.

On May 6, 2022, nameless tweeted:

> "Last year, nameless prepared a condition report in
> connection with the Sotheby's auction of Kevin McCoy's
> Ethereum-based 'Quantum' NFT [(hyperlink to Natively
> digital)].  McCoy's 'Quantum' NFT was originally created
> on the Namecoin blockchain.  The condition report
> included a statement that Quantum's 'specific Namecoin
> entry was removed from the system after not being
> renewed, and was effectively burned from the chain.'  In
> light of subsequent allegations challenging this
> statement, nameless has decided to retract its condition
> report.  [N]ameless expresses no opinion about the merits
> of the allegations.

AC ¶ 88.

## B.   Procedural History

Free Holdings, a Canadian corporation, originally brought this action against

McCoy; Sotheby's; nameless, a corporation based in Colorado; and Alex Amsel, the

buyer of the *Quantum* NFT, on February 1, 2022, challenging their

characterizations that they were involved with the first NFT, and that the

Namecoin record associated with *Quantum* had been "burned" or "removed."

---

[8] Where it is not otherwise incorporated in the pleadings, a court may "take judicial
notice that an article was published," but may "not take judicial notice of the truth
of the facts in the article."  *Karol v. City of New York*, 396 F. Supp. 3d 309, 318
(S.D.N.Y. 2019) (citing *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425
(2d Cir. 2008)).

Complaint ("Compl."), Dkt. No. 1; *see also* AC ¶¶ 60–70.  On March 8, 2022, Free

Holdings voluntarily dismissed its claims against Amsel.  Dkt. No. 24.  On April 6,

2022, the parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C.

§ 636(c).  Dkt. No. 38.  On May 9, 2022, Free Holdings filed an amended complaint,

in which it asserts five causes of action: (1) unjust enrichment (¶¶ 110–16); (2)

slander (¶¶ 117–26); (3) deceptive and unlawful trade practices under New York

General Business Law ("G.B.L.") § 349 (¶¶ 127–39); (4) commercial disparagement

(¶¶ 140–48); and (5) false or misleading representations under 15 U.S.C. § 1125(a)

(¶¶ 149–58).[9]  Dkt. No. 47.  It further requests that the Court:

> declar[e] and adjudicat[e] that (i) Free Holdings is the
> rightful owner of the Namecoin-based *Quantum*; (ii) the
> Namecoin-*Quantum* has not been burned or otherwise
> removed from the Namecoin blockchain; and (iii) the
> statements issued by McCoy and Sotheby's in connection
> with their sale of the Ethereum-*Quantum* were false and
> misleading[;]

and seeks damages and injunctive relief.  *Id.* at 24–25.[10]

On May 10, 2022, Free Holdings dismissed its claims against nameless.  Dkt.

No. 48.  On June 30, 2022, McCoy and Sotheby's both moved to dismiss the

amended complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure, Dkt. Nos. 54, 59, and filed accompanying memoranda of law,

---

[9] As its first cause of action, Free Holdings asserts "Declaratory Judgment," which
is not a cause of action but rather a form of relief.  *See, e.g., Cisco Sys., Inc. v.
Synamedia Ltd.*, 557 F. Supp. 3d 464, 474 (S.D.N.Y. 2021) ("A request for relief in
the form of a declaratory judgment does not constitute an independent cause of
action.") (citing *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 14 F.3d 726,
731 (2d Cir. 1993)).

[10] This citation refers to page numbers of the amended complaint as the paragraphs
seeking relief are not numbered.

16

declarations, and exhibits of various sources cited in the amended complaint.  *See* Defendant Sotheby's Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint ("Sotheby's Mem."), Dkt. No. 55; Rothstein Decl., Dkt. No. 56; Defendant Kevin McCoy's Memorandum of Law in Support of his Motion to Dismiss ("McCoy Mem."), Dkt. No. 60; and Charron Decl., Dkt. No. 61.[11]  On July 7, 2022, the Court accepted video footage as exhibits to the motion papers, including those filed by Sotheby's, annexed to the Rothstein Declaration.  Dkt. No. 62.  On August 16, 2022, Free Holdings filed memoranda of law in opposition to both motions to dismiss and an accompanying declaration.  *See* Pl. Mem. McCoy; Peltz Decl., Dkt No. 66-1; Plaintiff's Memorandum of Law in Opposition to Sotheby's Inc.'s Motion to Dismiss the Amended Complaint ("Pl. Mem. Sotheby's"), Dkt. No. 64.  On September 1, 2022, Sotheby's and McCoy each filed a reply memorandum of law.  Dkt. Nos. 68, 69.

## II.   DISCUSSION

In their respective motions, defendants contend that Free Holdings has failed to allege an injury sufficient for standing or a claim that is ripe for review, warranting dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).  In the alternative, they argue that all of Free Holdings' claims should be dismissed under Rule 12(b)(6) for failure to state a claim.  For the following reasons, the Court concludes that Free Holdings has not alleged an injury sufficient for standing to

---

[11] While they filed separate motion papers, Sotheby's and McCoy joined in each other's motions as well.  Dkt. Nos. 54, 55 at 1; Dkt. No. 60 at 1.

sue.  The Court further concludes that even if Free Holdings had standing, it has failed to state a claim upon which relief can be granted.

## A.  Legal Standards

### 1.  Motion To Dismiss For Lack Of Subject Matter Jurisdiction

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it."  *Gelmart Indus., Inc. v. Everready Battery Co., Inc.*, No. 13-CV-6310 (PKC), 2014 WL 1512036, at *2 (S.D.N.Y. Apr. 15, 2014) (quoting *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)).  In deciding such a motion, the Court construes the complaint in the plaintiff's favor and accepts all factual allegations as true.  *Id.*  However, "[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Ryan v. United States*, No. 15-CV-2248 (GHW), 2015 WL 7871041, at *3 (S.D.N.Y. Dec. 3, 2015) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)).

In evaluating a Rule 12(b)(1) motion, "the Court may consider evidence outside the pleadings."  *Id.*  "[P]laintiffs [may] come forward with evidence of their own to controvert that presented by the defendant if the affidavits submitted on a 12(b)(1) motion . . .  reveal the existence of factual problems in the assertion of jurisdiction."  *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 57 (2d Cir. 2016) (quotations omitted).  "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it

does not contradict plausible allegations that are themselves sufficient to show standing." *Id.*

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *L.M., et al. v. Johnson*, No. 14-CV-3833 (NGG) (VMS), 2015 WL 8540876, at *2 (E.D.N.Y. Dec. 7, 2015) (quoting *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)); *see also Gunn v. Ambac Assur. Corp.*, No. 11-CV-5497 (PAC) (JLC), 2012 WL 2401649, at *10 (S.D.N.Y. June 26, 2012), *adopted by* 2012 WL 3188849 (S.D.N.Y. Aug. 6, 2012).

## 2.  Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted

Rule 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In considering a Rule 12(b)(6) motion, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

To survive dismissal, the plaintiff must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Facial plausibility exists when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 of the Federal Rules of Civil Procedure "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### 3. Evidentiary Standard On A Motion To Dismiss Under Rule 12(b)(6)

On a motion to dismiss under Rule 12(b)(6), "district courts must limit their consideration to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; or (4) documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Ebomwonyi*, 473 F. Supp. 3d at 344–45 (quoting *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014)) (cleaned up).

For a document "[t]o be incorporated by reference, the complaint must make a clear, definite and substantial reference to [it]." *McLennon*, 171 F. Supp. 3d at 88 (quoting *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010)) (citation omitted). "Limited quotation does not constitute

20

incorporation by reference." *Id.* at 88–89 (quoting *Looney v. Black*, 702 F.3d 701, 716 n.2 (2d Cir. 2012)). "Even where a document is not incorporated by reference, it may be considered if it is integral to the complaint." *Id.* at 89. "A document is integral to the complaint where the plaintiff (1) has actual notice of the document and its information and (2) has relied upon the documents in framing the complaint." *Id.* (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (cleaned up). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (cleaned up).

The Federal Rules of Evidence establish that judicial notice may be taken of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "To that end, dictionaries and encyclopedia may be consulted." *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988). A court need not convert a motion to dismiss for failure to state a claim to one for summary judgment merely because it has considered extrinsic evidence for purposes of resolving a motion to dismiss for lack of subject matter jurisdiction. *See, e.g.*, *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 161 (E.D.N.Y. 1998).

**B. The Court Lacks Subject Matter Jurisdiction Over Free Holdings' Claims**

The gravamen of Free Holdings' amended complaint is that its alleged

proprietary interest in "Namecoin-*Quantum*"—its term for the NFT it claims on

Namecoin—was injured by defendants' allegedly false statements that the record of

*Quantum* on Namecoin was "burned" or "removed" and their allegedly false

representation that the "NFT they sold at auction was the first NFT ever created."

AC ¶¶ 119–20, 142–43, 151–52.[12]  Defendants counter that those statements and

characterizations were not false, and that Free Holdings has failed to allege a

concrete injury resulting from them.  McCoy Mem. at 2; Sotheby's Mem. at 1, 17–18.

Thus, defendants move to dismiss for lack of subject matter jurisdiction.

### 1.  Free Holdings' Claims Are Not Justiciable

The Court first analyzes whether Free Holdings has alleged an injury

sufficient for standing under Article III of the U.S. Constitution.  As discussed

below, Free Holdings has alleged no concrete or particularized injury sufficient for

standing to sue in federal court.

#### a.  Article III Standing and Ripeness

The Constitution limits the judicial power of federal courts to decide cases or

controversies.  *See* U.S. Const. art. III, § 2, cl. 1.  "Constitutional standing thus is

the threshold question in every federal case, determining the power of the court to

---

[12] Free Holdings's choice of terminology—"Namecoin-*Quantum*" and "Ethereum-*Quantum*"—supports its view that there are two NFTs called *Quantum* and that it has ownership rights to the one on Namecoin.  AC ¶¶ 1–2, 6.  This terminology is not used in any of the exhibits Free Holdings attaches or in the sources to which it cites.  Defendants alternatively refer to two Namecoin NFTs—a "2014 NFT" and a "2021 NFT"—to support their position that Free Holdings' proprietary interest is in a new, distinct NFT it created on Namecoin in 2021 when it claimed -709a.  *See, e.g.*, McCoy Mem. at 19 n.7.  At the motion to dismiss stage, the Court, construing the pleadings in Free Holdings' favor, refers to its terminology where it would not cause confusion.

**SPA-23**

entertain the suit." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 339 (S.D.N.Y. 2021) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotations omitted)). "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *NYCLU v. Grandeau*, 528 F.3d 122, 130 (2d Cir. 2008).

Article III requires a plaintiff first to allege that it "suffered an injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Wilhelm v. Beasley*, No. 15-CV-4029 (LAK), 2016 WL 94254, at *2 (S.D.N.Y. Jan. 7, 2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.,* 934 F. Supp. 2d 516, 525 (E.D.N.Y. 2013) ("If a plaintiff has not yet suffered a concrete injury-in-fact, he or she . . . could also be said to suffer from a lack of ripeness . . . ."), *aff'd*, 548 F. App'x 741 (2d Cir. 2014). Injury-in-fact requires a "personal stake in the outcome of the controversy"—at a minimum, "a proprietary interest in[ ]the claim." *Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 417, 420 (2d Cir. 2015) (citing *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108 (2d Cir. 2008) ("[T]he minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim.")). The remaining requirements for Article III standing are "a causal connection between the injury and the conduct complained of" and a likelihood, "as opposed to mere[ ]speculati[on], that the injury will be redressed by a favorable decision." *Wilhelm*,

2016 WL 94254, at *2 (quoting *Lujan*, 504 U.S. at 560–61).

"Although the plaintiff must independently establish that it has standing to bring this action, and that its claim is ripe, the Court will analyze these inquir[i]es together because this case concerns whether plaintiff's injury is currently concrete, and not hypothetical, which implicates both standing and ripeness." *SC Note Acquisitions*, 934 F. Supp. 2d at 526. At the pleading stage, "[e]ach element of standing must be supported" at least by "general factual allegations of injury resulting from the defendant's conduct." *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534 (2d Cir. 2020) (cleaned up). As Free Holdings' allegations rely on its proprietary interest in *Quantum qua* name -709a, the analysis begins there.

### i. Free Holdings Has Failed To Allege A Proprietary Interest In *Quantum*

Free Holdings claims a proprietary interest in "[t]he blockchain record for the Namecoin-*Quantum*," which, it alleges, "remains active and under [its] control." AC ¶ 69. The claim to -709a, under Free Holdings' theory of NFT ownership, confers a property interest in *Quantum* itself. *Id.*; *see also id.* ¶¶ 103–07. Notably, Free Holdings nowhere alleges an interest in the NFT minted on Ethereum that McCoy and Sotheby's sold. Indeed, it alleges that the two "are different NFTs." *Id.* ¶ 7. McCoy disputes Free Holdings' theory of ownership, arguing that a name on Namecoin is distinct from the underlying NFT. McCoy Mem. at 3 n.2. Thus, according to McCoy, Free Holdings merely claimed -709a, creating a distinct NFT, which confers no proprietary interest in *Quantum* itself. *See* McCoy Mem. at 4–7.

**SPA-25**

Free Holdings does provide an adequate factual basis to support a plausible proprietary interest in -709a—that is, assertions of title displayed on the -709a Record Page and by Twitter user @EarlyNFT. *See* AC ¶¶ 38, 42–43. Free Holdings has thus alleged a proprietary interest in -709a sufficient for standing. However, Free Holdings has not articulated any facts to support its claim to ownership of *Quantum* vis-à-vis its claim to -709a. As McCoy points out, Free Holdings "never alleges that it can or could control" *Quantum*. McCoy Mem. at 5. As factual support, Free Holdings provides only its own alleged statements on Namecoin that it "assert[ed] title to the file at the URL http://static.mccoyspace.com/gifs/quantum.gif" and that "[t]itle transfers to whoever controls this blockchain entry," -709a Record Page, along with an article explaining that the significance of name ownership on Namecoin is open to debate. *See* Pl. Mem. McCoy at 8 n.5 (citing Defining NFT); Dkt. No. 66, Ex. C (same); McCoy Mem. at 5, 12. Even taken together, they are insufficient to give rise to a legally-protected interest in *Quantum*.

### ii.   Free Holdings Has Failed To Allege Injury-In-Fact

Setting aside conclusory statements that merely recite the elements of the claims in the pleadings, the harm that Free Holdings alleges as a result of defendants' statements in Natively Digital, the challenged publication, consists of three theories: (1) loss of opportunity to profit from Sotheby's and McCoy's $1,472,000 sale; (2) damage to the value of its claimed Namecoin property; and (3) the expense of "$5,311.49 seeking to have McCoy and Sotheby's issue public

SPA-26

statements correcting their false and misleading claims." AC ¶¶ 48, 139, 148, 158; *see also, e.g.*, *Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).

In support of the first theory, Free Holdings points to the tweet from @EarlyNFT that it allegedly directed at McCoy's Twitter account asking, "Are you interested in the sale of Quantum or not then?" AC ¶ 48. Free Holdings argues that "[i]f McCoy had taken up this offer," its claimed Namecoin NFT "could have been included in McCoy's sale . . . at the Sotheby's auction (and corrected related marketing statements)." Pl. Mem. McCoy at 11. But the pleadings raise no suggestion that defendants either were legally obligated to include Free Holdings in their auction sale, or that McCoy even responded to (or should have responded to) the cryptic offer made by an anonymous Twitter user. And because no facts are alleged to suggest that Free Holdings had any claim to a share in the sale in the first place, there is no basis to support an inference that an injury occurred.

Regarding the second theory—damage to the value of its claimed Namecoin property—as McCoy points out, Free Holdings "does not allege any actual, imminent or attempted sale of [its claimed] NFT," nor that it "even *tried* to market it[ ]." McCoy Mem. at 13–14 (emphasis in original). Free Holdings' vague speculation that "[a]ny prospective purchaser of Namecoin-*Quantum* would now have valid reason to doubt [its] value," Pl. Mem. McCoy at 12, is legally insufficient. *See, e.g., ATSI Commc'ns*, 493 F.3d at 98 ("plaintiff must provide . . . factual

26

allegations . . . above the speculative level") (quoting *Twombly*, 550 U.S. at 555).

As to Free Holdings' alleged expenditure of $5,311.49 to have defendants issue public statements to correct the record, it is well-established that a plaintiff may not "manufacture standing merely by inflicting harm on [itself] based on . . . fears of hypothetical future harm that is not certainly impending." *Steven v. Carlos Lopez & Assocs., LLC*, 422 F. Supp. 3d 801, 807 (S.D.N.Y. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013)), *aff'd sub nom.*, *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295 (2d Cir. 2021). This expenditure thus fails to give rise to standing.

While the Court is mindful that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," Free Holdings has not pleaded *any* actual or imminent harm to its alleged proprietary interest. *Sonterra Cap. Master Fund*, 954 F.3d at 534 (citation omitted). Thus, Free Holdings has no Article III standing to bring the claims it has alleged in its amended complaint.

## C. The Amended Complaint Fails To State A Claim

Having concluded that Free Holdings has not alleged injury sufficient for standing, the Court does not need to consider, as a matter of law, whether the amended complaint states any claims. Nonetheless, both for completeness' sake and because of the novelty of the issues presented here, it will analyze each of Free Holdings' claims for relief to determine if any of them are cognizable. *See, e.g.*, *Desir v. Fla. Cap. Bank, N.A.*, 377 F. Supp. 3d 168, 174 (E.D.N.Y. 2019) (finding no

27

SPA-28

subject matter jurisdiction, but even assuming jurisdiction, analyzing whether complaint failed on 12(b)(6) grounds).[13]  For the reasons set forth below, the Court concludes that none are.  Free Holdings has not pleaded any viable cause of action against defendants that would otherwise survive a motion to dismiss, even if it were to establish standing.

### 1.  Free Holdings Has Failed To State A Claim Of Unjust Enrichment

As to its unjust enrichment claim, Free Holdings alleges that its Namecoin NFT "has significant value due to its status as the first NFT and such value is being significantly diminished by [defendants'] false and misleading statements."  AC ¶ 98; *see also id.* ¶¶ 110–16.  It argues that defendants were unjustly enriched when they "claimed the identity, titles, and prestige associated with the Namecoin-*Quantum* in order to market, promote, and sell [their own, separate] asset."  Pl. Mem. Sotheby's at 14.

"An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Georgia*

---

[13] Defendants have requested that all of Free Holdings' claims be dismissed with prejudice.  If the Court were to dismiss solely on subject matter jurisdiction grounds, the dismissal would be "without prejudice" as a matter of law.  *See, e.g.*, *Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021) (dismissals for lack of subject matter jurisdiction "must be without prejudice, rather than with prejudice").  However, dismissals for failure to state a claim are considered to be "with prejudice." *See, e.g.*, *Lynch v. Hanley*, No. 21-CV-25 (GTS) (ML), 2021 WL 2309688, at *2 n.4 (N.D.N.Y. June 7, 2021) (dismissal for failure to state a claim viewed as adjudication "on the merits" of the action, and thus dismissal "with prejudice" appropriate) (collecting cases).

**SPA-29**

*Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (cleaned up).[14]  "Thus, in order to adequately plead such a claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Id.* (cleaned up).  While there is no dispute that defendants were enriched (they made a $1,472,000 sale), Free Holdings does not allege that it has any proprietary interest in the NFT that McCoy and Sotheby's sold.  McCoy Mem. at 15; AC ¶ 136.  Moreover, Free Holdings has made no specific allegations that defendants' sale of an NFT (it does not even claim to own) was at its expense.  *See* AC ¶ 113 (alleging only that "McCoy and Sotheby's profits are obtained at Free Holdings' expense").

A viable unjust enrichment claim also requires some sort of connection between the plaintiff and defendants that would make the enrichment unjust. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (N.Y. 2011) ("Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated.").  In *Georgia Malone & Co.*, for example, the court concluded that "arm's length business interactions" between the parties were "too attenuated" to meet this requirement.  19 N.Y.3d at 517–18.

The only connections alleged between the parties are based on Free Holdings' unsuccessful attempts to contact McCoy on Twitter using the handle @EarlyNFT,

---

[14] As Free Holdings brings New York law claims and the parties rely on New York law in their briefs, the Court will apply New York law.  *See, e.g., Great W. Ins. Co. v. Graham*, No. 18-CV-6249 (VSB), 2020 WL 3415026, at *17 n.17 (S.D.N.Y. June 22, 2020) (parties' agreement on applicable law "may be implied by the parties' reliance on [it] in their briefs") (citation omitted).

SPA-30

and its alleged phone conversation with Sotheby's' Moustakis, memorialized in an email to which she did not respond.  AC ¶¶ 44–50, 79–81.  The pleadings provide no information as to why McCoy should have even known who @EarlyNFT was, much less that it was Free Holdings.  *See generally* AC ¶¶ 44–51.  A single phone call followed by an unanswered email may safely be characterized as an "arm's length business interaction" and anonymous unanswered replies on one social media network constitutes no interaction at all.[15]  Nothing in the amended complaint can be construed as describing a sufficiently close relationship between the parties to support an unjust enrichment claim.

In addition, Free Holdings argues that it would be "against equity and good conscience" to allow "McCoy and Sotheby's to retain the profits they obtained through the sale of the Ethereum-*Quantum*."  AC ¶ 19.  From the pleadings, however, Free Holdings has demonstrated nothing more than an attempt to exploit open questions of ownership in the still-developing NFT field to lay claim to the profits of a legitimate artist and creator.  It does not allege that it took any part in the creation of *Quantum* or the blockchains used to record it.  Free Holdings has thus failed to plausibly allege that unjust enrichment occurred in these circumstances.

---

[15] *See, e.g.*, Merriam-Webster, "Interaction", https://www.merriam-webster.com/dictionary/interaction (last visited Mar. 16, 2023) ("mutual or reciprocal action or influence"); *see also, e.g.*, *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 52 (S.D.N.Y.) (connection insufficient for unjust enrichment purposes between owner of artwork and foundation refusing to authenticate it), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015).

### 2.  Free Holdings Has Failed To State Claims Of Slander Of Title Or Commercial Disparagement

Free Holdings next alleges claims of slander of title and commercial disparagement based on its purported title on Namecoin.  AC ¶¶ 117–26, 140–48. For a viable slander of title claim, a plaintiff must adequately plead: "(1) a communication falsely casting doubt on the validity of [its] title, (2) reasonably calculated to cause harm [(in other words, malice)], and (3) resulting in special damages."  *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *11 (S.D.N.Y. Sept. 24, 2007); *see also Wei Su v. Sotheby's, Inc.*, No. 17-CV-4577 (VEC), 2019 WL 4917609, at *3 (S.D.N.Y. Oct. 4, 2019) ("[T]he claimant must plausibly allege that the offending party maliciously used false statements to cast doubt upon another's property interest, causing special damages, typically in the form of a lost sale resulting from the cloud on the claimant's title.").  Likewise, "product disparagement consists of: (1) a false statement; (2) published by Defendant to a third party; (3) with malice; and (4) with special damages." *Chamilia,* 2007 WL 2781246, at *18 (citing cases).  Where a plaintiff "has merely parroted the applicable legal standard" or fails to plead any facts suggesting malice, a slander of title claim will be dismissed.  *Horton v. Wells Fargo Bank N.A.*, No. 16-CV-1737 (KBF), 2016 WL 6781250, at *7 (S.D.N.Y. Nov. 16, 2016), *aff'd,* 703 F. App'x 23 (2d Cir. 2017); *see also Aleem v. Experience Hendrix, L.L.C.*, No. 16-CV-9206 (ER), 2017 WL 3105870, at *7 (S.D.N.Y. July 20, 2017) (plaintiffs failed to "submit any facts to suggest . . . purported communications . . . made with malice"). For either claim to survive, Free Holdings must therefore plausibly allege falsity,

31

SPA-32

malice, and special damages.  The Court analyzes them seriatim.

### i.   Free Holdings Has Not Alleged Falsity

The burden is on a plaintiff to allege "that the complained of statement is substantially false."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017); *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dep't 2015) (if statement "is substantially true," claim should be dismissed) (quotation omitted).  "[E]xpressions of pure opinion . . . are not actionable."  *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718 (S.D.N.Y. 2014) (citing *Torain v. Liu*, 279 Fed. App'x 46, 46 (2d Cir. 2008)).

Free Holdings has failed to meet its burden for several reasons.  First, it concedes that the representations it challenges—that *Quantum* was "burned" or "removed" from the Namecoin blockchain and that the NFT sold at auction "was the first NFT ever created," AC ¶¶ 119–20—are topics of debate.  It alleges that "Namecoin-*Quantum* . . . has not been 'burned,' and is currently controlled and owned by Free Holdings," AC ¶¶ 123, 146, but goes on to contradict that allegation in its own pleadings and in the materials it cites.  Specifically, Free Holdings admits that the NFT McCoy created on Namecoin "expire[d]," AC ¶¶ 3, 40, yet it also observes that "defining the legal import of control of digital assets on the Namecoin blockchain[ ]is the subject of differing opinions."  Pl. Mem. McCoy at 8.[16]

---

[16] Sotheby's urges the Court to take judicial notice of "news articles showing there is an existing debate about the range of potential definitions of these terms." Sotheby's Mem. at 14 n.6 (citing *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (in granting dismissal motion, taking judicial notice of newspaper articles showing public controversy in order "to place [defendants'] comments in the

**SPA-33**

Further, it cites and attaches to its motion papers an article explaining that "[w]hen a Namecoin domain expires, . . . it can be called 'burnt.'" Defining NFT.

Second, Free Holdings uses terminology that is misleading and fails to show falsity. It alleges that as "Namecoin-*Quantum* is considered the first NFT ever created," AC ¶ 37, Sotheby's falsely marketed "Ethereum-*Quantum* by Kevin McCoy . . . as the first NFT ever created." AC ¶ 120; *see also* Pl. Mem. Sotheby's at 10 ("the pleaded truth would . . . reveal[ ] to potential bidders that the Ethereum-*Quantum* was a copy of the presently-extant Namecoin-*Quantum*, rather than the alleged sole surviving vestige of a prized digital collectible."). Its allegations never quote defendants—or anyone else—stating that "Ethereum-*Quantum*" was the first NFT created. *See, e.g.*, AC ¶¶ 54–74. "Ethereum-*Quantum*" and "Namecoin-*Quantum*" are terms Free Holdings employs in its pleadings, and there is no evidence to suggest that defendants or anyone else ever used them in any public statements or challenged materials. Indeed, the statements Free Holdings cites to in its amended complaint—by defendants and others—characterize *Quantum* as the first NFT ever created, and do not distinguish between an "Ethereum-*Quantum*" and "Namecoin-*Quantum*." *See* AC ¶ 58 ("Kevin McCoy's *Quantum* is such a work. Minted on 2nd May 2014 21:27:35, or more precisely Namecoin block 174923, the NFT era quietly dawned."); ¶ 86 ("First ever crypto art nft – Quantum has arrived chez Sillytuna"); ¶ 95 ((citing Gopnik) ("That first NFT that Kevin created, which he'd attached to a modest digital abstraction titled 'Quantum,' sold last June at Sotheby's for $1.4

_____

broader social context.")). The Court need not do so because, as noted, Free Holdings has conceded as much.

million."); ¶ 97 ("FIRST-EVER NFT 'QUANTUM' SOLD FOR $1.47 MILLION").

Furthermore, Free Holdings nowhere disputes that "McCoy and Sotheby's accurately reported that *Quantum* was originally minted in 2014 on the Namecoin blockchain, and that McCoy 'moved the original on-chain data from a burned Namecoin token into a modern, industry standard, ERC 721 token, while preserving all of the original on-chain information.'" Sotheby's Mem. at 18 (citing Rothstein Decl., Ex. F.). Instead, it argues only that defendants purveyed a false "overall impression" that "Namecoin-*Quantum* did not exist," without citing any authority for its position that the "overall impression" of defendants' statements is to be considered in the falsity analysis. *See* Pl. Mem. Sotheby's at 11 (citing only *Ackerman v. Coca-Cola Co.,* No. 09-CV-395 (JG), 2010 WL 2925955, at *17 (E.D.N.Y. July 21, 2010) (does not address slander of title or commercial disparagement claims)). Moreover, defendants did not convey an "overall impression . . . that Namecoin-*Quantum* did not exist," because they actually explained *Quantum*'s blockchain history multiple times in Natively Digital. Pl. Mem. Sotheby's at 11. For instance, the description explains that the work was "[o]riginally minted on May 3, 2014 on Namecoin blockchain, and preserved on a token minted on May 28, 2021 by the artist," Natively Digital—a recounting consistent with Free Holdings' view that "Ethereum-*Quantum* is definitively not the world's first NFT." Pl. Mem. Sotheby's at 10. The Condition Report on Natively Digital explains that the NFT for auction "was minted May 2021, but the referenced pieces were originally made public in 2014, with a link to the image hosted on the

Namecoin network," and in one of his videos on Natively Digital, McCoy explains precisely how the "provenance chain . . . begins on Namecoin but now is irrevocably transferred to this more modern and stable specification on the Ethereum blockchain." *Quantum* Token – McCoy Tr. at 3:23–4:2.

Moreover, by Free Holdings' own allegations, it was not false for McCoy to explain that "the nature of [*Quantum*] lies in the immutable engraving of information to the Namecoin blockchain" and that it was based on his "idea to use blockchain technology to create indelible provenance and ownership of digital images of this kind." AC ¶¶ 56–57.  In fact, Free Holdings acknowledges that *Quantum* was created by McCoy, and that it was the first NFT.  AC ¶¶ 36–37.  Its position is that it claims title to an "indelible" record of *Quantum* on Namecoin, Pl. Mem. McCoy at 16–17, but, as discussed above, it does not claim title to the record of *Quantum* maintained on Ethereum.  AC ¶ 38.  Free Holdings has thus failed to sufficiently allege that any statements made by McCoy or Sotheby's were substantially false.

### ii.   Free Holdings Has Not Alleged Malice

As applicable here, malice requires a showing that defendants "either knew [their] statements were false or acted with reckless disregard as to whether they were false." *Conti v. Doe*, 535 F. Supp. 3d 257, 279 (S.D.N.Y. 2021); *see also Chamilia*, 2007 WL 2781246, at *11 (New York courts apply "actual malice" standard to slander of title claims).  A plaintiff fails to allege malice where it has not submitted any facts to suggest that the challenged statements were "made with

malice or that they were false." *Aleem*, 2017 WL 3105870, at *7.

Free Holdings has not pleaded any facts supporting even an inference of malice on the part of Sotheby's or McCoy. The allegations that defendants have not "issue[d] corrective public statements" and that they "maintain that" their statements are not false do not suggest malice because, as discussed, defendants do not believe their statements were false. AC ¶¶ 121, 144. As previously observed, Free Holdings concedes that reasonable minds believe defendants' understanding of *Quantum*'s ownership. *See* Defining NFT ("When a Namecoin domain expires, . . . it can be called 'burnt.'") (one of three interpretations of re-registered name on Namecoin). This falls well short of malice. *See, e.g. Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 756 (3d Dep't 2005) ("We find no evidence of the malicious intent necessary to support a cause of action for slander of title and, given our conclusion that defendant had probable cause to claim title to the disputed property, these public assertions cannot be said to have been made 'with a reckless disregard for their truth or falsity.'").

### iii.   Free Holdings Has Not Alleged Damages

Finally, a valid cause of action for slander of title or commercial disparagement requires an allegation of special damages, "typically . . . a lost sale resulting from the cloud on the claimant's title." *Wei Su*, 2019 WL 4917609, at *3; *see also, e.g. Kirby v. Wildenstein,* 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992) ("The rules surrounding the pleading and proof of special damages are stringent and well-articulated[: they] are limited to losses having pecuniary or economic value, and

SPA-37

must be fully and accurately stated, with sufficient particularity to identify actual

losses." (cleaned up)); *Rosenbaum v. City of New York,* 8 N.Y.3d 1, 12 (N.Y. 2006)

("[A] cause of action does not arise until special damages actually result.").  A

plaintiff must both name "the individuals who ceased to be customers, or who

refused to purchase, and itemize the exact damages."  *Bilinski v. Keith Haring*

*Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015) (citations omitted).  Free Holdings

has done neither.  It alleges only that the "value" of its Namecoin property "is being

significantly diminished by the false and misleading statements made by McCoy

and Sotheby's," AC ¶ 98, and that it "expended $5,311.49 seeking to have McCoy

and Sotheby's issue public statements correcting their false and misleading claims."

AC ¶¶ 100, 126.  It does not state a specific lost value, an estimated worth of its

claimed NFT, or any specific lost sales opportunities.  Moreover, "legal fees and

executive time, standing alone[,] do not comprise special damages." *Angio-Med.*

*Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989).  Free Holdings has

thus "not provide[d] sufficient factual support to establish [it is] entitled to special

damages."  *Aleem*, 2017 WL 3105870, at *7.[17]  For all these reasons, it has failed to

state a claim for slander of title or commercial disparagement.

### 3. Free Holdings Has Failed To State A Claim For Deceptive And Unlawful Trade Practices Under N.Y. G.B.L. § 349

Section 349 of the New York General Business Law prohibits "[d]eceptive

acts or practices in the conduct of any business, trade or commerce or in the

---

[17] Sotheby's further argues that its statements are protected opinions under the
First Amendment. *See, e.g.*, Sotheby's Mem. at 11–17.  As the Court concludes that
Free Holdings has failed to state claims for slander of title and commercial
disparagement on other grounds, it need not reach the constitutional issue.

furnishing of any service." N.Y. G.B.L. § 349(a).  It requires a showing that "(1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury." *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294 (LTS) (HBP), 2015 WL 5008762, at *3 (S.D.N.Y. Aug. 24, 2015) (citation omitted).  It is well-established that a "single shot transaction involving complex arrangements, knowledgeable and experienced parties and large sums of money is not a consumer-oriented transaction." *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 548 (S.D.N.Y. 2014) (collecting cases) (cleaned up).

Furthermore, the scope of § 349 is "limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety." *DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003) ("It is clear that the gravamen of the complaint must be consumer injury or harm to the public interest." (cleaned up) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  Corporate competitors may bring a claim under this statute "so long as some harm to the public at large is at issue," but "courts routinely reject" such claims where "the gravamen of the complaint is harm to plaintiff's business as opposed to the public interest in New York at large." *Gucci Am.*, 277 F. Supp. 2d at 273–74.

Free Holdings presses that there are exceptions to the bar on "single-shot"

transactions and that this suit presents a harm to the public interest because "New York's Department of Financial Services, . . . [is] planning to issue new guidance on how its rules apply to NFTs." Pl. Mem. McCoy at 20 n.7.  But it provides no applicable authority as to why the "single-shot" transaction here nor the sale of fine art at a preeminent auction house is the kind of harm to the public interest contemplated by § 349.  In fact, courts have routinely declined to apply § 349(a) in analogous circumstances.  *See, e.g.*, *4 K & D Corp.*, 2 F. Supp. 3d at 549 (competitor failed to allege "facts to show . . . luxury real estate transactions" affected "consumers at large"); *904 Tower Apartment LLC v. Mark Hotel LLC*, 853 F. Supp. 2d 386, 400 (S.D.N.Y. 2012) ("A transaction over $10 million in real estate, about which the alleged deceptive practices sound primarily in breach of, and fraudulent inducement into, contracts negotiated by counsel, is too unlike a typical consumer violation to be covered under the statute."); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 637 (S.D.N.Y. 2008) ("Although [plaintiff] insists [defendant's] conduct has ramifications for consumers at large, it has not furnished anything more than conclusory and speculative allegations about how the public will be deceived as to the affiliation or endorsement of its products.").

Additionally, the "gravamen" of Free Holdings' amended complaint is plainly the alleged harm to its business, not to the public.  *See, e.g.*, AC ¶ 139 ("The value of the Namecoin-*Quantum* NFT owned by Free Holdings has been significantly damaged as a result of all Defendants' statements and conduct.").  It has thus failed to state a claim under § 349.

39

SPA-40

### 4. Free Holdings Has Failed To State A Claim Under Section 43(a) Of The Lanham Act

To bring a claim under § 43(a) of the Lanham Act, a plaintiff must allege that (1) the statement it challenges is either "literally false" or "likely to confuse or deceive consumers;" (2) the "defendant misrepresented an inherent quality or characteristic of a good or service;" (3) "the defendant placed the false or misleading statement in interstate commerce;" and (4) "the plaintiff was injured as a result of the defendant's misrepresentation, either by a diversion of business or a loss of goodwill associated with the plaintiff's goods or services." *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 539–40 (S.D.N.Y. 2018) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014)).

A statement is "literally false" only if its message is "unambiguous" and not "susceptible to more than one reasonable interpretation." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (citations omitted); *Lokai Holdings, LLC v. Twin Tiger USA, LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018) ("[I]f the representation is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false, and the advertisement is actionable only upon a showing of actual consumer confusion." (citation omitted)).  As has already been discussed, it was not literally false to say that *Quantum* was the "first-ever" NFT, nor that the NFT McCoy created was "burned" or "removed" from the Namecoin blockchain because, by Free Holdings' own submissions, that is only one interpretation of what happens when names expire on Namecoin.  *See, e.g.*, Pl. Mem. McCoy at 8 ("defining the legal import of control of digital assets on the

40

Namecoin blockchain[ ]is the subject of differing opinions"); Defining NFT (three interpretations of re-registered name on Namecoin).

Moreover, Free Holdings has not alleged any "diversion of business or a loss of goodwill" in its own proprietary interest, because it does not allege to have had any business or goodwill in *Quantum* in the first place. *See* AC ¶¶ 149–58; ¶ 158 (alleging only that statements "caused damage to Free Holdings in an amount to be determined at trial, but not less than $1,472,000"); *see also, e.g.*, *Davis*, 345 F. Supp. 3d at 544 (no fact allegations of any lost business, *inter alia*, resulting in failed § 43(a) claim. It has thus failed to state a claim under § 43(a).

## 5. The Court Declines To Issue A Declaratory Judgment

Finally, Free Holdings requests a declaratory judgment that: "(a) [it] is the rightful owner of the Namecoin-*Quantum*; (b) [that] Namecoin-*Quantum* has not been 'burned' or otherwise 'removed' from the Namecoin blockchain; and [that] (c) the statements issued by McCoy and Sotheby's in connection with their sale of the Ethereum-*Quantum* were false and misleading." AC ¶ 109. But a court may only exercise its declaratory judgment authority where there is an "actual controversy" and where the plaintiff "provide[s] a substantive claim to relief based on a law other than the Declaratory Judgment Act." *Hello I Am Elliot, Inc. v. Sine*, No. 19-CV-6905 (PAE), 2020 WL 3619505, at *11 (S.D.N.Y. July 2, 2020); *see also Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002), ("[Declaratory judgment] actions are justiciable only in cases in which an 'actual controversy' exists." (citing 28 U.S.C. § 2201(a))), *aff'd*, 346 F.3d 357 (2d Cir. 2003).

SPA-42

An actual controversy requires a "disagreement [that has] taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *AARP v. 200 Kelsey Assocs., LLC*, No. 06-CV-81 (SCR), 2009 WL 47499, at *4 (S.D.N.Y. Jan. 8, 2009) (cleaned up).  It may not involve claims relying on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*

As the Court has already discussed, Free Holdings' pleadings fail to give rise to an "actual controversy" because it has not alleged any concrete or particularized injury stemming from defendants' representations.  *See KM Enterprises, Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012) ("[T]he statute that authorizes the declaratory judgment remedy expressly incorporates the Article III case or controversy limitation."), *aff'd*, 518 F. App'x 12 (2d Cir. 2013).  Moreover, there is no "independent substantive claim to support a declaratory judgment" here, as Free Holdings has failed to state any plausible legal claim.  *See, e.g.*, *Johnson v. Magnolia Pictures LLC*, No. 18-CV-9337 (VB), 2019 WL 4412483, at *3 (S.D.N.Y. Sept. 16, 2019) (no independent substantive basis for declaratory judgment where court dismissed claim); *KM Enterprises*, 2012 WL 4472010, at *19 ("As . . . the only remaining causes of action in the Amended Complaint [are] for a declaratory judgment and an injunction[,] Plaintiff cannot survive a motion to dismiss by relying on these claims as independent causes of action." (cleaned up)).  Declaratory relief is thus inappropriate.

SPA-43

### III.  CONCLUSION

For the reasons stated herein, the Court grants the motions to dismiss the amended complaint.  Accordingly, the Clerk is directed to mark the motions at docket numbers 54 and 59 as "granted" and enter judgment for defendants.

**SO ORDERED.**

Dated: March 17, 2023
    New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

43

SPA-44

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
FREE HOLDINGS INC.,

                              Plaintiff,

                 -against-                                              22 **CIVIL** 0881 (JLC)

                                                                       **JUDGMENT**

KEVIN MCCOY and SOTHEBY'S, INC.,

                              Defendant.
-------------------------------------------------------------X


            It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated March 17, 2023, the Court grants the motions to

dismiss the amended complaint; accordingly, the case is closed.


**Dated:**  New York, New York

          March 20, 2023


                                                      **RUBY J. KRAJICK**

                                              _____
                                                         **Clerk of Court**

                                    **BY:**
                                              _____
                                                         **Deputy Clerk**

SPA-45

 **United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $505 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* If you are unable to pay the $505 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/.**

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007-1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601-4150

Rev. 5/23/14

SPA-46

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

_____

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____

(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (     )(     )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: _____

_____

(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the ☐ judgment ☐ order entered on: _____

(date that judgment or order was entered on docket)

that: _____

_____

(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____

Dated                                              Signature*

_____

Name (Last, First, MI)

_____

Address          City          State          Zip Code

_____          _____

Telephone Number                      E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13

SPA-47

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

**MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time

to file a notice of appeal in this action. I would like to appeal the judgment

entered in this action on _____ but did not file a notice of appeal within the required
                                date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)


Dated: _____          _____
                                        Signature

_____
Name (Last, First, MI)

_____
Address                     City          State              Zip Code

_____          _____
Telephone Number                         E-mail Address (if available)


Rev. 3/27/15

SPA-48

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (       )(       )

**MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma pauperis* on appeal. This motion is supported by the attached affidavit.

_____
Dated

_____
Name (Last, First, MI)

_____
Address                          City

_____
Telephone Number

_____
Signature

_____
State                          Zip Code

_____
E-mail Address (if available)

Rev. 12/23/13

SPA-49

## Application to Appeal In Forma Pauperis

_____**v.** _____    Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.  _For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise._

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

SPA-50

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | $ 0 | $ 0 | $ 0 | $ 0 |

2.      *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.      *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

SPA-51

4.  *How much cash do you and your spouse have? $_____*

*Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| | | $ | $ |
| | | $ | $ |
| | | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.  *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| | | Make and year: |
| | | Model: |
| | | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: | | |
| Model: | | |
| Registration #: | | |

- 3 -

SPA-52

6.   *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.   *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| | | |
| | | |
| | | |

8.   *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included?      [  ] Yes  [  ] No<br>    Is property insurance included?      [  ] Yes  [  ] No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

**SPA-53**

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| Homeowner's or renter's: | $ | $ |
| Life: | $ | $ |
| Health: | $ | $ |
| Motor vehicle: | $ | $ |
| Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
| Motor Vehicle: | $ | $ |
| Credit card (name): | $ | $ |
| Department store (name): | $ | $ |
| Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | **$ 0** | **$ 0** |

9.      *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

      [  ] Yes        [  ] No        If yes, describe on an attached sheet.


10.    *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* [  ] Yes [  ] No

      *If yes, how much?* $ _____

- 5 -

SPA-54

11.    *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.    *Identify the city and state of your legal residence.*

City _____    State _____

Your daytime phone number: _____

Your age: _____    Your years of schooling: _____

Last four digits of your social-security number: _____